## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOSEPH DEANGELO *individually and on behalf of all others similarly situated,* | : | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| LVNV FUNDING LLC, RESURGENT | : | DOCKET NO.: 18-cv-15689 |
| CAPITAL SERVICES L.P., SHERMAN | : | |
| FINANCIAL GROUP LLC, SHERMAN | : | CIVIL ACTION |
| CAPITAL MARKETS LLC, SHERMAN | : | |
| ORIGINATOR III LLC, SHERMAN | : | **FIRST AMENDED CLASS ACTION** |
| ACQUISITION L.P., SHERMAN | : | **COMPLAINT** |
| ACQUISITION II LP, SHERMAN | : | |
| ACQUISITION LLC, SHERMAN | : | **JURY TRIAL DEMANDED** |
| ACQUISITION II GENERAL | : | |
| PARTNERSHIP LLC, SHERMAN | : | |
| CAPITAL, LLC, ALEGIS GROUP LLC, | : | |
| BENJAMIN W. NAVARRO, LESLIE G. | : | |
| GUTIERREZ, SCOTT E. SILVER, KEVIN | : | |
| P. BRANIGAN, ROBERT A. RODERICK, | : | |
| and KENNETT KENDALL, | : | |
| | : | |
| Defendants. | : | |

## CLASS ACTION COMPLAINT AND DEMAND FOR A TRIAL BY JURY

Plaintiff Joseph DeAngelo, by and through undersigned counsel, individually and on behalf

of all others similarly situated, as for his class action complaint against LVNV Funding, LLC,

Resurgent Capital Services L.P., Sherman Financial Group LLC, Sherman Capital Markets LLC,

Sherman Originator III LLC, Sherman Acquisition L.P., Sherman Acquisition II L.P., Sherman

Acquisition LLC, Sherman Acquisition II General Partnership, Sherman Capital LLC, Alegis

Group LLC, Benjamin W. Navarro, Leslie G. Gutierrez, Scott E. Silver, Kevin P. Branigan, Robert

A. Roderick, and Kennett Kendall (collectively, "Defendants") hereby alleges, upon due investigation, and, where stated, information and belief, as follows.

## NATURE OF THE ACTION

1.      Plaintiff brings this action to protect individuals across the country from Defendants' unfair, unconscionable, and illegal debt collection practices arising from so-called "Zombie Debt."

2.      Zombie debt is a national epidemic haunting hundreds of thousands of individual consumers all across the country. The revivification of zombie debt is a practice in which debt collectors attempt to collect on obligations that have been settled, paid off, discharged in bankruptcy, or rendered uncollectible due to expiration of the applicable statute of limitations.

3.      Debt collectors attempt to revive the settled debt by threatening and/or misleading consumers into making modest payments that will reset the statute of limitations or bring suit to collect the remaining debt, obtain default judgments, and, in some instances, attempt to garnish the consumers' wages.  Making false representations to consumers—and courts—about the legal status of uncollectable debt and bringing state court actions to collect on uncollectible debt are violations of the Fair Debt Collection Practices Act.

4.      Plaintiff Joseph DeAngelo, also known as Joseph DeAngelo, Jr. ("DeAngelo"), is a quintessential Zombie Debt victim, who resides in Gloucester County, New Jersey.

5.      On July 13, 2009, Defendant Resurgent Capital Services, L.P. ("Resurgent") brought an action in the name of Defendant LVNV Funding LLC ("LVNV") in the Superior Court of Gloucester County, Law Division, against DeAngelo to collect on a debt that was unquestionably stale at the time of filing under New Jersey's four year statute of limitations.

6.      A default judgment was entered against DeAngelo. He only became aware of the judgment in 2017, when LVNV Funding LLC began garnishing his wages. He successfully moved

to vacate the default judgment, and the court *sua sponte* granted summary judgment in his favor. A copy of the opinion is attached as **Exhibit A.**

7.      In the same opinion, the Court further underscored the policy concern that the majority of judgments on unpaid debts are default judgments entered solely on representations set forth in the debt collector's complaint. *Id*.

8.      Defendants Resurgent and LVNV are both part of a complicated series of shell, holding, and operating companies ultimately owned by Sherman Capital, LLC, who together constitute the Defendants in this action (collectively, the "Sherman Organization").  The Sherman Organization is an entity principally engaged in the business of purchasing and attempting to collect delinquent consumer debt.

9.      In addition to being one of the largest owners of consumer debt in the world, the Sherman Organization is one of the foremost practitioners of the art of unlawful revivification of zombie debt.

10.      The basic form of the Sherman Organization's unlawful scheme is reflected in its unfair and unconscionable treatment of Plaintiff Joseph DeAngelo.  Certain companies within the Sherman Organization, including LVNV, acquire time-barred debt that they know or should know cannot be legally collected through judicial process, but then proceed to institute an action anyway, hoping to generate as many default judgments and settlements as possible.

11.      The Sherman Organization often attempts to coerce consumers into making modest payments on debt that the Sherman Organization knows, or should know, is time-barred or otherwise uncollectible. They threaten legal action and barrage consumers with calls until the consumer feels they have no choice but to make a payment to stop the harassment. These new

payments often reset the statute of limitations, allowing debt collectors to pursue debts that had been previously settled or time-barred.

12.     When the Sherman Organization's efforts to torment consumers into making these payments fail, it often outright lies about receiving partial payments. It then proceeds to use these fraudulent payments as a basis to bring a collection action in state courts, unlawfully acquiring default judgments and garnishing consumer's wages as a result.

13.     The Sherman Organization has been the target of enforcement actions by the Maryland State Collection Agency Licensing Board and the New York Attorney General's Office regarding its unlawful debt collection practices. It has also been the subject of numerous private lawsuits, and the Eleventh Circuit Court of Appeals has held that it routinely violates the Fair Debt Collection Practices Act by bringing time-barred claims in bankruptcy proceedings.

14.     To expand its multibillion dollar empire of debt, the Sherman Organization has knowingly engaged in systematic abuse of judicial process in order to violate debt collection laws. This Court should hold the Sherman Organization accountable for its illegal, unfair, and unconscionable actions by awarding Plaintiff and the Class Members, among other relief, statutory, consequential, and punitive damages, as well as their attorney's fees and costs in this action.

**THE PARTIES**

15.     Plaintiff Joseph DeAngelo is an individual residing in Gloucester County, New Jersey.

16.     Defendant LVNV Funding, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 625 Pilot Road, Suite 3, Las Vegas, Nevada 89119.  However, the mailing address for its officers is 200 Meeting Street, Suite 206, Charleston, South Carolina, 29401 (the "Charleston Office").

-4-

17.    Defendant Resurgent Capital Services L.P. is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 55 Beattie Place, Suite 300, MS 425, Greenville, South Carolina 29601.

18.    Defendant Sherman Financial Group LLC ("SFG") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 200 Meeting Street, Suite 206, Charleston, South Carolina 29401.

19.    Defendant Sherman Capital Markets LLC ("SCM") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 200 Meeting Street, Suite 206, Charleston, South Carolina 29401.

20.    Defendant Sherman Originator III LLC ("SO") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 200 Meeting Street, Suite 206, Charleston, South Carolina 29401.

21.    Defendant Sherman Acquisition L.P. ("SALP") is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 9700 Bissonnet Street, Suite 2000, Houston, TX 77036.

22.    Defendant Sherman Acquisition LLC ("SALLC") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 200 Meeting Street, Suite 206, Charleston, South Carolina 29401.

23.    Defendant Sherman Acquisition II L.P. ("SAIILP") is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 200 Meeting Street, Suite 206, Charleston, South Carolina 29401.

24.    Defendant Sherman Acquisition II General Partnership LLC ("SAIIGLLC") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 200 Meeting Street, Suite 206, Charleston, South Carolina 29401.

25.    Defendant Sherman Capital LLC ("SC") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 200 Meeting Street, Suite 206, Charleston, South Carolina 29401.

26.    Defendant Alegis Group LLC ("Alegis") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 55 Beattie Place, Suite 300, MS 425, Greenville, South Carolina 29601.

27.    Defendant Benjamin W. Navarro is an individual residing in South Carolina.

28.    Defendant Leslie G. Gutierrez is an individual residing in South Carolina.

29.    Defendant Scott E. Silver is an individual residing in South Carolina.

30.    Defendant Kevin P. Branigan is an individual residing in South Carolina.

31.    Defendant Robert A. Roderick is an individual residing in South Carolina.

32.    Defendant Kennett "Rusty" Kendall is an individual residing in South Carolina.

33.    The defendants referenced above in ¶¶ 27-32 are collectively referred to herein as the Sherman Executive Defendants."

34.    The defendants referenced above in ¶¶ 15-33 are collectively referred to herein as the "Sherman Organization Defendants."

## JURISDICTION AND VENUE

35.    Defendants LVNV and Resurgent are subject to the personal jurisdiction of this Court because they routinely and systematically conduct business within this State, and they expressly availed themselves of the jurisdiction of this State through their abuse of judicial process to attempt to bring an action against Plaintiff DeAngelo to collect time-barred debt.

23468681v.2

36.     All other Sherman Organization Defendants are subject to the personal jurisdiction of this Court because those they routinely and systematically conduct business with this State, and because LVNV and Resurgent have no independent existence apart from the Sherman Organization.  LVNV and Resurgent are both owned ultimately by SFG, which is in turn owned by SC.  These companies dominate both subsidiaries and use them merely as instruments to carry out unlawful, unfair, and unconscionable debt collection practices.   Further, the Sherman Executive Defendants do not observe corporate formalities in the operation of the Sherman Organization. Because LVNV and Resurgent did not have independent existence apart from the Sherman Organization, the other Sherman Organization Defendants are subject to the jurisdiction of this Court.

37.     The Sherman Executive Defendants are subject to the personal jurisdiction of this Court because those Defendants routinely and systemically conduct business with this State, and because the Sherman Executives asserted effective control over LVNV, Resurgent, and the rest of the Sherman Organization, using the Organization as a whole as their plaything to accomplish a fraudulent purpose while failing to observe corporate formalities.

38.     Venue is proper because Defendants LVNV Funding and Resurgent Capital Services attempted to enforce an expired debt through the court system of this state.

## FACTUAL ALLEGATIONS

**A.    The Unlawful Practice of Revivification of Zombie Debt.**

39.     Zombie debt is a practice in which debt collectors attempt to collect on debts that have been settled, paid off, discharged in bankruptcy, or rendered uncollectible due to the statute of limitations.  If the consumer makes a payment, even against his or her own will, that can be used to try to revive the life of the debt.

40.    Debt collectors, including the Sherman Organization Defendants, get consumers to reset the statute of limitations by threatening them with legal action and misleading them about the legal status of their debt so that these consumers will make a small payment in order to cease the harassing calls and threats.  This new payment resets the statute of limitations and allows debt collectors to pursue debts that had previous been settled.

41.    Where debt collectors fail to convince consumers to make these payments, some outright lie about receiving a partial payment that would revive the debt or attempt to garnish the consumer's wages by means of an illegally obtained default judgment in order to revive the time-barred debt.

42.    As reported by CBS News on March 7, 2018:  "Zombie debts have come back with a vengeance.  Debt buyers pull these expired obligations out of cold storage and often use abusive and illegal tactics to collect.  Zombie debts generally started out as legitimate obligations that had been settled, paid off, discharged in bankruptcy or rendered uncollectible because of various state statutes of limitation."  *See* Kathy Kristof, *5 states with the most "zombie debt" complaints*, (March 7, 2018), https://www.cbsnews.com/news/5-states-with-the-most-zombie-debt-complaints/ (last visited September 19, 2018).  A copy of the article is attached as **Exhibit B**.

43.    According to recent research, "complaints about zombie debts have soared in recent years, jumping 66 percent in the first nine months of 2017 compared with the same period the year before.  However, the chance of being pursued by back-from-the-dead debt varies dramatically based on where you live.  In several states zombie debts are running rampant, according to Reward Expert's research.  *Id*.

44.    In a more recent article published on August 7, 2019, The Washington Post reiterated the dangers and maneuvers used in collecting Zombie debts.  "The efforts to collect an

old debt often focus on getting consumers to reset the statute of limitations through a variety of means…"  Even a payment of a few cents could revive the debt, and often debtors will be willing to make a small payment under the mistaken belief that doing so will stop the incessant calls and letter, not fully understanding the consequences of such an action.  These efforts by debt collectors "have contributed to the flood of debt-collection lawsuits clogging courts across the country." *See* Renae Merle, *Zombie debt: How collectors trick consumers into reviving dead debts* (Aug. 7, 2019)  https://www.washingtonpost.com/business/2019/08/07/zombie-debt-how-collectors-trick-consumers-into-reviving-dead-debts/ (last visited August 20, 2019).  A copy of the article is attached as **Exhibit C**.

45.     Concerned with this same trend, on May 7, 2019, the Consumer Financial Protection Bureau (CFPB), proposed a regulation seeking to clarify the FDCPA as related to debt collectors who violate the Act by attempting to collect on time-barred debt.  A copy of the proposed regulation is attached as **Exhibit D**, *Federal Register*, Vol. 84. No. 98, Tuesday May 21, 2019, Proposed Rule, pp. 23274-23418.

46.     The CFPB reviewed numerous courts' decisions holding that suits and threats of suit on time-barred debt violate the FDCPA. *See id.* at 23328.  Recognizing the danger of this continued practice, the CFPB stated, "[a] debt collector who sues or threatens to sue a consumer on a time-barred debt may explicitly or implicitly misrepresent to the consumer that the debt is legally enforceable, and that misrepresentation likely is material to consumers because it may affect their conduct with regard to the collection of the debt…" … "In addition, as courts have recognized, the passage of time 'dulls the consumer's memory of the circumstances and validity of the debt' and 'heightens the probability that [the consumer] will no longer have personal records detailing the status of the debt.' Consumers sued or threatened with suit on a time-barred debt may

not recognize that the debt is time barred, that time-barred debts are unenforceable in court, or that generally they must raise the expiration of the statute of limitations as an affirmative defense." *Id*.

47.    The CFPB also placed emphasis on the harm of suits and threats suits on time-barred debt, explaining that "[a] debt collector's threat to sue on a time-barred debt may prompt some consumers to pay or prioritize that debt over others in the mistaken belief that doing so is necessary to forestall litigation.  Similarly, suits on time-barred debts may lead to judgments against consumers on claims for which those consumers had meritorious defenses, including, but not limited to, a statute-of-limitations defense." *Id*.

48.    The proposed interpretation of the FDCPA Section 807 provides that "a debt collector must not bring or threaten to bring a legal action against a consumer to collect a debt that the debt collector knows or should know is a time-barred debt." *Id*. at 23329.  This Section relies on the explicit prohibition of the section that prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt," and false representation of "the character, amount, or legal status of any debt." *Id*.

49.    The Sherman Organization is an entity that routinely engages in the unlawful revivification of zombie debt.

**B.    The Internal Structure of the Sherman Organization.**

50.    The Sherman Organization comprises a complex web of shell, holding, and operating companies, organized in a matter designed to reap massive profits through the systematic and routine violation of debt collection laws, including, *inter alia*, the bringing of actions in state court to attempt to collect time-barred debt.

51.    The entities that comprise the Sherman Organization are ultimately owned and operated by or at the behest of a group of six individuals based in Charleston, South Carolina:

Benjamin Navarro, Leslie Gutierrez, Scott E. Silver, Kevin P. Branigan, Robert A. Roderick, and Kennett "Rusty" Kendall (collectively, the "Sherman Executives").

52.    The Sherman Executives own Sherman Capital LLC ("SC").

53.    SC owns Sherman Capital Markets LLC ("SCM" and Sherman Financial Group LLC ("SFG").

54.    SCM provides management services to SFG. SFG functions as a holding company, and is the ultimate owner of all other Sherman Organization entities.

55.    SFG owns Sherman Originator III LLC ("SO"), which in turn owns LVNV Funding LLC ("LVNV").

56.    LVNV's primary business activity is the purchase of consumer debt currently in default.

57.    SFG also owns Sherman Acquisition L.P. ("SALP"), Sherman Acquisition LLC ("SALLC") and Sherman Acquisition II General Partner LLC ("SAIIGPLLC").

58.    SAIIGPLLC is the general partner of Sherman Acquisition II L.P. ("SAIILP"), of which SFG is the limited partner.

59.    SALP, SALLC, and SAIILP all purchase consumer debt that is currently in default.

60.    SALLC is also involved in the management of SALP, SAIILP, and LVNV.

61.    SFG also wholly owns Alegis Group LLC ("Alegis").

62.    Alegis has a 1% partnership stake in Resurgent Capital L.P ("Resurgent"). Sherman Financial Group LLC holds the remaining 99% partnership stake in Resurgent. Alegis manages Resurgent.

63.    Resurgent services debts owned by SALP, SAIILP, SALLC, and LVNV.  It hires collection agencies to collect debt through traditional debt collection means, and also hires outside counsel to bring debt collection actions in state courts throughout the United States.

64.    In addition to the companies named as Defendants in this suit, SFG owns certain other subsidiaries, including Credit One Bank, a financial institution engaged in subprime lending.

65.    The Sherman Executives all hold various offices throughout the Sherman Organization.  While these titles and positions may shift over time, on information and belief, they are currently as follows:

(a)    Benjamin Navarro is the General Manager of LVNV, the President and Chief Executive Officer of SFG, the Chairman of SCM, and a manager of Alegis;

(b)    Leslie Gutierrez is the Chief Financial Officer of LVNV and a manager of SFG;

(c)    Scott Silver is the Vice President of SC, the General Counsel for SCM, and a manager of SFG;

(d)    Kevin Branigan is the President of LVNV, an investment banker with Sherman Capital Markets, the Vice President of SFG, the Vice President of Sherman Capital, and an officer of Sherman Originator IIII;

(e)    Robert A. Roderick is a director of Sherman Capital Markets and CEO and manager of Alegis;

(f)    Kennett "Rusty" Kendall is the Chief Financial Officer of SCM and Treasurer of LVNV.

66.    The entities that constitute the Sherman Organization do not have a genuine independent existence apart from each other.  Effective control of all the entities that comprise the

-12-

Sherman Organization is centralized in the collective hands of the Sherman Executives in the Charleston Office.

67.     The Sherman Executives fail to observe corporate formalities in their operation of the Sherman Organization.

68.     In depositions taken in the case *Cox v. Sherman Capital LLC, et al*., Defendants Benjamin W. Navarro and Kennett "Rusty" Kendall were unable to recall their actual ownership stakes and titles in the Sherman Organization. 2013 U.S. Dist. LEXIS 186865, *48 (S.D. Ind. Sept. 30, 2013),

69.     At deposition in the *Cox v. Sherman Capital LLC, et al.* case, Defendant Kennett "Rusty" Kendall explained the "Sherman structure" is run through "informal meetings" on "a variety of different things" by a "wide, varied group of people" who make decisions for the Sherman Organization as a whole. 2013 U.S. Dist. LEXIS 186865, *48 (S.D. Ind. Sept 30, 2013).

70.     Because control of the Sherman Organization is centralized in the Charleston Office, the entities that constitute the Sherman Organization act in concert to violate federal and state debt collection laws.

**C.     The Sherman Organization's Continuing History of Violating Debt Collection Laws.**

71.     Defendants have a long history of flagrantly violating state and federal debt collection laws.

72.     In 2011, the Maryland State Collection Agency Licensing Board in the Office of the Commissioner of Financial Regulation ("MSCALB") brought an action against the Sherman Organization and Sherman Executives. MSCALB charged that, *inter alia*:

    (a)     SALP, SAIILP, and SALLC had attempted to collect debt in Maryland without a collections license;

    (b)     LVNV had operated beyond the scope of its license;

-13-

(c)     Resurgent, on behalf of LVNV, had knowingly filed false, deceptive, or deficient affidavits with regard to the affiant's personal knowledge of the consumer claims;

(d)     Resurgent and LVNV had knowingly filed false or misleading affidavits with regard to the certification of business records;

(e)     Resurgent, LVNV, SALP, SAIILP, and SALLC intentionally misrepresented the amount of consumer claims and collected impermissible compound interest;

(f)     Resurgent, LVNV, SALP, SAIILP, and SALLC had knowingly requested and collected unauthorized attorney's fees and prejudgment interest at unauthorized rates;

(g)     Resurgent, LVNV, Alegis, Sherman Originator, SFG, SCM, Sherman Capital, and MSPII had intentionally made false statements or misrepresentations to conceal certain business names and relationships; and

(h)     LVNV had filed cases in which the relevant assignment documents evidence that LVNV did not have valid title to the consumer claims at issue.

73.     On June 28, 2012, LVNV and Resurgent, on behalf of themselves and the rest of the Sherman Organization, entered into a settlement agreement with MSCALB, whereby they agreed, *inter alia*:

(a)     To pay a penalty of $1,000,000;

(b)     To dismiss without prejudice all pending debt collection cases in Maryland;

(c)     To provide restitution in the total amount of $3,609,367.74 to consumers against whom judgment had been unlawfully entered;

(d)     To provide restitution in the total amount of $235,824.72 to consumers who had entered into settlement agreements for collection actions that were not lawfully initiated; A copy of the settlement agreement is attached as **Exhibit E**, and available online

http://www.dllr.state.md.us/finance/consumers/pdf/lvnvsettle.pdf, (last visited September 23, 2019).

74.    In 2014, the New York State Attorney General's Office concluded an investigation into the debt collection activities of SFG and its subsidiaries and found that:

(a)    When SFG brought actions to collect debt, it routinely failed to specify in the complaint "sufficient information to allow a reasonable consumer to determine whether SFG's claims [were] within the applicable statute of limitations, such as the date of last payment or delinquency on the alleged debt, the jurisdiction in which the cause(s) of action accrued, or the statute of limitations of that jurisdiction;"

(b)    SFG routinely violated a May 13, 2009 Civil Court of New York City order that all requests for the entry of default judgments be accompanied by a true and correct affidavit certifying that the action was brought within the applicable statute of limitations;

(c)    SFG routinely falsely certified to the Civil Court of New York City that actions it brought to collect debt were within the statute of limitations, when those actions were in fact time-barred; and

(d)    Between October 27, 2008 and August 14, 2012, SFG obtained more than 400 default judgments from time-barred collection actions in New York state courts.

75.    In settlement of the Attorney General's Office enforcement action, SFG agreed, *inter alia*:

(a)    Not to make material misrepresentations in order to collect debt;

(b)    Not to represent that it has a right to sue for time-barred debt;

(c)    Not to commence actions to collect time-barred debt;

(d)     To cease collection activity on judgments deemed by the Attorney General's Office to result from actions to collect time-barred debt;

(e)     To seek to vacate those judgments;

(f)     To pay the state $175,000 in costs, penalties, and fees.

*See A.G. Schneiderman Announces Settlements With Two Major Consumer Debt Buyers For Unlawful Debt Collection Actions* (May 8, 2014), https://ag.ny.gov/press-release/ag-schneiderman-announces-settlements-two-major-consumer-debt-buyers-unlawful-debt, (last visited September 23, 2019).  A copy of the article is attached as **Exhibit F**.

76.     In addition to the state enforcement actions, numerous private lawsuits have been brought against Sherman Organization entities for violations of debt collection laws.

77.     For example, in *Crawford v. LVNV Funding, LLC*, the Eleventh Circuit Court of Appeals found that LVNV had routinely engaged in the practice of asserting time-barred claims in bankruptcy proceedings, and that that practice violated the Fair Debt Collection Practices Act. 758 F.3d 1254, 1262 (11th Cir. 2014).

78.     From 2005 to present, the Sherman Organization, and in particular LVNV and Resurgent, have knowingly and maliciously engaged in a scheme to bring time-barred collections actions in state courts throughout the country, including New Jersey state courts.

79.     The Sherman Debt Purchasers, including LVNV, acquire consumer delinquent consumer debt for pennies on the dollar.  They do so knowing that a large portion of the debt they acquire is already time-barred, or will be time-barred by the time they seek to bring legal action to collect it.

80.     Resurgent contracts with third party law firms throughout the United States to bring debt collection actions in state court in the name of the Sherman Debt Purchasers.

81.     Resurgent directs these third party law firms to bring these debt collection actions even on debt that it knows or should know is time-barred.

82.     By and through their attorneys, Resurgent and the Sherman Debt Purchasers cause misleading or inadequate information to be contained in the debt collection complaints it files in state court.

83.     In many cases, the complaints in these actions either do not state, or do not state accurately, the date upon which the cause of action allegedly accrued.

84.     Resurgent and the Sherman Debt Purchasers, by and through their attorneys, will routinely certify or represent to courts that these debt collection actions were brought within the statute of limitations, even when they knew or should know that the actions were time-barred.

85.     The inadequate or misleading information contained in these complaints is part of an intentional effort on the part of Resurgent and the Sherman Debt Purchasers to mislead defendants and the courts.

86.     Because defendants in these actions are not apprised of the actual date the cause of action against them allegedly accrued, they are robbed of crucial information necessary to mount a successful statute of limitations defense.

87.     Because courts in these actions are not apprised of the actual date the cause of action accrued, and because they are at times actively mislead as to the actual date the cause of action accrued, they may enter erroneous judgments against defendants.

88.     Resurgent and the Sherman Debt Purchasers bring these actions knowing that default judgment will be entered in the majority of cases as defendants will not show up for court, because, *inter alia*:

(a)    Defendants may not be apprised of the information necessary to mount a statute of limitations defense;

(b)    Defendants may not recognize the alleged debt;

(c)    Defendants may believe that, due to the length of time that has passed between the accrual of the cause of action and the filing of suit, the debt is legally unenforceable and requires no response; and

(d)    Defendants may not be properly served with process, particularly given that the significant length of time that passes between the accrual of the cause of action and the filing of suit makes improper service more likely.

89.    Additionally, Resurgent and the Sherman Debt Purchasers bring these actions knowing that many defendants will pay monies to settle these claims.

90.    Resurgent and the Sherman Debt Purchases know that these defendants would not pay monies to settle these claims if they were apprised of the fact that the claims were time-barred.

91.    Resurgent and the Sherman Debt Purchasers all bring these debt collection actions knowing that many defendants will pay monies on attorney's fees and court costs to defend themselves.

92.    Resurgent and the Sherman Debt Purchasers bring these time-barred claims without regard to the rights of those defendants.

93.    When a defendant raises the statute of limitations as a defense against these actions, Resurgent and the Sherman Debt Purchasers routinely file responsive papers alleging that the defendant made partial payments since the date the cause of action accrued, reviving the time-barred claim.

94.     The allegations in these responsive papers are routinely either misleading or blatantly false, because, in many cases:

(a)     Defendant's partial payment did not toll the relevant statute of limitations; or

(b)     Defendant did not in fact make any partial payments.

95.     When default judgment is entered against a defendant on a time-barred claim, Resurgent and the Sherman Debt Collectors attempt to execute on that judgment, even though they know or should know that the judgment arose from a time-barred claim.

96.     In sum, Resurgent and the Sherman Debt Purchasers knowingly, intentionally, and maliciously engage in the unfair and unconscionable practice of bringing time-barred collection actions in state courts.  They do so in order to secure settlement agreements and the entry of as many default judgments as possible.  They do so with willful and wanton disregard for the rights of defendants.

97.     The actions of Resurgent and the Sherman Debt Purchasers are conducted on the behalf and behest of the Sherman Organization as a whole.  The Sherman Organization's massive revenue—in excess of $2 billion annually—can be attributed in substantial part to the illegal, unfair, and unconscionable practice of filing time-barred claims.

**D.      The Latest Victim of Sherman's Violation of Debt Collection Laws, Joseph DeAngelo.**

98.     On July 13, 2009, Resurgent, by and through its attorneys, Forster, Garbus & Garbus, brought an action in LVNV's name in the Superior Court of Gloucester County, Law Division, against DeAngelo, alleging that DeAngelo owed a debt of $28,382.10 arising from CitiFinancial, Inc ("Citi").  The Docket Number of this complaint was L-1242-09.

99.     The only debt DeAngelo ever had with Citi arose from a car loan he had purchased for his nephew in 1999. The car had been repossessed in 2004, long after the loan defaulted. The

last payment was made, at the latest, at some point in 2004. The New Jersey statute of limitations for consumer debt is four years.

100.    A default judgment was entered in this action on February 8, 2010.

101.    DeAngelo first became aware of the suit that had been instituted against him when Defendants LVNV and Resurgent, knowing, actually or constructively, that the debt they were pursuing was time-barred, used mail and/or electronic mail to serve a Notice of Wage Application upon DeAngelo on October 5, 2017. This Notice of Application for Wage Execution constituted both an attempt to collect a time-barred debt through legal action, and an implied representation that LVNV had a legal right to collect the time-barred debt, which it did not.

102.    The same Notice of Wage Application was filed with the Superior Court of New Jersey, along with proof of service to DeAngelo, on October 20, 2017.

103.    On October 25, 2017, Defendants LVNV and Resurgent filed a Writ of Execution against Wages with the Superior Court of New Jersey.

104.    DeAngelo owns the company he is employed at, and received this and all subsequent Notice of Wage Garnishment directly at his own company, which caused him substantial embarrassment.

105.    DeAngelo, through counsel, filed a motion on February 5, 2018 to vacate asserting that the debt was time-barred and that suit was brought in violation of the FDCPA.

106.    In responsive filings, LVNV falsely claimed that a partial payment had been made towards the debt at issue, tolling the statute of limitations. This constituted a false representation regarding the status of the debt at issue.

107. On May 10, 2018, Defendants LVNV and Resurgent once again used mail to send DeAngelo a Notice of Application for Wage Execution, despite having been put on notice through DeAngelo's February 5, 2018 motion to vacate that the debt was time-barred.

108. On June 8, 2018, Defendants LVNV Resurgent filed another Notice of Wage Garnishment with the Superior Court of New Jersey, again, despite having been put on notice through DeAngelo's February 5, 2018 motion to vacate that the debt was time-barred.

109. DeAngelo's motion to vacate, initially denied without prejudice, was renewed by new counsel, on September 24, 2018.

110. On August 13, 2019, the Hon. Timothy W. Chell, P.J., Superior Court of New Jersey, issued an opinion granting DeAngelo's motion to vacate and *sua sponte* granting summary judgment in favor of DeAngelo, thereby dismissing the action completely. *See* Ex. A.

111. In his opinion, Judge Chell emphasized the purpose of the FDCPA and recent regulatory developments as they relate to debt collectors who violate the Act by bringing suit on time-barred debts. *See* Ex. A, pg. 17

112. Citing to the Consumer Financial Protection Bureau's proposed regulation of May 2019, the court indicated, "this illegal debt collection practice 'may prompt some consumers to pay or prioritize the debt over others in the mistaken belief that doing so is necessary to forestall litigation' and 'may lead to judgments against consumers on claims for which those consumes had meritorious defenses, including but not limited to, a statute of limitation.'" *Id.* at pg. 23.

113. The opinion also emphasized that LVNV violated the FDCPA by bringing an action to that they "should have known … was unwinnable at the time it was filed." *Id.* at 22.

114. Defendants' unlawful, predatory behavior towards DeAngelo is typical of how the Sherman Organization treats thousands of alleged debtors.

-21-

## CLASS ALLEGATIONS

115.    Plaintiff brings this action pursuant to N.J. R. Civ. P. 4:32. Plaintiff brings this action on behalf of itself and the following classes of similarly situated persons: (collectively referred to as "the Classes"):

(a)    **Legal Action Class:** All persons against whom Resurgent or LVNV took any legal action to collect a time-barred debt on or after September 28, 2017;

(b)    **False Representations Class**: All persons towards whom Resurgent or LVNV falsely, deceptively, or misleading misrepresented, either explicitly or impliedly, the legal status of a time-barred debt, including by threatening to take legal action, on or after September 28, 2017.

116.    The following people are excluded from the Classes:

(a)    Any Judge or Magistrate presiding over this action and members of their family;

(b)    Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents or subsidiaries have a controlling interest along with their current and former employees, officers, and directors;

(c)    Persons whose claims in this matter have been finally adjudicated on the merits or otherwise waived;

(d)    Plaintiffs' and Defendants' counsel; and

(e)    The legal representatives, successors, and assigns of any such excluded persons.

117.    **Numerosity:** The exact number of members in the Classes is not currently known to Plaintiff, but individual joinder in this case is impracticable.  On information and belief, each of the classes and subclasses is likely to number at least several thousand members.

118.    **Common and Predominating Questions:** There are many questions of law and fact common to the claims of Plaintiff and the proposed members of the Classes, and those questions predominate over any questions that may only affect individual members. Common questions for the classes include but are not limited to the following:

(a)    Whether the collection actions at issue were time-barred;

(b)    Whether Defendants falsely represented the legal status of time-barred debt to Plaintiff and the False Representations Class;

(c)    Whether Plaintiff and the Classesmay recover money or property paid to Defendant as a result of unfair and unconscionable debt collection practices;

(d)    Whether Plaintiff and the Classes may recover costs they accrued, including court costs and attorney's fees, in defending Defendant's illegal lawsuits;

(e)    Whether Defendant's conduct was actuated by actual malice; and

(f)    Whether Defendant's conduct was accompanied by wanton and willful disregard of persons who foreseeably might be harmed by that conduct.

119.    **Typicality:** Plaintiff DeAngelo's claims are typical of the claims of the members of the Classes. Plaintiff DeAngelo sustained damages as a result of Defendants' unfair and unconscionable practice to attempt to collect time-barred debts.

120.    **Adequate Representation:** Plaintiff DeAngelo has and will continue to fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex litigation and class actions.  Plaintiff DeAngelo has no interests antagonistic to those of the classes or subclasses, and Defendants have no defenses unique to Plaintiff DeAngelo.  Plaintiff DeAngelo and his counsel are committed to vigorously prosecuting the action on behalf of the members of the classes and subclasses, and they have the resources

necessary to do so.  Neither Plaintiff DeAngelo nor his counsel have any interest adverse to those of the other members of the classes or subclasses.

121.    **Superiority:** This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Relative to class proceedings, individual litigation would increase the delay and expense to all parties and the Court, and require duplicative consideration of the legal and factual issues presented herein.  By contrast, a class action presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered by class proceedings, and uniformity of decisions will be ensured.

122.    Plaintiff DeAngelo reserves the right to revise these Class allegations and Class Definitions based on facts learned through additional investigation and discovery.

## FIRST CAUSE OF ACTION

### (Fair Debt Collections Practice Act: 15 U.S.C. § 1692, et seq.)

### As against Defendants Resurgent and LVNV

### On behalf of Plaintiff DeAngelo, and all similarly situated individuals

### (Legal Action Class)

123.    Plaintiff and the putative Legal Action Class Members repeat and re-allege the allegations set forth above herein.

124.    Defendants LVNV and Resurgent are a debt collectors as defined under 15 U.S.C. § 1692a(6), because they uses instrumentalities of interstate commerce to attempt to collect the time-barred debts. LVNV and Resurgent, in repeatedly serving by mail Notices of Application for Wage Execution upon DeAngelo in order to collect upon time-barred debt, violated 15 U.S.C. § 1692f(1).

23468681v.2

125.    LVNV and Resurgent, in repeatedly filing Notices of Application for Wage Execution against DeAngelo in the Superior Court of New Jersey in order to collect upon time-barred debt, again violated 15 U.S.C. § 1692f(1).

126.    DeAngelo suffered damages upon receipt of the notices, as they caused him substantial embarrassment and humiliation in front of his employees, damaging his reputation.

127.    DeAngelo incurred costs in retaining counsel to assist in bringing a motion to vacate the unlawfully obtained default judgment against him and to otherwise defend against execution on his wages.

128.    LVNV and Resurgent, in taking legal action against the Legal Act Members in an effort to collect upon time-barred debt, violated 15 U.S.C. § 1692f(1).

129.    As a result of Resurgent's and LVNV's unfair and unconscionable practice of taking legal action to collect time-barred debt, Legal Action Class Members paid monies to defend and settle these actions.

130.    Defendants LVNV and Resurgent knew or should have known that such actions were time-barred, but pursued collection of the debt anyway, with wanton and willful disregard for DeAngelo's and Legal Action Class Member's rights.

131.    If Defendants LVNV and Resurgent did not in fact know that the action was time-barred, they knew there was a substantial likelihood that it was, because, as a matter of routine practice, they willfully and wantonly disregard their duty of due diligence to ensure that actions they commence are timely.

132.    Each attempt to collect on the time-barred debt constitutes an individual violation of 15 U.S.C § 1692f(1), as it was a separate instance of an unfair and unconscionable practice of attempting to collect on a debt not authorized by law.

-25-

**SECOND CAUSE OF ACTION**

**(Fair Debt Collections Practice Act: 15 U.S.C. § 1692)**

**As against Defendants Resurgent and LVNV**

**On behalf of Plaintiff DeAngelo, and all similarly situated individuals**

**(False Representations Class)**

133.    As a result of Defendants Resurgent's and LVNV's unfair and unconscionable practice of falsely representing the legal status of debt, specifically by falsely representing to courts, DeAngelo, and the False Representations Class Members that time-barred debt was not in fact time-barred and by threatening DeAngelo and the False Representations Class Members with legal action to collect time-barred debt,,  DeAngelo and the False Representations Class Members paid monies to defend and settle these actions.

134.    LVNV and Resurgent, in repeatedly serving by mail Notices of Application for Wage Execution upon DeAngelo in order to collect upon time-barred debt, violated 15 U.S.C. § 1692e(2)(A) by impliedly representing that the debt at issue was not time-barred, and violated 15 U.S.C. § 1692e(5) by threatening to take legal action to collect time-barred debt (i.e., actually executing against DeAngelo's wages).

135.    LVNV's and Resurgent's actions also violated 15 U.S.C. § 1692e(2)(A) when it filed the Notices of Application for Wage Execution against DeAngleo in the New Jersey Superior Court, in that it impliedly made false representations as to the legal status of the debt at issue.

136.    Following Plaintiff DeAngelo's motions to vacate default judgment, Defendants Resurgent and LVNV caused responsive papers to be filed by and through LVNV's attorneys, which falsely alleged that partial payments had been made on the car debt since the 2004 default, supposedly reviving the time-barred claims, and misrepresented the status of the debt, when

Defendants knew or should have known that the debt could not be collected. This also constituted a false representation under 15 U.S.C. § 1692e(2)(A).

137.    Defendants Resurgent and LVNV's responsive papers constituted a false representation as to the legal status of the debt under 15 U.S.C. § 1692e(2)(A) and an attempt to collect a debt not authorized by law under 15 U.S.C. § 1692f(1).

138.    Defendants Resurgent and LVNV caused statutory and actual damages to False Representations Class Members by claiming, in the course of prosecuting time-barred collections efforts against the False Representations Class Members, that the time-barred claims were timely.

139.    Defendant Resurgent and LVNV also caused statutory and actual damages to False Representations Class Members by threatening to bring suit to collect time-barred debt..

140.    At all relevant times, Defendants Resurgent and LVNV acted either with actual malice, or willful and wanton disregard for the rights of alleged debtors.  For every action Defendants initiated, they were aware either:

(a)    That the action was time-barred;

(b)    That the action was likely time-barred, due to Defendants' willful and wanton pattern and practice of abrogating their duty of due diligence to ensure that actions they brought were timely.

141.    In sum, Defendants Resurgent and LVNV systemically violated the Fair Debt Collections Practices Act pursuant to a conspiracy to unlawfully enrich the Sherman Organization and Sherman Executives.

### THIRD CAUSE OF ACTION

### (Vicarious Liability)

### As Against All Sherman Executive Defendants and All Sherman Organization Defendants except LVNV and Resurgent

**On behalf of Plaintiff DeAngelo, and all similarly situated individuals.**

**(Legal Action Class and False Representation Class)**

142.    Plaintiff repeats and re-alleges the allegations set forth herein.

143.    In regards to the previous causes of action set forth herein, at all relevant times LVNV and Resurgent were part of the Sherman Organization.

144.    LVNV and Resurgent do not have an independent existence apart from the Sherman Organization.

145.    LVNV and Resurgent do not make decisions as independent entities.

146.    The Sherman Executives make decisions for the whole of the Sherman Organization in informal meetings held at their Charleston Office.

147.    At these meetings, the Sherman Executives do not observe corporate formalities.

148.    In other business operations, the Sherman Executives also do not observe corporate formalities.

149.    In depositions conducted for the case *Cox v. Sherman Capital LLC, et al.*, Benjamin W. Navarro and Kennett "Rusty" Kendall were unable to recall their actual ownership stakes and titles in the Sherman Organization. Sherman Executives often refer to themselves as working exclusively for "Sherman" or SFG, ignoring for all practical purposes the complex hierarchy of Sherman Organization entities they created.  2013 U.S. Dist. LEXIS 186865, *48-49 (S.D. Ind. Sept. 30, 2013),

150.    The division between the entities of the Sherman Organization is essentially fictitious. In reality, there is a single Sherman Organization. Decision-making is centralized in the hands of the Sherman Executives, who collectively manage day-to-day affairs for the whole Sherman Organization out of the Charleston Office.

151.    The Sherman Organization's common purpose is to bring in as much revenue as possible by attempting ruthlessly to collect on delinquent consumer debt, even when that debt is time-barred.

152.    The Sherman Organization's multi-billion dollar annual revenue would not be possible but for its fraudulent activity, namely the bringing of time-barred collection actions, and the misrepresentation of those actions as timely.

153.    To allow the Sherman Organization Defendants other than LVNV and Resurgent escape liability in this action would be to work substantial injustice, as the Sherman Organization operated as a single entity with common ownership and purpose, and acted with actual malice and willful and wanton disregard for the rights of alleged debtors by pursuing a fraudulent course of conduct, namely maliciously abusing process to institute time-barred collections actions.

154.    Additionally, the Sherman Organization as a whole engaged in fraudulent activity beyond the scope of the causes of actions specified in this complaint, including:

(a)    Attempting to collect debt without the relevant state license, or beyond the scope of a license;

(b)    Filing false, deceptive, or deficient affidavits with regards to affiant's personal knowledge of consumer claims;

(c)    Knowingly filing false or misleading affidavits with regards to the certification of businesses records;

(d)    Intentionally misrepresenting the amount of consumer claims;

(e)    Collecting impermissible compound interest;

(f)    Knowingly requesting and collecting unauthorized attorney's fees and prejudgment interest at unauthorized rates;

(g)    Making false statements or misrepresentations to conceal certain business names and relationships;

(h)    Filing cases in which the relevant assignment documents evidence that no part of the Sherman Organization had valid title to the consumer claim at issue.

155.    All of the Sherman Organization's fraudulent and illegal activity was authorized by the Sherman Executives, either as a whole or in part.

156.    To allow the Sherman Executive Defendants to escape liability in this action would work substantial injustice, as the Sherman Executive Defendants authorized and benefitted from Resurgent and LVNV's fraudulent and illegal activity.  The Sherman Executive Defendants did not observe corporate formalities and could not even keep track of their own titles and ownership interests in the various Sherman Organization entities.  The Sherman Organization existed essentially as a unitary plaything of the Sherman Executives, to fulfill their common purpose of enriching themselves through the collection of consumer debt without any regards to debt collection laws.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Class Members demand judgment in their favor against Defendants, and seek an order from the Court:

(a)    Certifying the proposed Classes;

(b)    Appointing Plaintiff as Class Representative for the respective Classes

(c)    Appointing Plaintiff's attorneys as Class Counsel for the Classes;

(d)    Declaring Defendants' conduct to be unlawful;

(e)    Permanently enjoining Defendants from engaging in the unfair and unconscionable conduct described above, including attempting to collect time-barred debts through abuse of process;

(f)     Requiring Defendants to restore to Plaintiff and Class Members any monies that were acquired by means of their unfair and unconscionable conduct, with interest;

(g)     Requiring Defendants to restore to Plaintiff and Class Members any monies that were spent in defense or settlement of time-barred claims that Defendant unlawfully brought;

(h)     Awarding Plaintiff and the Class Members compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined at trial;

(i)     Awarding Plaintiff and the Class Members punitive damages, in an amount to be determined at trial;

(j)     Requiring Defendants to pay Plaintiff's and Class Members' attorneys' fees and costs; and

(k)     Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues properly so tried.

**WHITE AND WILLIAMS LLP**

BY: _____
Michael O. Kassak, Esq.
Laura Rossi, Esq.
457 Haddonfield Road, Suite 400
Liberty View
Dated: September 23, 2019        Cherry Hill, New Jersey 08002
kassakm@whiteandwilliams.com
rossil@whiteandwilliams.com
Tel. (856) 317-3600
*Attorneys for Plaintiff Joseph DeAngelo and Putative Class Members.*

-31-

## <u>CERTIFICATE OF SERVICE</u>

I, Laura Rossi, Esq. hereby certify that on September 23, 2019, I served a true and correct copy of Plaintiff's First Amended Complaint via ECF to all counsel of record.

**WHITE AND WILLIAMS LLP**

BY: _____
Laura Rossi
*Attorneys for Plaintiff Joseph DeAngelo*
*and Putative Class Members.*

Dated: September 23, 2019

# EXHIBIT A

August 13, 2019

SUBMITTED FOR PUBLICATION

| | |
|---|---|
| LVNV FUNDING, LLC A/P/O CITIFINANCIAL, INC., | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: GLOUCESTER COUNTY |
| Plaintiff, | DOCKET NO.: GLO- L-1242-09 |
| vs. | **MEMORANDUM OF OPINION** |
| JOSEPH DEANGELO | |
| Defendants. | |

Laura Vendzules, Esquire
Kenneth Bressler, Esquire
Stephen Orlofsky, Esquire
Michael Darbee, Esquire
Blank Rome, LLP
300 Carnegie Center
Suite 220
Princeton, NJ 08540
For the Plaintiff

Michael Kassak, Esquire
Laura Rossi, Esquire
White and Williams, LLP
457 Haddonfield Road
Liberty View, Suite 400
Cherry Hill, NJ 08002
For the Defendant

TIMOTHY W. CHELL, P.J.Cv.

The matter before the Court was first initiated by the Plaintiff, LVNV Funding, LLC, in an action against the Defendant, Joseph DeAngelo. The complaint, filed on 7/13/09 alleged that the Defendant defaulted on a car loan and owed to the Plaintiff, a purchaser of the debt, the balance on the loan. The Defendant did not file an answer to the complaint, and a default judgment of $29,647.66 was entered against him on 2/18/10.

In late 2017, the Defendant received a Notice of Application for Wage Execution in the mail. The Defendant hired counsel and pursued a motion to vacate default judgment. The Court denied the motion without prejudice and gave the Defendant more time to investigate the circumstances around the service of the complaint, and other factors that could potentially warrant reopening the case.

A second motion to vacate the default judgment was filed on 9/28/18 and oral argument held on 11/9/18. The Court found that discovery and a plenary hearing were needed to resolve factual disputes regarding issues of service, and whether the motion was timely filed under Rule 4:50-1. The plenary hearing was held on 4/22/19 and summation briefs were submitted by the parties in lieu of closing arguments after they received a transcript of the proceedings.

I. The Issue of Service

A gateway question for the Court is whether or not service of the complaint was made on the Defendant in 2009 pursuant to R. 4:4-4. The Plaintiff may obtain *in personam* jurisdiction over a defendant by personal service "upon a competent individual of the age of 14 or over, by delivering a copy of the summons and complaint to the individual personally, or by leaving a copy thereof at the individual's dwelling place or usual place of abode with a competent member of the household of the age of 14 or over then residing therein." R. 4:4-4(a)(1). Additionally, the Sherriff must complete a proof of service and affidavit of service pursuant to R. 4:4-7.

IA. Findings of Fact

2

At the plenary hearing, the Sherriff's Affidavit of Service, Plaintiff's Exhibit 2, was introduced into evidence. It indicated that Joseph DeAngelo, the Defendant, was served with the complaint on 8/24/09 at 8:30 A.M. at his home address. The Sherriff's Officer who effectuated service, Sergeant Anthony DeCicco, testified that he does not have recollection of serving the Defendant, but explained the process of how he serves all civil complaints, his training and experience. He also explained that the Affidavit of Service admitted into evidence is not the original, because the proof of service is entered into the computer system. During cross-examination, Sergeant DeCicco acknowledged that a mistake could have been made when serving the complaint or when the information was entered into the electronic filing system.

The Court finds that Sergeant DeCicco is a well-trained Sherriff's officer familiar with service of process. The Court finds that this witness was very credible due to his demeanor in answering questions and ability to articulate the proper procedure for serving civil complaints. His knowledge of the Sherriff's Department document retention procedures also provides a reasonable explanation as to why there is no original affidavit of service. His inability to remember serving Mr. DeAngelo is reasonable under the circumstances because it would have occurred almost 10 years ago, and Sherriff's Officers typically serve 12-14 complaints in any given shift.

The Defendant testified that he does not recall being served with the complaint at all. He testified that during August of 2009 his usual routine was to leave his home between 6:00-7:30 during the work-week. Jeannette DeAngelo, the Defendant's wife, also testified that this was his habit and routine during 2009. The Defendant also stated that he was working closely with an attorney during this time, and that had he been served with the complaint, he would have promptly shown it to counsel. The Court finds important that the Defendant was an entrepreneur

3

and did not have a set time to arrive at his place of employment, particularly because he was in the real estate business at the time and did not have an office or any partners.

On the circumstances surrounding service, the Court finds the Defendant and Mrs. DeAngelo were generally credible. The Court finds it believable that Mr. DeAngelo would leave for work early on most days, but because he did not have a set place of employment or shift, the Court finds it equally possible that Mr. DeAngelo started his day later. Both Mr. and Mrs. DeAngelo stated that they had "no recollection" of ever being served with the complaint, which means that it is a possibility that Mr. DeAngelo was served but now cannot remember it happening given that it would have occurred almost a decade ago.

IB. Arguments

The Defendant argues that when "a default judgment is taken in the face of defective personal service, the judgment is generally void." Jameson v. Great Atlantic and Pacific Tea Co., 363 N.J. Super. 419, 425 (App. Div. 2003). The Defendant acknowledges that a Sherriff's Affidavit of Service is entitled to a rebuttable presumption of accuracy but argues that "if some evidence is presented tending to disprove the return, but is not sufficient to establish that the return is false, the presumption is nevertheless eliminated from the case." Id at 426-27. The Defendant argues that he has introduced corroborated evidence contradicting the Affidavit of Service, which includes his own testimony and that of his wife.

Additionally, the Defendant argues that his son, who was twelve at the time, has the same name as the Defendant, and would have answered "yes" if he was asked "Are you Joseph DeAngelo?" Sgt. DiCicco testified that if someone looked young in age, he would still ask them

their name and then follow up by asking them how old they were. The Defendant argues that this creates the reasonable possibility that Sgt. DeCicco served the papers upon twelve-year-old Joseph DeAngelo, III. The Court finds that it is very unlikely that Joseph DeAngelo III was the one served with the complaint. The Court finds it much more likely that Defendant was served the complaint. This is further supported by Mrs. DeAngelo's credible testimony that her twelve-year-old son never woke up early in the summer.

The Plaintiff argues that no credible evidence has been submitted that destroys the presumption of validity of a Sheriff's Affidavit. The Plaintiff argues that the Defendant was not a credible witness and that he is not telling the truth about being served with the complaint. The Plaintiff also argues that Sgt. DiCicco's inability to remember serving the Defendant is of no consequence because his notes and completion of the Affidavit of Service is how the interaction is recorded.

The Plaintiff also argues that case law does not support the Defendant's position because no Court Rules were violated when service was made unlike in Jameson where a cashier without authorization to accept service was delivered the complaint. 363 N.J. Super. 419. The Plaintiff argues essentially the same point by citing to Berger v. Patterson Veterans Taxi Service 244 N.J. Super. 200 (App. Div. 1990); Sobel v. Long Island Entertainment Productions, Inc., 328 N.J. Super. 285, (App. Div. 2000); and the unpublished case Horizon Blue Cross Blue Shield of N.J. v. Avolio, N.J. Super. Unpub. LEXIS 2569 (N.J. App. Div. Oct. 22, 2010).


IC. Conclusions of Law

The Court finds that the Defendant "ha[s] the overall burden of demonstrating that its failure to answer or otherwise appear and defend should be excused." Jameson 363 N.J. Super. 419 at 425-26. "The presumption of the truth of the facts recited in the return is rebuttable only by clear and convincing evidence." Pressler & Verniero, Current N.J. Court Rules, cmt on R. 4:4-7 (2019); see Garley v. Waddington, 177 N.J. Super. 173 (App. Div. 1981). The Court notes that a lower standard may apply, because the Appellate Division in Jameson stated, "if some evidence is presented tending to disprove the return but is not sufficient to establish that the return is false, the presumption is nevertheless eliminated from the case." Id at 427.

The Court finds that the Defendant both failed to rebut the presumption by clear and convincing evidence and failed to submit credible evidence tending to disprove the return, which may render the presumption inoperable. The only evidence submitted by the Defendant was his self-serving statement that he does not recall being served. The testimony by the Defendant and the Defendant's wife that the Defendant's habit was to leave between 6:00A.M. and 7:30A.M. for work only shows that it was possible that Mr. DeAngelo was not home at the time of service. The Defendant was "his own boss" and it is equally possible that he was home and served. The habit evidence creates only the speculation that the Defendant was not present at the time of service.

The Court also notes that the Defendant's argument that Mr. DeAngelo's twelve-year-old son could have been served is entirely speculative as well. No evidence was submitted that he looked old for a twelve-year-old, and Sgt. DeCicco's credible testimony that he would have inquired into a child's age was not challenged. Furthermore, the possibility that the Sheriff's Department made a mistake is not evidence that a mistake was made, even when considering the totality of the evidence presented to the Court.

6

For these reasons, the Court finds that the Sheriff's Affidavit of Service maintains the presumption of truth and accuracy, and therefore the Court finds that the Plaintiff properly effectuated process under R. 4:4-4 and R. 4:4-7. The Court will now address the motion to vacate under R. 4:50-1 in light of proper service.

## II. Motion to Vacate pursuant to R. 4:50-1(f)

R. 4:50-1 states that "[o]n motion, with briefs, and upon such terms as are just, the court may relieve a party ... from a final judgment or order for the following reasons: ... (f) any other reason justifying relief from the operation of the judgment or order. The catchall category, subsection (f), provides relief in exceptional circumstances "[a]nd in such exceptional cases its boundaries are as expansive as the need to achieve equity and justice." Pressler & Verniero, Current N.J. Court Rules, cmt. 5.6.1 on R. 4:50-1 (2019)(citing Court Invest. Co. v. Perillo, 48 N.J. 334, 341 (1966). "It is ... clear that an applicant's right to relief depends on the totality of the circumstances. Id (citing In re Guardianship of J.N.H., 172 N.J. 440, 476 (2002). Additionally, R. 4:50-2 states that "[t]he motion shall be made within a reasonable time" which is "dependent on the totality of the circumstances" as well. Pressler & Verniero, Current N.J. Court Rules, cmt. 3 on R. 4:50-2 (2019).

## IIA. Factual Findings

The Court finds that in 1999, the Plaintiff purchased a black Mercedes-Benz automobile for his nephew. While the Defendant in an earlier certification had stated he was the sole

borrower on the loan, the Defendant's wife had co-signed, based on the testimony at the hearing and documentary evidence. The Defendant testified that the car was a lemon, and that he stopped making payments on the vehicle in mid to late-2003. It is undisputed that the loan itself was restructured on 12/3/03, and no further payments were made after the restructuring. The Court makes the following credibility and factual findings.

(1) Defendant Joseph DeAngelo

The Court finds that the Defendant was credible on some points and not credible on others. The Defendant's testimony was credible when it came to his state of mind regarding the debt. He consulted with his sister, who worked in the debt-collection industry, who correctly informed him that debt collectors were not permitted to file suit on debts outside the statute of limitations. In his rebuttal testimony, Mr. DeAngelo stated that he did not recall receiving many of the documents informing him of the debt "because in my mind, I was – you know, I had nothing, no case against me. In my mind, I was through with this case and I don't know what other letters would be coming to me." Df. Trans. Pg. 283 4-7. The Court found this statement to be credible, because the Defendant essentially admitted that he knew the statute of limitations had run on the suit, and that he would be ignoring letters and information related to the debt because he was "through with this case."

The Court finds other aspects of the Defendant's testimony less credible. The Defendant, even if he was ignoring the letters or notices related to this case, would have known about the judgment based on the sheer volume of notices and the fact that several court notices were sent certified mail, return receipt requested, which included the Defendant's signature. Additionally, the Defendant stated he did not recall making a phone call to the collections attorney where he stated he was not Joseph DeAngelo and gave a different social security number in order to be put

8

GLO L 001242-09 08/13/2019 Pg 9 of 20 Trans ID: LCV20191423314

on their "Do not call" list. The records indicate that Mr. DeAngelo's cell phone was used for the call. The Court finds that Mr. DeAngelo seems to exercise selective memory when it came to this debt. The Court finds that Mr. DeAngelo took the attitude that he was "bulletproof" from this debt. It wasn't until his wages were garnished that he took the matter seriously.

Despite major issues with the Defendant's credibility in some areas, in others the Court did find his testimony believable. The Court found his testimony regarding the 2008 and 2009 alleged payments to be credible. The Defendant admitted to signing the loan modification in 2003. The Court finds it incredible that the Defendant would use a money order to make a payment and that this action is not consistent with any behavior of the Defendant.

(2) Ann Herthneck

Ms. Herthneck is employed by Resurgent Capital Services, LP. which is a master servicer for LVNV Funding. The witness testified that the Defendant's account was purchased in November of 2007 and they received all the documents provided from the previous owner of the debt. Ms. Herthneck also testified that there were no payments between 12/4/03-11/24/08 based on the "data string" sent from Citibank, the previous owner. The witness also testified that two payments were made on November 24th, 2008 that totaled $2,000, paid by money order.

The Court finds that Ms. Herthneck was a credible witness based on her demeanor and consistency in answering questions. The witness was familiar with documents and account in this matter. While this witness works for a company heavily influenced by the Plaintiff, the Court finds her testimony and interpretation of the documents to be believable. However, much of her testimony was based on documents received from the now defunct Red Line.

(3) Paul Bataillon

9

Mr. Bataillon is the CEO of Nations Recovery Center, a debt collector. He testified that a dunning letter was sent to the Defendant in the ordinary course of business, in addition to laying foundation for internal documents that indicated the Defendant had stated he never had an account with Citibank. His testimony was short and limited to explaining how documents were created in the ordinary course. The Court found him to be credible and credits his testimony.

(4) Walter Pawul

Mr. Pawul is a co-owner of PCI Group, a firm in the business of delivering letters such as invoices, statements, collection letters, etc. PCI Group sends collection letters on behalf of Foster, Garbus and Garbus, including letters to the Defendant. This witness testified regarding the process of sending letters and tracking them from production until they are mailed and received by the recipients. Mr. Pawul testified that the information in their database does not prove that the letters were actually left in the Defendant's mailbox, but that it would be the best practice to do so. The Court found this witness to be credible and experienced in the business of sending and tracking letters his company sends. His testimony was balanced and reasonable. The Court credits his testimony.

(5) David Levine

Mr. Levine is an attorney for the law firm Fine, Such, Kahn & Shepard, P.C., who was retained in 2017 to collect on the pre-existing judgment the Plaintiff obtained against the Defendant. The witness testified that a call log indicated the law firm received an incoming call on July 27, 2017 from 856-889-3191. The contents of the call were not admitted for the truth of the matter asserted but the record itself was admitted as a business record showing a call from Ms. DeAngelo's phone.

(6) Glenn Garbus

10

Mr. Garbus is a partner at the collections firm Foster, Garbus & Garbus. The witness testified that he filed the original complaint against the Defendant in this matter and his firm worked on the original collections' activity. He testified that the records of his office indicated that the wrong Joseph DeAngelo was served with the wage garnishment. The witness maintained that they always had the correct Joseph DeAngelo, but that the collections were based on incorrect documents from either the credit bureau, client or asset location service. This led the firm to attempt to collect on the wrong person for over three years. Mr. Garbus's testimony was limited but generally credible. However, the testimony was very self-serving on critical points, specifically his position that he believed the statute had not run because of the two $1000 payments. This testimony is not credible considering Mr. Garbus's area of expertise in debt collection litigation.

In summary, the Court finds that the last full payment on the vehicle was made sometime before December 2003. There were possibly two $1,000 payments on the account on 11/24/08 made by money order. The Plaintiff eventually filed the complaint on 7/13/09. Giving the benefit of the doubt to the Plaintiff, the Court finds that the date of default could have theoretically been as late as 3/17/04. The difference between that date and the filing of the complaint is greater than four years, while the difference between the date of the two $1,000 payments and the filing of the complaint was about seven months.

IIB. Arguments

The Defendant argues that he was never aware of the judgment entered against him until he was served with a wage garnishment in October of 2017. Additionally, the Defendant

11

believes he had the ability to disregard the dozens of phone calls and letters mailed to him

because he was under the impression that the statute of limitations had run, and he had no

interest in voluntarily repaying the debt. The Defendant argues that he had the right to assume

that the Plaintiff would not have brought suit, or enforced a judgment, on a time-barred debt

because it was a violation of the Fair Debt Collection Practices Act (FDCPA). 15 U.S.C. § 1692

to 1692p.

The Defendant also argues that equitable principles warrant vacating the default

judgment even if the Defendant was properly served. The Defendant cites to Arrow Mfg. Co.,

Inc. v. Levinson, 231 N.J. Super. 527 (App. Div. 1989) where the Court held it was not error to

consider the viability of a meritorious defense, including whether the failure to grant relief under

4:50-1(f) would be overly severe. In Arrow, the court vacated a default judgment even though

"the devious tactics of [Defendant] may have been the genesis of the ultimate default judgment

entered against him." Id at 534.

The Defendant argues that the evidence shows the Plaintiff filed suit after the four-year

statute of limitations had expired. Citing Midland Funding, LLC v. Thiel, 446 N.J. Super. 537

(App. Div. 2016), the Defendant argues that the Plaintiff violated the FDCPA by commencing a

lawsuit that was unwinnable according to the Plaintiff's own records.

The Defendant also argues that the $1,000 money orders in November 2008 were not

made by the Defendant, and that even if they were, they were not sufficient to revive the cause of

action. See Midland Funding LLC at 550.

In opposition, the Plaintiff argues that the Defendant had notice of the judgment on

several occasions, including the Request to Enter Default Judgment, the Final Judgment of

Default and a Notice of Application for Wage Execution. According to the Plaintiff's law firm

at the time, the Defendant signed the green card for each of these notices that were sent in January, February and March 2010, respectively. Additionally, the Plaintiff argues that many other letters and phone calls were sent to the Defendant regarding the debt, putting him on notice of the suit and judgment.

The Plaintiff also argues that the Plaintiff defaulted on several other debts during the same time period and had resorted to devious tactics to throw debt collectors off his scent. In particular, the Plaintiff argues that the Defendant, using his cell phone, made a call to the Plaintiff's law firm and gave a false name, social security number and stated he did not know Jeanette DeAngelo in order to be put on the "do not call list." The Plaintiff also alleges that the Plaintiff lied in a phone call with Nations Recovery, a debt servicer, when he stated he never had an account with CitiFinancial, even though he admitted at the plenary hearing that he did.

In a footnote, the Plaintiff argues that the Defendant's position that the FDCPA was violated by filing the suit after the statute of limitations had expired is flawed. The Plaintiff argues that without access to documents from the defunct debt servicers, the actual day the statute of limitations ends is not ascertainable. Moreover, the Plaintiff argues that even if the statute did expire, the Plaintiff did not file a lawsuit on a debt that appears to be time barred, without the debt collector having first determined the applicable statute of limitations after a reasonable inquiry. The Plaintiff argues that Glen Garbus testified that he believed that statute had not run because two $1,000 payments were made on the account in November 2008 and that it was a "bona fide error" under the law and not a FDCPA violation.

Finally, the Plaintiff cites to Baumann v. Marinaro, 95 N.J. 380, 395 (1984) and argues that the law does not favor vacating the default judgment because the law favors the finality of judgments. According to the Plaintiff, the law disfavors litigants who wait to litigate their rights,

see Woodrick v. Jack. J. Burke Real Estate, Inc., 306 N.J. Super. 61 (App. Div. 1997), and that

the statute of limitations defense, in particular, are waived if a litigant does not raise it in a timely

manner. The Plaintiff argues that the delay in bringing this motion to vacate the default

judgment has severely prejudiced the Plaintiff because several companies servicing this debt

declared bankruptcy and ceased operations and did not keep records, namely CitiFinancial and

Redline Recovery.


IIC. Conclusions of Law


The Court finds that in order for the Court to grant relief under R. 4:50-1(f) and R. 4:50-

2, exceptional circumstances must be present that show the motion to vacate was filed both

within a reasonable time and that the totality of the circumstances warrants reopening the matter.

This includes analyzing the meritorious defense of the Defendant and the likelihood of the

Plaintiff's success on the merits, in addition to public policy concerns.

Exceptional circumstances under R. 4:50-1(f) occur when "were [the rule] not applied, a

grave injustice would occur." US Bank National Ass'n v. Guillaume, 209 N.J. 449, 484 (2012)

(citing Housing Authority of Morristown v. Little, 135 N.J. 274 (1994)). Another exceptional

circumstance permitting relief under this rule is that there is public significance related to the

matter. See Manning Engineering, Inc. v. Hudson County Park Com., 74 N.J. 113 (1977)

(holding that a judgment on the merits should be vacated, after litigation before the Appellate

division and Supreme Court, because the public contract at issue was procured via corruption

even though Defense counsel knew for several years).


14

Exceptional circumstances may also arise when an order violates a federal statute. In

Johnson v. Johnson, 320 N.J. Super. 371 (App. Div. 1999) a dual final judgment of divorce

contained a provision that required the payment of attorneys' fees from the United Association of

Journeyman Plumbers and Pipe Fitters Local 322 Annuity Fund, of which the Plaintiff was a

participant. The Appellate Division found that the order violated the Employee Retirement

Income Security Act (ERISA) because it amounted to an illegal alienation of benefits under the

act and granted the motion to vacate under R. 4:50-1(f).

First, the Court will determine whether the Defendant has a meritorious defense in the

statute of limitations. The Court finds that in "[a]n action for breach of any contract for sale

must be commenced within four years after the cause of action has accrued." N.J.S.A. 12A:2-

725. In other words, if the suit was brought more than four years from the date of default, the

Defendant would have the complete defense of the statute of limitations. Based on the testimony

and documentary evidence, the Court found that the last full payment had to have been made

before December 2003. There were two payments of $1,000 in November of 2008, but "[i]n

collection actions, the right to institute and maintain suit arises on the date of default" and

"partial payments less than the minimum payment required after the date of default does not

change the date of default, and thus does not change the date on which the cause of action

accrued." Midland Funding, LLC v. Thiel, 446 N.J. Super. 537, 548 (App. Div. 2016). The

Court finds that since the suit was filed on 7/13/09, the statute of limitations would have been a

complete bar to the Plaintiff's, had the Defendant answered the complaint.

The Court will next determine whether the Plaintiff violated the FDCPA in bringing the

suit in the first place. A debt collector will be liable under the FDCPA if the debtor can prove

"(1) she is a consumer, (2) the party seeking payment is a debt collector, (3) the … challenged

15

practice involves an attempt to collect a 'debt' as the Act defines it, and (4) the collector has violated a provision of the FDCPA in attempting to collect the debt." Id at 549 (citing Douglass v. Convergent Outsourcing, 765 F.3d 299, 303 (3d Cir. 2014).

The fourth element can be proven if the debt collector "commences a lawsuit on a debt which he or she knows or should know is unavailable or unwinnable by reason of a legal bar such as the statute of limitations." Id at 550 (quoting Beattie 754 F. Supp. At 393). The FDCPA "imposes strict liability" but a "debt collector may escape liability if it can demonstrate by a preponderance of the evidence that its "violation of the Act was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." Rutgers-The State Univ. v. Fogel, 403 N.J. Super. 389, 392 n.2 (App. Div. 2008).

The Court finds that all four elements are met. (1) the Defendant was a consumer who purchased a vehicle; (2) LVNV Funding, LLC is a debt collector; and (3) the act of filing a lawsuit to collect a debt, as is the case here, is clearly an attempt to collect a debt under the Act. The Appellate Division's holding in Midland Funding, LLC v. Thiel makes it clear that commencing suit on a time-barred debt is a violation of the FDCPA even if partial payments were made on the account, meeting the fourth element.

The Plaintiff's assertion that Mr. Garbus's belief that the partial payments tolled the statute of limitations for bringing the action is a "bona fide error" under the FDCPA is without merit. In Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L.P.A., 559 U.S. 573 (2010), the United States Supreme Court held that "the bona fide error defense in § 1692k(c) does not apply to a violation of the FDCPA resulting from a debt collector's incorrect interpretation of the requirements of that statute." Id at 604-05. For this reason, the Court finds that Mr. Garbus's

16

mistaken belief that the debt was revived by the partial payments on the account is not a bona fide error. Further, as found above, this position of Mr. Garbus lacks credibility.

The Court also notes that even if there was a bona fide error under the act, it would have limited effect on the case at bar. There is no counterclaim for violations of the FDCPA because no answer has been filed. The bona fide error defense is a defense to the strict liability imposed by the Act. The violation still occurred because the Plaintiff should have known the lawsuit was unwinnable at the time it was filed.

The Court finds that public policy considerations are part and parcel of the totality of the circumstances. There are competing policies involved in this case, those being the public policy generally favoring the finality of judgments, the policy generally disfavoring default judgments, and the policy behind the FDCPA.

The Court finds that "the policy in favor of the finality of judgments plays a larger role in applications brought under [R. 4:50-1(f)] than the other subsections" of that rule. Nowosleska v. Steele, 400 N.J. Super. 297, 304 (App. Div. 2008)(citing First Morris Bank & Trust v. Roland Offset Serv., Inc., 357 N.J. Super. 68 (App. Div. 2003). But the "interest in repose must be 'weighed in the balance with the equally salutary principle that justice should be done in every case." Id quoting Hodgson v. Applegate, 31 N.J. 29, 43 (1959). In this case, given the length of time that has passed since default, the finality of judgments is more important than litigating the case on the merits and vacating the default, unless a "grave injustice would occur." Mancini v. E.D.S., 132 N.J. 330 (1993).

Congress passed the FDCPA because "there was abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors" and the stated purpose of the law is "to eliminate abusive debt collection practices by debt collectors, to insure that those

17

debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692 (a);(e).

In 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank) created the Consumer Financial Protection Bureau (CFPB), which has the authority to create regulations for the FDCPA. On May 7, 2019, the CFPB proposed regulations that would clarify the FDCPA as it relates to debt collectors who violate the Act by bringing suit on time-barred debts. See 84 F.R. 23274-23418 (May 21, 2019). In general, the proposed regulations codify existing case law describing it as a violation, but also documented important findings about the debt collection industry.

The CFPB found that this illegal debt collection practice "may prompt some consumers to pay or prioritize that debt over others in the mistaken belief that doing so is necessary to forestall litigation" and "may lead to judgments against consumers on claims for which those consumers had meritorious defenses, including but not limited, a statute of limitations defense." Id at 23328. The CFPB even acknowledged as a serious policy concern that "the vast majority of judgments on unpaid debts, including on time-barred debts, are default judgments, entered solely on the representations contained in the debt collector's complaint. Id. The Court finds that these policy concerns are important to the totality of the circumstances and finds that they weigh in favor of granting the motion.

In light of the above factors, the Court finds that the motion to vacate the default judgment must be granted because a grave injustice would occur. In Arrow Mfg. Co., Inc. v. Levinson, 231 N.J. Super. 527 (1989) the Appellate Division found that while willful actions to

evade service of process directly led to a default judgment, the sanction of making an individual liable for a corporate debt "was far too severe for that conduct." Id at 534.

In this case, the Defendant's failure to answer the complaint and further failure to file this motion until his wages were garnished is inexcusable neglect. Still, had the Defendant raised his meritorious defense in a timely fashion, he would not have a judgment against him at all because the debt was time-barred. The Court finds that denial of the motion and enforcement of the Final Judgment by Default would be "far too severe for that conduct" especially when considering the Plaintiff's conduct as well. The Court found that the Plaintiff violated the FDCPA in filing this suit. Denying the application would essentially condone the Plaintiff's illegal action for the same reason the Plaintiff should be admonished, the passage of time. If the Plaintiff brought the suit in a timely fashion, this motion would have no merit, and if the Defendant asserted this defense from the outset, the case would have been dismissed long ago.

As stated above, R. 4:50-2 requires that this motion be filed in a reasonable time, based on the totality of the circumstances. For largely the same reasons the Court found this motion should be granted under R. 4:50-1(f), the Court finds that the motion was made in a reasonable time according to the attendant circumstances and surrounding public policy. It would be inequitable to permit the Plaintiff to file a complaint clearly outside of the reasonable time to do so, then deny the Defendant's motion because it was filed late.

III. Conclusion

R. 1:1-2 states that "the [Court Rules] shall be construed to secure a just determination, simplicity in procedure, fairness in administration and the elimination of unjustifiable expense

19

and delay.  Unless otherwise stated, any rule may be relaxed or dispensed with by the court in

which the action is pending if adherence to it would result in an injustice."  Due to the unusual

course in which the case has proceeded, the Court will dispense with several rules.

The Court finds that the parties engaged in extensive discovery relating to the issues of

service and the meritorious defense asserted by the Defendant.  The Court then held a full

plenary hearing and made factual findings that Plaintiff's complaint was time-barred.  Requiring

the Defendant to now answer the complaint pursuant to R. 4:5-3 and file a motion for summary

judgment does not serve the interest of justice because it would complicate procedure and create

unjustifiable expense and delay because discovery and litigation on the statute of limitations

issue has already been completed.

Accordingly, the Court finds that the default judgment is VACATED and the Court, *sua*

*sponte*, GRANTS summary judgment in favor of the Defendant and orders the complaint be

dismissed.

# EXHIBIT B

Binge Drinking Documentary | Hurricane Dorian | Ghost Ship Verdict | Chef José Andrés | Country Singer Die

LIVE

# 5 states with the most "zombie debt" complaints

BY KATHY KRISTOF
MARCH 7, 2018 / 8:30 AM / MONEYWATCH

Zombie debts have come back with a vengeance. Debt buyers pull these expired obligations out of cold storage and often use abusive and illegal tactics to collect. Zombie debts generally started out as legitimate obligations that had been settled, paid off, discharged in bankruptcy or rendered uncollectible because of various state statutes of limitation.

5 states with the most "zombie debt" complaints - CBS News



However, these uncollectible bills are often repackaged with other delinquent loans and sold into the secondary market, generally for pennies on the dollar. Buyers of this debt then attempt to collect on all of it -- including the expired obligations -- bringing the expired debts back from the dead.

"By all rights, this is debt that should have been extinguished, but it continues to come back to life," said Rowan Tepper, senior analyst at RewardExpert, which recently completed a study of zombie debt complaints that had been filed with the Consumer Financial Protection Bureau going back to 2011.

## Trending News

- Facebook leaked 400 million users' phone numbers, report says
- More big retailers ask customers to leave guns behind
- Salmonella linked to dog treats sickens 143 people in 35 states
- Ariana Grande sues Forever 21 over look-alike ads

This analysis found that complaints about zombie debts have soared in recent years, jumping 66 percent in the first nine months of 2017 compared with the same period the year before. However, the chance of being pursued by back-from-the-dead debt varies dramatically based on where you live. In several states

zombie debts are running rampant, according to RewardExpert's research.

IRS debt collection

1. **Delaware** is the zombie debt capital of the nation, with 44.72 complaints about zombie debt collectors for each 100,000 residents. The most complaints are against Synchrony Financial (SYF), which specializes in issuing private-label credit cards for companies such as Amazon (AMZN), Walmart (WMT), Lowes (LOW) and JCPenny (JCP); and Encore Capital Group (ECPG), which was recently cited in another RewardExpert report for discriminatory and deceptive lending practices. Synchrony didn't respond to requests for comment. Officials at Encore said they hadn't had an opportunity to review the study, so they could not comment.

2. **Florida** logs 42.43 debt collection complaints per 100,000 residents. Encore Capital is, again, one of the primary offenders, according to RewardExpert. "We see significantly higher per-capita reports of attempts to collect out-of-statute, paid or unverifiable debts in the demographically younger and more diverse metro areas, such as Miami, Jacksonville and Tampa, where the complaint rate adds to 56 complaints per 100,000 residents," said Tepper. "This is affecting disproportionately lower-income and minority individuals, who are already

hurting."

3. **Georgia** comes in third with 42.42 zombie debt complaints per 100,000 residents. Encore Capital Group and Enhanced Recovery Co., better known as ERC, are the biggest offenders, said RewardExpert. (Nationwide, these are the two companies most likely to be hounding you about zombie debts, according to RewardExpert's research.) However, complaints are even more concentrated in urban areas in Georgia than they are in Florida. Residents of Atlanta logged 75 complaints per 100,000 residents, versus about 11 complaints per 100,000 in more rural areas of the state. Enhanced Recovery couldn't be reached for a comment.

4. **Nevada** logs 39.99 complaints per 10,000 residents, with Las Vegas and Reno being the state's zombie-debt capitals. Notably, identity theft is the cause of a number of the zombie debt complaints here, according to Tepper. Encore Capital and ERC were again the most complained about collectors in this state.

5. **Maryland** has almost as many zombies per capita as Nevada, with 38.65 complaints per 100,000 residents. Encore Capital and ERC were the most complained about collectors.

If you're contacted about a long-forgotten debt, it's important to be careful about what you say and do, said Tepper. In some cases, "acknowledging" that the debt might be yours could start the clock ticking all over again on debt collection statutes of limitation, formally bringing this once-dead debt back to life.

Although debt collectors will badger you to admit the debt is yours, say only that you want their mailing address, Tepper said. Then mail a written dispute, demanding verification of the debt. The collector is required by the Fair Debt

Collection Practices Act to provide that within 30 days.

Student debt tips

That may be the last you'll hear about the zombie debt because chances are good that the debt collector doesn't have proof, said Tepper. Often when debt is sold, it

doesn't have the requisite documentation that's legally necessary to collect.

If the company does provide verification, check it for discrepancies. Is the debt really yours? Is it the amount that you owe or owed? Was the debt repaid, settled or discharged in bankruptcy? Has the <u>statute of limitations</u> (which generally ranges from three to seven years from the last payment) expired, making the debt uncollectible?

If so, write the collection company again (<u>you can use this nice sample letter</u>) to notify it that the debt isn't collectible and you want the company to leave you alone.

Make sure you keep copies of all of this written communication, Tepper advised.

You'll need it if the collection collection attempts to take you to court. And even after the debt is settled, keep the information in a file. You may need it later because zombie debts have a tendency rise again.

"If the debt is resold, you could end up having to do this again," Tepper said. But if you have the documentation from the previous attempt, responding to each successive one should be a breeze.

Finally, if a collector sues you, make sure to respond to the court. Most cases are won by default, said Tepper. Respond in writing to the court with the statement that you don't recognize or acknowledge the validity of the debt in question and that you demand documentary evidence.

Once again, because the paper trail accompanying zombie debts is often scant, asking for proof required by the Fair Debt Collection Practices Act often triggers

9/6/2019                                                    5 states with the most "zombie debt" complaints - CBS News

dismissal of the case. However, if you simply don't respond to a court notice or summons, you could end up required to pay this zombie debt because you lost by default.

*First published on March 7, 2018 / 8:30 AM*

*© 2018 CBS Interactive Inc.. All Rights Reserved.*

**Kathy Kristof**

View all articles by Kathy Kristof on CBS MoneyWatch»
Kathy Kristof, editor of SideHusl.com, is an award-winning financial journalist and the author of *Investing 101*.

 **Twitter**

# If you wear Birkenstocks, you'll love this trick
PAID   WIKIBUY

# Unsold 2018 SUVs Going for Pennies on the Dollar
PAID   LIFESTYLE DAILY REVIEWS

# Two cannabis stocks for a potential $146 billion opportunity
PAID   THE MOTLEY FOOL

# Enter Any Name, Wait 105 Seconds, See Instant Results
PAID   TRUTHFINDER

# If You Can Qualify for Any Credit Card, These Are the Top 6
PAID   NERDWALLET

# 10 Most Fuel Efficient SUVs

# EXHIBIT C

8/8/2019    Zombie debt: How collectors trick consumers into reviving dead debts - The Washington Post

The Washington Post

**Business**

# Zombie debt: How collectors trick consumers into reviving dead debts

In many states, companies lose the right to collect debts after a few years. But there's a loophole they're increasingly using.

By Renae Merle

August 7

By last year, Terrie Raymer thought she was in the clear. A nearly $14,000 credit card debt she owed Target was now so old under Oklahoma's laws that she could no longer be sued to collect the money. It was a relief, and Raymer began making plans to restart her life, including buying a new home.

That's when she learned a debt collector was attempting to revive the old bill.

Debt collectors lose the right in many states to sue consumers after three or more years. But there's a loophole: If the consumer makes a payment, even against his or her own will, that can be used to try to revive the life of the debt.

Raymer says she made her last payment in 2013, putting the debt outside Oklahoma's five-year statute of limitations. But in 2016, a debt collector, Rausch Sturm, sued for the remaining debt and successfully garnished 19 cents from her checking account before dropping the lawsuit when she challenged it. Then last year, Rausch Sturm sued Raymer again, saying her last payment had been made in 2016.

"This [was] very scary as a mother of five," said Raymer, 54, a social worker from Bixby, Okla. "This lawsuit could have been the nail in the coffin for me."

The effort to revive Raymer's old debt was part of what consumer advocates and financial experts say is an accelerating effort within the $11 billion debt collection industry to make profits from debts that the financial industry once wrote off. The practice could prove increasingly profitable as the country's consumer debt reaches record levels — more than $4 trillion this year — and the industry is able to bring in "tens of billions of dollars" from debt past the statute of limitations every year, according to a report by the Receivables Management Association International.

In Rayman's case, Rausch Sturm dropped its lawsuit after being contacted by The Washington Post. It declined to comment on Raymer's case, citing consumer privacy, but said in a statement it complies with all relevant laws.

The efforts to collect on old debts often focus on getting consumers to reset the statute of limitations through a variety of means, including sending them credit cards that let them pay off their old debts or by allowing them to make a small payment to halt debt collection calls. The efforts have contributed to the flood of debt-collection lawsuits clogging courts across the country, consumer advocates say. In New York City, the number of debt-collection lawsuits surpassed 100,000 last year, compared with 47,000 in 2016, according to data from the New Economy Project, an advocacy group.

Texas and Washington state passed legislation this year making it more difficult to revive debt past its statute of limitations, but the industry successfully fought efforts in other states, including New York. And consumer advocates worry that new rules proposed by the Consumer Financial Protection Bureau — the first major update to the Fair Debt Collection Practices Act in more than 40 years — could further bolster the industry.

"Consumers just don't know the ins and outs of state and federal debt-collection laws and probably will not understand the consequences in the fine print" of making a payment that can revive an old debt, said Christine Hines, the legislative director for the National Association of Consumer Advocates, which lobbied for the CFPB to ban collection of debts beyond their statutes of limitations. "We're talking about old debt. That's why it's called a zombie. They often lack reliable records for both the collector and the consumer to rely on."

Debt collectors say they comply with the law. Some people may want to pay off a debt after it has passed its statute of limitations to repair their credit score or out of a sense of obligation, industry officials say.

## Confusion and deception

The legal treatment of old debt varies widely across the country, depending on the state and type of debt. Often, debt collectors are allowed to ask consumers to pay off their old bills even after the statute of limitations has passed but cannot sue for the money. But that can change if the consumer makes a small payment or acknowledges the debt in other ways.

The lack of federal standards can be confusing to consumers — and to debt collectors.

"There are 50 state legislatures that have different state laws," said Richard J. Perr, a lawyer at the Philadelphia firm of Fineman Krekstein & Harris who represents debt collectors. "Whether it's your utility bill, water service or a cellphone bill from Verizon or AT&T to your local doctor, they can all be treated differently."

The issue has become more common with the rise of debt buyers that acquire debts at a fraction of their value, consumer advocates say. In a 2017 report, the CFPB studied 298 debt portfolios sold online, including on Facebook, and found that a "substantial portion" of the accounts were likely "time-barred" — or beyond their statutes of limitations. One portfolio with a face value of $156 million was being sold for $125,000, or less than 1 cent per dollar, the CFPB found.

The complicated nature of the law can leave consumers at a disadvantage and lead to what is known in the industry as "duping," or tricking the consumer to revive old debts, said Marc C. McAllister, a professor at Texas State University who wrote the 2018 paper "Ending Litigation and Financial Windfalls on Time-Barred Debts."

"If you're unsavvy and don't really understand what's going on, you might agree to make a $10 payment just so they will stop calling," he said. "Now the entire amount has been revived, and they can sue you for the entire amount."

Jefferson Capital Systems, a debt collector, offered people with old debts past their statute of limitations a new credit card called the Majestic, according to records filed in Georgia's Northern U.S. District Court.

"Get a new start with the Majestic Fresh Start Solution and pre-approved unsecured Visa card. Soon you can enjoy all the convenience and benefits Visa has to offer," the company said in letters to more than 3.6 million consumers. But instead of getting new credit cards, the borrowers were enrolled in a repayment program for their old bills, the Federal Trade Commission found.

Jefferson is no longer involved in such programs, said Matt Pfohl, the company's general counsel, noting that the practice fell into a gray area but was "unfair." There is now more regulatory scrutiny of the industry and Jefferson's clients don't want to be involved in programs that could cause "reputational harm," he said.

9/6/2019                    Zombie debt: How collectors trick consumers into reviving dead debts - The Washington Post

The CFPB fined two of the country's largest debt buyers, Encore Capital Group and Portfolio Recovery Associates, a combined $80 million after they sent thousands of letters to consumers offering to "settle" their old debts without explaining that the payments would revive the old debts.

In a statement, Portfolio Recovery Associates said it has a "rigorous compliance framework" to ensure that it complies with states' statutes of limitations. Encore said it does not try to revive old debts and sues only when that is permissible.

## Collectors fight restrictions

The industry is fighting legislation across the country to rein in efforts to collect old debts, calling them misguided. Making such collections more difficult could drive up interest rates and make it harder for some people to get credit cards or loans, the industry argues.

The New York state Department of Financial Services recently sent subpoenas to six debt-collection firms after receiving a "substantial" number of complaints, including some involving debt beyond statutes of limitations where demands for payment could not legally be enforced, according to a person familiar with the cases but not authorized to speak publicly about them.

New York's state legislature also debated a bill this year that would have given debt collectors less time to collect on some old consumer debts — three years instead of six — and prevent the industry from going after the money at all once the debt reached its statute of limitations.

"Tons of creditors wait until the very last second to file that lawsuit, and it's just not fair," said state Sen. Kevin Thomas, who sponsored the bill. "This legislation is necessary to maintain a basic level of fairness and due process for all consumers."

The legislation failed when the industry balked, saying the changes would create new headaches for consumers. Restricting debt collectors' time frame would prompt many to sue more quickly and more often to beat the clock, industry associations opposing the bill said.

The CFPB has proposed the first major revision of 1977's Fair Debt Collection Practices Act, what the industry called a long-needed update to the law. But consumer advocates worry the CFPB is giving the industry too

9/6/2019                          Zombie debt: How collectors trick consumers into reviving dead debts - The Washington Post

much leeway, including more flexibility to pursue old debts by arguing the debt collector did not know a particular bill was past its statute of limitations.

The overhaul by the CFPB would fix a "draconian" system that unfairly punishes debt collectors for not knowing the statute of limitations on a debt, said Perr, the debt-collection-industry attorney and a former president of ACA International, a large industry group. "They are punished for the complexity of the system," he said.

The bureau acknowledged the difficulty of the issue in its more than 500-page proposal. Some small debt collectors told the CFPB that "determining whether the statute of limitations has expired can be complex," according to the proposal.

According to the proposal, the bureau is also considering whether to require debt collectors to tell consumers up front when their debt is beyond its statute of limitations.

That is unnecessary, Perr said. "It should not be the responsibility of the debt collector to tell consumers of the statute of limitations," he said. "Collection agencies are not people's lawyers. They shouldn't be giving legal advice."

The CFPB did not respond to an interview request for this story. The proposal seeks to create "clear rules of the road where consumers know their rights and debt collectors know their limitations," CFPB Director Kathleen L. Kraninger said in May.

## A debt revived

Raymer, the Oklahoma social worker, has been struggling with her old debts for years. After a divorce, she was left with a bill totaling more than $13,000 from a Target credit card. After she fell behind on the payments, the account was turned over to Wisconsin-based Rausch Sturm, a law firm that acts as a debt collector.

"Your journey to financial recovery begins here," the company says on its website.

Initially, Raymer said, she tried to work out a deal with Rausch Sturm to pay off the bill. But the firm wanted $4,000 a month, more than she could afford. "If they had come to me with a more reasonable payment plan, I would have worked with them," she said. "I wasn't in a financial position to do $4,000 a month."

Rausch Sturm eventually secured a judgment allowing it to garnish Raymer's checking account. The company had taken just 19 cents from her account in 2016 before Raymer challenged the court order, arguing she had not been properly notified of the suit, which was improperly served to her 14-year old daughter.

The company dropped its suit. But in July 2018, Rausch Sturm sued again. It claimed in court filings that Raymer had made a payment in January of 2016, the 19 cent garnishment, that allowed the firm to continue to pursue the debt.

Changing the date of the last payment from 2013 to 2016 was an unfair attempt to put the debt back within Oklahoma's five-year statute of limitations, said Raymer's attorney, Victor Wandres, who filed a motion to have the case thrown out of court. The 19 cents wasn't a voluntary payment and shouldn't be used to reset the statute of limitations, Wandres argued.

The firm's lawyer, Manuel H. Newburger, said in a statement that Rausch Sturm's policies are "confidential" but that the company does not pursue debts past their statute of limitations. "We have expended a great deal of effort to ensure that we comply with state and federal laws and regulations," he said.

*Magda Jean-Louis contributed to this report.*

**Renae Merle**
Renae Merle covers white-collar crime and Wall Street for The Washington Post. She has also worked for the Wall Street Journal and the Associated Press. **Follow** 🐦

The Washington Post

## Quality journalism needs support.

Labor Day Sale Ends Tomorrow: Subscribe for ~~$10~~ $4 every month ? that's every story for just $1 a week.

Get this offer

**Send me this offer**

Already a subscriber? **Sign in**

# EXHIBIT D

## BUREAU OF CONSUMER FINANCIAL PROTECTION

**12 CFR Part 1006**

**[Docket No. CFPB–2019–0022]**

**RIN 3170–AA41**

## Debt Collection Practices (Regulation F)

**AGENCY:** Bureau of Consumer Financial Protection.

**ACTION:** Proposed rule with request for public comment.

**SUMMARY:** The Bureau of Consumer Financial Protection (Bureau) proposes to amend Regulation F, 12 CFR part 1006, which implements the Fair Debt Collection Practices Act (FDCPA) and currently contains the procedures for State application for exemption from the provisions of the FDCPA. The Bureau's proposal would amend Regulation F to prescribe Federal rules governing the activities of debt collectors, as that term is defined in the FDCPA. The Bureau's proposal would, among other things, address communications in connection with debt collection; interpret and apply prohibitions on harassment or abuse, false or misleading representations, and unfair practices in debt collection; and clarify requirements for certain consumer-facing debt collection disclosures.

**DATES:** Comments must be received on or before August 19, 2019.

**ADDRESSES:** You may submit comments, identified by Docket No. CFPB–2019–0022 or RIN 3170–AA41, by any of the following methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

• *Email: 2019-NPRM-DebtCollection@ cfpb.gov.* Include Docket No. CFPB–2019–0022 or RIN 3170–AA41 in the subject line of the email.

• *Mail:* Comment Intake—Debt Collection, Bureau of Consumer Financial Protection, 1700 G Street NW, Washington, DC 20552.

• *Hand Delivery/Courier:* Comment Intake—Debt Collection, Bureau of Consumer Financial Protection, 1700 G Street NW, Washington, DC 20552.

*Instructions:* The Bureau encourages the early submission of comments. All submissions should include the agency name and docket number or Regulatory Information Number (RIN) for this rulemaking. Because paper mail in the Washington, DC area and at the Bureau is subject to delay, commenters are encouraged to submit comments electronically. In general, all comments received will be posted without change

to *http://www.regulations.gov.* In addition, comments will be available for public inspection and copying at 1700 G Street NW, Washington, DC 20552, on official business days between the hours of 10:00 a.m. and 5:00 p.m. Eastern Time. You can make an appointment to inspect the documents by telephoning 202–435–7275.

All comments, including attachments and other supporting materials, will become part of the public record and subject to public disclosure. Proprietary or sensitive personal information, such as account numbers, Social Security numbers, or names of other individuals, should not be included. Comments will not be edited to remove any identifying or contact information.

**FOR FURTHER INFORMATION CONTACT:** Adam Mayle, Counsel; or Dania Ayoubi, Owen Bonheimer, Seth Caffrey, David Hixson, David Jacobs, Courtney Jean, or Kristin McPartland, *Senior Counsels,* Office of Regulations, at 202–435–7700. If you require this document in an alternative electronic format, please contact *CFPB_accessibility@cfpb.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Summary of the Proposed Rule

The Bureau proposes to amend Regulation F, which implements the *Fair Debt Collection Practices Act* (FDCPA),[1] to prescribe Federal rules governing the activities of debt collectors, as that term is defined in the FDCPA (FDCPA-covered debt collectors). The proposal focuses on debt collection communications and disclosures and also addresses related practices by debt collectors. The Bureau also proposes that FDCPA-covered debt collectors comply with certain additional disclosure-related and record retention requirements pursuant to the Bureau's rulemaking authority under title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act).[2]

In 1977, Congress passed the FDCPA to eliminate abusive debt collection practices by debt collectors, to ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.[3] The statute was a response to "abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors."[4] According to Congress,

these practices "contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy."[5]

The FDCPA established certain consumer protections, but interpretative questions have arisen since its passage. Some questions, including those related to communication technologies that did not exist at the time the FDCPA was passed (such as mobile telephones, email, and text messaging), have been the subject of inconsistent court decisions, resulting in legal uncertainty and additional cost for industry and risk for consumers. As the first Federal agency with authority under the FDCPA to prescribe substantive rules with respect to the collection of debts by debt collectors, the Bureau proposes to clarify how debt collectors may employ such newer communication technologies in compliance with the FDCPA and to address other communications-related practices that may pose a risk of harm to consumers and create legal uncertainty for industry. The Bureau also proposes to interpret the FDCPA's consumer disclosure requirements to clarify how industry participants can comply with the law and to assist consumers in making better-informed decisions about debts they owe or allegedly owe.[6]

### A. Coverage and Organization of the Proposed Rule

The Bureau's proposed rule is based primarily on its authority to issue rules to implement the FDCPA. Consequently, the proposal generally would impose requirements on debt collectors, as that term is defined in the FDCPA. However, the Bureau proposes certain provisions of the regulation based on the Bureau's Dodd-Frank Act rulemaking authority. With respect to debt collection, the Bureau's authority under the Dodd-Frank Act generally may address the conduct of those who collect debt related to a consumer financial product or service, as that term is defined in the Dodd-Frank Act.[7] Proposed rule

---

[1] 15 U.S.C. 1692–1692p.

[2] Public Law 111–203, 124 Stat. 1376 (2010).

[3] 15 U.S.C. 1692(e).

[4] 15 U.S.C. 1692(a).

[5] *Id.*

[6] Because this is a proposed rule, the Bureau's statements herein regarding proposed interpretations of the FDCPA or the Dodd-Frank Act do not represent final Bureau interpretations. The Bureau is not, through its proposed interpretations, finding that conduct either violates or is permissible under the FDCPA or the Dodd-Frank Act.

[7] Covered persons under the Dodd-Frank Act include persons who are "engage[d] in offering or providing a consumer financial product or service"; this generally includes persons who are "collecting debt related to any consumer financial product or service" (*e.g.,* debt related to the extension of consumer credit). *See* 12 U.S.C. 5481(5), (6), (15)(A)(i), (x).

provisions that rely on the Bureau's Dodd-Frank Act rulemaking authority generally would not, therefore, require FDCPA-covered debt collectors to comply if they are not collecting debt related to a consumer financial product or service.[6] Such FDCPA-covered debt collectors, however, would not violate the FDCPA by complying with any such provisions adopted in a final rule.

The proposed rule restates the FDCPA's substantive provisions largely in the order that they appear in the statute, sometimes without further interpretation. Restating the statutory text of all of the substantive provisions may facilitate understanding and compliance by ensuring that stakeholders need to consult only the regulation to view all relevant definitions and substantive provisions. Where the Bureau proposes to restate statutory text without further interpretation, the relevant section-by-section analysis explains that the proposed rule restates the statutory language with only minor wording or organizational changes for clarity. Except where specifically stated, the Bureau does not intend to codify existing case law or judicial interpretations of the statute by restating the statutory text. The Bureau requests comment on the proposed approach of restating the substantive provisions of the FDCPA.

The proposed rule has four subparts. Subpart A contains generally applicable provisions, such as definitions that would apply throughout the regulation. Subpart B contains proposed rules for FDCPA-covered debt collectors. Subpart C is reserved for any future debt collection rulemakings. Subpart D contains certain miscellaneous provisions.

### B. Scope of the Proposed Rule

#### Communications Proposals

Debt collection efforts often begin with attempts by a debt collector to reach a debt collector may benefit a consumer by helping the consumer to either

⁶ These provisions appear in proposed §§ 1006.14(b)(1)(ii) (repeated or continuous telephone calls or telephone conversations), 1006.30(b)(1)(ii) (prohibition on the sale, transfer, or placement of certain debts), and 1006.34(c)(2)(iv) (certain information about the debt) and (3)(iv) (certain information about consumer protections). Note that proposed §§ 1006.14(b)(1)(i) and 1006.30(b)(1)(i) would prohibit the same conduct by all FDCPA-covered debt collectors that proposed §§ 1006.14(b)(1)(ii) and 1006.30(b)(1)(ii) would prohibit only for FDCPA-covered debt collectors collecting consumer financial product or service debt. Additionally, the record retention requirement in § 1006.100 is proposed only pursuant to Dodd-Frank Act rulemaking authority but would apply to all FDCPA-covered debt collectors.

resolve a debt the consumer owes, or identify and inform the debt collector if the debt is one that the consumer does not owe. However, debt collection communications also may constitute unfair practices, may contain false or misleading representations, or may be harassing or abusive either because of their content (for example, when debt collectors employ profanity) or because of the manner in which they are made (for example, when debt collectors place excessive telephone calls with the intent to harass or abuse).

Communication technology has evolved significantly since the FDCPA was enacted in 1977. Today, consumers may prefer communicating with debt collectors using newer technologies, such as emails, text messages, or web portals, because these technologies may offer greater efficiency, convenience, and privacy. These technologies also may allow consumers to exert greater control over the timing, frequency, and duration of communications with debt collectors—for example, by choosing when, where, and how much time to spend responding to a debt collector's email. Debt collectors also may find that these technologies are a more effective and efficient means of communicating with consumers.

To address concerns about debt collection communications and to clarify the application of the FDCPA to newer communication technologies, the Bureau proposes to:
• Define a new term related to debt collection communications: Limited-content message. This definition would identify what information a debt collector must and may include in a message left for consumers (with the inclusion of no other information permitted) for the message to be deemed not to be a communication under the FDCPA. This definition would permit a debt collector to leave a message for a consumer without communicating, as defined by the FDCPA, with a person other than the consumer.
• Clarify the times and places at which a debt collector may communicate with a consumer, including by clarifying that a consumer need not use specific words to assert that a time or place is inconvenient for debt collection communications.
• Clarify that a consumer may restrict the media through which a debt collector communicates by designating a particular medium, such as email, as one that cannot be used for debt collection communications.
• Clarify that, subject to certain exceptions, a debt collector is prohibited from placing a telephone call to a person more than seven times

within a seven-day period or within seven days after engaging in a telephone conversation with the person.
• Clarify that newer communication technologies, such as emails and text messages, may be used in debt collection, with certain limitations to protect consumer privacy and to prevent harassment or abuse, false or misleading representations, or unfair practices. For example, the Bureau proposes to require that a debt collector's emails and text messages include instructions for a consumer to opt out of receiving further emails or text messages. The Bureau also proposes procedures that, when followed, would protect a debt collector from liability for unintentional violations of the prohibition against third-party disclosures when communicating with a consumer by email or text message.

#### Consumer Disclosure Proposals

The FDCPA requires that a debt collector send a written notice to a consumer, within five days of the initial communication, containing certain information about the debt and actions the consumer may take in response, unless such information was provided in the initial communication or the consumer has paid the debt. To clarify the information that a debt collector must provide to a consumer at the outset of debt collection, including (if applicable) in a validation notice, the Bureau proposes:
• To specify that debt collectors must provide certain information about the debt and the consumer's rights with respect to the debt. The Bureau also proposes to require a debt collector to provide prompts that a consumer could use to dispute the debt, request information about the original creditor, or take certain other actions. The Bureau also proposes to permit a debt collector to include certain optional information.
• A model validation notice that a debt collector could use to comply with the FDCPA and the proposed rule's disclosure requirements.
• To clarify the steps a debt collector must take to provide the validation notice and other required disclosures electronically.
• A safe harbor if a debt collector complies with certain steps when delivering the validation notice within the body of an email that is the debt collector's initial communication with the consumer.

The Bureau also proposes to prohibit a debt collector from suing or threatening to sue a consumer to collect a time-barred debt. The Bureau plans to test consumer disclosures related to time-barred debt and, after testing, will

assess whether a debt collector who collects a time-barred debt must disclose that the debt collector cannot sue to collect the debt because of its age. At a later date, the Bureau may release a report on such testing and issue a disclosure proposal related to the collection of time-barred debt. Stakeholders will have an opportunity to comment on such testing if the Bureau intends to use it to support disclosure requirements in a final rule.

Additional Proposals

The Bureau proposes to address certain other consumer protection concerns in the debt collection market. For example, the Bureau proposes:

• To clarify that the personal representative of a deceased consumer's estate is a consumer for purposes of proposed § 1006.6, which addresses communications in connection with debt collection. This clarification generally would allow a debt collector to discuss a debt with the personal representative of a deceased consumer's estate. The Bureau also proposes to clarify how a debt collector may locate the personal representative of a deceased consumer's estate. In addition, the proposed rule would interpret the requirement that a debt collector provide the validation notice to a "consumer" to require the notice be provided to the person acting on behalf of a deceased consumer's estate, *i.e.*, the executor, administrator, or personal representative of a deceased consumer's estate, who would have the right to dispute the debt.

• To prohibit a debt collector from furnishing information about a debt to a consumer reporting agency before *communicating* with the consumer about the debt.

• To prohibit, with certain exceptions, the sale, transfer, or placement for collection of a debt if a debt collector knows or should know that the debt has been paid or settled or has been discharged in bankruptcy, or that an identity theft report has been filed with respect to the debt.

The Bureau requests comment on all aspects of the proposed rule.

*C. Effective Date*

The Bureau proposes that the effective date of the final rule would be one year after the final rule is published in the **Federal Register**. The Bureau requests comment on this proposed effective date.

**II. Background**

*A. Debt Collection Market Background*

A consumer debt is commonly understood to be a consumer's

obligation to pay money to another person or entity. Sometimes a debt arises out of a closed-end loan. At other times, a debt arises from a consumer's use of an open-end line of credit, most commonly a credit card. And in other cases, a debt arises from a consumer's purchase of goods or services with payment due thereafter. Often there is an agreed-upon payment schedule or date by which the consumer must repay the debt.

For a variety of reasons, consumers sometimes are unable (or in some instances unwilling) to make payments when they are due. Collection efforts may directly recover some or all of the overdue amounts owed to debt owners and thereby may indirectly help to keep consumer credit available and more affordable to consumers.[9] Collection activities also can lead to repayment plans or debt restructuring that may provide consumers with additional time to make payments or resolve their debts on more manageable terms.[10]

The debt collection industry includes creditors, third-party debt collectors (including debt collection law firms), debt buyers, and a wide variety of related service providers. Debt collection is estimated to be an $11.5 billion-dollar industry employing nearly 118,500 people across approximately 7,700 collection agencies in the United States.[11]

*Creditors*

When an account becomes delinquent, initial collection efforts often are undertaken by the original creditor or its servicer. The FDCPA typically does not cover these first-party recovery efforts. If these first-party recovery efforts result in resolution of the debt, whether through payment in full or another arrangement, the consumer typically will not interact with a third-party debt collector.

*Third-Party Debt Collectors*

If a consumer's payment obligations remain unmet, a creditor may send the account to a third-party debt collector to recover on the debt in the third-party debt collector's name. A creditor may choose to send an account to a third-

party debt collector for several reasons, including because the third-party debt collector possesses capabilities and expertise that the creditor lacks. Third-party debt collectors usually are paid on a contingency basis, typically a percentage of recoveries; debt collectors contracting with creditors on a contingency basis generated a large majority of the industry's 2018 revenue.[12] Contingency debt collectors compete with one another to secure business from creditors based on, among other factors, the debt collectors' effectiveness in obtaining recoveries.[13]

*Debt Buyers*

If contingency collections prove unsuccessful—or if a particular creditor prefers not to use such third-party debt collectors—a creditor may sell unpaid accounts to a debt buyer. In 2009, the Federal Trade Commission (FTC) called the advent and growth of debt buying "the most significant change in the debt collection business" in recent years.[14] Debt buyers purchase defaulted debt from creditors or other debt owners and thereby take title to the debt. Credit card debt comprises a large majority of the debt that debt buyers purchase.[15] Debt buyers generated about one-third of debt collection revenue, or about $3.5 billion, in 2017.[16] Creditors who sell their uncollected debt to debt buyers receive a certain up-front return, but these debts typically are sold at prices that are a fraction of their face value. Debt buyers typically price their offers for portfolios based upon their projections of the amount they will be able to collect. The debt buyer incurs the risk of recovering

---

[9] *See* Bureau of Consumer Fin. Prot., *Fair Debt Collection Practices Act: CFPB Annual Report 2013*, at 9 (Mar. 2013), *https://www.consumerfinance.gov/ data-research/research-reports/annual-report-on-the-fair-debt-collection-practices-act/* (hereinafter 2013 FDCPA Annual Report).

[10] *See id.*

[11] *See* Bureau of Consumer Fin. Prot., *Fair Debt Collection Practices Act: CFPB Annual Report 2019*, at 8 (Mar. 2019), *https://files.consumerfinance.gov/ f/documents/cfpb_fdcpa_annual-report-congress_03-2019.pdf* (hereinafter 2019 FDCPA Annual Report).

[12] *Id.* at 10.

[13] While third-party collection agencies have been increasing in size in recent years, third-party debt collection continues to include a significant number of smaller entities. *See* Robert M. Hunt, *Understanding the Model: The Life Cycle of a Debt*, at 15, Fed. Reserve Bank of Phila. (June 6, 2013), *https://www.ftc.gov/sites/default/files/documents/ public_events/life-debt-data-integrity-debt-collection/understandingthemodel.pdf*.

[14] Fed. Trade Comm'n, *The Structure and Practices of the Debt Buying Industry*, at i (2013), *https://www.ftc.gov/sites/default/files/documents/ reports/structure-and-practices-debt-buying-industry/debtbuyingreport.pdf* (hereinafter FTC Debt Buying Report).

[15] *Id.* at 7 (citing *Credit Card Debt Sales in 2008*, 921 Nilson Rep. 10 (Mar. 2009)).

[16] Bureau of Consumer Fin. Prot., *Fair Debt Collection Practices Act: CFPB Annual Report 2018*, at 10 (Mar. 2018), *https:// files.consumerfinance.gov/f/documents/cfpb_fdcpa_annual-report-congress_03-2018.pdf* (hereinafter 2018 FDCPA Annual Report) (citing Edward Rivera, *Debt Collection Agencies in the US*, IBIS World (Dec. 2017)). Although debt buyers represent about one-third of industry revenue, this overstates debt buyers' share of dollars collected, since debt buyer revenue includes all amounts recovered, whereas the revenue of contingency debt collectors includes only the share of recoveries retained by the debt collector. *Id.*

less than the sum of the amount it paid to acquire the debt and its expenses to collect the debt.

Typically a debt buyer engages in debt collection, attempting to collect debts itself. However, a debt buyer also may use a third-party debt collector or a series of such debt collectors. If the debt buyer is unable to collect some of the debts it purchased, the debt buyer may sell the debt again to another debt buyer. Any single debt thus may be owned by multiple entities over its lifetime. The price paid for a debt generally will decline as the debt ages and passes from debt buyer to debt buyer, because the probability of payment decreases.[17]

### Debt Collection Law Firms

If debt collection attempts are unsuccessful, a debt owner may try to recover on a debt through litigation. Most debt collection litigation is filed in State courts. Debt owners often retain law firms and attorneys that specialize in debt collection and that are familiar with State and local rules. If a debt owner obtains a judgment in its favor, post-litigation efforts may include garnishment of wages or seizure of assets.

### B. Debt Collection Methods

The debt collection experience is a common one—approximately one in three consumers with a credit record reported having been contacted about a debt in collection in 2014.[18] Of those, 27 percent reported having been contacted about a single debt over the prior year, 57 percent reported having been contacted about two to four debts, and 16 percent reported having been contacted about more than four debts.[19]

A creditor typically stops communicating with a consumer once responsibility for an account has moved to a third-party debt collector. Active debt collection efforts typically begin with the debt collector attempting to locate the consumer, usually by identifying a valid telephone number or mailing address, so that the debt collector can establish contact with the consumer. To obtain current contact information, a debt collector may look

to information that transferred with the account file, public records, data sellers, or proprietary databases of contact information. A debt collector may also attempt to obtain location information for a consumer from third parties, such as family members who share a residence with the consumer or colleagues at the consumer's workplace.

Once a debt collector has obtained contact information for a consumer, the debt collector typically will seek to communicate with the consumer to obtain payment on some or all of the debt. The debt collector may tailor the collection strategy depending on a variety of factors, including the size and age of the debt and the debt collector's assessment of the likelihood of obtaining money from the consumer. For example, rather than affirmatively locating and contacting consumers, some debt collectors collecting relatively small debts—such as many medical, utility, and telecommunications debts—will report the debts to consumer reporting agencies (CRAs) and then wait for consumers to contact them after discovering the debts on their consumer reports.[20] Other types of debt are subject to statutory or regulatory requirements that may affect how a debt collector tries to recover on them. For example, privacy protections may affect how a debt collector seeks to recover on a medical debt, and the availability of administrative wage garnishment and tax refund intercepts may affect how a debt collector seeks to recover on a Federal student loan.

Changes in a consumer's situation may warrant a change in a debt collector's recovery strategy, such as when information purchased from CRAs or other third parties indicates that the consumer has started a new job. A debt owner also may "warehouse" a debt and cease collection efforts for a significant period. A new debt collector may later be tasked with resuming collection efforts because, for example, the debt owner has sold the account, detected a possible change in the consumer's financial situation, or wishes to make periodic attempts at some recovery. Each time a new debt collector obtains responsibility for collecting the debt, the consumer likely will be subject to communications or communication attempts from the new debt collector. For the consumer, this may mean

contact from a series of different debt collectors over a number of years. During this time, the consumer may make payments to multiple debt collectors or may receive communication attempts from multiple debt collectors that may stop and restart at irregular intervals, until the debt is paid or settled in full or collection activity ceases for other reasons.

### C. Consumer Protection Concerns

Each year, consumers submit tens of thousands of complaints about debt collection to Federal regulators;[21] many of those complaints relate to practices addressed in the proposed rule. Consumers also file thousands of private actions each year against debt collectors who allegedly have violated the FDCPA. Since the Bureau began operations in 2011, it has brought numerous debt collection cases against third-party debt collectors, alleging both FDCPA violations and unfair, deceptive, or abusive debt collection acts or practices in violation of the Dodd-Frank Act.[22] In these cases, the Bureau has ordered civil penalties, monetary compensation for consumers, and other relief. In its supervisory work, the Bureau similarly has identified many FDCPA violations during examinations of debt collectors. Over the past decade, the FTC and State regulators also have brought numerous additional actions against debt collectors for violating Federal and State

---

[17] FTC Debt Buying Report, *supra* note 14, at 23–24.

[18] Bureau of Consumer Fin. Prot., *Consumer Experience with Debt Collection: Findings from CFPB's Survey of Consumer Views on Debt,* at 5 (2017), *http://files.consumerfinance.gov/f/documents/201701_cfpb_Debt-Collection-Survey-Report.pdf* (hereinafter CFPB Debt Collection Consumer Survey). This figure includes consumers contacted only by creditors as well as those contacted by one or more debt collection firms. *Id.* at 13.

[19] *Id.* at 13.

[20] Bureau of Consumer Fin. Prot., *Consumer Credit Reports: A Study of Medical and Non-Medical Collections,* at 35–36 (2014), *http://files.consumerfinance.gov/f/201412_cfpb_reports_consumer-credit-medical-and-non-medical-collections.pdf* (hereinafter CFPB Medical Debt Report).

[21] *See, e.g.,* 2019 FDCPA Annual Report, *supra* note 11, at 15–16; Fed. Trade Comm'n, *2018 Consumer Sentinel Network Databook,* at 4, 7 (Feb. 2019), *https://www.ftc.gov/system/files/documents/reports/consumer-sentinel-network-data-book-2018/consumer_sentinel_network_data_book_2018_0.pdf*; 2018 FDCPA Annual Report, *supra* note 16, at 14–15; Fed. Trade Comm'n, *2017 Consumer Sentinel Network Databook,* at 3, 6 (Mar. 2018), *https://www.ftc.gov/system/files/documents/reports/consumer-sentinel-network-data-book-2017/consumer_sentinel_data_book_2017.pdf*; Bureau of Consumer Fin. Prot., *2017 Fair Debt Collection Practices Act: CFPB Annual Report 2017,* at 15–16 (Mar. 2017), *https://files.consumerfinance.gov/f/documents/201703_cfpb_Fair-Debt-Collection-Practices-Act-Annual-Report.pdf* (hereinafter 2017 FDCPA Annual Report); Fed. Trade Comm'n, *Consumer Sentinel Network Data Book for January–December 2016,* at 3, 6 (Mar. 2017), *https://www.ftc.gov/system/files/documents/reports/consumer-sentinel-network-data-book-january-december-2016/csn_cy-2016_data_book.pdf.*

[22] *See, e.g.,* Consent Order, *In re Encore Capital Grp.,* 2015–CFPB–0022 (Sept. 9, 2015), *http://files.consumerfinance.gov/f/201509_cfpb_consent-order-encore-capital-group.pdf;* Consent Order, *In re Portfolio Recovery Assocs., LLC,* 2015–CFPB–0023 (Sept. 9, 2015), *http://files.consumerfinance.gov/f/201509_cfpb_consent-order-portfolio-recovery-associates-llc.pdf;* Complaint, *Consumer Fin. Prot. Bureau v. Nat'l Corrective Grp., Inc.,* 1:15–cv–00899–RDB (D. Md. Mar. 30, 2015), *http://files.consumerfinance.gov/f/201503_cfpb_complaint-national-corrective-group.pdf.*

debt collection and consumer protection laws.

### D. FDCPA and Dodd-Frank Act Protections for Consumers

Federal and State governments historically have sought to protect consumers from harmful debt collection practices. From 1938 to 1977, the Federal government primarily protected consumers through FTC enforcement actions against debt collectors who engaged in unfair or deceptive acts or practices in violation of section 5 of the FTC Act.[23] When Congress enacted the FDCPA in 1977, it found that "[e]xisting laws and procedures for redressing . . . injuries [were] inadequate to protect consumers."[24] Congress found that "[t]here [was] abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors," and that these practices "contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy."[25]

The FDCPA was enacted, in part, "to eliminate abusive debt collection practices by debt collectors, [and] to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged."[26] Among other things, the FDCPA: (1) Prohibits debt collectors from engaging in harassment or abuse, making false or misleading representations, and engaging in unfair practices in debt collection; (2) restricts debt collectors' communications with consumers and others; and (3) requires debt collectors to provide consumers with disclosures concerning the debts they owe or allegedly owe.

Until the creation of the Bureau, no Federal agency was authorized to issue regulations to implement the substantive provisions of the FDCPA. Courts have issued opinions providing differing interpretations of various FDCPA provisions, and there is considerable uncertainty with respect to how the FDCPA applies to communication technologies that did not exist in 1977. Further, to reduce legal risk, debt collectors typically use the language of the statute in making required disclosures, even though that language can be difficult for consumers to understand.

The Dodd-Frank Act amended the FDCPA to provide the Bureau with authority to "prescribe rules with

respect to the collection of debts by debt collectors."[27] Section 1031 of the Dodd-Frank Act also authorizes the Bureau, among other things, to prescribe rules applicable to a covered person or service provider identifying as unlawful unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service.[28] Section 1031(b) provides that rules under section 1031 may include requirements for the purpose of preventing such unfair, deceptive, or abusive acts or practices.[29] Covered persons under the Dodd-Frank Act include persons who are "engage[d] in offering or providing a consumer financial product or service";[30] this generally includes persons who are "collecting debt related to any consumer financial product or service" (e.g., debt related to the extension of consumer credit).[31] Covered persons under the Dodd-Frank Act thus include many FDCPA-covered debt collectors, as well as many creditors and their servicers, who are collecting debt related to a consumer financial product or service.

### III. The Rulemaking Process

The Bureau has conducted a wide range of outreach on the scope and substance of this proposed rule, including by holding field hearings,[32] hosting two joint roundtables with the FTC,[33] and issuing an Advance Notice of Proposed Rulemaking (ANPRM) in November 2013.[34] The Bureau has conducted several rounds of qualitative testing of prototype debt collection

disclosure forms and has conducted formal and informal surveys over the past several years to obtain a more comprehensive and systematic understanding of debt collection practices. The Bureau also convened a Small Business Review Panel in August 2016 to obtain feedback from small debt collectors. Since the Bureau began studying this market, the Bureau has met on many occasions with various stakeholders, including consumer advocacy groups, debt collection trade associations, industry participants, academics with expertise in debt collection, Federal prudential regulators, and other State and State consumer protection regulators. The Bureau also received a number of comments specific to the debt collection rulemaking in response to its Request for Information Regarding the Bureau's Adopted Regulations and New Rulemaking Authorities[35] and its Request for Information Regarding the Bureau's Inherited Regulations and Inherited Rulemaking Authorities,[36] and the Bureau has considered these comments in developing the proposed rule. In addition, the Bureau has engaged in general outreach, speaking at consumer advocacy group and industry events and visiting consumer organizations and industry stakeholders. The Bureau has provided other regulators with information about the proposed rule, has sought their input, and has received feedback that has helped the Bureau to prepare this proposed rule.

### A. 2013 Advance Notice of Proposed Rulemaking

The Bureau issued an ANPRM regarding debt collection in November of 2013. The ANPRM sought information about both first- and third-party debt collection practices, including: Debt collectors' communication and calling practices; the use of disclosures, such as time-barred debt disclosures, in debt collection; the quantity and quality of information in the debt collection system; credit reporting by debt collectors; the prevalence and use of litigation by debt collectors, including by debt collection attorneys; and record retention, monitoring, and compliance issues.

The Bureau received more than 23,000 comments in response to the ANPRM, with approximately 379 non-form comments submitted. These non-form comments were provided by consumers, consumer advocacy groups,

---

[23] 15 U.S.C. 45.

[24] 15 U.S.C. 1692(b).

[25] 15 U.S.C. 1692(a).

[26] 15 U.S.C. 1692(e).

[27] 15 U.S.C. 1692l(d).

[28] Dodd-Frank Act section 1031(b), 12 U.S.C. 5531(b).

[29] Id.

[30] 12 U.S.C. 5481(6).

[31] 12 U.S.C. 5481(5), (15)(A)(i), (x).

[32] See Bureau of Consumer Fin. Prot., Field Hearing on Debt Collection in Seattle, WA (Oct. 24, 2012), https://www.consumerfinance.gov/about-us/events/archive-past-events/field-hearing-on-debt-collection-from-seattle-washington/; Bureau of Consumer Fin. Prot., Field Hearing on Debt Collection in Portland, ME (July 10, 2013), https://www.consumerfinance.gov/about-us/events/archive-past-events/field-hearing-debt-collection-portland-me/; Bureau of Consumer Fin. Prot., Field Hearing on Debt Collection in Sacramento, CA (July 28, 2016), https://www.consumerfinance.gov/about-us/events/archive-past-events/field-hearing-debt-collection-sacramento-calif/.

[33] Fed. Trade Comm'n & Bureau of Consumer Fin. Prot., Debt Collection and the Latino Community: An FTC–CFPB Roundtable (Oct. 23, 2014), https://www.ftc.gov/news-events/events-calendar/2014/10/debt-collection-latino-community-roundtable; Fed. Trade Comm'n & Bureau of Consumer Fin. Prot., Roundtable on Data Integrity in Debt Collection: Life of a Debt (July 6, 2013), https://www.ftc.gov/system/files/documents/public_events/71120/life-debt-roundtable-transcript.pdf.

[34] 78 FR 67848 (Nov. 12, 2013).

[35] 83 FR 12286 (Mar. 21, 2018).

[36] 83 FR 12881 (Mar. 26, 2018).

industry participants and trade associations, legal groups including law school clinics, State Attorneys General, and other stakeholders. The Bureau also worked with Cornell University's Regulation Room, which interacted with consumers to obtain their input and submitted a consolidated comment representing views from a multitude of consumers. Comments on the ANPRM related to both first- and third-party collection efforts. Commenters provided significant feedback regarding debt collector communication practices and interactions with consumers, consumer disclosures, and the use of newer communication technologies. Specific comments are discussed in more detail in part V where relevant.

*B. Consumer Testing*

The Bureau contracted with a third-party vendor, Fors Marsh Group (FMG), to assist with developing, and to conduct qualitative consumer testing of, two potential consumer-facing debt collection model disclosure forms: The validation notice and the statement of consumer rights. The Bureau sought insight into consumers' existing understanding of debt collection protections and how consumers would interact with the forms if they were adopted in a final rule. Specific findings from the consumer testing are discussed in more detail in part V where relevant.[37]

Validation Notice Testing

*Focus groups.* FMG facilitated five focus groups in July 2014 to assess consumers' thoughts about debt collectors and debt collection, to evaluate their perceptions of disclosures provided by debt collectors, and to measure their understanding of consumers' rights in debt collection. Two focus groups, one consisting of participants who had been contacted by a debt collector within the previous two years and one consisting of participants without such experience, were held in Arlington, Virginia, on July 16, 2014. Three focus groups, two consisting of participants with debt collection experience and one consisting of participants without such debt collection

experience, were held in New Orleans, Louisiana, on July 29, 2014. In conjunction with the release of this proposal, the Bureau is making available a report prepared by FMG regarding the focus group testing (FMG Focus Group Report).[38]

*Cognitive Testing.* FMG also conducted 30 one-on-one interviews of consumers to assess their perceptions, preferences, and understanding of different validation notices and to evaluate how each of the notices might affect consumer behavior. The interviews took place at three locations: Arlington, Virginia, on September 23 and 24, 2014; Minneapolis, Minnesota, on October 9 through 11, 2014; and Las Vegas, Nevada, on October 23 and 24, 2014. At each location, FMG interviewed 10 participants, seven of whom had debt collection experience and three of whom did not.

FMG tested three validation notices at each location. The first form was modeled closely on validation notices commonly used by debt collectors. The form included the disclosures specifically required by FDCPA section 809(a), and the language on the form generally mirrored the statutory language. The second form provided the same information as the first form, but in plainer language. The third form used the same language as the second form, along with additional information, including consumer protection information, chain-of-title information describing the history of the debt, and, for two of the testing locations, information about time-barred debts.

FMG asked the participants to define, locate, and explain the meaning of specific elements on each form. Participants responded to three surveys, each with three Likert-scale questions.[39] Participants were asked to compare the first and second forms side-by-side and were asked targeted questions about what they would do after reading individual elements of each notice. In conjunction with the release of this proposal, the Bureau is making available a report prepared by FMG regarding the

cognitive testing (FMG Cognitive Report).[40]

*Usability Testing.* FMG also conducted 30 additional one-on-one interviews of consumers to assess their perceptions, preferences, and understanding of different model validation notices and to evaluate what influence, if any, these forms could have on their behavior. FMG interviewed 23 consumers who had been contacted by a debt collector within the previous two years and seven without such experience. The interviews took place at three locations: Arlington, Virginia, on March 31 and April 1, 2015; Minneapolis, Minnesota, on April 14 and 15, 2015; and Las Vegas, Nevada, on April 28 and 29, 2015. During the interviews, researchers asked participants comprehension questions to determine their understanding of the forms and debriefing questions to establish their reactions to and perceptions of the forms. Researchers also engaged consumers in testing activities to assess their interactions with the forms. In conjunction with the release of this proposal, the Bureau is making available a report prepared by FMG regarding the usability testing (FMG Usability Report).[41] The Bureau also is making available a report prepared by FMG summarizing the focus group testing, cognitive testing, and usability testing (FMG Summary Report).[42]

Quantitative Testing

The Bureau plans to conduct a web survey of 8,000 individuals possessing a broad range of demographic characteristics. The survey will explore consumer comprehension and decision-making in response to sample debt collection disclosures relating to time-

---

[37] While the Bureau tested a statement of consumer rights disclosure, this proposal would not require debt collectors to provide such a disclosure to consumers. Instead, the Bureau proposes to require *certain* debt collectors to provide on the validation notice a statement referring consumers to a Bureau-provided website that would describe certain consumer protections in debt collection. See the section-by-section analysis of proposed § 1006.34(c)(3)(iv). Because the Bureau does not propose to require debt collectors to provide consumers with a statement of consumer rights disclosure, the Bureau does not summarize testing related to that disclosure in this proposal.

[38] *See generally* Fors Marsh Grp., *Debt Collection Focus Groups* (Aug. 2014), *https:// files.consumerfinance.gov/f/documents/cfpb_debt-collection_fmg-focus-group-report.pdf* (hereinafter FMG Focus Group Report). The focus group testing was conducted in accordance with OMB control number 3170–0022, Generic Information Collection Plan for the Development and/or Testing of Model Forms, Disclosures, Tools, and Other Similar Related Materials.

[39] A Likert-scale is a commonly used research scale that asks respondents to specify their level of agreement or disagreement with a series of statements.

[40] *See generally* Fors Marsh Grp., *Debt Collection Cognitive Interviews* (n.d.), *https:// files.consumerfinance.gov/f/documents/cfpb_debt-collection_fmg-cognitive-report.pdf* (hereinafter FMG Cognitive Report). The cognitive testing was conducted in accordance with OMB control number 3170–0022, Generic Information Collection Plan for the Development and/or Testing of Model Forms, Disclosures, Tools, and Other Similar Related Materials.

[41] *See generally* Fors Marsh Grp., *Debt Collection User Experience Study* (Feb. 2016), *https:// files.consumerfinance.gov/f/documents/cfpb_debt-collection_fmg-usability-report.pdf* (hereinafter FMG Usability Report). Like the other testing, the usability testing was conducted in accordance with OMB control number 3170–0022, Generic Information Collection Plan for the Development and/or Testing of Model Forms, Disclosures, Tools, and Other Similar Related Materials.

[42] *See generally* Fors Marsh Grp., *Debt Collection Validation Notice Research: Summary of Focus Groups, Cognitive Interviews, and User Experience Testing* (Feb. 2016), *https:// files.consumerfinance.gov/f/documents/cfpb_debt-collection_fmg-summary-report.pdf* (hereinafter FMG Summary Report).

barred debts. The Bureau will use the information it gathers to help assess how the Bureau may improve the clarity and effectiveness of debt collection disclosures, among other things. On February 4, 2019, in accordance with the Paperwork Reduction Act of 1995,[43] the Bureau proposed an information collection that described the web survey and was open for public comment for 30 days.[44] The comment period closed on March 6, 2019. This request is pending under OMB review and can be viewed on OMB's electronic docket at *https:// www.reginfo.gov/public/do/ PRAViewICR?ref_nbr=201902-3170-001* (see ICR Reference Number 201902–3170–001). Stakeholders will have an opportunity to comment on a report describing the web survey results if the Bureau proposes to use those results to support disclosure requirements in a final rule.

### C. Study of Debt Collection Market Operations

To better understand the operational costs of debt collection firms, including law firms, the Bureau surveyed debt collection firms and vendors and published a report based on that study in July 2016 (CFPB Debt Collection Operations Study or Operations Study).[45] The answers to the survey questions aided the Bureau's understanding of the compliance costs to debt collectors if the proposal were finalized. As a qualitative study, the survey's results are not necessarily representative of the debt collection industry as a whole, but they provide a broad understanding of how a range of different types of debt collectors operate.

The Operations Study focused on understanding how debt collection firms obtain information about delinquent consumer accounts and attempt to collect on those accounts.[46] Between July and September 2015, the Bureau sent a written survey to debt collection firms. The survey focused on current practices and included

questions about employees, types of debt collected, clients, vendors, software, policies and procedures for consumer interaction, disputes, furnishing data to CRAs, litigation, and compliance. Between August and October 2015, the Bureau conducted telephone interviews with a subset of survey respondents. The interviews included several specific questions about the types of voicemails debt collectors leave and what share of lawsuits filed against consumers end with entry of default judgment, as well as some open-ended questions about the costs associated with making changes to collection management systems to address changes in State regulations. From July to October 2015, the Bureau conducted telephone interviews with debt collection vendors. A particular focus of these interviews was collection management systems, including programming and consulting services provided to system users. The Bureau also asked vendors about print mail services, predictive dialers, voice analytics, payment processing, and data services.

Although the Bureau constructed the survey sample to ensure representation of debt collection firms of various sizes, the survey was not intended to be nationally representative. Nonetheless, the survey findings generally have informed the Bureau's understanding of the operations and operating costs of various types of debt collection firms. Part VI discusses the Bureau's findings from the study in greater detail.

### D. Survey of Consumer Experiences With Debt Collection

The Bureau conducted a survey of consumers' experiences with debt collection, approved under OMB control number 3170–0047, Debt Collection Survey from the Consumer Credit Panel, and published a report of the findings in January 2017 (CFPB Debt Collection Consumer Survey or Consumer Survey).[47] Distributed to consumers in December 2014, the survey asked consumers about their experiences with creditors and debt collectors over the prior year, including disputes and lawsuits, and how they prefer to communicate with a creditor or debt collector. The survey also asked for information on each consumer's demographic characteristics, general financial situation, and credit-market experiences. The survey sample was selected from the Bureau's Consumer Credit Panel, which consists of a nationally representative, de-identified

set of credit records maintained by one of the three nationwide CRAs, and responses were weighted to provide nationally representative results. The Consumer Survey, which included survey participants' self-reported responses, provided a more comprehensive picture of consumers' experiences and preferences related to debt collection than was previously available.[48] The Bureau considered survey responses when developing the proposal.

The Consumer Survey describes in detail several key findings relating to the prevalence of debt collection, the extent to which consumers dispute debts, and the extent to which creditors or debt collectors pursue the collection of debts through lawsuits. About one-third of consumers with a credit file at one of the three nationwide CRAs reported being contacted by a creditor or debt collector about a debt in the prior year, and most of those consumers reported being contacted about two or more debts.[49] More than one-half of the consumers who had been contacted about a debt in collection indicated that at least one of the debts about which they had been contacted was not theirs or was for the wrong amount. Roughly one-quarter of the consumers who had been contacted about a debt in collection reported having disputed a debt with their creditor or debt collector in the past year.[50] About one-in-seven consumers (about 15 percent) who had been contacted about a debt in collection reported having been sued by a creditor or debt collector in the preceding year.[51]

The Consumer Survey also describes in detail several key findings related to the frequency with which consumers are contacted about debts in collection, how often consumers ask debt collectors to stop contacting them, how consumers prefer to be contacted by debt collectors, and the frequency with which consumers report negative experiences with debt collectors. More than one-third of consumers (37 percent) contacted about a debt in collection indicated that the creditor or debt collector that most recently had contacted them tried to reach them at least four times per week. Seventeen percent reported that the creditor or debt collector tried to reach them at least eight times per week. Close to two-thirds of consumers (63 percent) said

---

[43] 44 U.S.C. 3501 *et seq.*

[44] *See* Agency Information Collection Activities: Submission for OMB Review; Comment Request, 84 FR 1518 (Feb. 4, 2019).

[45] *See generally* Bureau of Consumer Fin. Prot., *Study of Third-Party Debt Collection Operations* (July 2016), *https://www.consumerfinance.gov/ documents/755/20160727_cfpb_Third_Party_Debt_ Collection_Operations_Study.pdf* (hereinafter CFPB Debt Collection Operations Study).

[46] Most respondents collected debt on behalf of clients, rather than buying debt and collecting on their own behalf. Respondents that bought some debt reported that the majority of accounts they collected were for clients. As a result, the Operations Study did not provide distinct information on debt buyers and their operations as compared to third-party debt collectors.

[47] *See generally* CFPB Debt Collection Consumer Survey, *supra* note 18.

[48] *Id.* at 4.

[49] *Id.* at 13.

[50] *Id.* at 24–25.

[51] *Id.* at 27.

they were contacted too often by the most recent creditor or debt collector.[52]

Consumers contacted at the same frequency by creditors and debt collectors were more likely to characterize contact by a debt collector as occurring "too often" than when a creditor engaged in the same frequency of contact. In addition, 42 percent of consumers who reported they had been contacted about a debt in collection said they had asked at least one creditor or debt collector to stop contacting them in the prior year, but only one in four consumers who made this request reported that the contact stopped. Consumers contacted by debt collectors were more likely than those contacted by creditors to report negative experiences, such as being treated impolitely or being threatened.[53]

Almost one-half of the consumers (including those who did not report having been contacted by a creditor or debt collector about a debt in collection in the prior year) said they would most prefer debt collectors to contact them by letter. When asked the way they would least like debt collectors to contact them, consumers most commonly indicated in-person contacts (20 percent of consumers). Nearly two-thirds of consumers said it was "very important" that others not see or hear a message from a creditor or debt collector. At the same time, most consumers also preferred that a creditor or debt collector include their name and the purpose of the call (*i.e.,* debt collection) in a voicemail or answering-machine message.[54]

### E. Small Business Review Panel

In August 2016, the Bureau convened a Small Business Review Panel (Small Business Review Panel or Panel) with the Chief Counsel for Advocacy of the Small Business Administration (SBA) and the Administrator of the Office of Information and Regulatory Affairs with the Office of Management and Budget (OMB).[55] As part of this process, the Bureau prepared an outline of proposals under consideration and the alternatives

considered (Small Business Review Panel Outline or Outline),[56] which the Bureau posted on its website for review by the small entity representatives participating in the Panel process and by the general public.

The Panel participated in initial teleconferences with small groups of the small entity representatives to introduce the Outline and supporting materials and to obtain feedback. The Panel then conducted a full-day outreach meeting with the small entity representatives in August 2016 in Washington, DC. The Panel gathered information from the small entity representatives and made findings and recommendations regarding the potential compliance costs and other impacts of the proposals under consideration on those entities. Those findings and recommendations are set forth in the Small Business Review Panel Report, which is part of the administrative record in this rulemaking and is available to the public.[57] The Bureau has considered these findings and recommendations in preparing this proposal and addresses many of them in greater detail in part V.[58]

### IV. Legal Authority

The Bureau issues this proposal pursuant to its authority under the FDCPA and the Dodd-Frank Act. As amended by the Dodd-Frank Act, FDCPA section 814(d) provides that the Bureau "may prescribe rules with respect to the collection of debts by debt collectors," as defined in the FDCPA.[59]

---

[52] *Id.* at 30–31. As discussed further in the Consumer Survey, consumers' estimates of the frequency of contacts are subject to uncertainty because the survey does not purport to distinguish in its questions or analysis between various factual scenarios.

[53] *Id.* at 34–35, 45–46.

[54] *Id.* at 36–38.

[55] The Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), as amended by section 1100G(a) of the Dodd-Frank Act, requires the Bureau to convene a Small Business Review Panel before proposing a rule that may have a substantial economic impact on a significant number of small entities. *See* Public Law 104–121, tit. II, 110 Stat. 847, 857 (1996) (as amended by Pub. L. 110–28, section 8302 (2007)).

[56] Bureau of Consumer Fin. Prot., *Small Business Review Panel for Debt Collector and Debt Buyer Rulemaking: Outline of Proposals Under Consideration and Alternatives Considered* (July 2016), *https://files.consumerfinance.gov/f/ documents/20160727_cfpb_Outline_of_ proposals.pdf* (hereinafter Small Business Review Panel Outline). The Bureau also gathered feedback on the Small Business Review Panel Outline from other stakeholders, members of the public, and the Bureau's Consumer Advisory Board and Community Bank Advisory Council.

[57] Bureau of Consumer Fin. Prot., U.S. Small Bus. Admin., & Office of Mgmt. & Budget, *Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Debt Collector and Debt Buying Rulemaking* (Oct. 2016), *https://files.consumerfinance.gov/f/documents/ cfpb_debt-collector-debt-buyer_SBREFA-report.pdf* (hereinafter Small Business Review Panel Report).

[58] Certain proposals under consideration in the Small Business Review Panel Outline and discussed in the Small Business Review Panel Report are not included in this proposed rule and therefore are not discussed in part V. For example, because this proposed rule would apply only to FDCPA-covered debt collectors, the Bureau does not include a discussion of proposals under consideration that would have imposed information transfer requirements on first-party creditors who generally are not FDCPA-covered debt collectors.

[59] 15 U.S.C. 1692*l*(d). As noted, the Bureau is the first Federal agency with authority to prescribe substantive debt collection rules under the FDCPA.

Section 1022(a) of the Dodd-Frank Act provides that "[t]he Bureau is authorized to exercise its authorities under Federal consumer financial law to administer, enforce, and otherwise implement the provisions of Federal consumer financial law."[60] Section 1022(b)(1) of the Dodd-Frank Act provides that the Director may prescribe rules and issue orders and guidance, as may be necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof.[61] "Federal consumer financial law" includes title X of the Dodd-Frank Act and the FDCPA.[62]

These and other authorities are discussed in greater detail in parts IV.A through E below. Part IV.A discusses how the Bureau proposes to interpret its authority under sections 806 through 808 of the FDCPA. Parts IV.B through E discuss the Bureau's relevant authorities under the Dodd-Frank Act and the Electronic Signatures in Global and National Commerce Act (E–SIGN Act).

### A. FDCPA Sections 806 Through 808

As discussed in part V, the Bureau proposes several provisions, in whole or in part, pursuant to its authority to interpret FDCPA sections 806, 807, and 808, which set forth general prohibitions on, and requirements relating to, debt collectors' conduct and are accompanied by non-exhaustive lists of examples of unlawful conduct. This section provides an overview of how the Bureau proposes to interpret FDCPA sections 806 through 808.

FDCPA section 806 generally prohibits a debt collector from "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt."[63] Then, "[w]ithout limiting the general application of the foregoing," it lists six examples of conduct that violate that section.[64] Similarly, FDCPA section 807 generally prohibits a debt collector from "us[ing] any false, deceptive, or misleading representation or means in connection with the collection of any debt."[65] Then,

---

Prior to the Dodd-Frank Act's grant of authority to the Bureau, the FTC published various materials providing guidance on the FDCPA. The FTC's materials have informed the Bureau's rulemaking and, if relevant to particular proposed provisions, are discussed in part V.

[60] 12 U.S.C. 5512(a).

[61] 12 U.S.C. 5512(b)(1).

[62] 12 U.S.C. 5481(12)(H), (14).

[63] 15 U.S.C. 1692d.

[64] *Id.* at 1692d(1)–(6).

[65] 15 U.S.C. 1692e.

"[w]ithout limiting the general application of the foregoing," section 807 lists 16 examples of conduct that violate that section.[66] Finally, FDCPA section 808 prohibits a debt collector from "us[ing] unfair or unconscionable means to collect or attempt to collect any debt." [67] Then, "[w]ithout limiting the general application of the foregoing," FDCPA section 808 lists eight examples of conduct that violate that section.[68] The Bureau interprets FDCPA sections 806 through 808 in light of: (1) The FDCPA's language and purpose; (2) the general types of conduct prohibited by those sections and, where relevant, the specific examples enumerated in those sections; and (3) judicial precedent.[69]

Interpreting General Provisions in Light of Specific Prohibitions or Requirements

By their plain terms, FDCPA sections 806 through 808 make clear that their examples of prohibited conduct do not "limit[ ] the general application of" those sections' general prohibitions. The FDCPA's legislative history is consistent with this understanding,[70] as are opinions by courts that have addressed this issue.[71] Accordingly, the Bureau may prohibit conduct that the specific examples in FDCPA sections 806 through 808 do not address if the conduct violates the general prohibitions.

The Bureau proposes to use the specific examples in FDCPA sections 806 through 808 to inform its interpretation of those sections' general

[66] Id., at 1692e(1)–(16).
[67] 15 U.S.C. 1692f.
[68] Id. at 1692f(1)–(8).
[69] Where the Bureau proposes requirements pursuant only to its authority to implement and interpret sections 806 through 808 of the FDCPA, the Bureau does not take a position on whether such practices also would constitute an unfair, deceptive, or abusive act or practice under section 1031 of the Dodd-Frank Act. Where the Bureau proposes an intervention both pursuant to its authority to implement and interpret FDCPA sections 806 through 808 and pursuant to its authority to identify and prevent unfair acts or practices under Dodd-Frank Act section 1031, the section-by-section analysis explains why the Bureau proposes to identify the act or practice as unfair under the Dodd-Frank Act.
[70] See, e.g., S. Rept. No. 95–382, 95th Cong., 1st Sess. 2, at 4 (1977), reprinted in 1977 U.S.C.C.A.N. 1695, 1698 (hereinafter S. Rept. No. 382) ("[T]his bill prohibits in general terms any harassing, unfair, or deceptive collection practice. This will enable the courts, where appropriate, to proscribe other improper conduct which is not specifically addressed."). Courts have also cited legislative history in noting that, "[i]n passing the FDCPA, Congress identified abusive collection attempts as primary motivations for the Act's passage." Hart v. FCI Lender Servs, Inc., 797 F.3d 219, 226 (2d Cir. 2015).
[71] See, e.g., Stratton v. Portfolio Recovery Assocs., LLC, 770 F.3d 443, 450 (6th Cir. 2014) ("[T]he listed examples of illegal acts are just that—examples.").

prohibitions. Accordingly, the proposal would interpret the general provisions of FDCPA sections 806 through 808 to prohibit or require certain conduct that is similar to the types of conduct prohibited or required by the specific examples. For example, the proposal would interpret the general provisions in FDCPA sections 806 through 808 as protecting consumer privacy in debt collection in ways similar to the specific restrictions in: (1) FDCPA section 806(3), which prohibits, with certain exceptions, the publication of a list of consumers who allegedly refuse to pay debts; [72] (2) FDCPA section 808(7), which prohibits communicating with a consumer regarding a debt by postcard; and FDCPA section 808(8), which prohibits the use of certain language and symbols on envelopes.[73] The interpretative approach of looking to specific provisions to inform general provisions is consistent with judicial precedent indicating that the general prohibitions in the FDCPA should be interpreted "in light of [their] associates." [74] For example, courts have held that violating a consumer's privacy interest through public exposure of a debt violates the FDCPA, noting that violating a consumer's privacy is a type of conduct prohibited by several specific examples.[75] In this way, the Bureau uses the specific examples in FDCPA sections 806 through 808 to inform its understanding of the general provisions, consistent with the statute's use of the phrase "without limiting the general application of the foregoing" to introduce the specific examples.[76]

Judicial Precedent

The Bureau interprets the general prohibitions in FDCPA sections 806 through 808 in light of the significant body of existing court decisions interpreting those provisions, which provides instructive examples of collection practices that are not addressed by the specific prohibitions in those sections but that nonetheless run afoul of the FDCPA's general prohibitions in sections 806 through 808.[77] For example, courts have held

[72] 15 U.S.C. 1692d(3).
[73] 15 U.S.C. 1692f(7)–(8).
[74] Currier v. First Resolution Inv. Corp., 762 F.3d 529, 534 (6th Cir. 2014) (citing Limited, Inc. v. C.I.R., 286 F.3d 324, 332 (6th Cir. 2002)).
[75] See id. at 535.
[76] 15 U.S.C. 1692d–1692f.
[77] This interpretive approach is consistent with courts' reasoning that these general prohibitions should be interpreted in light of conduct that courts have already found violate them. See, e.g., Todd v. Collecto, Inc., 731 F.3d 734, 739 (7th Cir. 2013). While judicial precedent informs the Bureau's interpretation of the general prohibitions in FDCPA sections 806 through 808, the Bureau does not

that a debt collector could violate FDCPA section 808 by using coercive tactics such as citing speculative legal consequences to pressure the consumer to engage with the debt collector.[78] Additionally, courts have held that a debt collector could violate FDCPA sections 806 through 808 by taking certain actions to collect a debt that a consumer does not actually owe or that is not actually delinquent.[79] Similarly, a debt collector could violate FDCPA section 807 by, for example, giving "a false impression of the character of the debt," [80] such as by failing to disclose that an amount collected includes fees,[81] or by failing to disclose that the applicable statute of limitations has expired.[82]

Several courts have applied an objective standard of an "unsophisticated" or "least sophisticated" consumer to FDCPA sections 807 [83] and 808 [84] and an

propose to adopt specific judicial interpretations through its restatement of the general prohibitions except where noted in the proposal.

[78] See, e.g., Hosseinzadeh v. M.R.S. Assocs., Inc., 387 F. Supp. 2d 1104, 1117 (C.D. Cal. 2005) (denying debt collector's motion for summary judgment on section 808 claim where debt collector used false name and implied that consumer "would have legal problems" if consumer did not return debt collector's telephone call).

[79] See, e.g., Fox v. Citicorp Credit Servs., Inc., 15 F.3d 1507, 1517 (9th Cir. 1994) (reversing grant of summary judgment to debt collector in part because "a jury could rationally find" that filing writ of garnishment was unfair or unconscionable under section 808 when debt was not delinquent); Ferrell v. Midland Funding, LLC, No. 2:15–cv–00126–JHE, 2015 WL 2450615, at *3–4 (N.D. Ala. May 22, 2015) (denying debt collector's motion to dismiss section 806 claim where debt collector allegedly initiated collection lawsuit even though it knew plaintiff did not owe debt); Pittman v. J.J. Mac Intyre Co. of Nev., Inc., 969 F. Supp. 609, 612–13 (D. Nev. 1997) (denying debt collector's motion to dismiss claims under sections 807 and 808 where debt collector allegedly attempted to collect fully satisfied debt).

[80] Fields v. Wilber Law Firm, P.C., 383 F.3d 562, 565–66 (7th Cir. 2004) (reversing dismissal of plaintiff's claims brought under sections 807 and 808 because dunning letter that failed to communicate that total amount due included attorneys' fees "could conceivably mislead an unsophisticated consumer").

[81] Id.

[82] See, e.g., Pantoja v. Portfolio Recovery Assocs., 852 F.3d 679, 686–87 (7th Cir. 2017).

[83] See, e.g., Hartman v. Great Seneca Fin. Corp., 569 F.3d 606, 613 (6th Cir. 2009) (applying least sophisticated consumer standard to section 807 claim); Bentley v. Great Lakes Collection Bureau, 6 F.3d 60, 62 (2d. Cir. 1993) (same); Swanson v. S. Or. Credit Serv., Inc., 869 F.2d 1222, 1227 (9th Cir. 1988) (same).

[84] See, e.g., Crawford v. LVNV Funding, LLC, 758 F.3d 1254, 1258 (11th Cir. 2014) ("[W]e have adopted a 'least-sophisticated consumer standard to evaluate whether a debt collector's conduct is 'deceptive,' 'misleading,' 'unconscionable,' or 'unfair' under the statute."); LeBlanc v. Unifund CCR Partners, 601 F.3d 1185, 1200–01 (11th Cir. 2010) (applying least sophisticated consumer standard to section 808 claim); Turner v. J.V.D.B. & Assocs., Inc., 330 F.3d 991, 997 (7th Cir. 2003)

objective, vulnerable consumer standard to FDCPA section 806.[85] In determining whether particular acts violate FDCPA sections 806 through 808, the Bureau interprets those sections to incorporate "an objective standard" that is designed to protect consumers who are "of below-average sophistication or intelligence" or who are "especially vulnerable to fraudulent schemes." [86]

Courts have reasoned, and the Bureau agrees, that "[w]hether a consumer is more or less likely to be harassed, oppressed, or abused by certain debt collection practices does not relate solely to the consumer's relative sophistication" and may be affected by other circumstances, such as the consumer's financial and legal resources.[87] Courts have further reasoned that section 807's prohibition on false, deceptive, or misleading representations incorporates an objective, "unsophisticated" consumer standard.[88] This standard "protects the consumer who is uninformed, naive, or trusting, yet it admits an objective element of reasonableness." [89] The Bureau agrees with the reasoning of courts that have applied this standard or a "least sophisticated consumer" standard.[90] The Bureau proposes to use

the term "unsophisticated" consumer to describe the standard it will apply in this proposal when assessing the effect of conduct on consumers.

### FDCPA's Purposes

FDCPA section 802 establishes that the purpose of the statute is to eliminate abusive debt collection practices by debt collectors, to ensure that debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.[91] In particular, FDCPA section 802 delineates certain specific harms that the general and specific prohibitions in sections 806 through 808 were designed to alleviate. Section 802 states: "[T]he use of abusive, deceptive, and unfair debt collection practices by many debt collectors . . . contribute[s] to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy." [92]

### B. Dodd-Frank Act Section 1031

#### Section 1031(b)

Section 1031(b) of the Dodd-Frank Act provides the Bureau with authority to prescribe rules to identify and prevent unfair, deceptive, or abusive acts or practices. Specifically, Dodd-Frank Act section 1031(b) authorizes the Bureau to prescribe rules applicable to a covered person or service provider identifying as unlawful unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service.[93] Section 1031(b) of the Dodd-Frank Act further provides that "[r]ules under this section may include requirements for the purpose of preventing such acts or practices" [94] (sometimes referred to as prevention authority). The Bureau proposes certain provisions based on its authority under Dodd-Frank Act section 1031(b).

Section 1031(b) of the Dodd-Frank Act is similar to the FTC Act provisions

relating to unfair and deceptive acts or practices.[95] Given these similarities, where the Bureau relies on Dodd-Frank Act section 1031(b) authority to support particular provisions, the Bureau is guided, in part, by case law and Federal agency rulemakings addressing unfair and deceptive acts or practices under the FTC Act. For example, case law establishes that, under the FTC Act, the FTC may impose requirements to prevent acts or practices that the FTC identifies as unfair or deceptive so long as the preventive requirements have a reasonable relation to the identified acts or practices.[96] Where the Bureau relies on Dodd Frank Act section 1031(b) prevention authority to support particular proposals, the Bureau explains how the preventive requirements have a reasonable relation to the identified unfair, deceptive, or abusive acts or practices.

#### Section 1031(c)

Section 1031(c)(1) of the Dodd-Frank Act provides that the Bureau shall have no authority under section 1031 to declare an act or practice in connection with a transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service, to be unlawful on the grounds that such act or practice is unfair, unless the Bureau "has a reasonable basis" to conclude that: (A) The act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition.[97] Section 1031(c)(2) of the Dodd-Frank Act provides that, in determining whether an act or practice is unfair, the Bureau may consider established public policies as evidence to be considered with all other evidence. Public policy considerations may not serve as a primary basis for such a determination.[98] The Bureau proposes certain interventions based in part on its authority under Dodd-Frank Act section 1031(c).

The unfairness standard under Dodd-Frank Act section 1031(c)—requiring primary consideration of the three elements (substantial injury, not reasonably avoidable by consumers, and

---

(applying unsophisticated consumer standard to section 808 claim). Circuit courts have also held, for example, that the least sophisticated consumer standard applies to a consumer's understanding of a validation notice required under FDCPA section 809 and threats to take legal action under FDCPA section 807(5). *See Swanson,* 869 F.2d at 1225–27; *Wilson,* 225 F.3d 350, 353 (3d Cir. 2000).

[85] *Gammon,* 27 F.3d at 1257.

[86] For example, in *Jeter* v. *Credit Bureau, Inc.,* 760 F.2d 1168, 1179 (11th Cir. 1985), the court applied a standard analogous to the "least sophisticated consumer" to an FDCPA section 806 claim, holding that claims under section 806 "should be viewed from the perspective of a consumer whose circumstances makes him relatively more susceptible to harassment, oppression, or abuse."

[87] *Jeter,* 760 F.2d at 1179 ("[R]ather, such susceptibility might be affected by other circumstances of the consumer or by the relationship between the consumer and the debt collection agency. For example, a very intelligent and sophisticated consumer might well be susceptible to harassment, oppression, or abuse because he is poor (*i.e.,* has limited access to the legal system), is on probation, or is otherwise at the mercy of a power relationship.").

[88] *See Brief for the United States as Amicus Curiae Supporting Respondents, supra* note 86, at *10, 27–30.

[89] *Gammon,* 27 F.3d at 1257.

[90] *See, e.g., Rosenau* v. *Unifund Corp.,* 539 F.3d 218, 221 (3d Cir. 2008) ("We use the 'least sophisticated debtor' standard in order to effectuate the basic purpose of the FDCPA: To protect all consumers, the gullible as well as the shrewd") (internal quotation marks and citation omitted); *Clomon,* 988 F.2d at 1319 ("To serve the purposes

of the consumer-protection laws, courts have attempted to articulate a standard for evaluating deceptiveness that does not rely on assumptions about the 'average' or 'normal' consumer. This effort is grounded, quite sensibly, in the assumption that consumers of below-average sophistication or intelligence are especially vulnerable to fraudulent schemes. The least-sophisticated-consumer standard protects these consumers in a variety of ways.").

[91] 15 U.S.C. 1692(e).

[92] 15 U.S.C. 1692(a).

[93] 12 U.S.C. 5531(b).

[94] *Id.*

[95] 15 U.S.C. 45.

[96] *See Jacob Siegel Co.* v. *Fed. Trade Comm'n,* 327 U.S. 608, 612–13 (1946) ("The Commission is the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed. It has wide latitude for judgment and the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist.").

[97] 12 U.S.C. 5531(c)(1).

[98] 12 U.S.C. 5531(c)(2).

countervailing benefits to consumers or to competition) and permitting secondary consideration of public policy—is similar to the unfairness standard under the FTC Act.[99] Section 5(n) of the FTC Act was amended in 1994 to incorporate the principles set forth in the FTC's "Commission Statement of Policy on the Scope of Unfairness Jurisdiction," [100] issued on December 17, 1980. The FTC Act unfairness standard, the FTC Policy Statement on Unfairness, rulemakings by the FTC and other Federal agencies,[101] and related cases [102] inform the scope and meaning of the Bureau's authority under Dodd-Frank Act section 1031(b) to issue rules that identify and prevent acts or practices that the Bureau determines are unfair pursuant to Dodd-Frank Act section 1031(c).

*Substantial injury.* The first element for a determination of unfairness under Dodd-Frank Act section 1031(c)(1) is that the act or practice causes or is likely to cause substantial injury to consumers. As discussed above, the FTC Act unfairness standard, the FTC Policy Statement on Unfairness, rulemakings by the FTC and other Federal agencies, and related cases inform the meaning of the elements of the unfairness standard under Dodd-Frank Act section 1031(c)(1). The FTC noted in its Policy Statement on Unfairness that substantial injury ordinarily involves monetary harm.[103] The Policy Statement stated that trivial or speculative harms are not cognizable under the test for substantial injury.[104] The FTC also noted that an injury is "sufficiently substantial" if it consists of a small amount of harm to a large number of individuals or raises a significant risk of harm.[105] The FTC has found that substantial injury also may involve a large amount of harm experienced by a small number of individuals.[106] As described in the FTC Policy Statement, emotional effects from an act or practice might be a basis for a finding of unfairness in an extreme case in which tangible injury from the act or practice could be clearly demonstrated,[107] and the D.C. Circuit has upheld an FTC conclusion that the demonstrated effects on consumers from threats to seize household possessions were sufficient to form part of the substantial injury along with financial harm.[108] The Bureau has stated that emotional impact and other more subjective types of harm "will not ordinarily amount to substantial injury" but that, in *certain circumstances,* "emotional impacts may amount to or contribute to substantial injury." [109]

*Not reasonably avoidable.* The second element for a determination of unfairness under Dodd-Frank Act section 1031(c)(1) is that the substantial injury is not reasonably avoidable by consumers. As discussed above, the FTC Act unfairness standard, the FTC Policy Statement on Unfairness, rulemakings by the FTC and other Federal agencies, and related case law inform the meaning of the elements of the unfairness standard under Dodd-Frank Act section 1031(c)(1). The FTC stated that knowing the steps for avoiding injury is not enough for the injury to be reasonably avoidable; rather, the consumer must also understand and appreciate the necessity of taking those steps.[110] As the FTC explained in its Policy Statement on Unfairness, most unfairness matters are brought to "halt some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking." [111] The D.C. Circuit has noted that, if such behavior exists, there is a "market failure" and the agency "may be required to take corrective action." [112] Assessing whether an injury is reasonably avoidable also requires taking into account the costs of making a choice other than the one made and the availability of alternatives in the marketplace.[113]

*Countervailing benefits to consumers or competition.* The third element for a determination of unfairness under Dodd-Frank Act section 1031(c)(1) is that the act or practice's countervailing benefits to consumers or to competition do not outweigh the substantial consumer injury. As discussed above, the FTC Act unfairness standard, the FTC Policy Statement on Unfairness, rulemakings by the FTC and other Federal agencies, and related cases inform the meaning of the elements of the unfairness standard under Dodd-Frank Act section 1031(c)(1). In applying the FTC Act's unfairness standard, the FTC has stated that it generally is important to consider both the costs of imposing a remedy and any benefits that consumers receive as a result of the act or practice. Authorities addressing the FTC Act's unfairness standard indicate that the countervailing benefits test does not require a precise quantitative analysis of benefits and costs, as such an analysis may be unnecessary or, in some cases,

---

[99] Section 5(n) of the FTC Act, as amended in 1994, provides that, "The [FTC] shall have no authority . . . to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the [FTC] may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination." 15 U.S.C. 45(n).

[100] Letter from the FTC to Hon. Wendell Ford and Hon. John Danforth, Committee on Commerce, Science & Transportation, United States Senate, Commission Statement of Policy on the *Scope of Consumer Unfairness Jurisdiction* (Dec. 17, 1980), *reprinted in Int'l Harvester Co.,* 104 F.T.C. 949, 1070–76 (1984), *https://www.ftc.gov/sites/default/files/documents/commission_decision_volumes/volume-104/ftc_volume_decision_104_ july_-_december_1984pages949_-_1088.pdf* (hereinafter FTC Policy Statement on Unfairness); *see also* S. Rept. 103–130, at 12–13 (1993), *reprinted in* 1994 U.S.C.C.A.N. 1776 (legislative history to FTC Act amendments indicating congressional intent to codify the principles of the FTC Policy Statement on Unfairness).

[101] In addition to the FTC's rulemakings under unfairness authority, certain Federal prudential regulators have prescribed rules prohibiting unfair practices under section 18(f)(1) of the FTC Act and, in doing so, they applied the statutory elements consistent with the standards articulated by the FTC. *See* 74 FR 5498, 5502 (Jan. 29, 2009) (background discussion of legal authority for interagency Subprime Credit Card Practices rule; The Board, FDIC, and the OCC also previously issued guidance generally adopting these standards for purposes of enforcing the FTC Act's prohibition on unfair and deceptive acts or practices. *See id.*

[102] *See, e.g., Consumer Fin. Prot. Bureau v. NDG Fin. Corp.,* No. 15–cv–52110 CM, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016); *Consumer Fin. Prot. Bureau v. Universal Debt & Payment Sols., LLC,* No. 1:15–CV–00–859 RWS, 2015 WL 11439178 (N.D. Ga. Sept. 1, 2015); *Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc.,* 219 F. Supp. 3d 878 (S.D. Ind. 2015).

[103] *See* FTC Policy Statement on Unfairness, *supra* note 100, at 1073.

[104] *Id.*

[105] *Id.* at 1073 n.12.

[106] *Int'l Harvester Co.,* 104 F.T.C. 949, 1064 (1984).

[107] FTC Policy Statement on Unfairness, *supra* note 100, at 1073 n.16 ("In an extreme case, however, where tangible injury could be clearly demonstrated, emotional effects might possibly be considered as the basis for a finding of unfairness").

[108] *See Am. Fin. Servs. Assoc. v. FTC,* 767 F.2d 957, 973–74 n.20 (D.C. Cir. 1985) ("the Commission found that 'the threat to seize household possessions causes 'great emotional suffering, humiliation, anxiety, and deep feelings of guilt, and this distress can lead to physical breakdowns or illness, disruption of the family, and undue strain on family relationships' '") (internal citations omitted).

[109] Bureau of Consumer Fin. Prot., *CFPB Supervision and Examination Process,* at UDAAP 2 (Apr. 2019), *https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual.pdf.*

[110] *See Int'l Harvester,* 104 F.T.C. at 1066.

[111] FTC Policy Statement on Unfairness, *supra* note 100, at 1074.

[112] *Am. Fin. Servs. Assoc.,* 767 F.2d at 976.

[113] *See* FTC Policy Statement on Unfairness, *supra* note 100, at 1074 n.19 ("In some senses any injury can be avoided—for example, by hiring independent experts to test all products in advance, or by private legal actions for damages—but these courses may be too expensive to be practicable for individual consumers to pursue."); *Am. Fin. Servs. Assoc.,* 767 F.2d at 976–77 (reasoning that, because of factors such as substantial similarity of contracts offered by creditors, "consumers have little ability or incentive to shop for a better contract").

impossible; rather, the agency is expected to gather and consider reasonably available evidence.[114]

*Public policy.* As noted above, Dodd-Frank Act section 1031(c)(2) provides that, in determining whether an act or practice is unfair, the Bureau may consider established public policies as evidence to be considered with all other evidence. Public policy considerations, however, may not serve as a primary basis for such a determination.[115]

### C. Dodd-Frank Act Section 1032

The Bureau proposes certain provisions based in part on its authority under Dodd-Frank Act section 1032. Dodd-Frank Act section 1032(a) provides that the Bureau may prescribe rules to ensure that the features of any consumer financial product or service, "both initially and over the term of the product or service," are "fully, accurately, and effectively disclosed to consumers in a manner that permits consumers to understand the costs, benefits, and risks associated with the product or service, in light of the facts and circumstances."[116] Under Dodd-Frank Act section 1032(a), the Bureau is empowered to prescribe rules regarding the disclosure of the "features" of consumer financial products and services generally. Accordingly, the Bureau may prescribe rules containing disclosure requirements even if other Federal consumer financial laws do not specifically require disclosure of such features.

Dodd-Frank Act section 1032(b)(1) provides that "any final rule prescribed by the Bureau under this section requiring disclosures may include a model form that may be used at the option of the covered person for

provision of the required disclosures."[117] Dodd-Frank Act section 1032(b)(2) provides that such a model form "shall contain a clear and conspicuous disclosure that at a minimum—(A) uses plain language comprehensible to consumers; (B) contains a clear format and design, such as an easily readable type font; and (C) succinctly explains the information that must be communicated to the consumer."[118] Dodd-Frank Act section 1032(b)(3) provides that any such model form "shall be validated through consumer testing.";[119]

Dodd-Frank Act section 1032(c) provides that, in prescribing rules pursuant to Dodd-Frank Act section 1032, the Bureau "shall consider available evidence about consumer awareness, understanding of, and responses to disclosures or communications about the risks, costs, and benefits of consumer financial products or services."[120] Dodd-Frank Act section 1032(d) provides that "[a]ny covered person that uses a model form included with a rule issued under this section shall be deemed to be in compliance with the disclosure requirements of this section with respect to such model form."[121]

### D. Other Authorities Under the Dodd-Frank Act

The Bureau proposes certain interventions based in part on its authority under Dodd-Frank Act sections 1022 and 1024. Section 1022(b)(1) of the Dodd-Frank Act provides that the Bureau's Director "may prescribe rules and issue orders and guidance, as may be necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof."[122] "Federal consumer financial laws" include the FDCPA and title X of the Dodd-Frank Act.[123]

Section 1022(b)(2) of the Dodd-Frank Act prescribes certain standards for rulemaking that the Bureau must follow in exercising its authority under Dodd-Frank Act section 1022(b)(1).[124] See part VI for a discussion of the Bureau's standards for rulemaking under Dodd-Frank Act section 1022(b)(2).

Proposed § 1006.100 concerning the retention of records would be based in part on the Bureau's authority under

Dodd-Frank Act section 1024(b)(7)(A) and (B)[125] as applied to debt collectors who are nondepository covered persons that the Bureau supervises under Dodd-Frank Act section 1024(a).[126] The section-by-section analysis of proposed § 1006.100 contains an additional description of the authorities on which the Bureau relies for proposed § 1006.100.

### E. The E-SIGN Act

The E-SIGN Act provides standards for determining if delivery of a disclosure by electronic record satisfies a requirement in a statute, regulation, or other rule of law that the disclosure be provided or made available to a consumer in writing. The E-SIGN Act sets forth criteria under which Federal regulatory agencies may exempt a specified category or type of record from the consent requirements for electronic disclosures in the E-SIGN Act.[127] For the reasons set forth in part V, proposed § 1006.42(c) and (d) would exempt electronic delivery of certain required notices from the consent requirements of the E-SIGN Act. Pursuant to E-SIGN Act section 104(b)(1), which permits the Bureau to interpret the E-SIGN Act through the issuance of regulations, proposed comments 6(c)(1)–1 and –2 provide an interpretation of the E-SIGN Act as applied to a debt collector responding to a consumer's notification that the consumer refuses to pay the debt or wants the debt collector to cease communication; proposed comments 38–2 and –3 provide an interpretation of the E-SIGN Act as applied to a debt collector responding to a consumer dispute or request for original-creditor information; and proposed § 1006.42(b)(1) and proposed comment 42(b)(1)–1 provide an interpretation of the E-SIGN Act as applied to certain disclosures that the regulation would require debt collectors to provide.

---

[114] *Pa. Funeral Dirs. Ass'n* v. *FTC*, 41 F.3d 81, 91 (3d Cir. 1994) (upholding FTC's amendments to the Funeral Industry Practices Rule and noting that "much of a cost-benefit analysis requires predictions and speculation"); *Int'l Harvester*, 104 F.T.C. at 1065 n.59 ("In making these calculations we do not strive for an unrealistic degree of precision. . . . We assess the matter in a more general way, giving consumers the benefit of the doubt in close issues. . . . What is important . . . is that we retain an overall sense of the relationship between costs and benefits. We would not want to impose compliance costs of millions of dollars in order to prevent a bruised elbow."); *see also* S. Rept. 103–130, at 13 (1994) (noting that, "[i]n determining whether a substantial consumer injury is outweighed by the countervailing benefits of a practice, the Committee does not intend that the FTC quantify the detrimental and beneficial effects of the practice in every case. In many instances, such a numerical benefit-cost analysis would be unnecessary; in other cases, it may be impossible. This section would require, however, that the FTC carefully evaluate the benefits and costs of each exercise of its unfairness authority, gathering and considering reasonably available evidence.").

[115] 12 U.S.C. 5531(c)(2).

[116] 12 U.S.C. 5532(a).

[117] 12 U.S.C. 5532(b)(1).

[118] 12 U.S.C. 5532(b)(2).

[119] 12 U.S.C. 5532(b)(3).

[120] 12 U.S.C. 5532(c).

[121] 12 U.S.C. 5532(d).

[122] 12 U.S.C. 5512(b)(1).

[123] 12 U.S.C. 5481(14).

[124] 12 U.S.C. 5512(b)(2).

[125] Dodd-Frank Act section 1024(b)(7)(A) authorizes the Bureau to prescribe rules to facilitate supervision of persons identified as larger participants of a market for a consumer financial product or service as defined by rule in accordance with section 1024(a)(1)(B) of the Dodd-Frank Act, and Dodd-Frank Act section 1024(b)(7)(B) authorizes the Bureau to require a person described in Dodd-Frank Act section 1024(a)(1) to retain records for the purpose of facilitating supervision of such persons and assessing and detecting risks to consumers.

[126] 12 U.S.C. 5514(b)(7)(A)–(B).

[127] 15 U.S.C. 7004(d)(1).

## V. Section-by-Section Analysis

*Subpart A—General*

Section 1006.1    Authority, Purpose, and Coverage

1(a) Authority

FDCPA section 817 provides that the Bureau shall by regulation exempt from the requirements of the FDCPA any class of debt collection practices within any State if the Bureau determines that certain conditions have been met.[128] Before the Bureau's creation, FDCPA section 817 provided the same authority to the FTC, and the FTC issued a rule to describe procedures for a State to apply for such an exemption.[129] After the Dodd-Frank Act granted the Bureau FDCPA rulewriting authority, the Bureau restated the FTC's existing rule regarding State exemptions without substantive change as the Bureau's Regulation F, 12 CFR part 1006.[130] Existing § 1006.1(a) thus states that the purpose of Regulation F is to establish procedures and criteria for States to apply to the Bureau for an exemption as provided in FDCPA section 817.

Consistent with the Bureau's proposal to revise part 1006 to regulate the debt collection activities of FDCPA-covered debt collectors, the Bureau proposes to revise existing § 1006.1(a) to set forth the Bureau's authority to issue such rules. Proposed § 1006.1(a) provides that part 1006 is known as Regulation F and is issued by the Bureau pursuant to sections 814(d) and 817 of the FDCPA,[131] title X of the Dodd-Frank Act,[132] and section 104(b)(1) and (d)(1) of the E–SIGN Act.[133] The Bureau proposes to move the remainder of existing § 1006.1(a), regarding State-law exemptions from the FDCPA, to paragraph I(a) of appendix A of the regulation.[134]

1(b) Purpose

Existing § 1006.1(b) defines terms relevant to the procedures and criteria for States to apply to the Bureau for an exemption as provided in FDCPA section 817. Consistent with the Bureau's proposal to revise part 1006 to regulate the debt collection activities of FDCPA-covered debt collectors, the Bureau proposes to revise § 1006.1(b) to identify the purposes of part 1006. The Bureau proposes to move the definitions

in existing § 1006.1(b) to paragraph 1(b) of appendix A of the regulation.[135]

Consistent with FDCPA section 802, proposed § 1006.1(b) explains that part 1006 carries out the purposes of the FDCPA, which include eliminating abusive debt collection practices by debt collectors, ensuring that debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and promoting consistent State action to protect consumers against debt collection abuses. Consistent with Dodd-Frank Act section 1032, proposed § 1006.1(b) further explains that part 1006 also prescribes requirements to ensure that certain features of debt collection are fully, accurately, and effectively disclosed to consumers in a manner that permits consumers to understand the costs, benefits, and risks associated with debt collection, in light of the facts and circumstances. Finally, consistent with Dodd-Frank Act sections 1022(b)(1) and 1024(b)(7), proposed § 1006.1(b) explains that part 1006 sets forth record retention requirements to enable the Bureau to administer and carry out the purposes of the FDCPA and the Dodd-Frank Act and to prevent evasions thereof, and to facilitate supervision of debt collectors and the assessment and detection of risks to consumers.

1(c) Coverage

The Bureau proposes to add § 1006.1(c) to address coverage under the proposed rule, which, with the exception of proposed § 1006.108 and appendix A, would apply to FDCPA-covered debt collectors.[136] Proposed § 1006.1(c)(1) thus provides that, except as provided in § 1006.108 and appendix A regarding applications for State exemptions from the FDCPA, proposed part 1006 applies to debt collectors as defined in proposed § 1006.2(i), *i.e.,* debt collectors covered by the FDCPA.[137]

Proposed § 1006.1(c)(1) also would implement FDCPA section 814(d), which provides, in part, that the Bureau may not prescribe rules under the FDCPA with respect to motor vehicle dealers as described in section 1029(a) of the Dodd-Frank Act.[138] Proposed

§ 1006.1(c)(1) would clarify that Regulation F would not apply to a person excluded from coverage by section 1029(a) of the Dodd-Frank Act.[139]

The Bureau proposes certain provisions of the proposed rule only under sections 1031 or 1032 of the Dodd-Frank Act. Dodd-Frank Act section 1031 grants the Bureau authority to write regulations applicable to covered persons and service providers to identify and prevent unfair, deceptive, or abusive acts or practices in connection with a transaction with a consumer for, or the offering of, a consumer financial product or service.[140] Dodd-Frank Act section 1032 grants the Bureau authority to ensure that the features of any consumer financial product or service are fully, accurately, and effectively disclosed to consumers.[141] Under the Dodd-Frank Act, collecting a debt related to any consumer financial product or service generally is, itself, a consumer financial product or service.[142] Of primary relevance here, a consumer financial product or service includes the extension of consumer credit.[143] Provisions proposed only under Dodd-Frank Act sections 1031 or 1032, if adopted, therefore would apply to FDCPA-covered debt collectors only to the extent that such debt collectors were collecting a debt related to an extension of consumer credit or another consumer financial product or service.[144] This would include, for example, FDCPA-covered debt collectors collecting debts related to consumer mortgage loans or credit cards.

Proposed § 1006.1(c)(2) would clarify that certain provisions in proposed Regulation F apply to FDCPA-covered debt collectors only when they are collecting consumer financial product or service debt, as defined in § 1006.2(f).[145] Proposed § 1006.1(c)(2) specifies that these provisions are in §§ 1006.14(b)(1)(ii), 1006.30(b)(1)(ii),

---

[128] 15 U.S.C. 1692o.

[129] *See* 16 CFR part 901.

[130] 76 FR 78121 (Dec. 16, 2011).

[131] 15 U.S.C. 1692*l*(d), 1692o.

[132] 12 U.S.C. 5481 *et seq.*

[133] 15 U.S.C. 7004(b)(1), 7004(d)(1).

[134] *See* the section-by-section analysis of proposed § 1006.108 and appendix A.

[135] *See id.*

[136] Proposed § 1006.108 and appendix A would apply to States.

[137] Section 812 of the FDCPA addresses the furnishing of deceptive forms and applies to any person, not just to debt collectors. Proposed 1006.30(e) would prohibit FDCPA-covered debt collectors from furnishing deceptive forms. Other persons would continue to be prohibited from furnishing deceptive forms under FDCPA section 812.

[138] 12 U.S.C. 5519(a).

[139] This proposed exclusion would apply only to Regulation F. Any motor vehicle dealers who are FDCPA-covered debt collectors would still need to comply with the FDCPA.

[140] 12 U.S.C. 5531(b).

[141] 12 U.S.C. 5532.

[142] It is a financial product or service if, for example, it is delivered offered, or provided in connection with a consumer financial product or service. *See* 12 U.S.C. 5481(5)(B), 5481(15)(A)(x).

[143] 12 U.S.C. 5481(15)(A)(i). The Dodd-Frank Act defines credit to mean the right granted by a person to a consumer to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase. 12 U.S.C. 5481(7).

[144] 12 U.S.C. 5481(5).

[145] *See* the section-by-section analysis of proposed § 1006.2(f).

and 1006.34(c)(2)(iv) and (3)(iv). The Bureau requests comment on all aspects of proposed § 1006.1(c), including on whether additional clarification would be helpful.

Section 1006.2   Definitions

FDCPA section 803 defines terms used throughout the statute.[146] Proposed § 1006.2 would repurpose existing § 1006.2 to implement and interpret FDCPA section 803 and define additional terms that would be used in the regulation.[147] The Bureau proposes to move existing § 1006.2, which describes how a State may apply for an exemption from the FDCPA, to paragraph II of appendix A of the regulation.[148]

Paragraphs (c), (g), and (*l*) of proposed § 1006.2 would implement the FDCPA section 803 definitions of Bureau, creditor, and State, respectively. These paragraphs generally restate the statute, with only minor wording and organizational changes for clarity, and thus are not addressed further in the section-by-section analysis below. Proposed § 1006.2(a) and (b), (d) through (f), and (h) through (k) would define other terms that would be used in the regulation, as described below. The Bureau proposes § 1006.2 to implement and interpret FDCPA section 803, pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors. In addition to the specific comment requests noted below, the Bureau generally requests comment on whether additional clarification is needed for any of the proposed definitions and on whether additional definitions would be helpful. For example, the proposal uses the term "day" to refer to any day, including weekends and public holidays. The Bureau requests comment on whether adding a defined term such as "calendar day" and using it in the final rule would be helpful.

2(a) Act or FDCPA

Proposed § 1006.2(a) provides that the terms Act and FDCPA mean the Fair Debt Collection Practices Act.

2(b) Attempt To Communicate

Several of the proposed rule's requirements would apply not only to communications as defined in

§ 1006.2(d) but also to communication attempts. For example, proposed § 1006.6(b) and (c) would, among other things, prohibit a debt collector from communicating or attempting to communicate with a consumer at times or places that the debt collector knows or should know are inconvenient to the consumer or after a consumer notifies the debt collector in writing that the consumer wishes the debt collector to cease further communication with the consumer. In addition, proposed § 1006.22(f)(3) and (4) would generally prohibit a debt collector from communicating or attempting to communicate with a consumer using an email address that the debt collector knows or should know is maintained by the consumer's employer or by a social media platform that is viewable by a person other than the consumer.

To facilitate compliance with the proposed provisions that apply to attempts to communicate, proposed § 1006.2(b) would define an attempt to communicate as any act to initiate a communication or other contact with any person through any medium, including by soliciting a response from such person. Proposed § 1006.2(b) further states that an attempt to communicate includes providing a limited-content message, as defined in § 1006.2(j). The Bureau proposes this definition of attempt to communicate on the basis that any outreach by a debt collector to a consumer—whether by a telephone call, text message, email, or otherwise—is designed to bring about a communication either immediately (e.g., a consumer answers a debt collector's telephone call and they engage in a conversation about the debt) or at a later point in time (e.g., in response to a missed telephone call or a limited-content message from a debt collector, a consumer calls or texts the debt collector and they engage in a conversation about the debt).

As proposed, an attempt to communicate covers a broader range of activity than a communication. As discussed in the section-by-section analysis of proposed § 1006.2(d), the proposed rule would define a communication, consistent with FDCPA section 803(2), as the conveying of information regarding a debt directly or indirectly to any person through any medium. The proposed definition of communication further states that a debt collector does not convey information regarding a debt directly or indirectly to any person if the debt collector provides only a limited-content message, as defined in proposed § 1006.2(j). The proposed definition of attempt to communicate, in contrast, does not

require the conveying of information regarding a debt. As the examples in proposed comment 2(b)–1 illustrate, an attempt to communicate includes leaving a limited-content message for a consumer or placing a telephone call to a person, regardless of whether the debt collector speaks to any person or leaves any message at the dialed number. Proposed comment 2(b)–1 also would clarify that an act to initiate a communication or other contact with a person is an attempt to communicate regardless of whether the attempt, if successful, would be a communication that conveys information regarding a debt directly or indirectly to any person.

Although the proposed definition of attempt to communicate covers a broader range of conduct than the proposed definition of communication, in many circumstances the same conduct may give rise to both an attempt to communicate and a communication. For example, a debt collector who places a telephone call to a consumer and speaks to the consumer about the debt has both attempted to communicate with the consumer (by initiating the call and speaking to the consumer) and communicated with the consumer (by conveying information about the debt). Sometimes, however, an attempt to communicate may not give rise to a communication. For example, a debt collector who places an unanswered telephone call to a consumer and chooses not to leave a message has attempted to communicate with the consumer but has not communicated with the consumer. The Bureau requests comment on proposed § 1006.2(b) and on proposed comment 2(b)–1.

2(d) Communicate or Communication

FDCPA section 803(2) defines the term communication to mean the conveying of information regarding a debt directly or indirectly to any person through any medium.[149] Proposed § 1006.2(d) would implement and interpret this definition.

Proposed § 1006.2(d) first restates the statutory definition of communication, with only minor changes for clarity. Proposed § 1006.2(d) also would interpret FDCPA section 803(2) to provide that a debt collector does not convey information regarding a debt directly or indirectly to any person— and therefore does not communicate with any person—if the debt collector provides only a limited-content message, as defined in proposed § 1006.2(j). The section-by-section analysis of proposed § 1006.2(j)

---

[146] 15 U.S.C. 1692a.

[147] FDCPA section 803(7) defines the term "location information." 15 U.S.C. 1692a(7). The Bureau proposes to define that term in § 1006.10, rather than in § 1006.2. See the section-by-section analysis of proposed § 1006.10(a).

[148] See the section-by-section analysis of proposed § 1006.108 and appendix A.

[149] 15 U.S.C. 1692a(2).

regarding limited-content messages explains and requests comment both on the proposed content of limited-content messages and on the Bureau's proposal to interpret the term communication in § 1006.2(d) as excluding such messages.

Proposed comment 2(d)–1 notes that a communication can occur through "any medium" and explains that "any medium" includes any oral, written, electronic, or other medium. The proposed comment states that a communication may occur, for example, in person or by telephone, audio recording, paper document, mail, email, text message, social media, or other electronic media. The Bureau proposes comment 2(d)–1 in part to clarify that debt collectors may communicate with consumers through newer communication media, such as electronic media. The Bureau elsewhere proposes provisions to clarify how debt collectors may use those media to communicate with consumers. The Bureau requests comment on proposed § 1006.2(d) and on proposed comment 2(d)–1 and on whether additional clarification about the definition of communication would be useful.

### 2(e) Consumer

FDCPA section 803(3) defines a consumer as any natural person obligated or allegedly obligated to pay any debt.[150] Proposed § 1006.2(e) would implement this definition, interpret it to include a deceased natural person who is obligated or allegedly obligated to pay a debt, and cross-reference the special definition of consumer for certain communications in connection with the collection of a debt set forth in proposed § 1006.6(a).

As summarized in part I.B, the Bureau proposes to address several consumer protection concerns and ambiguities in statutory language related to the *collection of debts owed by deceased* consumers, also known as decedent debt. One such issue is that the FDCPA does not specify whether a consumer, as defined in section 803(3), includes a deceased consumer (or whether a natural person, as that term is used in section 803(3), includes a deceased natural person). Because the definition of consumer in FDCPA section 803(3) is silent with respect to deceased consumers, debt collectors may be uncertain, when collecting a deceased consumer's debts, how to comply with FDCPA provisions that refer to a debt collector's obligations to a consumer. For example, certain important FDCPA disclosure requirements, such as a debt collector's obligation to provide

a validation notice and to respond to disputes and requests for original-creditor information, refer only to a debt collector's obligations to consumers.[151] In the absence of guidance, debt collectors may be uncertain who, if anyone, should receive the validation notice and have the right to dispute the debt if the consumer obligated or allegedly obligated to pay the debt is deceased. Without a validation notice and an opportunity to dispute the debt, individuals trying to resolve debts in a deceased consumer's estate may experience difficulty because they lack information needed to determine whether they are being asked to pay the right debt, in the right amount, to the right debt collector, and to assert dispute rights. To address that concern, the Bureau proposes to clarify in the commentary to §§ 1006.34(a)(1) and 1006.38 that a person who is authorized to act on behalf of the deceased consumer's estate, such as the executor, administrator, or personal representative, operates as the consumer for purposes of proposed §§ 1006.34(a)(1) and 1006.38.[152]

Consistent with those clarifications, the Bureau proposes in § 1006.2(e) to interpret the definition of consumer in FDCPA section 803(3) to mean any natural person, whether living or deceased, who is obligated or allegedly obligated to pay any debt. The proposed interpretation should clarify the meaning of the term consumer in the decedent debt context and appears to be consistent with a modern trend in the law that favors recognizing, as a default, the continued existence of a natural person after death.[153] Further, the

Bureau notes that debt collectors often collect or attempt to collect debts from deceased consumers (*i.e.*, from their estates), which presents many of the *same consumer-protection concerns as* collecting or attempting to collect debts from living consumers.

In addition to proposing to clarify the meaning of the term consumer in the *decedent debt* context, the Bureau proposes in § 1006.2(e) to cross-reference the special definition of consumer for certain communications in connection with the collection of a debt in proposed § 1006.6(a). As described in the section-by-section analysis of proposed § 1006.6, FDCPA section 805(d) identifies certain persons in addition to the section 803(3) consumer as persons with whom a debt collector may communicate in connection with the collection of any debt without violating FDCPA section 805(b)'s prohibition on third-party disclosures.[154] The Bureau proposes to implement FDCPA section 805(d) in § 1006.6(a) and to cross-reference the § 1006.6(a) definition in proposed § 1006.14(h). As discussed below, proposed § 1006.14(h) would prohibit a debt collector from communicating or attempting to communicate with a consumer through a medium of communication if the consumer has requested that the debt collector not use that medium to communicate with the consumer. Accordingly, proposed § 1006.2(e) provides that, for purposes of proposed §§ 1006.6 and 1006.14(h), the term consumer has the meaning given to it in proposed § 1006.6(a). For further discussion, see the section-by-section analysis of proposed § 1006.6(a). The Bureau requests comment on the definition of consumer in proposed § 1006.2(e), including on whether the definition should include deceased consumers.

### 2(f) Consumer Financial Product or Service Debt

As discussed in the section-by-section analysis of proposed § 1006.1(c), certain proposed provisions would apply to debt collectors only if they are collecting a debt related to a consumer

---

[150] 15 U.S.C. 1692a(3).

[151] *See* 15 U.S.C. 1692g(a)–(b).

[152] See proposed comments 34(a)(1)–1, 34(d)(1)(ii)–2, and 38–1.

[153] *See, e.g.*, Cal. Civ. Proc. Code sec. 377.20(a) (2018) ("Except as otherwise provided by statute, a cause of action for or against a person is not lost by reason of the person's death, but survives subject to the applicable limitations period."). Federal law often provides an unclear answer about whether claims survive the death of a natural person. Rule 25(a) of the Federal Rules of Civil Procedure allows substitution "[i]f a party dies and the claim is not extinguished," but Federal statutes often do not address whether claims extinguish upon the death of a plaintiff or defendant and, in these cases, Federal common law generally permits survival of claims where they are merely remedial in nature and not penal. *See Ex parte Schreiber*, 110 U.S. 76, 80 (1884). Most authority suggests that claims brought under other portions of the Consumer Credit Protection Act (CCPA), of which the FDCPA is subchapter V, likely are remedial rather than penal in nature. *See, e.g., Murphy v. Household Fin. Corp.*, 560 F.2d 206, 210 (6th Cir. 1977) (holding, in a widely adopted test, that double damages under Truth in Lending Act (TILA), subchapter I of the CCPA, are remedial rather than penal); *In re Wood*, 643 F.2d 188, 192 (5th Cir. 1980) (following *Murphy* to conclude that trustee of debtor's estate had standing to bring claims under TILA). On the

other hand, some courts, for example, follow the tradition of the common law and treat a "natural person" as ceasing to exist at the point of death. *See, e.g., Williamson v. Treasurer*, 814 A.2d 1153, 1164 (N.J. Super. Ct. App. Div. 2003) ("We would not describe the body or remains of a deceased person as still a human being or a natural person." (interpreting the New Jersey Right to Know law and citing *Natural person*, Black's Law Dictionary (7th ed. 1999))). In light of the conflicting traditions and the FDCPA's silence, it appears appropriate to regard the statutory term "consumer" as ambiguous as to whether it includes or excludes a deceased consumer.

[154] 15 U.S.C. 1692c(d).

financial product or service, as that term is defined in section 1002(5) of the Dodd-Frank Act.[155] Debt related to a consumer financial product or service *would include, for example,* debts related to consumer mortgage loans or credit cards. For ease of reference, proposed § 1006.2(f) would define the term consumer financial product or service *debt* to mean a debt related to a consumer financial product or service, as consumer financial product or service is defined in section 1002(5) of the Dodd-Frank Act.

### 2(h) Debt

FDCPA section 803(5) defines the term debt for purposes of the FDCPA. Proposed § 1006.2(h) would implement FDCPA section 803(5) and generally restates the statute. Proposed § 1006.2(h) also would clarify that, for purposes of § 1006.2(f), the term debt means debt as that term is used in the Dodd-Frank Act. The Bureau proposes this clarification to ensure that, when determining whether a debt is a debt related to a consumer financial product or service for purposes of § 1006.2(f), debt collectors and other stakeholders refer to the Dodd-Frank Act rather than the FDCPA's definition of debt.

### 2(i) Debt Collector

FDCPA section 803(6) defines the term debt collector for purposes of the FDCPA. The introductory language of FDCPA section 803(6) generally provides that a debt collector is any person: (1) Who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts (*i.e.,* the "principal purpose" prong), or (2) who regularly collects, or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due to another (*i.e.,* the "regularly collects" prong).[156] FDCPA section 803(6) also sets forth several exclusions from the general definition.[157] Proposed § 1006.2(i) would implement FDCPA section 803(6)'s definition of debt collector and generally restates the statute, with only minor wording and organizational changes for clarity [158] and to specify that the term excludes private entities that operate certain bad check enforcement programs that comply with FDCPA section 818.[159]

The Supreme Court recently has interpreted FDCPA section 803(6). In *Henson* v. *Santander Consumer USA Inc.,* the Court held that a company may collect defaulted debts that it has purchased from another without being an FDCPA-covered debt collector.[160] In so holding, the Court decided only whether, by using its own name to collect debts that it had purchased, Santander met the "regularly collects" prong of the introductory language in FDCPA section 803(6). The Court expressly declined to address two other ways that a debt buyer like Santander might qualify as a debt collector under FDCPA section 803(6): (1) By meeting the "regularly collects" prong by regularly collecting or attempting to collect debts owned by others, in addition to collecting debts that it purchased and owned; or (2) by meeting the "principal purpose" prong of the definition.[161] The Court held that Santander was not a debt collector within the meaning of the "regularly collects" prong because Santander was collecting debts that it purchased and owned, *not collecting debts owed to another.*[162]

Proposed § 1006.2(i) generally would restate FDCPA section 803(6)'s definition of debt collector. Consistent with the Court's holding in *Henson,* the proposed definition thus could include a debt buyer collecting debts that it purchased and owned, if the debt buyer either met the "principal purpose" prong of the definition or regularly collected or attempted to collect debts owned by others, in addition to collecting debts that it purchased and owned.[163]

### 2(j) Limited-Content Message

FDCPA section 803(2) defines the term communication to mean the conveying of information regarding a debt directly or indirectly to any person through any medium.[164] As discussed, proposed § 1006.2(d) would implement

and interpret that definition, including by specifying that a debt collector does not engage in an FDCPA communication if the debt collector provides only a limited-content message.[165] Proposed § 1006.2(j) would further interpret FDCPA section 803(2) by defining the content that a limited-content message would be required and permitted to include. For the reasons discussed below, under the Bureau's interpretation of the term communication, a limited-content message would not convey information about a debt directly or indirectly to any person, and, as a result, a debt collector could provide such a message for a consumer without communicating with any person for the purposes of the FDCPA or Regulation F.

The definition of communication is central to the FDCPA's protections, many of which regulate a debt collector's communications with a consumer or other person. For example, FDCPA section 805 [166] restricts when and where a debt collector may communicate with a consumer, FDCPA sections 806 through 808 [167] contain requirements concerning the form and content of a debt collector's communications with a consumer or other person, and FDCPA section 804 [168] imposes requirements on a debt collector communicating with any person other than the consumer for the purpose of acquiring location information about the consumer.

Uncertainty about what constitutes a communication, however, has led to questions about how debt collectors can leave voicemails or other messages for consumers while complying with certain FDCPA provisions. Most significantly, if a voicemail or other message is a communication with a consumer, FDCPA section 807(11) requires that the debt collector identify itself as a debt collector or inform the consumer that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose.[169] A debt collector who leaves a message with such disclosures, however, risks violating FDCPA section 805(b)'s prohibition against revealing debts to third parties if the disclosures are seen or heard by a third party.[170] Uncertainty about what constitutes a communication may result in debt collectors repeatedly calling consumers

---

[155] 12 U.S.C. 5481(5). See the section-by-section analysis of proposed § 1006.1(c).

[156] 15 U.S.C. 1692a(6).

[157] *Id.*

[158] For example, to avoid obsolete language, proposed § 1006.2(i) uses the term "mail" instead of "the mails."

[159] 15 U.S.C. 1692p.

---

[160] *Henson* v. *Santander Consumer USA, Inc.,* 137 S. Ct. 1718 (2017). In addition to *Henson,* the Supreme Court also recently interpreted FDCPA section 803(6) to hold that a business engaged in no more than nonjudicial foreclosure proceedings is not an FDCPA-covered debt collector, except for the limited purpose of FDCPA section 808(6). *See Obduskey v. McCarthy & Holthus LLP,* 139 S. Ct. 1029 (2019).

[161] *Henson,* 137 S. Ct. at 1721. The Court had not identified these questions as being presented when it granted certiorari. *Id.*

[162] *Id.* at 1721–22.

[163] *See, e.g., Barbato v. Greystone Alliance, LLC,* 916 F.3d 260 (3d Cir. 2019) (holding that a debt buyer whose principal purpose was debt collection was an FDCPA-covered debt collector even though the debt buyer outsourced its collection activities to third parties).

[164] 15 U.S.C. 1692a(2).

---

[165] See the section-by-section analysis of proposed § 1006.2(d).

[166] 15 U.S.C. 1692c.

[167] 15 U.S.C. 1692d–1692f.

[168] 15 U.S.C. 1692b.

[169] 15 U.S.C. 1692c(11). See also the section-by-section analysis of proposed § 1006.18(e).

[170] 15 U.S.C. 1692c(b). See also the section-by-section analysis of proposed § 1006.6(d).

and hanging up rather than risking liability by leaving messages.

Courts interpreting the FDCPA's definition of communication and the intersection of FDCPA sections 805(b) and 807(11) have reached conflicting results. Some courts hold that a message asking for a return call from a consumer is a communication and that a debt collector who leaves such a message violates FDCPA section 805(b)'s prohibition on communicating with third parties if the message is heard by a person other than the consumer.[171] These courts also hold that, because the message is a communication with the consumer, it must include a statement pursuant to FDCPA section 807(11) that the caller is attempting to collect a debt, which further increases the likelihood that a third party hearing the message would know that the message relates to debt collection.[172] Conversely, other courts hold that a message limited to certain content—such as the debt collector's name, a statement that the caller is a debt collector, and a call-back number—is not a communication and thus does not, itself, constitute a prohibited third-party disclosure under FDCPA section 805(b) or require an FDCPA section 807(11) disclosure.[173]

Many debt collectors state that they err on the side of caution and make repeated telephone calls instead of leaving messages on a consumer's voicemail or with a third party who answers a consumer's telephone, or sending text messages.[174] Such repeated telephone calls may frustrate many consumers. Indeed, consumers often complain to the Bureau about the number of collection calls they receive and, to a lesser degree, about debt collectors' reluctance to leave voicemails.[175] In comments to the Bureau's ANPRM and in feedback during the SBREFA process, many debt collectors stated that they would place fewer telephone calls if they were confident that leaving voicemails or other messages for consumers would not expose them to risk of liability under the FDCPA.[176] The FTC and the U.S. Government Accountability Office also have previously noted the need to clarify the law regarding debt collectors' ability to leave voicemails for consumers.[177]

To address uncertainty about what constitutes an FDCPA communication and to reduce the need for debt collectors to rely on repeated telephone calls without leaving messages to establish contact with consumers, the Bureau proposes § 1006.2(j) to interpret FDCPA section 803(2) and define a message whose content would not "convey[ ] information regarding a debt directly or indirectly to any person." Specifically, proposed § 1006.2(j) would provide that a limited-content message means a message for a consumer that includes all of the content described in § 1006.2(j)(1), and that may include any of the content described in § 1006.2(j)(2), but does not include other content. As discussed in the section-by-section analysis of proposed § 1006.2(b) and (d), a limited-content message would not be a communication, as defined in § 1006.2(d), but would be an attempt to communicate, as defined in § 1006.2(b).

Under the proposal, a debt collector who leaves a limited-content message for a consumer would not have communicated with the consumer or any other person through that message. In turn, because FDCPA sections 805(b) and 807(11) both apply only to communications as defined by the FDCPA, the requirements described in those sections would not apply to the limited-content message. Accordingly, a limited-content message would not be required to include a disclosure pursuant to FDCPA section 807(11) (as implemented by proposed § 1006.18(e)), and a debt collector would not risk violating FDCPA section 805(b) (as

---

[171] See, e.g., Cordes v. Frederick J. Hanna & Assocs., P.C., 789 F. Supp. 2d 1173, 1177 (D. Minn. 2011) (holding that debt collector violated FDCPA section 805(b) by leaving voicemail messages that disclosed that the caller was a debt collector); Marisco v. NCO Fin. Sys., Inc., 946 F. Supp. 2d 287, 289, 291–96 (E.D.N.Y. 2013) (holding that consumer stated a claim for a violation of FDCPA 805(b) where debt collector's voicemail message was overheard by a third party and stated, in part, "This is an important message from NCO Financial Systems, Inc. The law requires that we notify that this is a debt collection company. This is an attempt to collect a debt and any information obtained will be used for that purpose. This is an attempt to collect a debt."); Fed. Trade Comm'n v. Check Enforcement, No. CIV.A. 03–2115 (JWB), 2005 WL 1677480, at *8 (D.N.J. July 18, 2005) ("[T]he record indicates that defendants left messages on home answering machines, which were overheard by family members and other third parties, to obtain payments from alleged indebted consumers. Thus, defendants have . . . engaged in prohibited communications with third parties in violation of Section 805 of the FDCPA."), aff'd sub nom. Fed. Trade Comm'n v. Check Investors, Inc., 502 F.3d 159 (3d Cir. 2007); see also Foti v. NCO Fin. Sys., Inc., 424 F. Supp. 2d 643, 655–56 (S.D.N.Y. 2006) ("Defendant's voicemail message, while devoid of any specific information about any particular debt, clearly provided some information, even if indirectly, to the intended recipient of the message. Specifically, the message advised the debtor that the matter required immediate attention, and provided a specific number to call to discuss the matter. Given that the obvious purpose of the message was to provide the debtor with enough information to entice a return call, it is difficult to imagine how the voicemail message is not a communication under the FDCPA.").

[172] Foti, 424 F. Supp. 2d at 657–58 ("[A] narrow reading of the term 'communication' to exclude instances such as the present case where no specific information about a debt is explicitly conveyed could create a significant loophole in the FDCPA, allowing debtors to circumvent the § 1692e(11) disclosure requirement, and other provisions of the FDCPA that have a threshold 'communication' requirement, merely by not conveying specific information about the debt . . . . Such a reading is inconsistent with Congress's intent to protect consumers from 'serious and widespread' debt collection abuses."); Hosseinzadeh v. M.R.S. Assocs., Inc., 387 F. Supp. 2d 1104, 1116 (C.D. Cal. 2005) ("Because it appears that defendant's messages are 'communications' subjecting defendant to the provisions of § 1692e(11), it also appears that defendant has violated § 1692e(11) because the messages do not convey the information required by § 1692e(11), in particular, that the messages were from a debt collector.").

[173] See, e.g., Zortman v. J.C. Christensen & Assocs., Inc., 870 F. Supp. 2d 694, 701, 707–08 (D. Minn. 2012) (holding that debt collector did not violate FDCPA section 805(b) by leaving a voicemail message that stated, "We have an important message from J.C. Christensen & Associates. This is a call from a debt collector. Please call 866–319–8619."); Zweigenhaft v. Receivables Performance Mgmt., LLC, No. 14 CV 01074 RJD JMA, 2014 WL 6085912, at *1 (E.D.N.Y. Nov. 13, 2014) (similar); Biggs v. Credit Collections, Inc., No. CIV–07–0053–F, 2007 WL 4034997, at *4 (W.D. Okla. Nov. 15, 2007) ("Words matter—in this instance, the words of the voice mails and the words of the statutory definition of a 'communication.' The transcript of the voice mail messages demonstrates that the voice mails 'convey[ed]' no 'information regarding a debt.' No amount of liberal construction can broaden the statutory language to encompass the words recorded in these voice mails."); see also Consent Order at ¶ IV.A., Fed. Trade Comm'n v. Expert Global Solutions, Inc., No. 3:13–cv–02611–M (N.D. Tex. July 16, 2013), https://www.ftc.gov/sites/default/files/documents/cases/2013/07/130709ncoorder.pdf (enjoining defendant debt collector from leaving recorded messages in which defendant states both the debtor's name and that the caller is a debt collector, unless the recipient's voicemail greeting identifies only the debtor's first and last name or defendant has already spoken with the debtor at the called number).

[174] See, e.g., Small Business Review Panel Report, supra note 57, at 25–26.

[175] See the section-by-section analysis of proposed § 1006.14(b)(2).

[176] See Bureau of Consumer Fin. Prot., Advanced Notice of Proposed Rulemaking, Debt Collection (Regulation F), 78 FR 67848, 67867 (Nov. 12, 2013)

(noting that debt collectors believe that recent case law presents a dilemma in which a debt collector's voicemail for a consumer may not be able to comply with both FDCPA sections 805(b) and 807(11)); Fed. Trade Comm'n, Collecting Consumer Debts: The Challenges of Change, at 36 n.228 (Feb. 2009), https://www.ftc.gov/sites/default/files/documents/reports/collecting-consumer-debts-challenges-change-federal-trade-commission-workshop-report/dcwr.pdf (hereinafter FTC Modernization Report) (summarizing industry members' comments that conflicting case law on debt collectors' ability to communicate by newer forms of technology deters debt collectors from using such technologies, including leaving voicemails); id. at 47–49 (noting industry commenters' concerns about their ability to leave voicemails that comply with the FDCPA and recommending that the law regarding voicemails be clarified).

[177] See FTC Modernization Report, supra note 176, at 49–50; U.S. Gov't Accountability. Off., GAO–09–748, Credit Cards: Fair Debt Collection Practices Act Could Better Reflect the Evolving Debt Collection Marketplace and Use of Technology, at 47–48, 52 (Sept. 2009), http://www.gao.gov/assets/300/295588.pdf.

implemented by proposed § 1006.6(d)) if someone other than the consumer heard or received the message.

The proposal would define a limited-content message as, in part, a message "for a consumer." As a result, any message left for a person other than a consumer would not be a limited-content message. FDCPA section 807(11)'s requirement that a debt collector disclose that the purpose of a communication is to collect a debt and that any information obtained will be used for that purpose applies only when a debt collector is communicating "with the consumer." Concerns about the intersection of FDCPA sections 805(b) and 807(11) are thus not as relevant when a debt collector contacts a person other than a consumer. In addition, because debt collectors generally are prohibited from communicating with a person other than the consumer, they generally have no need to contact third parties, and, when such communications are permitted for obtaining location information about a consumer, FDCPA section 804 already provides a comprehensive disclosure regime. Therefore, it may not be necessary to specify the content of a message that does not constitute a communication if left by a debt collector for a person other than the consumer.

The proposal would enable a debt collector to transmit a limited-content message by voicemail, by text message, or orally. Debt collectors may be most likely to use these methods to send limited-content messages, and these methods may be most likely to generate a response from a consumer. The proposal would not enable a debt collector to transmit a limited-content message by email because, as discussed below, email messages typically require additional information (e.g., a sender's email address) that may in some circumstances convey information about a debt, and consumers may be unlikely to read or respond to an email containing solely the information included in a limited-content message (e.g., consumers may disregard such an email as spam or a security risk). In addition, other aspects of the proposed rule (e.g., the procedures described in proposed § 1006.6(d)(3) for emails and text messages) may encourage debt collectors to send debt collection communications to consumers by email. Accordingly, a rule that would enable debt collectors to send limited-content messages by email might not sufficiently protect consumers' privacy interests or be of significant benefit to debt collectors.

Proposed comment 2(j)–1 explains that any message other than a message

that includes the content specified in § 1006.2(j) is not a limited-content message. The comment further explains that, if a message includes any other content and such other content directly or indirectly conveys any information about a debt, including but not limited to any information that indicates that the message relates to the collection of a debt, the message would be a communication, as defined in proposed § 1006.2(d). Proposed comment 2(j)–2 provides examples of limited-content messages.

Proposed comment 2(j)–3 provides examples of ways in which a debt collector could transmit a limited-content message to a consumer, such as by leaving a voicemail at the consumer's telephone number, sending a text message to the consumer's mobile telephone number, or leaving a message orally with a third party who answers the consumer's home or mobile telephone number. Proposed comment 2(j)–3 notes, however, that leaving a limited-content message would be subject to other FDCPA provisions, including the prohibitions on harassing or abusive conduct and unfair or unconscionable practices in FDCPA sections 806 and 808, respectively.[178] As the section-by-section analyses of proposed §§ 1006.2(b) and (d), 1006.6(b) and (c), 1006.14(h), and 1006.22(f)(3) and (4) explain in more detail, consumers may be harassed or otherwise injured not only by communications, but also by attempts to communicate, including when a debt collector conveys limited-content messages. Accordingly, those sections propose certain restrictions on when and how a debt collector may attempt to communicate with a person, including by leaving a limited-content message.

Proposed comment 2(j)–4 would clarify that a debt collector who places a telephone call and leaves only a limited-content message for a consumer does not, with respect to that telephone call, violate FDCPA section 806(6)'s prohibition on the placement of telephone calls without meaningful disclosure of the caller's identity. Under the proposed interpretation, the content described in proposed § 1006.2(j)(1) would meaningfully disclose the caller's identity. The proposed interpretation would be limited to the narrow circumstance of a debt collector providing only a limited-content message to a consumer. As described below, proposed § 1006.2(j)(1) would require a limited-content message to include the name of a natural person whom the consumer could contact as

---

[178] 15 U.S.C. 1692d, 1692f.

well as a telephone number that the consumer could use to reply to the debt collector; a limited-content message could not contain any content that is not described in proposed § 1006.2(j)(1) or (2), and debt collectors would be prohibited from including false or misleading statements about the caller's identity or the purpose of the call. As a result, the message should not mislead a consumer about the identity of the caller and the consumer could use the contact information to call a particular employee of a debt collector. Upon receiving such a call and engaging in a communication, the debt collector would be required by FDCPA section 807(11) to disclose to the consumer that the communication is from a debt collector. This sequence of events—a limited-content message followed by a communication in which the debt collector provides the FDCPA section 807(11) disclosures—may benefit consumers more than the status quo, under which many debt collectors place repeated telephone calls without leaving any message or any contact information that the consumer can use to reply to the debt collector.

The interpretation in proposed comment 2(j)–4 would apply only when a debt collector places a telephone call and leaves only a limited-content message for a consumer. It would not extend to any other message a debt collector leaves for a consumer or other person, as such messages might not include all of the content that must be included in a limited-content message, might include content that is not described in proposed § 1006.2(j)(1) or (2) and that conveys a misleading impression about the caller's identity or purpose of the call, or might constitute a communication that is subject to FDCPA section 807(11) or that otherwise would need to include different disclosures about the caller's identity and purpose in order to satisfy FDCPA section 806(6). Similarly, the rationale in proposed comment 2(j)–4 would not extend to a telephone call that is a live conversation with the consumer because, again, the content of such a conversation would be different than the content of a limited-content message.

The Bureau requests comment on whether the proposal to define a limited-content message that a debt collector could leave for a consumer without risking a violation of FDCPA sections 805(b) or 807(11) will enable debt collectors to establish contact with consumers while reducing the number of telephone calls that consumers receive. The Bureau further requests comment on the costs and benefits of

permitting debt collectors to leave limited-content messages for consumers, including on whether those costs and benefits differ depending on whether a debt collector leaves a limited-content message: (1) In a voicemail message on a home, mobile, or work telephone; (2) in a live conversation with a third party who answers the consumer's home, mobile, or work telephone number; or (3) by text message. The Bureau requests comment on whether there are other communication media, such as email, by which debt collectors should be permitted to leave limited-content messages, including in particular on the advantages and disadvantages of the proposed approach, which would not permit debt collectors to send limited-content messages by email. In addition, the Bureau requests comment on whether a debt collector should be permitted to leave limited-content messages with third parties only in certain circumstances (e.g., if a third party answers the consumer's telephone number) and whether a debt collector should be able to include additional content in a limited-content message if leaving it with a third party (e.g., a request that the third party take a message).

The Bureau also requests comment on the proposed commentary. In particular, the Bureau requests comment on whether proposed comment 2(j)–4 properly interprets the requirement to "meaningful[ly] disclose the caller's identity" as satisfied when a debt collector places a telephone call and leaves only a limited-content message, and on whether there are other disclosures that would satisfy the meaningful disclosure requirement of FDCPA section 806(6) without causing the message to become a communication (i.e., without conveying information about a debt directly or indirectly to any person).

During the SBREFA process, small entity representatives overwhelmingly supported a rule clarifying how and when a debt collector may leave a voicemail or other message for a consumer.[179] They predicted that a rule defining a limited-content message that is not a communication under the FDCPA would reduce the number and frequency of collection calls as well as facilitate communications between debt collectors and consumers. The Small Business Review Panel Report recommended that the Bureau request comment on the costs and benefits of any limited-content message proposal, including on the costs and benefits of

[179] Small Business Review Panel Report, supra note 57, at 36.

providing limited-content messages by media other than telephone, and of any proposal that would require debt collectors to include a toll-free callback telephone number in a limited-content message (as the proposal then under consideration would have).[180] Proposed § 1006.2(j) and the requests for comment in this section are consistent with the feedback received during the SBREFA process, which supported a definition of limited-content message, and the Panel Report's recommendations.

2(j)(1) Required Content

Proposed § 1006.2(j)(1) would require that limited-content messages include certain content to ensure that they facilitate contact between debt collectors and consumers. In particular, proposed § 1006.2(j)(1) provides that a limited-content message must include all of the following: The consumer's name, a request that the consumer reply to the message, the name or names of one or more natural persons whom the consumer can contact to reply to the debt collector,[181] a telephone number that the consumer can use to reply to the debt collector,[182] and, if delivered electronically, a disclosure explaining how the consumer can stop receiving messages through that medium.[183] The consumer's name and a request that the consumer reply to the message may help to ensure that the correct person receives the message and is prompted to respond. Including in the message a telephone number that the consumer can use to reply to the message, as well as the name of at least one person the

[180] Id.
[181] Proposed § 1006.18(f) would clarify that a debt collector's employee does not violate § 1006.18 by using an assumed name when communicating or attempting to communicate with a person, provided that the employee uses the assumed name consistently and that the employer can readily identify any employee who is using an assumed name. See the section-by-section analysis of proposed § 1006.18(f).
[182] The proposal under consideration during the SBREFA process would have required the telephone number to be toll-free to the consumer (e.g., a 1–800 number). See Small Business Review Panel Outline, supra note 56, at 24. In light of feedback from some small entity representatives regarding the potential costs of maintaining a 1–800 number for the sole purpose of being able to transmit limited-content messages, the proposed rule would not require a toll-free telephone number.
[183] Proposed § 1006.6(e) would require a debt collector who communicates or attempts to communicate with a consumer electronically in connection with the collection of a debt using, among other things, a telephone number for text messages or other electronic-medium address, to include in such communication or attempt to communicate a clear and conspicuous statement describing one or more ways the consumer can opt out of further electronic communications or attempts to communicate by the debt collector to that address or telephone number. See the section-by-section analysis of proposed § 1006.6(e).

consumer can speak to, should enable the consumer to reply to the message and interact with a debt collector's employee who has access to information about the debt in collection. In the case of a limited-content message sent by text message, a disclosure explaining how the consumer can stop receiving such messages may help prevent harassment, as further explained in the section-by-section analysis of proposed § 1006.6(e). In addition, the Bureau understands that the content required by § 1006.2(j)(1) often is included in a voicemail or other message for a person in a wide variety of non-debt collection circumstances, so a third party hearing or observing the message may not infer from its content that the consumer owes a debt. Under this proposed interpretation, none of the items in the limited-content message themselves individually or collectively convey that the consumer owes a debt or other information regarding a debt.

Proposed comment 2(j)(1)(iv)–1 notes that a limited-content message must include a telephone number that the consumer can use to reply to the debt collector. The proposed comment explains that a voicemail or a text message that spells out, rather than enumerates numerically, a vanity telephone number is not a limited-content message. Spelling out a vanity telephone number could, in some circumstances, convey information about a debt or otherwise disclose that the message is from a debt collector. The Bureau considered permitting such telephone numbers to be included in limited-content messages on the condition that they do not convey information about a debt, but such a condition would require a case-by-case analysis to determine if a particular vanity number conveyed information about a debt. As a result, permitting the inclusion of a vanity number in any or all circumstances could undermine the certainty that the limited-content message definition is designed to provide and could increase the risk that a third party hearing or observing the message could infer that it relates to debt collection. Similarly, the sender's email address could, in some circumstances, convey information about a debt. In part for that reason, proposed § 1002.2(j) would not permit a limited-content message to include a sender's email address and, consequently, would effectively prohibit sending a limited-content message by email. As discussed, debt collectors also may have less of a need to send a limited-content message by email because proposed § 1006.6(d)(3) would clarify the procedures that a debt

collector could maintain to avoid incurring liability for a prohibited third-party communication by email, thereby reducing the risk to debt collectors of sending debt collection communications to consumers by email.

## 2(j)(2) Optional Content

Proposed § 1006.2(j)(2) would permit a debt collector to include in a limited-content message certain content that may help prompt a consumer to reply but that, unlike the content described in proposed § 1006.2(j)(1), may not be necessary to enable the consumer to reply to the message or to prevent harassment. In particular, proposed § 1006.2(j)(2) provides that a limited-content message also may include one or more of the following: A salutation, the date and time of the message, a generic statement that the message relates to an account, and suggested dates and times for the consumer to reply to the message. The proposed interpretation would hold that none of these items, individually or collectively, conveys that the consumer owes a debt or other information regarding a debt.

The Bureau requests comment on all aspects of proposed § 1006.2(j), including on the proposed interpretation that none of the content described in proposed § 1006.2(j)(1) and (2) conveys information regarding a debt. The Bureau also requests comment on whether the proposal to allow a limited-content message to include a generic statement that the message relates to an "account" raises a risk that the message would convey information about a debt to a third party hearing or observing the message, and whether there is an alternative statement that would better minimize such risk. For example, the Bureau considered proposing permitting a limited-content message to state that the message relates to a "personal," "business," "confidential," "private," "important," or "time-sensitive" matter, but each of these might, in at least certain contexts, be misleading or confusing to a consumer. The Bureau further requests comment on whether there is sufficient information required or permitted in the limited-content message to prompt consumers to make a return call or text to the included telephone number and, if not, what additional information could be included in the message that would not cause the message to constitute a communication. The Bureau also requests comment on whether including a sender or recipient email address or a vanity telephone number in a limited-content message could convey information about a debt to a third party hearing or observing the

message and reduce the utility of a bright-line definition. Finally, the Bureau requests comment on the media by which debt collectors anticipate that they would send limited-content messages and on whether additional clarification is necessary regarding sending limited-content messages by media other than telephone.

## 2(k) Person

Proposed § 1006.2(k) would define the term person to have the meaning set forth in 1 U.S.C. 1, which provides that, "in determining the meaning of any Act of Congress, unless the context indicates otherwise," the term person includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." [184] The FDCPA does not define the term person, and the context does not appear to indicate that a meaning other than the meaning in 1 U.S.C. 1 should apply. The term person is used throughout the FDCPA and the proposed regulation. The Bureau proposes to define this term to facilitate compliance, with only minor wording changes from the statute.

## Subpart B—Rules for FDCPA Debt Collectors [185]

*Section 1006.6 Communications in Connection With Debt Collection*

FDCPA section 805 generally limits how debt collectors may communicate with consumers and third parties when collecting debts. [186] Proposed § 1006.6 would implement and interpret FDCPA section 805; it also would interpret FDCPA sections 806 and 808 to provide certain additional protections regarding debt collection communications.

## 6(a) Definition

FDCPA section 805(d) provides that, for purposes of section 805, the term consumer includes certain individuals other than the person obligated or allegedly obligated to pay the debt. Accordingly, the protections in FDCPA section 805 apply to these individuals and the person obligated or allegedly obligated to pay the debt. Also, debt collectors may communicate with these individuals in connection with the collection of any debt without violating the FDCPA's prohibition on third-party

disclosures. [187] For example, under FDCPA section 805(d), a debt collector may communicate not only with the consumer who owes or allegedly owes the debt, but also with the consumer's spouse, parent (if the consumer is a minor), guardian, executor, or administrator, [188] even though debt collectors generally are prohibited from communicating in connection with the collection of a debt with third parties. [189] A debt collector may communicate with third parties to seek location information about consumers, but the debt collector may not state that the consumer owes any debt. [190]

Proposed § 1006.6(a) would implement and interpret FDCPA section 805(d) and would define consumer for purposes of proposed §§ 1006.6 and 1006.14(h). Consistent with proposed § 1006.2(e), which, as described above, would interpret consumer to include deceased persons, proposed comments 6(a)(1)–1 and 6(a)(2)–1 would clarify that surviving spouses and parents of deceased minor consumers, respectively, are consumers for purposes of proposed § 1006.6. Except for these clarifications, and except for the interpretations discussed in the section-by-section analysis of proposed § 1006.6(a)(4) and (5), proposed § 1006.6(a) generally mirrors the statute. The section-by-section analysis below therefore addresses only proposed § 1006.6(a)(4) and (5).

## 6(a)(4)

Proposed § 1006.6(a)(4) would implement FDCPA section 805(d)'s definition of the term consumer as related to executors and administrators. Proposed § 1006.6(a)(4) generally restates the statute and its commentary also interprets FDCPA section 805(d) to include the personal representative of the deceased consumer's estate.

As discussed above, FDCPA section 805 generally limits the individuals with whom a debt collector may discuss the debt to those individuals identified as consumers in FDCPA section 805(d). If the consumer who owes or allegedly owes the debt is deceased, the consumer's family members may find that debt collectors are reluctant to communicate with the individuals attempting to resolve any outstanding debts of the decedent unless they are among the individuals identified in FDCPA section 805(d) with whom a debt collector may generally discuss the

---

[184] *See* 1 U.S.C. 1.

[185] Consistent with its proposal to amend Regulation F to prescribe Federal rules governing the activities of debt collectors, the Bureau proposes to move existing §§ 1006.3 through 1006.8 regarding applications for State exemptions from the FDCPA to appendix A of the regulation. See the section-by-section analysis of proposed § 1006.108 and appendix A.

[186] 15 U.S.C. 1692c.

[187] 15 U.S.C. 1692c(d).

[188] *Id.*

[189] *See* 15 U.S.C. 1692c(b).

[190] *See* 15 U.S.C. 1692b. For additional discussion of these provisions, see the section-by-section analyses of proposed §§ 1006.6(d) and 1006.10(c).

debt, *i.e.*, individuals with the title of executor or administrator under State law. This reluctance may delay the prompt resolution of estates.

The Bureau understands that most States currently provide procedures for resolving estates that are faster and less expensive than the formal probate process that may have been more common when Congress enacted the FDCPA more than 40 years ago. Under these expedited State procedures, an individual with the authority to pay the decedent's debts out of the assets of the estate may lack the particular title of executor or administrator under State law. The Bureau proposes to interpret the terms executor and administrator as used in the FDCPA to include personal representatives, which is defined in proposed comment 6(a)(4)–1 as any person who is authorized to act on behalf of the deceased consumer's estate. These terms are not defined in the FDCPA, and the FDCPA does not indicate that they are limited to persons who formally have the title of executor or administrator under State law. Rather, it is ambiguous whether the terms executor and administrator include personal representatives of a consumer's estate, as these persons serve the functions of executors or administrators but do not formally have that title. Accordingly, the Bureau proposes to interpret executor and administrator in a manner that is flexible enough to recognize the evolution in estate resolution processes over time, including the use of a personal representative to be the executor or administrator of the decedent's estate.[191]

The ability to resolve the debts of estates outside of the formal probate process through informal processes may benefit consumers. If a debt collector does not communicate with an estate *because no executor or administrator exists*, the debt collector might force the estate into probate, which could substantially burden the resources of the estate and the deceased consumer's heirs or beneficiaries. These burdens may be particularly acute for small estates and for individuals of limited means. Probate also adds costs and delays for debt collectors. In its Policy Statement on Decedent Debt, the FTC voiced similar concerns about unnecessarily pushing estates into probate. In light of such concerns, the FTC indicated that the agency would

take no enforcement action against debt collectors who communicated about a decedent's debts with an individual who has the authority to pay the debts out of the assets of the deceased consumer's estate.[192]

For these reasons, and pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors, the Bureau proposes § 1006.6(a)(4). The Bureau requests comment on proposed § 1006.6(a)(4).

Proposed comment 6(a)(4)–1 would clarify that the terms executor and administrator include the personal representative of the consumer's estate, and that a personal representative of the consumer's estate is any person who is authorized to act on behalf of the deceased consumer's estate. The proposed comment explains that persons with such authority may include personal representatives under the informal probate and summary administration procedures of many States, persons appointed as universal successors, persons who sign declarations or affidavits to effectuate the transfer of estate assets, and persons who dispose of the deceased consumer's assets extrajudicially.

The term personal representative in comment 6(a)(4)–1 includes the same individuals as those recognized by the FTC's Policy Statement on Decedent Debt.[193] As the FTC has noted, some of the terms used to describe these individuals come from the Uniform Probate Code.[194] However, proposed comment 6(a)(4)–1 adapts the general description of the term personal representative from Regulation Z, 12 CFR 1026.11(c), comment 11(c)–1 (persons "authorized to act on behalf of the estate") rather than the general description found in the FTC's Policy Statement (persons with the "authority to pay the decedent's debts from the assets of the decedent's estate."). The Bureau believes that this change is non-substantive. The description of the term personal representative also reflects the language that a debt collector may use to acquire location information about the executor, administrator, or personal representative of the deceased consumer's estate, as explained in

proposed comment 10(b)(2)–1.[195] The Bureau requests comment on the scope of the definition of personal representative in proposed comment 6(a)(4)–1 and on any ambiguity in the illustrative descriptions of personal representatives. The Bureau specifically requests comment on experiences under the FTC's Policy Statement on Decedent Debt.

In its Small Business Review Panel Outline, the Bureau stated that it was considering limiting the definition of personal representative to individuals recognized under State probate or estate laws.[196] However, the Bureau received feedback from industry indicating that many State laws define personal representative to mean an executor or administrator. In these States, the definition of personal representative under consideration in the Small Business Review Panel Outline would have restricted communication to formally appointed executors or administrators, which would not have alleviated the harms the Bureau intended to address. Proposed comment 6(a)(4)–1, which provides that a personal representative is any person who is authorized to act on behalf of the deceased consumer's estate, is designed to address this post-SBREFA feedback.

*6(a)(5)*

Proposed § 1006.6(a)(5) would interpret FDCPA section 805(d)'s definition of the term consumer to include confirmed successors in interest. Under Regulations X and Z, a successor in interest is a person to whom a borrower transfers an ownership interest either in a property securing a mortgage loan subject to subpart C of Regulation X, or in a dwelling securing a closed-end consumer credit transaction under Regulation Z, provided that the transfer is: (1) A transfer by devise, descent, or operation of law on the death of a joint tenant or tenant by the entirety; (2) a transfer to a relative resulting from the death of a borrower; (3) a transfer where the spouse or children of the borrower become an owner of the property; (4) a transfer resulting from a decree of a dissolution of marriage, legal separation agreement, or from an incidental property settlement agreement, by which the spouse of the borrower becomes an owner of the property; or (5) a transfer into an *inter vivos* trust in which the borrower is and remains a beneficiary and which does not relate to

---

[191] Additionally, the word "includes" in FDCPA section 805(d) indicates that section 805(d) is an exemplary, rather than an exhaustive, list of the categories of individuals who are consumers for purposes of FDCPA section 805. *See* 15 U.S.C. 1692c(d).

[192] Statement of Policy Regarding Communications in Connection with the Collection of Decedents' Debts, 76 FR 44915, 44919 (July 27, 2011) (hereinafter FTC Policy Statement on Decedent Debt).

[193] *Id.*

[194] Statement of Policy Regarding Communications in Connection with Collection of a Decedent Debt, 75 FR 62389, 62391–92 (Oct. 8, 2010) (describing the processes of informal probate and administration and universal succession).

[195] See the section-by-section analysis of proposed § 1006.10(b).

[196] Small Business Review Panel Outline, *supra* note 56, at 32–33.

a transfer of rights of occupancy in the property.[197] A confirmed successor in interest, in turn, means a successor in interest once a servicer has confirmed the successor in interest's identity and ownership interest in the relevant property type.[198]

As the Bureau explained in its Amendments to the 2013 Mortgage Rules under the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z) (2016 Servicing Final Rule)[199] and its concurrently issued FDCPA interpretive rule (2016 FDCPA Interpretive Rule),[200] the word "includes" in FDCPA section 805(d) indicates that section 805(d) is an exemplary, rather than an exhaustive, list of the categories of individuals who are consumers for purposes of FDCPA section 805. The Bureau explained that FDCPA section 805 recognizes the importance of permitting debt collectors to communicate with a narrow category of persons other than the individual who owes or allegedly owes the debt who, by virtue of their relationship to that individual, may need to communicate with the debt collector in connection with the collection of the debt. The Bureau further explained that, given their relationship to the individual who owes or allegedly owes the debt, confirmed successors in interest are—like the narrow categories of persons enumerated in FDCPA section 805(d)—the type of individuals with whom a debt collector needs to communicate about the debt. The Bureau therefore interpreted the term consumer for purposes of FDCPA section 805 to include a confirmed successor in interest as that term is defined in Regulation X, 12 CFR 1024.31, and Regulation Z, 12 CFR 1026.2(a)(27)(ii).[201]

*Consistent with that interpretation,* and pursuant to its authority under FDCPA section 814(d) to write rules with respect to the collection of debts by debt collectors, the Bureau proposes to interpret FDCPA section 805(d) in § 1006.6(a)(5) to provide that a confirmed successor in interest, as defined in Regulations X and Z, is a consumer for purposes of proposed § 1006.6. The Bureau requests comment on proposed § 1006.6(a)(5), including on the benefits and risks of communications about debts between debt collectors and confirmed successors in interest.

---

[197] 12 CFR 1024.31; 1026.2(a)(27)(i).

[198] 12 CFR 1024.31; 1026.2(a)(27)(ii).

[199] 81 FR 72160 (Oct. 19, 2016).

[200] 81 FR 71977 (Oct. 19, 2016).

[201] *Id.* at 71979; 81 FR 72160, 72181 (Oct. 19, 2016).

## 6(b) Communications With a Consumer—In General

*FDCPA section 805(a)* restricts how a debt collector may communicate with a consumer in connection with the collection of any debt and provides certain exceptions to these prohibitions.[202] The Bureau generally proposes § 1006.6(b) to implement and interpret FDCPA section 805(a) to specify circumstances in which a debt collector is prohibited from communicating with a consumer in connection with the collection of any debt. In addition, the Bureau proposes § 1006.6(b) to interpret FDCPA sections 806 and 808 to prohibit a debt collector from attempting to communicate with a consumer if FDCPA section 805(a) would prohibit the debt collector from communicating with the consumer. The Bureau proposes § 1006.6(b) pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to *the collection of debts by debt* collectors.

### Attempts To Communicate

The Bureau proposes to clarify in proposed § 1006.6(b) that a debt collector is prohibited from attempting to communicate with a consumer in the same circumstances in which FDCPA *section 805(a)* prohibits the debt collector from communicating with the consumer. As discussed, proposed § 1006.2(b) would define an attempt to communicate to mean any attempt by a debt collector to initiate contact with any person, including by soliciting a response from such person, regardless of whether the attempt, if successful, would be a communication as defined in proposed § 1006.2(d). For example, a debt collector who places a telephone call to the consumer that goes unanswered has attempted to communicate with the consumer. The phrase attempt to communicate thus appears throughout proposed § 1006.6(b)(1) through (4).

The Bureau proposes to limit attempts to communicate in § 1006.6(b) based on interpretations of FDCPA sections 806 and 808. FDCPA section 806 prohibits a debt collector from engaging in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt.[203] FDCPA section 806(5) provides that causing a telephone

---

[202] 15 U.S.C. 1692c(a). Specifically, FDCPA section 805(a)(1) prohibits certain communications at unusual or inconvenient times and places, section 805(a)(2) prohibits certain communications with a consumer represented by an attorney, and section 805(a)(3) prohibits certain communications at a consumer's place of employment.

[203] 15 U.S.C. 1692d.

to ring repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number is an example of conduct the natural consequence of which is to harass, oppress, or abuse. FDCPA section 806(5) thus recognizes that telephone calls may have the natural consequence of harassment, oppression, or abuse even if no conversation ensues. A consumer who hears a telephone ringing at an *inconvenient time or place* but who does not answer it may experience the natural consequence of harassment from the telephone ringing in much the same way as a consumer who answers and speaks to the debt collector on the telephone. For this reason, the Bureau proposes to interpret FDCPA section 806 as prohibiting a debt collector from attempting to communicate at times when and places where a communication would be prohibited as inconvenient.

*FDCPA section 808 prohibits a debt* collector from using unfair or unconscionable means to collect or attempt to collect any debt.[204] A debt collector who places a telephone call without the intent to speak to any person who answers the telephone (thus avoiding a communication for purposes of FDCPA section 805) may be causing injury to persons at the called number without any legitimate purpose, and thus may be engaging in a prohibited unfair or unconscionable act under FDCPA section 808. Additionally, section 808 targets practices that pressure a consumer to pay debts the consumer might not otherwise have paid. A debt collector's attempts to communicate at a time when or a place where a communication would be prohibited could pressure the consumer to pay the debt to avoid further intrusions on the consumer's privacy, and the Bureau interprets such conduct as unfair or unconscionable under FDCPA section 808. The Bureau requests comment on its proposed interpretations regarding attempts to communicate.

### 6(b)(1) Prohibitions Regarding Unusual or Inconvenient Times or Places

FDCPA section 805(a)(1) prohibits a debt collector from, among other things, communicating with a consumer in *connection with the collection of any* debt at times or places that the debt collector knows or should know are inconvenient to the consumer, subject to certain exceptions. As discussed in the section-by-section analysis below, proposed § 1006.6(b)(1)(i) and (ii)

---

[204] 15 U.S.C. 1692f.

generally would implement and interpret FDCPA section 805(a)(1).

Proposed comment 6(b)(1)–1 provides general interpretations and illustrations of the time and place restrictions in proposed § 1006.6(b)(1). Proposed comment 6(b)(1)–1 illustrates how a debt collector knows or should know that a time or place is inconvenient to a consumer. The proposed comment explains that a debt collector may know, or should know, that a time or place is inconvenient to a consumer if the consumer uses the word "inconvenient" to notify the debt collector. The proposed comment also explains that, even if the consumer does not use the word "inconvenient" to notify the debt collector, the debt collector nevertheless may know, or should know, based on the facts and circumstances, that a time or place is inconvenient. The Bureau proposes this interpretation because FDCPA section 805(a)(1) refers to what is "inconvenient to the consumer," without specifying that a consumer must designate communications as inconvenient using the word "inconvenient." The Bureau's proposed interpretation also is consistent with some case law holding that a consumer need not use the precise language of the statute to invoke the protections of FDCPA section 805.[205]

Proposed comment 6(b)(1)–1 would further clarify that, if the consumer initiates a communication with the debt collector at a time or from a place that the consumer previously designated as inconvenient, the debt collector may respond once to that consumer-initiated communication at that time or place. Because the consumer initiated the communication, the debt collector neither knows nor should know that responding to that specific communication is inconvenient to the consumer. The debt collector is permitted to respond once. After that response, the debt collector must not communicate or attempt to communicate further with the consumer at that time or place until the consumer conveys that the time or place is no longer inconvenient. Proposed comment 6(b)(1)–1 also provides four specific examples of when a debt collector knows or should know that the time or place of a communication is inconvenient to a consumer.

The Bureau requests comment on proposed § 1006.6(b)(1) and on comment 6(b)(1)–1, including on whether other general clarifications regarding inconvenient times or places would be useful or whether other

examples and illustrations would be instructive. The Bureau specifically requests comment on whether additional clarification is needed regarding the delivery of legally required communications at a time or place that a debt collector knows or should know is inconvenient to a particular consumer. The Bureau requests comment on whether to require a debt collector to ask a consumer at the outset of all debt collection communications whether the time or place is convenient to the consumer. The Bureau also requests comment on what effect a consumer-initiated communication should have on the times and places that a debt collector knows or should know are inconvenient to the consumer.

*6(b)(1)(i)*

FDCPA section 805(a)(1) provides, in relevant part, that a debt collector may not communicate with a consumer in connection with the collection of any debt at any unusual time, or at a time that the debt collector knows or should know is inconvenient to the consumer.[206] FDCPA section 805(a)(1) specifies that, in the absence of knowledge of circumstances to the contrary, a debt collector shall assume that the convenient time for communicating with a consumer is after 8:00 a.m. and before 9:00 p.m., local time at the consumer's location.

Proposed § 1006.6(b)(1)(i) would implement and interpret FDCPA section 805(a)(1)'s prohibitions regarding unusual or inconvenient times.[207] The Bureau interprets the language in FDCPA section 805(a)(1) that a debt collector shall assume that the convenient time for communicating with a consumer is after 8:00 a.m. and before 9:00 p.m. to mean that a time before 8:00 a.m. and after 9:00 p.m. local time at the consumer's location is inconvenient, unless the debt collector has knowledge of circumstances to the contrary. The Bureau requests comment on proposed § 1006.6(b)(1)(i).[208]

Proposed comment 6(b)(1)(i)–1 would clarify that, for purposes of determining the time of an electronic communication under § 1006.6(b)(1)(i), an electronic communication occurs when the debt collector sends it, not, for example, when the consumer receives or views it. Ambiguity exists about whether, for purposes of FDCPA section 805(a)(1), an electronic communication occurs at the time of sending or at the time of receipt or viewing. A rule that clarifies that an electronic communication occurs when the debt collector sends it makes it possible for a debt collector to comply. A debt collector can control the time at which it chooses to send communications, whereas it often would be impossible for a debt collector to determine when a consumer receives or views an electronic communication. Accordingly, under proposed § 1006.6(b)(1)(i), a debt collector would be prohibited from sending an electronic communication at a time that the debt collector knows or should know is inconvenient to the consumer. The Bureau requests comment on proposed comment 6(b)(1)(i)–1.

Proposed comment 6(b)(1)(i)–2 would provide a safe harbor and illustrate how a debt collector could comply with proposed § 1006.6(b)(1)(i) and FDCPA section 805(a)(1) if the debt collector has conflicting or ambiguous information regarding a consumer's location, such as telephone numbers with area codes located in different time zones or a telephone number with an area code and a physical address that are inconsistent. Proposed comment 6(b)(1)(i)–2 would clarify that, if a debt collector is unable to determine a consumer's location, then, in the absence of knowledge of circumstances to the contrary, the debt collector would comply with the prohibition in § 1006.6(b)(1)(i) on communicating at inconvenient times if the debt collector communicated or attempted to communicate with the consumer at a time that would be convenient in all of the locations at which the debt collector's information indicated the consumer might be located. A debt collector with such conflicting information may know or should know that it is inconvenient to contact a consumer at a time outside of the presumptively convenient times (8:00 a.m. to 9:00 p.m.) in any of the time zones in which the consumer might be located. As indicated by some industry

---

[205] See, e.g., Horkey v. J.V.D.B. & Assocs., Inc., 333 F.3d 769, 773 (7th Cir. 2003).

[206] 15 U.S.C. 1692c(a)(1).

[207] As discussed in the section-by-section analysis of proposed § 1006.6(b), proposed § 1006.6(b)(1)(i) also would interpret FDCPA sections 806 and 808 to prohibit a debt collector from attempting to communicate with a consumer at a time when FDCPA section 805(a)(1) would prohibit the debt collector from communicating with the consumer.

[208] In the Small Business Review Panel Outline, the Bureau described a proposal under consideration to define the 30-day period after the death of a consumer as an inconvenient time for communicating about the deceased consumer's debt with surviving spouses or parents (in the case of deceased minor consumers) or persons acting as executors, administrators, or personal representatives of a deceased consumer's estate. See Small Business Review Panel Outline, supra note 56, at 33. The proposed rule does not include such a waiting period. The Bureau requests evidence of specific consumer harm and benefits from debt collection communications occurring within 30 days after a consumer's death.

commenters in response to the Bureau's ANPRM, some debt collectors already have adopted this proposed approach for determining the convenient times to contact a consumer if the debt collector has conflicting location information for the consumer. Proposed comment 6(b)(1)(i)–2 also provides two examples of how a debt collector could comply with proposed § 1006.6(b)(1)(i). The Bureau requests comment on proposed comment 6(b)(1)(i)–2.

6(b)(1)(ii)

FDCPA section 805(a)(1) provides, in relevant part, that a debt collector may not communicate with a consumer in connection with the collection of any debt at any unusual place, or at a place that the debt collector knows or should know is inconvenient to the consumer.[209] Proposed § 1006.6(b)(1)(ii) would implement this prohibition and generally restates the statute, with only minor changes for clarity.[210][211]

6(b)(2) Prohibitions Regarding Consumer Represented by an Attorney

FDCPA section 805(a)(2) prohibits a debt collector from communicating with a consumer in connection with the collection of any debt if the debt collector knows the consumer is represented by an attorney with respect to the debt and has knowledge of, or can readily ascertain, the attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer.[212] Proposed § 1006.6(b)(2) would implement this prohibition and generally restates the statute.[213] The Bureau requests comment on proposed § 1006.6(b)(2), including whether additional clarification regarding this prohibition would be useful.

6(b)(3) Prohibitions Regarding Consumer's Place of Employment

FDCPA section 805(a)(3) prohibits a debt collector from communicating with a consumer in connection with the collection of any debt at the consumer's place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication.[214] Proposed § 1006.6(b)(3) would implement this prohibition and generally restates the statute.[215]

Even under circumstances where proposed § 1006.6(b)(3) may not apply because the debt collector does not know or have reason to know that a consumer's employer prohibits the consumer from receiving *communications in connection with* the collection of a debt at the consumer's place of employment, proposed § 1006.22(f)(3), discussed below, would prohibit the debt collector from communicating or attempting to communicate with the consumer using an email address that the debt collector knows or should know is provided to the consumer by the consumer's employer, unless an exception under proposed § 1006.22(f)(3) applies (i.e., the debt collector has received directly from the consumer either prior consent to use that email address or an email from that email address).[216] Proposed comment 6(b)(3)–1 cross-references the employer-provided email rule described in proposed § 1006.22(f)(3).

The Bureau requests comment on proposed § 1006.6(b)(3). The Bureau also requests comment on whether additional clarification would be useful with respect to a debt collector's communications or attempts to communicate with a consumer while at work, for example, on a consumer's non-work mobile telephone or portable electronic device.

6(b)(4) Exceptions

FDCPA section 805(a) provides certain exceptions to its limitations on a debt collector's communications with a consumer. Proposed § 1006.6(b)(4) would implement and interpret the exceptions in FDCPA section 805(a).

6(b)(4)(i)

Proposed § 1006.6(b)(4)(i) would implement the text in FDCPA section 805(a) that, in relevant part, sets forth the exception for the prior consent of the consumer given directly to the debt collector.[217] Proposed § 1006.6(b)(4)(i) generally mirrors the statute, except that proposed § 1006.6(b)(4)(i) would interpret FDCPA section 805(a) to require that the consumer's prior consent must be given during a communication that would not violate proposed § 1006.6(b)(1) through (3), i.e., the prohibitions on communications with a consumer at unusual times or inconvenient times or places, communications with a consumer represented by an attorney, and communications at the consumer's place of employment. For example, ordinarily a debt collector could not place a telephone call to a consumer at midnight and obtain the consumer's prior consent for future debt collection communications. The Bureau interprets a consumer's prior consent to be consent obtained in the absence of conduct that would compromise or eliminate a consumer's ability to freely choose whether to consent. A communication that would violate proposed § 1006.6(b)(1) through (3) (e.g., consent obtained from a represented consumer where the consumer's attorney is not present) is likely to compromise or eliminate a consumer's ability to freely choose whether to consent. By addressing only prior consent purported to be obtained during a communication that would violate proposed § 1006.6(b)(1) through (3), the Bureau does not intend to suggest that prior consent obtained in other unlawful ways would comply with FDCPA section 805(a).

Proposed comments 6(b)(4)(i)–1 and –2 would clarify the meaning of prior consent.[218] Proposed comment 6(b)(4)(i)–1 explains that, if a debt collector learns during a communication that the debt collector is communicating with a consumer at an inconvenient time or place, the debt collector cannot during that communication ask the consumer to consent to the continuation of that debt collection communication. The Bureau proposes this comment because consent that satisfies proposed § 1006.6(b)(4)(i) must be "prior" and therefore given in advance of a communication that otherwise would violate proposed § 1006.6(b)(1) through

---

[209] 15 U.S.C. 1692c(a)(1).

[210] As discussed in the section-by-section analysis of proposed § 1006.6(b), proposed § 1006.6(b)(1)(ii) also would interpret FDCPA sections 806 and 808 to prohibit a debt collector from attempting to communicate with a consumer at a place at which FDCPA section 805(a)(1) would prohibit the debt collector from communicating with the consumer.

[211] In the Small Business Review Panel Outline, the Bureau described a proposal under consideration to designate four categories of places as presumptively inconvenient. *See* Small Business Review Panel Outline, *supra* note 56, at 29–30. In response to feedback received during the SBREFA process, the Bureau does not propose that intervention at this time.

[212] 15 U.S.C. 1692c(a)(2).

[213] As discussed in the section-by-section analysis of proposed § 1006.6(b), proposed § 1006.6(b)(2) also would interpret FDCPA sections 806 and 808 to prohibit a debt collector from attempting to

communicate with a consumer who is represented by an attorney if FDCPA section 805(a)(2) would prohibit the debt collector from communicating with that consumer.

[214] 15 U.S.C. 1692c(a)(3).

[215] As discussed in the section-by-section analysis of proposed § 1006.6(b), proposed § 1006.6(b)(3) also would interpret FDCPA sections 806 and 808 to prohibit a debt collector from attempting to communicate with a consumer at the consumer's place of employment if FDCPA section 805(a)(3) would prohibit the debt collector from communicating with the consumer there.

[216] For additional discussion of proposed work email restrictions, see the section-by-section analysis of proposed § 1006.22(f)(3).

[217] 15 U.S.C. 1692c(a).

[218] The interpretations and illustrations of prior consent discussed here also apply to proposed §§ 1006.14(b) and 1006.22(f), as discussed in the corresponding section-by-section analyses below.

(3). Additionally, permitting a debt collector to ask a consumer to consent to a communication once the debt collector knows the communication is occurring at an inconvenient time or place would undermine the very protection guaranteed to the consumer under FDCPA section 805(a)(1). Although proposed comment 6(b)(4)(i)–1 would clarify that the debt collector would be prohibited from asking the consumer to consent to the continuation of the communication at the inconvenient time or place, the comment also would clarify that a debt collector may ask the consumer what time or place would be convenient.

Proposed comment 6(b)(4)(i)–2 restates the rule that the prior consent of the consumer must be given directly to the debt collector and explains that a debt collector cannot rely on the prior consent of the consumer given to the original creditor or to a previous debt collector. The Bureau proposes this interpretation because prior consent given to the original creditor or to a previous debt collector is not given "directly" to the debt collector, as the FDCPA expressly requires.[219] The Bureau requests comment on proposed § 1006.6(b)(4)(i) and its related commentary, including on whether additional clarification regarding a consumer's prior consent for the purposes of these rule provisions would be instructive. Additionally, because the definition of consumer for purposes of proposed § 1006.6 includes the individuals listed in proposed § 1006.6(a)(1) through (5) (e.g., the consumer's spouse), the Bureau requests comment on whether additional clarification is needed regarding which "consumer" may give prior consent pursuant to proposed § 1006.6(b)(4)(i).

### 6(b)(4)(ii)

Proposed § 1006.6(b)(4)(ii) would implement the text in FDCPA section 805(a) that, in relevant part, sets forth the exception for the express permission of a court of competent jurisdiction.[220] Proposed § 1006.6(b)(4)(ii) generally restates the statute, with only minor changes for clarity.

### 6(c) Communications With a Consumer—After Refusal To Pay or Cease Communication Notice

FDCPA section 805(c) provides that, subject to certain exceptions, if a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt (the "cease communication provision").[221] The Bureau proposes § 1006.6(c) to implement and interpret FDCPA section 805(c) and pursuant to the Bureau's authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors.

### 6(c)(1) Prohibitions

Proposed § 1006.6(c)(1) would implement FDCPA section 805(c)'s cease communication provision and generally restates the statute, with only minor changes for clarity. Specifically, proposed § 1006.6(c)(1) would provide that, except as provided in proposed § 1006.6(c)(2), a debt collector must not communicate or attempt to communicate further with a consumer with respect to a debt if the consumer notifies the debt collector in writing that: (i) The consumer refuses to pay the debt; or (ii) the consumer wants the debt collector to cease further communication with the consumer.[222]

The Bureau proposes to interpret the applicability of the E-SIGN Act to a consumer electronically notifying a debt collector that the consumer wants the debt collector to cease further communication.[223] Specifically, the Bureau proposes to interpret FDCPA section 805(c)'s writing requirement as being satisfied if a consumer notifies a debt collector using a medium of electronic communication through which a debt collector accepts electronic communications from consumers, such as email or a website portal. Thus, a debt collector would be

required to give legal effect to a consumer's notification submitted electronically only if the debt collector generally chose to accept electronic communications from consumers. The Bureau proposes to codify this interpretation of the E-SIGN Act in proposed comment 6(c)(1)–2.

Proposed comment 6(c)(1)–1 would implement FDCPA section 805(c)'s provision that, if such notice is made by mail, a consumer's notification is complete upon receipt by the debt collector.[224] Proposed comment 6(c)(1)–1 would apply this standard to all written or electronic forms of a consumer's notification. The Bureau notes that FDCPA section 805(c) does not state that only mail notifications are complete upon receipt, but rather leaves vague when other forms of notification are complete. The Bureau proposes to clarify this ambiguity by providing that written or electronic forms of notification are complete upon receipt. The Bureau proposes this clarification on the basis that, regardless of the medium, before a debt collector has received a notification, it may not be reasonable to consider the debt collector to have been notified. On the other hand, once the debt collector has received a notification, the debt collector can reasonably be considered to have been notified.

The Bureau requests comment on proposed § 1006.6(c)(1) and on proposed comment 6(c)(1)–1, including on: Whether additional clarification is needed with respect to a consumer's notification pursuant to proposed § 1006.6(c)(1) being complete upon receipt by the debt collector; whether a debt collector should be afforded a certain period of time to update its systems to reflect the consumer's request even after the notification is received, and if so, how long; and whether receipt works differently for different written and electronic communication media. Additionally, because the definition of consumer for purposes of proposed § 1006.6 includes the individuals listed in proposed § 1006.6(a)(1) through (5) (e.g., the consumer's spouse), the Bureau requests comment on whether additional clarification is needed regarding which "consumer" may notify the debt collector pursuant to proposed § 1006.6(c)(1).

### 6(c)(2) Exceptions

FDCPA section 805(c) provides exceptions to the cease communication provision. The exceptions allow a debt collector to communicate with a

---

[219] This proposal is also consistent with the FDCPA's legislative history. See H. Rept. No. 95–131, at 5 (1977) ("The committee intends that in section [805] the 'prior consent' be meaningful, i.e., that any prior consent by a consumer is to be a voluntary consent and shall be expressed by the consumer directly to the debt collector. Consequently, the committee intends that any term in a contract which requires a consumer to consent in advance to debt collection communication would not constitute 'prior consent' by such consumer.").

[220] 15 U.S.C. 1692c(a).

[221] 15 U.S.C. 1692c(c).

[222] For the same reasons that proposed § 1006.6(b) would prohibit debt collectors from attempting to communicate with consumers if FDCPA section 805(a) would prohibit communications with consumers, proposed § 1006.6(c) would interpret FDCPA sections 806 and 808 to prohibit a debt collector from attempting to communicate with a consumer if FDCPA section 805(c) would prohibit the debt collector from communicating with the consumer.

[223] Section 104(b)(1)(A) of the E-SIGN Act provides authority for a Federal regulatory agency with rulemaking authority under a statute to interpret section 101 of the E-SIGN Act with respect to that statute by regulation. 15 U.S.C. 7004(b)(1)(A).

[224] 15 U.S.C. 1692c(c).

consumer even after a consumer has notified a debt collector pursuant to FDCPA section 805(c)'s cease communication provision: (1) To advise the consumer that the debt collector's further efforts are being terminated; (2) to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or (3) where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy.[225] Proposed § 1006.6(c)(2) would implement these exceptions and generally restates the statute, with only minor changes for clarity.

In the 2016 Servicing Final Rule [226] and the concurrently issued 2016 FDCPA Interpretive Rule,[227] the Bureau interpreted the written early intervention notice required in Regulation X, 12 CFR 1024.39(d)(3), to fall within the exceptions to the cease communication provision in FDCPA section 805(c)(2) and (3). As the Bureau explained in the 2016 Servicing Final Rule, the Bureau concluded that, because failure to provide the written early intervention notice required by Regulation X, 12 CFR 1024.39(d)(3), is closely linked to the ability of a mortgage servicer (who also is a debt collector subject to the FDCPA with respect to a mortgage loan) to invoke its specified remedy of foreclosure, the notice falls within the exceptions in FDCPA sections 805(c)(2) and (3).[228] For a further discussion of the requirement in Regulation X, see the 2016 Servicing Final Rule's section-by-section analysis discussion of 12 CFR 1024.39(d)(3).[229] The Bureau proposes comment 6(c)(2)– 1 to incorporate by reference this interpretation, which applies to a mortgage servicer who also is a debt collector subject to the FDCPA with respect to a mortgage loan.

## 6(d) Communications With Third Parties

FDCPA section 805(b) prohibits a debt collector from communicating, in connection with the collection of any debt, with any person other than the consumer or certain other persons.[230] FDCPA section 805(b) also identifies

certain exceptions to this prohibition. Proposed § 1006.6(d)(1) would implement FDCPA section 805(b)'s general prohibition against communicating with third parties, and proposed § 1006.6(d)(2) would implement the exceptions. Proposed § 1006.6(d)(3) would specify, for purposes of FDCPA section 813(c), procedures that are reasonably adapted to avoid an error in sending an email or text message that would result in a violation of FDCPA section 805(b). The Bureau proposes § 1006.6(d) pursuant to its authority under FDCPA section 814(d) to write rules with respect to the collection of debts by debt collectors.

### 6(d)(1) Prohibitions

With limited exceptions, FDCPA section 805(b) prohibits a debt collector from communicating, in connection with the collection of any debt, with any person other than the consumer (as defined in FDCPA section 805(d)) or certain other persons. Proposed § 1006.6(d)(1) would implement FDCPA section 805(b) and generally restates the statute, with minor wording and organizational changes for clarity. Proposed comment 6(d)(1)–1 explains that, because a limited-content message is not a communication, a debt collector does not violate § 1006.6(d)(1) if the debt collector leaves a limited-content message for a consumer orally with a third party who answers the consumer's home or mobile telephone.[231] The comment explains that the message would be an attempt to communicate with the consumer (as defined in proposed § 1006.2(b)). It further explains, however, that if, during the course of the interaction with the third party, the debt collector conveys content other than the specific limited-content-message items described in proposed § 1006.2(j)(1) and (2), and such other content directly or indirectly conveys any information regarding a debt, the message is a communication, subject to the prohibition on third-party communications in proposed § 1006.6(d)(1). The Bureau requests comment on proposed § 1006.6(d)(1) and on whether additional clarification would be useful.

### 6(d)(2) Exceptions

FDCPA section 805(b) specifies exceptions to the general prohibition against a debt collector communicating with third parties, including that a debt collector may engage in an otherwise

prohibited communication with the prior consent of the consumer given directly to the debt collector. Proposed § 1006.6(d)(2) would implement the exceptions in FDCPA section 805(b) and generally restates the statute, with minor wording and organizational changes for clarity. Proposed comment 6(d)(2)–1 refers to the commentary to proposed § 1006.6(b)(4)(i) for guidance concerning a consumer giving prior consent directly to a debt collector. Additionally, because the definition of consumer for purposes of proposed § 1006.6 includes those individuals listed in proposed § 1006.6(a)(1) through (5) (e.g., the consumer's spouse), the Bureau requests comment on whether additional clarification is needed regarding which consumer under proposed § 1006.6(a) may give prior consent pursuant to proposed § 1006.6(d).

### 6(d)(3) Reasonable Procedures for Email and Text Message Communications

FDCPA section 813(c) provides that a debt collector may not be held liable in any action brought under the FDCPA if the debt collector shows by a preponderance of evidence that the violation was not intentional, that it resulted from a bona fide error, and that it occurred even though the debt collector maintained procedures reasonably adapted to avoid the error.[232] Proposed § 1006.6(d)(3) identifies procedures that a debt collector may use to obtain a safe harbor from civil liability for unintentionally violating the third-party disclosure prohibition in proposed § 1006.6(d)(1) and, by extension, FDCPA section 805(b), as a result of a bona fide error resulting from a communication by email or text message.

FDCPA section 805(b) generally prohibits a debt collector from communicating with any person other than the consumer unless the consumer provides consent directly to the debt collector. FDCPA section 803(2), in turn, defines the term communication to include the conveying of information regarding a debt directly or indirectly to any person.[233] In the context of oral communications, courts have found that, if a debt collector leaves a voice message that is overheard by a third party, the debt collector may violate FDCPA section 805(b) by indirectly conveying information regarding a debt to a person other than the consumer.[234]

---

[225] 15 U.S.C. 1692c(c)(1)–(3).

[226] 81 FR 72160 (Oct. 19, 2016).

[227] 81 FR 71977 (Oct. 19, 2016).

[228] 81 FR 72160, 72232 (Oct. 19, 2016).

[229] Id. at 72233–38.

[230] 15 U.S.C. 1692c(b). Specifically, FDCPA section 805(b) prohibits communicating with any person other than the consumer, the consumer's attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the creditor's attorney, or the debt collector's attorney.

[231] The Bureau separately requests comment in the section-by-section analysis of proposed § 1006.2(j) defining limited-content messages on whether to permit a debt collector to leave limited-content messages with third parties.

[232] 15 U.S.C. 1692k(c).

[233] See the section-by-section analysis of proposed § 1006.2(d).

[234] See the section-by-section analysis of proposed § 1006.2(j).

While nothing in the FDCPA prohibits debt collectors from communicating using newer communication media such as email and text messages, the case law regarding communications has given rise to uncertainty about how FDCPA section 805(b) applies to such media, because of the potential for inadvertent disclosure of communications to third parties. In pre-proposal feedback, several industry stakeholders asserted that this uncertainty, particularly about liability for third-party disclosures, discourages the use of electronic communications in debt collection.[235] Consistent with this feedback, the Bureau's Consumer Survey found that only 8 percent of consumers contacted by a debt collector were contacted by email—even though email is widely available and less expensive than other forms of communication, and 15 percent of surveyed consumers said that email was their most preferred method of being contacted about a debt in collection.[236] In pre-proposal feedback, industry participants expressed interest in communicating with consumers using electronic technologies. They therefore requested that the Bureau clarify how FDCPA section 805(b) applies to the inadvertent disclosure of an electronic communication to a third party not authorized to receive it.[237]

In light of this feedback and evidence suggesting that some consumers may prefer debt collectors to communicate by newer media, the Bureau proposes to identify procedures that debt collectors may use to reduce the risk of liability from communicating with consumers by email or text message. Pursuant to its authority to implement and interpret FDCPA sections 805(b) and 813(c), the Bureau proposes § 1006.6(d)(3) to specify when a debt collector maintains procedures that are reasonably adapted, for purposes of FDCPA section 813(c), to avoid a bona fide error in sending an email or text message communication that would result in a violation of § 1006.6(d)(1). A debt collector would maintain such procedures if, when communicating with a consumer using an email address or, in the case of a text message, a telephone number, the debt collector's procedures include steps to reasonably confirm and document that the debt collector: (1) Has obtained and used the email address or telephone number in accordance with one of the three methods specified in § 1006.6(d)(3)(i); and (2) has taken the additional steps specified in § 1006.6(d)(3)(ii).

The procedures in proposed § 1006.6(d)(3) are designed to ensure that a debt collector who uses a specific email address or telephone number to communicate with a consumer by email or text message does not have a reason to anticipate that an unauthorized third-party disclosure may occur. The FTC staff and some courts have found that debt collectors *do not* violate the prohibition on third-party disclosures unless they have reason to anticipate that the disclosure may be heard or read by third parties.[238] Designing the procedures around the reason-to-anticipate standard is consistent with these principles. A debt collector who follows the procedures in proposed § 1006.6(d)(3) may not have reason to anticipate that a disclosure may be heard or read by a third party.

Proposed § 1006.6(d)(3) would not fully eliminate a debt collector's risk of liability for third-party disclosures. To be protected from civil liability under FDCPA 813(c), a debt collector would need to show, by a preponderance of the evidence, that the debt collector's disclosure to the third party was unintentional and that the debt collector, in fact, maintained the specified procedures. As proposed, this would require a debt collector to show that the procedures included steps to reasonably confirm and document that the debt collector acted in accordance with proposed § 1006.6(d)(3)(i) and (ii). For example, procedures that permitted a debt collector to use obviously incorrect email addresses merely because the addresses were obtained consistent with one of the three methods would not satisfy proposed § 1006.6(d)(3)'s reasonableness requirement.[239]

The procedures in proposed § 1006.6(d)(3) address email and text message communications only. At this time, the Bureau does not propose procedures related to the use of less-developed and less-widespread forms of electronic communication because consumers do not appear accustomed to using such technologies in their financial lives. The Bureau may revisit this conclusion if consumer use of these technologies changes. The Bureau also does not propose procedures related to the use of voicemails. The limited-content message described in proposed § 1006.2(j) is designed to enable debt collectors to leave voicemails for consumers without risking third-party disclosures.

Proposed § 1006.6(d)(3) does not identify the only circumstances in which a debt collector may communicate with a consumer by email or text message, nor does it identify the only procedures that may be reasonably adapted to avoid a violation of proposed § 1006.6(d)(1) and FDCPA section 805(b). Thus, a debt collector would not necessarily violate proposed § 1006.6(d)(1) or FDCPA section 805(b) if the debt collector communicated with a consumer by email or text message without following the procedures in proposed § 1006.6(d)(3). Depending on the facts, a debt collector could show by a preponderance of the evidence that any third-party disclosures were *unintentional* and that *the debt collector* employed procedures reasonably adapted to avoid them.

The Bureau requests comment on *proposed* § 1006.6(d)(3). In particular, the Bureau requests comment on the risk of third-party disclosure and resulting consumer harm posed by debt collection communications that take place by email or text message. The

---

[235] An industry trade association commenting on the Bureau's ANPRM surveyed its members and found that only 15 percent of respondents communicated electronically with consumers, primarily because of concerns about liability. A later study by a consulting firm, released in 2017, reported that about one-third of debt collectors communicate with consumers by email. Ernst & Young, *The Impact of Third-Party Debt Collection on the US National and State Economies in 2016: Prepared for ACA Int'l*, at 5 (Nov. 2017), *https://www.acainternational.org/assets/ernst-young/ey-2017-aca-state-of-the-industry-report-final-5.pdf*; *see also* Gov't Accountability Off., No. GAO–09–748, *Fair Debt Collection Practices Act Could Better Reflect the Evolving Debt Collection Marketplace and Use of Technology*, at 48 (Sept. 2009), *https://www.gao.gov/assets/300/295588.pdf* ("Debt collection agencies have been reluctant to use email and faxes to communicate with debtors because of the risk that someone other than the debtor may read the transmission, which could violate FDCPA's prohibition on disclosure to third parties.").

[236] *See* CFPB Debt Collection Consumer Survey, *supra* note 18, at 37, 42.

[237] For example, one industry trade association suggested that the Bureau establish a presumption against liability when debt collectors use consumer-provided email addresses and telephone numbers. In addition, a Federal regulator recently recommended that the Bureau "codify that reasonable digital communications, especially when they reflect a consumer's preferred method, are appropriate for use in debt collection." U.S. Dept. of Treasury, *A Financial System that Creates Economic Opportunities: Nonbank Financials, FinTech, and Innovation*, at 21 (July 2018), *https://home.treasury.gov/news/press-releases/sm447*.

[238] *See, e.g.*, Statements of General Policy or Interpretation: Staff Commentary on the FDCPA, 53 FR 50097, 50104 (Dec. 13, 1988) ("A debt collector does *not* violate [FDCPA section 805(b)] when an eavesdropper overhears a conversation with the consumer, unless the debt collector has reason to anticipate the conversation will be overheard."); *Peak v. Prof'l Credit Serv.*, No. 6:14–cv–01856–AA, 2015 WL 7862774, at *5–6 (D. Or. Dec. 2, 2015); *Berg v. Merchants Ass'n Collection Div., Inc.*, 586 F. Supp. 2d 1336, 1342, 1345 (S.D. Fla 2008); *Chlanda v. Wymard*, No. C–3–93–321, 1995 WL 17917574, at *2 (S.D. Ohio Sept. 5, 1995).

[239] In addition, a debt collector who communicates with a consumer consistent with proposed § 1006.6(d)(3) would not be protected from liability for violations unrelated to third-party disclosures (*e.g.*, for failure to include the opt-out notice that proposed § 1006.6(e) would require).

Bureau is especially interested in any data or other information bearing on the harm associated with such disclosure. The Bureau also requests comment on whether the procedures identified in proposed § 1006.6(d)(3) are likely to increase debt collectors' use of emails and text messages to communicate with consumers. The Bureau also requests comment on whether additional clarification is needed about the requirement that a debt collector's procedures include steps to reasonably confirm and document that the debt collector acted in accordance with proposed § 1006.6(d)(3)(i) and (ii). In addition, the Bureau requests comment on whether to clarify the meaning of the term email in proposed § 1006.6(d)(3), such as by specifying that it includes direct messaging technology in mobile applications or on social media platforms.

6(d)(3)(i) Method of Obtaining and Using an Email Address or Telephone Number

Proposed § 1006.6(d)(3)(i) describes three methods of obtaining and using an email address or, in the case of a text message, a telephone number. As discussed below, a debt collector whose policies and procedures include steps to reasonably confirm and document compliance with proposed § 1006.6(d)(3)(i) would be entitled to a safe harbor from liability for an unintentional third-party disclosure resulting from use of one of the three methods, assuming the debt collector's procedures also include steps to reasonably confirm and document compliance with proposed § 1006.6(d)(3)(ii).

6(d)(3)(i)(A)

A debt collector who communicates with a consumer electronically using an email address or telephone number that the consumer recently used to contact the debt collector electronically may not have reason to anticipate that the communication may be read by third parties with whom the debt collector is not otherwise permitted to communicate about the debt. This is because, the Bureau believes, a consumer generally is better positioned than a debt collector to determine whether third parties have access to a specific email address or telephone number, and a consumer's decision to communicate electronically using a specific email address or telephone number may suggest that the consumer has assessed the risk of third-party disclosure to be low. For this reason, proposed § 1006.6(d)(3)(i)(A) provides

that a debt collector could obtain[240] a safe harbor from liability for an unintentional third-party disclosure if the debt collector maintained procedures to reasonably confirm and document that the debt collector communicated with the consumer using an email address or, in the case of a text message, a telephone number that the consumer recently used to contact the debt collector for purposes other than opting out of electronic communications.[241]

Proposed § 1006.6(d)(3)(i)(A) would apply to any email address or, in the case of a text message, any telephone number—including any work email address or any work telephone number—the consumer used to contact the debt collector for purposes other than opting out of electronic communications. As discussed in the section-by-section analysis of proposed § 1006.22(f)(3), the proposed rule generally would prohibit a debt collector from attempting to communicate with a consumer using an email address that the debt collector knows or should know is maintained by the consumer's employer. Work emails appear to present a heightened risk of third-party disclosure because many employers have a legal right to read messages sent or received by employees on work email accounts, and some employers exercise that right. Text messages sent to a work telephone number appear to present a heightened risk of third-party disclosure for the same reason. However, some consumers may be in a position to assess the risk that an employer will read their work emails or work text messages based on, among other things, their knowledge of work policies and practices, so it may be reasonable for a debt collector to presume that a consumer who initiates an electronic communication with a debt collector using a work email address or work telephone number has assessed that risk to be low.

In addition, proposed § 1006.6(d)(3)(i)(A) would apply only if the consumer recently used the email address or telephone number to contact

the debt collector. Telephone numbers frequently are disconnected and reassigned from one person to another. In fact, according to a recent Federal Communications Commission (FCC) notice of proposed rulemaking, nearly 35 million telephone numbers are disconnected and made available for reassignment each year.[242] Given the frequency with which telephone numbers are reassigned, it may be reasonable for a debt collector to anticipate that sending a text message to a telephone number that the consumer has not recently used could result in the disclosure of sensitive information to third parties—namely, persons to whom the consumer's telephone number has been reassigned. Because a telephone number the consumer recently used may be less likely to have been reassigned than a telephone number the consumer used in the more distant past, proposed § 1006.6(d)(3)(i)(A)'s recency requirement may limit the third-party disclosure risk posed by the reassignment of telephone numbers. Although email addresses do not appear to carry as great a risk of reassignment as telephone numbers,[243] for consistency and ease of administration of the regulation, the Bureau nevertheless proposes to apply the same recency requirement to email addresses.

The Bureau requests comment on proposed § 1006.6(d)(3)(i)(A). In particular, the Bureau requests comment on what, if anything, a consumer's decision to contact a debt collector using a work email address or, in the case of a text message, a work telephone number may suggest about the consumer's assessment of the risk of third-party disclosure. The Bureau also requests comment on what, if anything, a consumer's decision to contact a debt collector using a non-work email address or, in the case of a text message, a non-work telephone number may suggest about the consumer's

---

[240] To be entitled to a safe harbor, the debt collector's procedures also would need to comply with proposed § 1006.6(d)(3)(ii).

[241] As discussed in the section-by-section analysis of proposed § 1006.14(h)(2), if a consumer opts out of receiving electronic communications from a debt collector, the debt collector would be permitted to reply once to confirm the consumer's request to opt out, provided that the reply contains no information other than a statement confirming the consumer's request. Proposed § 1006.6(d)(3)(i)(A)'s safe harbor would not be available to a debt collector who sends the reply to an email address or, in the case of a text message, a telephone number that the consumer used only for purposes of opting out of electronic communications.

[242] *Advanced Methods to Target and Eliminate Unlawful Robocalls,* 83 FR 17631, 17632 (Apr. 23, 2018) ("Consumers disconnect their old numbers and change to new telephone numbers for a variety of reasons, including switching telephone providers without porting numbers and getting new wireline telephone numbers when they move.").

[243] Although email addresses can be reassigned, the Bureau has not identified evidence suggesting that reassignment happens frequently. For example, one of the largest email providers states it does not reassign email addresses. *See Delete Your Gmail Service,* Google Account Help, *https://support.google.com/accounts/answer/61177?co=GENIE.Platform%3DDesktop&hl=en* (last visited May 6, 2019). One industry report suggests that a majority of consumers have never deactivated an email account. Direct Marketing Ass'n, *Consumer Email Tracker 2017,* at 6 (2017), *https://dma.org.uk/uploads/misc/5a1583ff3301a-consumer-email-tracking-report-2017-(2)_5a1583ff32f65.pdf.*

assessment of the risk of third-party disclosure. In addition, the Bureau requests comment on the third-party disclosure risks to consumers posed by the practice of reassigning telephone numbers. The Bureau also requests comment on whether the recency requirement in proposed § 1006.6(d)(3)(i)(A) adequately addresses those risks, and, if not, on how the Bureau could address them in a final rule. In addition, the Bureau requests comment on whether to apply the recency requirement to emails. The proposed rule does not define when a consumer's contact would qualify as recent. The Bureau therefore also requests comment on whether and how to define recent in the context of proposed § 1006.6(d)(3)(i)(A), including on whether contact by the consumer in the past year should qualify as recent.

6(d)(3)(i)(B)

A debt collector may not have reason to anticipate that an electronic communication to a consumer's non-work email address or non-work telephone number may be read by third parties with whom the debt collector is not otherwise permitted to communicate about the debt if the consumer has received notice and a reasonable opportunity to opt out of such communications, but the consumer has not done so. This is because, the Bureau believes, a consumer's failure to opt out in these circumstances may suggest that the consumer has assessed the risk of such a disclosure to be low. For this reason, proposed § 1006.6(d)(3)(i)(B) provides that a debt collector could obtain [244] a safe harbor from liability for an unintentional third-party disclosure if the debt collector maintained procedures to reasonably confirm and document that: (1) The debt collector communicated with the consumer using a non-work email address or, in the case of a text message, a non-work telephone number, after the creditor or the debt collector provided the consumer with notice that the debt collector might use that non-work email address or non-work telephone number for debt collection communications and a reasonable opportunity to opt out; and (2) the consumer did not opt out.

Proposed § 1006.6(d)(3)(i)(B) would apply only to non-work email addresses and non-work telephone numbers; it would not apply to work email addresses or work telephone numbers. A notice-and-opt-out process may not be reasonably designed to prevent

employers from reading electronic debt collection communications sent to work email addresses and work telephone numbers. Unlike a consumer's affirmative decision to contact a debt collector using a work email address or, in the case of a text message, a work telephone number, as described in proposed § 1006.6(d)(3)(i)(A), a consumer's failure to opt out of the debt collector's use of a work email address or a work telephone number may not indicate that the consumer has assessed the risk of third-party disclosure to be low. Instead, it may reflect an unwillingness to engage with a debt collector in any manner—even to opt out of further communications—using a work email address or a work telephone number.

Proposed comment 6(d)(3)(i)–1 would clarify that an email address qualifies as a non-work email address unless the debt collector knows or should know that the email address is provided to the consumer by the consumer's employer. The proposed comment also refers to § 1006.22(f)(3) and its related commentary for further clarification regarding whether a debt collector knows or should know that an email address is provided by a consumer's employer. The proposed comment also would clarify that a telephone number qualifies as a non-work telephone number unless the debt collector knows or should know that the telephone number is provided to the consumer by the consumer's employer.

The Bureau requests comment on proposed § 1006.6(d)(3)(i)(B) and on comment 6(d)(3)(i)–1. In particular, the Bureau requests comment on what, if anything, a consumer's failure to opt out of a debt collector's use of a non-work email address or, in the case of a text message, a non-work telephone number may suggest about the consumer's assessment of the risk of third-party disclosure. The Bureau also requests comment on what, if anything, a consumer's failure to opt out of a work email address or, in the case of a text message, a work telephone number may suggest about the consumer's assessment of the risk of third-party disclosure.

6(d)(3)(i)(B)(1)

Proposed § 1006.6(d)(3)(i)(B)(1) describes three requirements that a debt collector using the notice-and-opt-out approach would need to confirm and document had been satisfied. First, the creditor or the debt collector would need to notify the consumer clearly and conspicuously that the debt collector might use a specific non-work email address or a specific non-work

telephone number for debt collection communications by email or text message. The creditor or the debt collector may provide the notice orally, in writing, or electronically, but, if provided electronically, the notice could not be sent to the specific non-work email address or non-work telephone number the debt collector seeks to use for future communications. This limitation may help avoid a third-party disclosure through the notice itself, which could occur if the opt-out notice were sent to the email address or telephone number identified in the notice.

Second, the creditor or the debt collector would need to provide the notice no more than 30 days before the debt collector engages in debt collection communications by email or text message. This timing component is meant to ensure that the consumer has made a decision about whether to opt out, including based on the risk of third-party disclosure, at a time reasonably contemporaneous with the proposed electronic communications.

Third, the notice would need to identify the legal name of the debt collector and the non-work email address or non-work telephone number the debt collector proposes to use, describe one or more ways the consumer could opt out of such communications, and provide the consumer with a specified reasonable period during which to opt out before the debt collector would begin such communications. The content of the notice is meant to ensure that the notice includes enough information for the consumer to make an adequately informed decision about whether to opt out and, should the consumer elect to opt out, to prepare to receive any electronic communications.[245]

Although the procedures described in proposed § 1006.6(d)(3)(i)(B) include steps to reasonably confirm and document that the creditor or the debt collector provided the opt-out notice described in proposed § 1006.6(d)(3)(i)(B)(1), they do not include a requirement to provide the notice itself in writing. Proposed comment 6(d)(3)(i)(B)(1)–1 would clarify that the opt-out notice described in § 1006.6(d)(3)(i)(B)(1) may be provided orally, in writing, or

---

[244] To be entitled to a safe harbor, the debt collector's procedures also would need to comply with proposed § 1006.6(d)(3)(ii).

[245] As explained below, the Bureau proposes comment 6(d)(3)(i)(B)(1)–2 to clarify that, when an opt-out notice is provided orally, the creditor or the debt collector may require the consumer to make an opt-out decision during that same communication. As also noted below, the Bureau does not propose to specify what would qualify as a reasonable opt-out period when an opt-out notice is provided in writing or electronically; however, the Bureau requests comment on this issue.

electronically. The proposed comment also would clarify that the opt-out notice must be provided clearly and conspicuously, as defined in § 1006.34(b)(1), and that, if the opt-out notice is provided in writing or electronically, it must comply with the requirements of § 1006.42(a) for providing required disclosures.[246] The Bureau proposes comment 6(d)(3)(i)(B)(*1*)–1 to provide consumers, debt collectors, and creditors with the flexibility to satisfy the proposed notice-and-opt-out requirements orally or electronically, which may be more convenient or efficient in some circumstances.

Proposed comment 6(d)(3)(i)(B)(*1*)–2 would clarify how to provide the opt-out notice described in proposed § 1006.6(d)(3)(i)(B)(*1*) to the consumer in an oral communication, such as in a telephone or in-person conversation. The comment explains that, if a creditor or a debt collector provides the opt-out notice orally, the creditor or the debt collector may require the consumer to make an opt-out decision during that same communication. Proposed comment 6(d)(3)(i)(B)(*1*)–2 appears consistent with industry practice in other markets for consumer financial products and services, where consumers may commonly make decisions about their communication preferences at one time, often at origination.

Proposed comment 6(d)(3)(i)(B)(*1*)–3 would clarify that a debt collector or a creditor may provide the opt-out notice together with other notices required under the rule. As discussed in the section-by-section analysis of proposed § 1006.42(c)(2)(ii) and (d), the proposed rule would permit a debt collector to deliver required disclosures by hyperlink if, among other things, the debt collector or a creditor first provided the consumer with notice and an opportunity to opt out. Because it may be more convenient and cost effective for consumers, debt collectors, and creditors if consumers can make their various communication preferences known at the same time, proposed comment 6(d)(3)(i)(B)(*1*)–3 would clarify that a debt collector or a creditor may include the opt-out notice described in § 1006.6(d)(3)(i)(B)(*1*) in the same communication as the opt-out notice described in § 1006.42(d)(1) or (2), as applicable.

The Bureau requests comment on proposed § 1006.6(d)(3)(i)(B)(*1*) and its

related commentary. In particular, the Bureau requests comment on whether to limit further the email addresses or telephone numbers to which a creditor or a debt collector may send the opt-out notice that would be required by proposed § 1006.6(d)(3)(i)(B)(*1*) and, if so, what those limitations should be. The Bureau also requests comment on proposed § 1006.6(d)(3)(i)(B)(*1*)'s requirement to provide the notification no more than 30 days before the debt collector's first communication pursuant to proposed § 1006.6(d)(3)(i)(B), including on whether the period should be shortened or lengthened. The Bureau also requests comment on whether to clarify, for purposes of proposed § 1006.6(d)(3)(i)(B)(*1*), what constitutes a reasonable period within which to opt out when an opt-out notice is not provided through a telephone conversation. In addition, the Bureau requests comment on whether, in other consumer financial products and services markets, consumers commonly make decisions about their communication preferences during a single telephone call. The Bureau also requests comment on the benefits and risks of allowing debt collectors and creditors to include the opt-out notice described in proposed § 1006.6(d)(3)(i)(B)(*1*) in the same communication as the opt-out notice described in proposed § 1006.42(d)(1) or (2), as applicable.

### 6(d)(3)(i)(B)(2)

As discussed above, proposed § 1006.6(d)(3)(i)(B)(*1*) describes requirements that a debt collector using the notice-and-opt-out approach would need to confirm and document had been satisfied. One such requirement is to provide the consumer with a reasonable period during which to opt out of receiving debt collection communications by email or text message to the non-work email address or non-work telephone number identified in the opt-out notice. The consumer's failure to opt out in these circumstances may suggest that the consumer has assessed the risk of third-party disclosure is low.[247] For this

reason, proposed § 1006.6(d)(3)(i)(B)(*2*) provides that, if the opt-out period specified in the notice has expired and the consumer has not opted out, the debt collector may use the specific non-work email address or non-work telephone number to send debt collection communications by email or text message.

Proposed comment 6(d)(3)(i)(B)(*2*)–1 would clarify how proposed § 1006.6(d)(3)(i)(B)(*2*) would work with proposed § 1006.14(h), which would prohibit a debt collector from communicating or attempting to communicate with a consumer through a medium of communication if the consumer has requested that the debt collector not use that medium to communicate with the consumer.[248] Proposed comment 6(d)(3)(i)(B)(*2*)–1 provides that, if a consumer requests after the expiration of the opt-out period set forth in the § 1006.6(d)(3)(i)(B)(*1*) opt-out notice that a debt collector not use the non-work email address or non-work telephone number specified in that notice, § 1006.14(h) would prohibit the debt collector from communicating or attempting to communicate with the consumer using that email address or telephone number. Likewise, if the consumer requests after the expiration of the opt-out period that the debt collector not communicate with the consumer by email or text message, § 1006.14(h) prohibits the debt collector from communicating or attempting to communicate with the consumer by email or text message, including by using the non-work email address or non-work telephone number specified in the § 1006.6(d)(3)(i)(B)(*1*) opt-out notice. The Bureau requests comment on proposed § 1006.6(d)(3)(i)(B)(*2*) and its related commentary.

### 6(d)(3)(i)(C)

A debt collector who communicates with a consumer electronically using the consumer's non-work email address or non-work telephone number recently used by the creditor or a prior debt collector may not have reason to anticipate that the communication may be read by third parties with whom the debt collector is not otherwise permitted to communicate about the debt. The Bureau has not identified data suggesting that creditors communicate with consumers at non-work email addresses or non-work telephone numbers that are generally accessible to

---

[246] As discussed in the section-by-section analysis of proposed § 1006.42(a)(1), that section would apply when debt collectors provide certain required disclosures in writing or electronically; it would not apply when debt collectors provide those disclosures orally.

[247] By contrast, as explained in the section-by-section analysis of proposed § 1006.6(d)(3)(ii)(B), a consumer's failure to opt out of a debt collector's use of a work email address or, in the case of a text message, a work telephone number may not indicate that the consumer has assessed the risk of third-party disclosure is low. When it comes to a debt collector's use of a non-work email address or non-work telephone number, a consumer likely possesses the information necessary to assess the risk of unwanted third-party disclosure. With respect to work email addresses and telephone numbers, however, a consumer who receives a debt

collection communication may not wish to engage with a debt collector in any manner—even to opt out of further communications—using a work email address or telephone number.

[248] See the section-by-section analysis of proposed § 1006.14(h).

such individuals. Further, the Bureau believes that a consumer's decision to communicate with a creditor or a prior debt collector using a non-work email address or non-work telephone number may suggest that the consumer has assessed the risk of third-party disclosure to be low.

For these reasons, proposed § 1006.6(d)(3)(i)(C) provides that a debt collector could obtain [249] a safe harbor from liability for an unintentional third-party disclosure if the debt collector maintained procedures to reasonably confirm and document that: (1) The debt collector communicated with the consumer using a non-work email address or, in the case of a text message, a non-work telephone number that the creditor or a prior debt collector obtained from the consumer to communicate about the debt; (2) before the debt was placed with the debt collector, the creditor or the prior debt collector recently sent communications about the debt to the non-work email address or non-work telephone number; and (3) the consumer did not request the creditor or the prior debt collector to stop using the non-work email address or non-work telephone number to communicate about the debt.

Proposed § 1006.6(d)(3)(i)(C) would apply only to non-work email addresses and non-work telephone numbers. As noted above, some employers monitor work email addresses, and some employers may also monitor text messages sent to and from work telephone numbers. A consumer might agree to receive electronic communications from a creditor to a work email address or work telephone number without regard to the risk that an employer might monitor or read those communications because a consumer may not consider communications from a creditor to be as sensitive as communications from a debt collector. In other words, consumer consent to a creditor's use of a work email address or, in the case of a text message, a work telephone number might not mean that the risk of third-party disclosure is low. Therefore, procedures that permit a debt collector to communicate using a work email address or work telephone number merely because the creditor communicated using that email address or telephone number might not prevent unintentional disclosures of debt collection communications to

employers.[250] Nor does the Bureau propose that a prior debt collector's use of a consumer's work email address or work telephone number would be sufficient to justify a later debt collector's use of that email address or telephone number. Even if a consumer had indicated to a prior debt collector that the risk of monitoring by an employer was low, an employer's monitoring policies and practices can change and debt collectors may differ in their approach to communications with consumers.

Proposed § 1006.6(d)(3)(i)(C) would apply only if the creditor or a prior debt collector recently used the non-work email address or non-work telephone number to send communications about the debt. The Bureau proposes this recency requirement for the same reasons that it proposes the recency requirement in § 1006.6(d)(3)(i)(A).[251]

The Bureau requests comment on proposed § 1006.6(d)(3)(i)(C), including on how often creditors communicate with consumers using non-work email addresses and, in the case of text messages, non-work telephone numbers. The Bureau also requests comment on what, if anything, a consumer's decision to communicate with a creditor or a prior debt collector using a non-work email address or non-work telephone number may suggest about the consumer's assessment of the risk of third-party disclosure. In addition, the Bureau requests comment on the third-party disclosure risks to consumers posed by the practice of reassigning telephone numbers. The Bureau also requests comment on whether the recency requirement in proposed § 1006.6(d)(3)(i)(C) adequately addresses these risks, and, if not, on how the Bureau could address them in a final rule. In addition, the Bureau requests comment on whether to apply the recency requirement to email addresses. The proposed rule does not define when a creditor's or a prior debt collector's communication about the debt would qualify as recent. The Bureau therefore also requests comment on whether and how to define recent in the context of proposed § 1006.6(d)(3)(i)(C), including on whether a communication by the creditor or a prior debt collector in the past year should qualify as recent.

6(d)(3)(ii) Additional Requirements

To fall within the safe harbor from liability that proposed § 1006.6(d)(3) would establish for unintentional violations of proposed § 1006.6(d)(1) and FDCPA section 805(b), a debt collector's procedures would not only need to include steps to reasonably confirm and document that the debt collector obtained and used an email address or, in the case of a text message, a telephone number consistent with one of the three methods identified in proposed § 1006.6(d)(3)(i), but the procedures also would need to comply with proposed § 1006.6(d)(3)(ii). Proposed § 1006.6(d)(3)(ii) would require a debt collector to take steps to prevent communications using an email address or telephone number that the debt collector knows has led to a disclosure prohibited by § 1006.6(d)(1).[252]

The Bureau proposes § 1006.6(d)(3)(ii) on the basis that a debt collector whose procedures are not designed to prevent recurrence of a known violation may intend to convey information related to the debt or its collection to a third party. The Bureau requests comment on proposed § 1006.6(d)(3)(ii), including on whether the procedures described in proposed § 1006.6(d)(3)(ii) are reasonably adapted to avoid a violation of the prohibition on third-party disclosures in proposed § 1006.6(d)(1) and FDCPA section 805(b).

6(e) Opt-Out Notice for Electronic Communications or Attempts To Communicate

The Bureau's proposal includes several provisions designed to facilitate debt collectors' use of electronic communication media, such as emails and text messages, when collecting debts. Some consumers, however, may not wish to receive electronic debt collection communications because, for example, they receive too many such communications or because such communications force them to incur charges.[253] To address this concern, proposed § 1006.6(e) would require debt

---

[249] To be entitled to a safe harbor, the debt collector's procedures also would need to comply with proposed § 1006.6(d)(3)(ii).

[250] The special sensitivity of debt collection communications is reflected in the law: The FDCPA regulates a debt collector's communications at the consumer's place of employment, while consumer credit origination and servicing laws, such as the Truth in Lending Act, generally do not. See 15 U.S.C. 1692c(a)(3).

[251] See the section-by-section analysis of proposed § 1006.6(d)(3)(i)(A).

[252] As noted above, even if a debt collector selects an email address or telephone number in accordance with the procedures in proposed § 1006.6(d)(3), the debt collector would not be permitted to communicate or attempt to communicate with a consumer using that email address or telephone number if doing so would violate another provision of the proposed rule, such as the opt-out-notice requirements of proposed § 1006.6(e).

[253] CFPB Debt Collection Consumer Survey, supra note 18, at 36–37 (noting that almost one-half of consumers said they would most prefer to be reached by written letter and that the second most common preference for contact was through some kind of telephone other than a work telephone).

collectors to notify consumers how to opt out of receiving electronic debt collection communications or communication attempts directed at a specific email address, telephone number for text messages, or other electronic-medium address.

The Bureau generally believes that the use of electronic media for debt collection communications can further the interests of both consumers and debt collectors. But electronic communications also pose potential consumer harms. One potential harm relates to consumer harassment. The FDCPA recognizes this harm in section 806, which prohibits conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt. Because communicating with consumers electronically is essentially costless, debt collectors may have little economic incentive to limit the number of such communications. As discussed in the section-by-section analysis of proposed § 1006.14(b), however, repeated or continuous debt collection communications may have the natural consequence of harassing, oppressing, or abusing the recipient. In part for this reason, the proposed rule would establish bright-line rules limiting the frequency with which a debt collector may place telephone calls in connection with the collection of a debt. However, the frequency limits in the proposed rule would not apply to emails or text messages.[254]

Another potential consumer harm relates to communication costs. The FDCPA recognizes this harm in section 808(5), which prohibits debt collectors from causing charges to be made to any person for communications by concealment of the true purpose of the communication and specifies that such charges include, but are not limited to, collect telephone calls. Although many consumers have unlimited text messaging plans, some do not.[255] Consumers without unlimited text

messaging plans may incur a charge each time they receive a text message, or each time they receive a text message that exceeds a specified limit.[256] For these consumers, receiving a text message from a debt collector may be similar to accepting a collect call from a debt collector.

One way to help consumers address potentially harassing or costly electronic communications or communication attempts is to provide them with a convenient way to opt out of such communications. In pre-proposal feedback, a debt collector and several consumer advocates supported an opt-out requirement. An opt-out requirement also would be consistent with several established public policies protecting consumers who receive electronic communications.[257]

For these reasons, proposed § 1006.6(e) would require a debt collector who communicates or attempts to communicate with a consumer electronically in connection with the collection of a debt using a specific email address, telephone number for text messages, or other electronic-medium address to include in each such communication or attempt to communicate a clear and conspicuous statement describing one or more ways

the consumer can opt out of further electronic communications or attempts to communicate by the debt collector to that address or telephone number. Proposed § 1006.6(e) also would prohibit a debt collector from requiring, directly or indirectly, that the consumer, in order to opt out, pay any fee or provide any information other than the email address, telephone number for text messages, or other electronic-medium address subject to the opt-out. The Bureau proposes to require debt collectors to provide consumers with opt-out instructions to help ensure that a consumer who receives written electronic communications from a debt collector can, with minimal effort and cost, stop the debt collector from sending further written electronic communications or communication attempts directed at a specific address or telephone number.[258] Proposed comment 6(e)–1 would clarify that clear and conspicuous under § 1006(e) has the same meaning as in § 1006.34(b)(1) regarding validation notices and provides examples illustrating the proposed rule.

Proposed § 1006.6(e) seeks to address a group of concerns that are unique to written electronic communications and attempts to communicate. With respect to concerns about harassment from excessive communications of other types, consumers likely know how to request debt collectors to stop placing unwanted telephone calls, and proposed § 1006.14(h) would require debt collectors to honor such requests. In addition, the frequency limitations in proposed § 1006.14(b)(2) would apply to telephone calls. Moreover, debt collectors are unlikely to communicate by mail repeatedly because of the cost.[259] With respect to concerns about costs, consumers generally do not incur costs when they receive written letters, whereas some consumers do incur costs when they receive text messages. Accordingly, proposed § 1006.6(e) would not apply to non-electronic communications and attempts to

---

[254] See the section-by-section analysis of proposed § 1006.14(b). Proposed § 1006.14(b)(2) provides that, subject to § 1006.14(b)(3), a debt collector violates § 1006.14(b)(1) by placing a telephone call to a particular person in connection with the collection of a particular debt either: (i) More than seven times within seven consecutive days, or (ii) within a period of seven consecutive days after having had a telephone conversation with the person in connection with the collection of such debt, with the date of the telephone conversation being the first day of the seven-consecutive-day period.

[255] According to one 2015 estimate, approximately 10 percent of U.S. mobile telephone numbers are not enrolled in an unlimited text plan. See Josh Zagorsky, Almost 90% of Americans Have Unlimited Texting, Instant Census Blog (Dec. 8, 2015), https://instantcensus.com/blog/almost-90-of-americans-have-unlimited-texting.

[256] The FCC has found, for example, that unwanted calls and text messages can create substantial costs for consumers when aggregated across many contacts. See, e.g., In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 F.C.C.Rcd. 7961, 8021 (2015) ("In addition to the invasion of consumer privacy for all wireless consumers, the record confirms that some are charged for incoming calls and messages. These costs can be substantial when they result from the large numbers of voice calls and texts autodialers can generate."), set aside in part by ACA Int'l v. Fed. Commc'ns Comm'n, 885 F.3d 687 (D.C. Cir. 2018).

[257] For example, with respect to emails, the Controlling the Assault of Non-Solicited Pornography and Marketing (CAN–SPAM) Act reflects a public policy in favor of providing consumers with a specific mechanism to opt out of certain email messages. See 15 U.S.C. 7704(a)(3) (requiring that commercial emails include a functioning return email address or other internet-based mechanism, clearly and conspicuously displayed, for the recipient to request not to receive future email messages from the sender at the address where the message was received); Fed. Trade Comm'n, CAN–SPAM Act: A Compliance Guide for Business (Sept. 2009), https://www.ftc.gov/tips-advice/business-center/guidance/can-spam-act-compliance-guide-business (explaining that messages covered by the CAN–SPAM Act "must include a clear and conspicuous way for the recipient can opt out of getting email from [the sender] in the future"). In addition, the FTC's regulations implementing the CAN–SPAM Act prohibit charging a fee or imposing other requirements on recipients who wish to opt out of certain email communications. 16 CFR 316.5; see also Definitions & Implementation Under the CAN–SPAM Act, 73 FR 29654, 29675 (May 21, 2008) (concluding that, to implement an unsubscribe function, requests for personal information are unnecessary).

[258] For ease of reference, throughout the section-by-section analysis of proposed § 1006.6(e), the Bureau uses the phrase "written electronic communications" to refer to emails, text messages, and other electronic communications that are readable. The Bureau's use of this phrase has no bearing on the Bureau's interpretation of the terms "written" or "in writing" under any law or regulation, including the FDCPA or the E-SIGN Act.

[259] See, e.g., 15 U.S.C. 7701(a)(1) (noting Congressional finding, in connection with CAN–SPAM Act, that the "low cost" of email makes it "extremely convenient and efficient"); Arthur Middleton Hughes, Why Email Marketing is King, Harv. Bus. Rev. (Aug. 21, 2012), https://hbr.org/2012/08/why-email-marketing-is-king ("Direct mail costs more than $600 per thousand pieces. With email, there are almost no costs at all.").

communicate with a consumer, such as letters. Nor would it apply to telephone calls.

While emails and text messages are common forms of written electronic communications today, technology likely will evolve to introduce newer forms of written electronic communications. Proposed § 1006.6(e) would apply to all written electronic communications, regardless of whether they are specified in the rule and regardless of whether they exist now or come to exist in the future. For example, direct messaging communications on social media and communications in an application on a private website, mobile telephone, or computer, would be covered by proposed § 1006.6(e).

In its Small Business Review Panel Outline, the Bureau described a proposal under consideration to require debt collectors, absent consumer consent, to use free-to-end-user (FTEU) text messages so that the debt collector, rather than the consumer, would incur any charge for the message.[260] On balance, however, requiring FTEU technology may be too restrictive. FTEU technology may only be supported by certain wireless platforms, and industry standards may only permit its use with affirmative consumer consent.[261] Requiring debt collectors to use FTEU technology could therefore disadvantage some consumers by preventing them from receiving text messages, even when text messages are an equal or preferred medium of communication.

The Bureau requests comment on proposed § 1006.6(e) and its related commentary, including on the costs to debt collectors and benefits to consumers. In addition, the Bureau requests comment on the potential consumer harms posed by written electronic communications, including the proportion of consumers in debt collection that do not maintain unlimited text messaging plans and the cost to such consumers of receiving text messages. The Bureau also requests comment on whether consumers are likely to find it harassing, oppressive, or abusive to receive written electronic

communications, such as emails and text messages, without having a simple mechanism to make them stop, and the costs consumers incur when trying to unsubscribe from written electronic communications that do not contain an unsubscribe option. In addition, the Bureau requests comment on whether to identify a non-exclusive list of words or phrases that express an opt-out instruction. In pre-proposal outreach, for example, one consumer advocate urged that debt collectors be required to honor standard phrases, such as "stop," "unsubscribe," "end," "quit," and "cancel." The Bureau also requests comment on whether to specify the period within which a debt collector must process a consumer's request to opt out pursuant to proposed § 1006.6(e), and, if so, what that period should be.

The Bureau proposes § 1006.6(e) as an interpretation of FDCPA section 806 pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors. FDCPA section 806 prohibits conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt. It is essentially costless for debt collectors to send written electronic communications, such as emails and text messages, to consumers. Debt collectors may therefore have little economic incentive to limit the number of such communications. Individual consumers may find it harassing, oppressive, or abusive to receive written electronic communications, such as emails and text messages, without having a simple mechanism to make them stop. The Bureau proposes § 1006.6(e) to provide consumers with a way to stop written electronic communications that they find harassing, oppressive, or abusive.

The Bureau also proposes § 1006.6(e) as an interpretation of FDCPA section 808 pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors. FDCPA section 808 prohibits the use of unfair or unconscionable means to collect or attempt to collect any debt. It may be unfair or unconscionable for a debt collector to send a consumer a written electronic communication, such as an email or text message, without providing an unsubscribe option. Because written electronic communications, such as emails and text messages, are essentially costless for debt collectors, failing to provide consumers with an unsubscribe option may lead to excessive written electronic communications. In the absence of a

convenient unsubscribe option, a consumer who wishes to unsubscribe from written electronic communications may incur time and cost doing so. The process may require the consumer to write an unsubscribe request, search for and identify the debt collector (an entity with whom the consumer may not be familiar), obtain contact information for the debt collector, and follow up with the debt collector if necessary. On balance, these costs to consumers do not appear to outweigh the benefit to debt collectors of omitting an unsubscribe option from written electronic communications. Further, FDCPA section 808(5) specifically prohibits debt collectors from causing charges to be incurred through the concealment of the true purpose of a communication, and it specifies that such charges include collect telephone calls. A debt collector who sends a text message to a consumer who lacks an unlimited text messaging plan may—similar to a debt collector who places a collect call to a consumer while concealing the purpose of the call—cause the consumer to incur communications charges that the consumer does not wish to incur. The Bureau proposes § 1006.6(e) to limit written electronic communications that cause consumers to incur such charges.

The Bureau also proposes § 1006.6(e) pursuant to its authority under section 1032(a) of the Dodd-Frank Act to prescribe rules to ensure that the features of any consumer financial product or service are fully, accurately, and effectively disclosed to consumers in a manner that permits consumers to understand the costs, benefits, and risks associated with the product or service, in light of the facts and circumstances. A consumer's ability to opt out of written electronic communications from a debt collector is a feature of debt collection, and the opt-out instructions required by proposed § 1006.6(e) disclose that feature to consumers.

Section 1006.10   Acquisition of Location Information

FDCPA section 804 imposes certain requirements and limitations on a debt collector who communicates with any person other than the consumer for the purpose of acquiring location information about the consumer.[262] FDCPA section 803(7) defines the term location information.[263] The Bureau understands that there may be some uncertainty regarding aspects of these provisions, such as how to determine whether a debt collector who has acquired some information about a

---

[260] Small Business Review Panel Outline, *supra* note 56, at appendix H at 1.

[261] According to one industry website, FTEU is supported by six carriers (AT&T, Boost, Sprint, T-Mobile, Verizon Wireless, and Virgin Mobile). iVision Mobile, *Free to End User (FTEU), http:// www.ivisionmobile.com/text-messaging-software/ free-to-end-user-fteu.asp* (last visited May 6, 2019); Mobile Mkt'g Ass'n, *U.S. Consumer Best Practices for Messaging: Version 7.0*, at 43 (Oct. 16, 2012), *https://www.mmaglobal.com/files/bestpractices.pdf* (describing FTEU "Cross Carrier Guidelines" as providing that "[c]ontent providers must obtain opt-in approval from subscribers before sending them any SMS or MMS messages or other content from a short code").

[262] 15 U.S.C. 1692c.

[263] 15 U.S.C. 1692a(7).

consumer's whereabouts no longer has the purpose of acquiring location information when communicating with a person other than the consumer. Such uncertainty may relate at least in part to broader issues regarding the information debt collectors receive from creditors. The Bureau will continue to consider these and other issues related to location information communications to identify areas that pose a risk of consumer harm or require clarification.

Accordingly, proposed § 1006.10 would implement FDCPA sections 803(7) and 804 and generally mirrors the statute, with minor wording and organizational changes for clarity.[264] Proposed 1006.10(c), however, would clarify that a debt collector who is subject to the frequency restrictions in FDCPA section 804 also must comply with the frequency restrictions in proposed 1006.14(b)—that is, the proposal's limits on telephone calls also apply to location calls. The Bureau proposes § 1006.10 pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors.

The Bureau also proposes two comments clarifying what is location information in the decedent debt context. Proposed comment 10(a)–1 would clarify the definition of location information in the decedent debt context by providing that, if a consumer obligated or allegedly obligated to pay any debt is deceased, location information includes the information described in proposed § 1006.10(a) for a person who is authorized to act on behalf of the deceased consumer's estate. The Bureau proposes this comment on the basis that, as discussed in the section-by-section analysis of proposed § 1006.2(e) (definition of consumer), the term consumer under the FDCPA includes deceased consumers. A debt collector may obtain location information for such consumers by obtaining location information for the person with the authority to act on behalf of the deceased consumer's estate. Proposed comment 10(a)–1 would enable debt collectors who are trying to collect a deceased consumer's debts to locate a person with the authority to act on behalf of the deceased consumer's estate, thereby facilitating the prompt resolution of estates.

Proposed comment 10(b)(2)–1 would interpret FDCPA section 804(2) in the decedent debt context. Proposed

comment 10(b)(2)–1 explains that, if the consumer obligated or allegedly obligated to pay the debt is deceased, and the debt collector is attempting to locate a person with the authority to act on behalf of the deceased consumer's estate, the debt collector does not violate § 1006.10(b)(2) by stating that the debt collector is seeking to identify and locate a person who is authorized to act on behalf of the deceased consumer's estate.

In its Policy Statement on Decedent Debt, the FTC stated that it would refrain from taking enforcement action under FDCPA section 804(2) against debt collectors who state that they are seeking to locate a person "with the authority to pay any outstanding bills of the decedent out of the decedent's estate."[265] FDCPA section 804(2) prohibits debt collectors communicating with third parties from stating that the consumer owes any debt. The FTC believed that, unlike the word "debts," a reference to "outstanding bills" would be unlikely to reveal information about whether the deceased consumer was delinquent on those bills because nearly all consumers leave some bills at the time of their death.[266] The Bureau is concerned that even references to "outstanding bills" may convey that the *consumer owes* a debt because the definition of "debt" in FDCPA section 803(5) broadly includes "any obligation or alleged obligation of a consumer to pay money arising out of a transaction . . . primarily for personal, family, or household purposes." Accordingly, the Bureau proposes to limit debt collectors to asking for information about a person authorized to act on behalf of the deceased consumer's estate. However, the FTC's phrase "with the authority to pay any outstanding bills of the decedent out of the decedent's estate" may be more understandable than the Bureau's proposed phrase "who is authorized to act on behalf of the deceased consumer's estate." The Bureau requests comment on proposed comment 10(b)(2)–1, including on any experiences with the language contained in the FTC's Policy Statement on Decedent Debt and on whether the rule should follow the FTC's approach.

## Section 1006.14 Harassing, Oppressive, or Abusive Conduct

FDCPA section 806 prohibits a debt collector from engaging in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a

debt.[267] It lists six non-exhaustive examples of such prohibited conduct. Proposed § 1006.14 would implement and interpret FDCPA section 806. Except with respect to proposed § 1006.14(b) and (h), proposed § 1006.14 generally restates the statute, with only minor wording and organizational changes for clarity. Paragraph (a) and paragraphs (c) through (g) of proposed § 1006.14 are not addressed further in the section-by-section analysis below.[268]

### 14(b) Repeated or Continuous Telephone Calls or Telephone Conversations

FDCPA section 806 generally prohibits a debt collector from engaging in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt. FDCPA section 806(5) describes one example of conduct prohibited by section 806: Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.[269] Proposed § 1006.14(b)(1) through (5) would implement and interpret FDCPA section 806(5)—and, by extension, FDCPA section 806[270]—by restating the language of section 806(5), with one clarification, and by proposing numerical limits on the frequency with which a debt collector may place telephone calls to a person. The proposed frequency limits include certain exceptions and would establish whether a debt collector has violated or has complied with FDCPA section 806(5).

For debt collectors collecting a consumer financial product or service debt, as defined in proposed § 1006.2(f), proposed § 1006.14(b)(1) through (5) also would identify an unfair act or practice under section 1031(b) of the Dodd-Frank Act and would prescribe requirements for the purpose of preventing covered persons from engaging in that unfair act or

---

[264] For example, while no change in meaning is intended, the proposal substitutes the phrase "by mail" for the phrase "effected by the mails or telegram" in FDCPA section 804(5) to avoid obsolete language.

[265] FTC Policy Statement on Decedent Debt, *supra* note 192, at 44918–23.

[266] *Id.* at 44921 n.56.

[267] 15 U.S.C. 1692d.

[268] Proposed § 1006.14(a) would implement FDCPA section 806's general prohibition against conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt. Proposed § 1006.14(c) through (g) would implement FDCPA section 806(1) through (4) and (6) (15 U.S.C. 1692d(1)–(4), (6)).

[269] 15 U.S.C. 1692d(5).

[270] Because the conduct described in FDCPA section 806(5) merely illustrates conduct that section 806 prohibits, proposed § 1006.14(b)(1) through (5) necessarily implements and interprets both FDCPA section 806 and 806(5). For efficiency, the section-by-section analysis of proposed § 1006.14(b)(1) through (5) focuses primarily on interpreting the language of FDCPA section 806(5).

practice.[271] Although FDCPA section 806 and 806(5) and section 1031(b) of the Dodd-Frank Act define the conduct they proscribe differently, in the interest of brevity, the discussion below generally uses the catchalls "harass" and "harassment" to refer to the conduct addressed by proposed § 1006.14(b)(1) through (5).

The Bureau proposes § 1006.14(b)(1) through (5) pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors, as well as its authority under section 1031(b) of the Dodd-Frank Act to prescribe rules to identify and prevent unfair acts or practices in connection with the collection of a consumer financial product or service debt, as that term is defined in proposed § 1006.2(f).

14(b)(1) In General

14(b)(1)(i) FDCPA Prohibition

FDCPA section 806(5) prohibits a debt collector from "causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." Since the FDCPA's 1977 enactment, telephone-calling technology has evolved, and changes in technology may create uncertainty about whether a debt collector has "caus[ed] a telephone to ring." It now is common to place a telephone call and be connected to the dialed number without ever causing a traditional, audible ring. For example, many telephones afford users the option to have their telephones ring in the form of vibrating, visual, or customized audio alerts. In addition, many callers, including many debt collectors, now can bypass a person's opportunity to answer the telephone by connecting directly to the person's voicemail. As a result, debt collectors can place telephone calls or leave voicemail messages for a person without ever causing a traditional, audible ring. Such telephone calls, if made repeatedly and continuously, nonetheless may be intended to harass or may have the effect of harassing a person in ways that the FDCPA prohibits. For that reason, even if a debt collector's telephone call may not cause a traditional ring, the Bureau's proposal treats the call as within the scope of FDCPA section 806(5), or in any event within the scope of FDCPA section 806, if the call is connected to the dialed number.

Accordingly, the Bureau proposes to interpret the prohibitions in FDCPA section 806 and 806(5) as applying when a debt collector "places" a telephone call.[272]

For these reasons, and pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors, as well as pursuant to its authority to implement and interpret FDCPA section 806 and 806(5), the Bureau proposes to provide in § 1006.14(b)(1)(i) that, in connection with the collection of a debt, a debt collector must not place telephone calls or engage any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.

The Bureau proposes comment 14(b)(1)–1 to clarify that placing a telephone call includes placing a telephone call that results in a ringless voicemail (or "voicemail drop") but does not include sending an electronic message (e.g., a text message or an email) to a mobile telephone.[273] The Bureau proposes this clarification because, given the specific language of FDCPA section 806(5), the Bureau believes that Congress may have intended for this provision to apply to communications that present the opportunity for the parties to engage in a live telephone conversation or that result in an audio message. In addition, as discussed in the section-by-section analysis of proposed § 1006.14(b)(2), the Bureau understands that few debt collectors contact consumers using such electronic messages and, as a result, that debt collectors have not been sending electronic messages to consumers repeatedly or continuously with intent to harass them or to cause substantial injury. The Bureau requests comment on proposed § 1006.14(b)(1)(i) and on comment 14(b)(1)–1.

The Bureau also requests comment on whether to interpret FDCPA section 806 and 806(5) as prohibiting debt collectors from using communication media other than telephone calls frequently and repeatedly with intent to annoy, abuse, or harass any person in connection with the collection of any debt. For example, the Bureau considered proposing a broader version of proposed

§ 1006.14(b)(1)(i) that would have prohibited repeated or continuous attempts to contact a person by other media, such as by sending letters, emails, or text messages. Under such an approach, contacts by such other media also could be subject to a bright-line frequency limit, similar to the structure for telephone calls in proposed § 1006.14(b)(2). The Bureau does not propose subjecting communication media other than telephone calls to the prohibitions on repeated or continuous contacts (or to bright-line limits on the number of permissible contacts per week) primarily because the Bureau is not aware of evidence demonstrating that debt collectors commonly harass consumers or others through repeated or continuous debt collection contacts by media other than telephone calls.

As to mail, the Bureau has received few complaints about debt collectors sending excessive letters; in fact, available evidence suggests that a significant percentage of consumers prefer to communicate with debt collectors by mail.[274] In addition, in feedback to the Bureau after publication of the Small Business Review Panel Outline, industry stakeholders and consumer advocates agreed that there currently is not evidence of a need to regulate the frequency with which debt collectors communicate with consumers or others by mail. The cost of sending mail—currently about $0.50 to $0.80 cents to print and mail a letter, as noted in part VI—is significantly greater than the cost of making telephone calls and may deter debt collectors from sending excessive communications by mail.[275]

As to email and text messages, debt collectors generally have not yet begun communicating with consumers using these or other newer communication media.[276] The Bureau thus is unaware of evidence, including from consumer complaints or feedback from industry stakeholders or consumer advocates, demonstrating that debt collectors commonly use such media to contact consumers repeatedly or continuously with intent to harass or with the effect of harassing them. Indeed, both industry

---

[271] Dodd-Frank Act section 1031 applies to covered persons and service providers. Debt collectors collecting consumer financial product or service debt are covered persons. 12 U.S.C. 5481(5), (6), (15)(A)(x).

[272] As explained in the section-by-section analysis of proposed § 1006.14(b)(3)(iii), the proposed rule also provides that a debt collector's telephone calls that are unable to connect to the dialed number do not count toward, and are permitted in excess of, the frequency limits in proposed § 1006.14(b)(2).

[273] Proposed comment 14(b)(1)–1 also would clarify that the same interpretation of "placing a telephone call" applies with respect to proposed § 1006.14(b)(1)(ii).

[274] Forty-two percent of respondents to the Bureau's Debt Collection Consumer Survey who had been contacted about a debt in the prior year identified mail as their preferred medium of communication for debt collection. See CFPB Debt Collection Consumer Survey, supra note 18, at 37.

[275] The Bureau notes that the Commonwealth of Massachusetts's debt collection regulations, which include communication frequency limits for debt collectors and creditors, exclude postal mail from those limits. See 209 Code, Mass. Regs 18.14(1)(d); 940 Code Mass. Regs. 7.04(1)(f) (frequency limits apply to telephone calls and text messages).

[276] See generally the section-by-section analysis of proposed § 1006.6(d)(3).

stakeholders and consumer advocates have suggested that such media may be inherently less harassing than telephone calls because, for example, recipients may have more freedom to decide when to engage with an email or a text message than with a debt collection telephone call.[277] Although the Bureau currently is unaware of sufficient evidence of consumer injury that would suggest a need for restricting the frequency of email and text message communications, the Bureau recognizes that the use of such media, if abused, could harass consumers in some of the same ways as repeated or continuous telephone calls or telephone conversations.[278] The Bureau notes that proposed § 1006.14(a)—which generally prohibits any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of any debt—would apply to harassment through media other than telephone calls and could provide sufficient protection to consumers. The Bureau requests comment on the proposed approach, including on whether the frequency limits should apply to communication media other than telephone calls and, if so, to which media.[279]

During the SBREFA process, the Bureau's proposal under consideration to establish numerical limits on the frequency with which debt collectors communicate and attempt to communicate with consumers and others would have applied to all forms of communication media, not just to telephone calls. Several small entity representatives suggested that, in their experience, consumers increasingly prefer communicating by email, and that excluding email from any frequency limits would encourage debt collectors to use email instead of potentially more harassing communication strategies, such as placing repeated telephone calls. One small entity representative advised that using email to contact consumers allowed it to greatly reduce its number of outbound telephone calls, resulting in fewer consumer complaints and enabling it to monitor communications for compliance with the FDCPA more easily. In addition, small entity representatives suggested that written correspondence (e.g., mailed letters) should be excluded from any frequency limits. The Small Business Review Panel therefore recommended that the Bureau consider whether the frequency limits should apply equally to all communication channels.[280] Limiting proposed § 1006.14(b)(1)(i) and (2) to a prohibition against repeated and continuous telephone calls should address small entity representatives' concerns about a frequency limit that would apply to all types of communication media.

**14(b)(1)(ii) Identification and Prevention of Dodd-Frank Act Unfair Act or Practice**

The Bureau proposes § 1006.14(b)(1)(ii) to identify that a debt collector who is engaged in the collection of a consumer financial product or service debt, as that term is defined in proposed § 1006.2(f), engages in an unfair act or practice by placing telephone calls or engaging any person in telephone conversation repeatedly or continuously, such that the natural consequence is to harass, oppress, or abuse any person at the called number. The Bureau proposes § 1006.14(b)(1)(ii) on the basis that such conduct by debt collectors is an unfair act or practice as described in Dodd-Frank Act section 1031(c) because, as discussed in the section-by-section analysis of proposed § 1006.14(b)(2) below,[281] the conduct causes or is likely to cause substantial injury to consumers that consumers cannot reasonably avoid and that is not outweighed by countervailing benefits to consumers or to competition.[282] The Bureau also proposes § 1006.14(b)(1)(ii) to provide requirements to prevent such an unfair act or practice; specifically, under the proposal, a debt collector engaged in the collection of a consumer financial product or service debt must not exceed the calling frequency limits proposed in § 1006.14(b)(2). The Bureau proposes § 1006.14(b)(1)(ii) pursuant to its authority under section 1031(b) of the Dodd-Frank Act to prescribe rules to identify and prevent unfair acts or practices in connection with the collection of a consumer financial product or service debt, as that term is defined in proposed § 1006.2(f).

**14(b)(2) Frequency Limits**

Proposed § 1006.14(b)(2) sets forth bright-line frequency limits for debt collection telephone calls. This section-by-section analysis discusses the Bureau's proposal to establish bright-line frequency limits generally; the section-by-section analysis of proposed § 1006.14(b)(2)(i) and (ii) addresses the specific numerical frequency limits that the Bureau proposes.

As noted, FDCPA section 806 prohibits a broad range of debt collection communication practices that harm consumers and others, and section 806(5) in particular prohibits debt collectors from making telephone calls or engaging a person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass. Section 806(5) does not identify a specific number of telephone calls or telephone conversations within any particular timeframe that would violate the statute. In the years since the FDCPA was enacted, courts interpreting FDCPA section 806(5) have not developed a consensus or bright-line rule regarding call frequency.[283] While several States and localities have imposed numerical limits on debt collection contacts, the limits vary, and the large majority of jurisdictions have not established any numerical limits.[284]

Also in the years since the FDCPA was enacted, technological developments have intensified the

---

[277] As with mail, the Bureau notes that Massachusetts's debt collection regulations do not limit the frequency of a debt collector's email communications. See *supra* note 275.

[278] *Cf. Clements v. HSBC Auto Fin., Inc.*, Civ. A. No. 5:09–cv–0086, 2011 WL 2976558, at *5 (S.D. W. Va. July 21, 2011) ("That Plaintiffs were not at home all of the time and, therefore, could not have heard each one of the calls is of little moment. They had notice of every missed call through Caller ID. . . . Missed calls communicate more than a phone number. They can, depending on volume and frequency, communicate urgency and panic.").

[279] The Bureau notes in particular that the FCC has interpreted a statutory reference to "mak[ing] any call" as encompassing the sending of text messages. See *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14,014, 14,115 ¶ 165 (2003).

[280] Small Business Review Panel Report, *supra* note 57, at 37.

[281] Section 1006.14(b)(2) proposes bright-line frequency limits that would determine whether a debt collector has violated § 1006.14(b)(1).

[282] Section 1031(c) of the Dodd-Frank Act defines unfairness without regard to a covered person's or service provider's intent. For FDCPA-covered debt collectors who are collecting a consumer financial produce or service debt, the Bureau's proposal therefore identifies the unfair act or practice as repeated or continuous telephone calls that have the natural consequence of harassment, oppression, or abuse, without regard to the debt collector's intent.

[283] *See, e.g., Turner v. Prof'l Recovery Servs., Inc.*, 956 F. Supp. 2d 573, 578 (D.N.J. 2013) (noting the lack of consensus or bright-line rule); *Neu v. Genpact Servs., LLC*, No. 11–CV–2246 W KSC, 2013 WL 1773822, at *4 (S.D. Cal. Apr. 25, 2013) (same); *Hicks v. Am.'s Recovery Sols., LLC*, 816 F. Supp. 2d 509, 515 (N.D. Ohio 2011) (same).

[284] For example, the Commonwealth of Massachusetts and City of New York generally limit debt collectors to initiating two communications per week with a consumer. See 209 Code. Mass. Regs 18.14(1)(d) (limiting contacts by debt collectors); 940 Code Mass. Regs. 7.04(1)(f) (limiting contacts by creditors engaged in debt collection); N.Y.C. Admin. Code 5–77(b)(1)(iv) (limiting contacts by debt collectors). The State of Washington generally limits debt collectors to three total communications and one workplace communication per week with a consumer. See Wash. Rev. Code 19.16.250(13)(a), (b). The States of New Hampshire and Oregon limit the frequency of workplace communications. See N.H. Rev. Stat. Ann. 358–C:3(I)(c); Or. Rev. Stat. 646.639(2)(g).

consumer-protection concerns underlying FDCPA section 806(5). In 1977, placing a telephone call was typically a manual process that required a caller to dial a telephone number one digit at a time. Since then, the development of "predictive dialers" has enabled callers, such as debt collectors, to load a large number of telephone numbers into a program that automatically dials the numbers and, if the call is answered, connects the call to a debt collector. Predictive dialers have substantially reduced the cost to debt collectors of placing telephone calls and have enabled debt collectors to place many more calls at a very low cost.[285]

In light of these developments, and in the absence of a bright-line rule about how many telephone calls is too many, numerous problems with call frequency persist. Frequent telephone calls are a consistent source of consumer-initiated litigation and consumer complaints to Federal and State regulators. Consumers' lawsuits allege injuries such as feeling harassed, stressed, intimidated, or threatened, and sometimes allege adverse impacts on employment.[286] In addition, from 2011 through 2018, the Bureau and the FTC received over 100,000 complaints about repeated debt collection telephone calls.[287] Some consumers submit

narrative descriptions along with their complaints to the Bureau, providing a window into their experiences with repeated telephone calls. Some consumers describe being called multiple times per day, every day of the week, for weeks or months at a time.[288] Some consumers report that repeated calls make them feel upset, stressed, intimidated, hounded, or weary, or that such calls interfere with their health or sleep or—when debt collection voicemails fill their inboxes—their ability to receive other important messages.[289]

When Congress conferred FDCPA rulemaking authority on the Bureau through the Dodd-Frank Act in 2010, it relied, in part, on consumers' experiences with repeated or continuous debt collection telephone calls to observe that case-by-case enforcement of the FDCPA had not ended the consumer harms that the statute was designed to address. In a 2010 report prepared in connection with the Restoring American Financial Stability Act of 2010 (the Senate's predecessor bill to the Dodd-Frank Act), the Senate Committee on Banking, Housing, and Urban Affairs cited consumer complaints to the FTC about, among other things, debt collectors "bombarding [them] with continuous calls" to conclude that abusive debt collection practices had continued to proliferate since the FDCPA's passage.[290] In connection with that finding, among others, Congress granted the Bureau the authority to prescribe rules with respect to the activities of FDCPA-covered debt collectors, as well

as to issue regulations to prevent and prohibit persons covered under the Dodd-Frank Act from engaging in unfair, deceptive, or abusive acts or practices.[291]

Consumers' experiences with, and complaints about, repeated or continuous debt collection telephone calls do not necessarily establish that the conduct in each instance would have violated FDCPA section 806(5). They do, however, suggest a widespread consumer protection problem that has persisted for 40 years notwithstanding the FDCPA's existing prohibitions and case-by-case enforcement by the FTC and the Bureau as well as private FDCPA actions.[292] To address this persistent harm, the Bureau proposes § 1006.14(b)(2) to establish bright-line rules for determining whether a debt collector has violated FDCPA section 806(5) (and, in turn, FDCPA section 806), as implemented and interpreted in proposed § 1006.14(b)(1).

Proposed § 1006.14(b)(2) provides that, subject to § 1006.14(b)(3), a debt collector violates proposed § 1006.14(b)(1) by placing a telephone call to a particular person in connection with the collection of a particular debt either: (i) More than seven times within seven consecutive days, or (ii) within a period of seven consecutive days after having had a telephone conversation with the person in connection with the collection of such debt, with the date of

[285] See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 F.C.C. Rcd. 7961, 8021 (2015) ("Autodialers can quickly dial thousands of numbers, a function that costs large numbers of wireless consumers money and aggravation."), set aside in part by ACA Int'l v. Fed. Commc'ns Comm'n, 885 F.3d 687 (D.C. Cir. 2018).

[286] See, e.g., Meadows v. Franklin Collection Serv., Inc., 414 F. App'x 230, 233–34 (11th Cir. 2011) (reversing district court's dismissal of consumer's FDCPA section 806(5) claim where "[plaintiff] testified that [the debt collector's] phone calls eventually made her feel harassed, stressed, upset, aggravated, inconvenienced, frustrated, shaken up, intimidated, and threatened on occasion. And, several times the calls woke her up from sleep and caused her difficulty sleeping."); Roots v. Am. Marine Liquidators, Inc., No. 0:12–CV–00602–JFA, 2012 WL 3136462, at *1–2 (D.S.C. Aug. 1, 2012) (awarding damages to consumer where, among other things, "[p]laintiff testified that after his manager learned that Plaintiff was getting repeated collection calls at work, they treated him differently which caused him to seek out other employment. Plaintiff took a new job in April, 2012, which resulted in a pay reduction of $2.00 per hour for a period of 52 weeks. He works 40 hours each week, for a total loss of income in the amount of $4,160.").

[287] See 2019 FDCPA Annual Report, supra note 11, at 15–17; 2018 FDCPA Annual Report, supra note 16, at 14–16; 2017 FDCPA Annual Report, supra note 21, at 15–17; Bureau of Consumer Fin. Prot., Fair Debt Collection Practices Act: CFPB Annual Report 2016, at 18–19 (Mar. 2016), https://files.consumerfinance.gov/f/201603_cfpb-fair-debt-collection-practices-act.pdf; Bureau of Consumer Fin. Prot., Fair Debt Collection Practices Act: CFPB Annual Report 2015, at 12–14 (Mar. 2015), https://files.consumerfinance.gov/f/201503_cfpb-fair-debt-

collection-practices-act.pdf; Bureau of Consumer Fin. Prot., Fair Debt Collection Practices Act: CFPB Annual Report 2014, at 11–13, 19 (Mar. 2014), https://files.consumerfinance.gov/f/201403_cfpb_fair-debt-collection-practices-act.pdf; 2013 FDCPA Annual Report, supra note 9, at 17; Bureau of Consumer Fin. Prot., Fair Debt Collection Practices Act: CFPB Annual Report 2012, at 8 (Mar. 2012), https://files.consumerfinance.gov/f/201203_cfpb-FDCPA_annual_report.pdf. This total reflects complaints about all persons collecting debt, including creditors and other first-party collectors in addition to debt collectors covered by the FDCPA. For complaints submitted to the Bureau, complaint data reflects the number of complaints that consumers self-identified as being primarily about frequent or repeated debt collection communications (consumers must choose only one topic when filing their complaints). The Bureau has not attempted to identify the specific number of communications-related consumer complaints that it has received because many complaints that consumers self-identify as being primarily about a different issue also may include concerns about a debt collector's communication practices.

[288] See generally Bureau of Consumer Fin. Prot., Consumer Complaints, https://data.consumerfinance.gov/dataset/Consumer-Complaints/s6ew-h6mp (last visited May 6, 2019).

[289] Id.

[290] S. Rept. 111–176, at 19 (2010).

[291] 15 U.S.C. 1692l; Dodd-Frank Act sections 1031(b), 1032; 12 U.S.C. 5531(b), 5532 (2010).

[292] See, e.g., Complaint at ¶¶ 63, 124–28, Fed. Trade Comm'n & Consumer Fin. Prot. Bureau v. Green Tree Servicing LLC, No. 0:15–cv–02064 (D. Minn. Apr. 21, 2015), https://www.ftc.gov/enforcement/cases-proceedings/112-3008/green-tree-servicing-llc (alleging that defendant violated FDCPA section 806(5) by, among other things, having frequently called consumers between seven and 20 times per day, every day, week after week); Complaint at ¶¶ 20–22, 41, Fed. Trade Comm'n v. K.I.P., LLC, No. 1:15–cv–02985 (N.D. Ill. Apr. 6, 2015), https://www.ftc.gov/enforcement/cases-proceedings/152-3048/kip-llc-payday-loan-recovery-group (alleging that defendant violated FDCPA section 806(5) by, among other things, "call[ing] consumer multiple times per day or night . . . over an extended period of time"); Complaint at ¶¶ 22, 50–53, Fed. Trade Comm'n v. Expert Glob. Sols, Inc., No. 3–13 CV 2611–M (N.D. Tex. July 8, 2013), https://www.ftc.gov/enforcement/cases-proceedings/1023201/expert-global-solutions-inc-nco-group-inc (alleging that defendants violated FDCPA section 806(5) by, among other things, "call[ing] multiple times per day or frequently over an extended period of time [including,] for example, calling some persons three or more time per day"); Complaint at ¶¶ 80, 97(b), Fed Trade Comm'n v. Jefferson Capital Sys., LLC, No. 1:08–cv–1976 BBM (N.D. Ga. June 10, 2008), https://www.ftc.gov/enforcement/cases-proceedings/062-3212/compucredit-corporation-jefferson-capital-systems-llc (alleging that defendant violated FDCPA section 806(5) by, among other things, "[calling] individual consumers in excess of twenty times per day, in some cases, at intervals of only twenty to thirty minutes").

the telephone conversation being the first day of the seven-consecutive-day period.[293] As discussed in the section-by-section analysis of proposed § 1006.14(b)(2)(i) and (ii), which addresses the specific frequency limits that the Bureau proposes, the Bureau proposes § 1006.14(b)(2) pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors, its authority to implement and interpret FDCPA section 806 and 806(5), and its authority under Dodd-Frank Act section 1031(b) to prescribe rules to prevent Bureau-identified unfair acts or practices in connection with any transaction with a consumer for a consumer financial product or service.

Proposed § 1006.14(b)(2) would apply not only to debt collection calls placed to consumers who owe or are alleged to owe debt, but to any person (with certain exceptions described below). Congress recognized the potential harm from debt collectors placing repeated or continuous telephone calls to persons other than consumers when it enacted FDCPA section 806(5), which protects "any person" from repeated or continuous telephone calls or conversations made with intent to annoy, abuse, or harass. Likewise, Dodd-Frank Act section 1031 applies to acts or practices "in connection with a transaction with a consumer for a consumer financial product or service" (or "the offering of") a consumer financial product or service"), provided that "the act or practice causes or is likely to cause substantial injury to consumers" and meets the other criteria for unfairness. Like the language of FDCPA section 806(5), the language of Dodd-Frank Act section 1031 suggests that an act or practice may be unfair to consumers generally, presumably even if the injury is to a consumer who is not a party to the transaction creating the debt, so long as the injury is "in connection with" a transaction with a consumer for a consumer financial product or service. The frequency limits in proposed § 1006.14(b)(2) thus would apply to any person (with certain exceptions described below), not only to

the consumer who is alleged to owe the debt.[294]

The Bureau requests comment on the proposal to establish a bright-line rule to determine when a debt collector's calling frequency has violated FDCPA section 806(5) and the prohibition in proposed § 1006.14(b)(1)(i), as well as to prevent an unfair act or practice under Dodd-Frank Act section 1031(b). As discussed, under such a bright-line rule, a debt collector who exceeds the frequency limits would per se violate FDCPA section 806(5) and the prohibitions in proposed § 1006.14(b)(1), while a debt collector who stays within the frequency limits would per se comply with those provisions. In lieu of a bright-line rule, it would be possible, for example, to have a rebuttable-presumption rule. Under a rebuttable presumption, a debt collector who exceeded the frequency limits presumptively would violate FDCPA section 806(5) and the prohibitions in proposed § 1006.14(b)(1), but the debt collector would have the opportunity to rebut that presumption.

As discussed further in the section-by-section analysis of proposed § 1006.14(b)(4) below, the Bureau does not propose a rebuttable presumption because the benefits of a rebuttable presumption approach are unclear. It appears that most, if not all, of the circumstances that might require a debt collector to exceed the frequency limits could be addressed by specific exceptions to a bright-line rule.[295] It thus appears that a well-defined, bright-line rule with specific exceptions could provide needed flexibility without sacrificing the clarity of a bright-line rule. A bright-line rule may also promote predictability and reduce the risk and uncertainty of litigation. The Bureau requests comment on this aspect of the proposal and on whether, if a rebuttable presumption approach were adopted, the Bureau should retain any of the exceptions described in proposed § 1006.14(b)(3).

During the SBREFA process, the Bureau's proposal under consideration would have applied to any of a debt collector's communications or attempts to communicate. The Bureau's Small Business Review Panel Outline noted that a bright-line rule could provide

exceptions for certain types of contacts, but the Outline did not identify any particular exceptions that were under consideration.[296] Small entity representatives suggested that contacts initiated by consumers should not count toward the frequency limits, and the Small Business Review Panel Report recommended that the Bureau consider whether consumer-initiated contacts should be excluded.[297] Proposed § 1006.14(b)(2) would count only telephone calls that a debt collector "places" to a person toward the frequency limits, which may help to address small entity representatives' concerns about consumer-initiated contacts.

14(b)(2)(i)

Proposed § 1006.14(b)(2)(i) provides that, subject to the exceptions in § 1006.14(b)(3), a debt collector violates § 1006.14(b)(1)(i) by placing a telephone call to a person more than seven times within seven consecutive days in connection with the collection of a particular debt. Under this bright-line rule, and subject to the exceptions in proposed § 1006.14(b)(3), a debt collector who places more than seven telephone calls to any person within seven consecutive days about a debt would per se violate FDCPA section 806 and 806(5) and the prohibitions in proposed § 1006.14(b)(1).[298]

The Bureau's proposed frequency limits take into account a number of competing considerations. One consideration is that, for many—perhaps most—people, even a small number of debt collection telephone calls may have the natural consequence of causing them to experience harassment, oppression, or abuse, and therefore, assuming a debt collector is aware of this effect, the debt collector's placement of even a small number of such calls may indicate that the debt collector has the requisite intent to annoy, abuse, or harass. In the Bureau's Debt Collection Consumer Survey, nearly 90 percent of respondents who

---

[293] Because proposed § 1006.14(b)(1)(ii) provides that a debt collector engaged in the collection of a consumer financial product or service debt must not exceed the calling frequency limits proposed in § 1006.14(b)(2), such a debt collector who exceeds the frequency limits also would violate proposed § 1006.14(b)(1)(ii). Separately, proposed § 1006.14(b)(4) provides a parallel bright-line rule that debt collectors who place telephone calls or engage in telephone conversations at or below the levels in § 1006.14(b)(2) do not, based on their calling frequency, violate the FDCPA, the Dodd-Frank Act, or § 1006.14(b)(1).

[294] While proposed § 1006.14(b)(2) would apply to "any person," the Bureau uses the term "consumer" throughout this section-by-section analysis as a shorthand to refer both to consumers, as defined by the FDCPA, and others who may be contacted by debt collectors.

[295] See the section-by-section analysis of proposed § 1006.14(b)(3) for a discussion of the Bureau's proposed exceptions.

[296] Small Business Review Panel Outline, supra note 56, at 25.

[297] See Small Business Review Panel Report, supra note 57, at 37.

[298] Because proposed § 1006.14(b)(1)(ii) provides that a debt collector engaged in the collection of a consumer financial product or service debt must not exceed the frequency limits proposed in § 1006.14(b)(2), such a debt collector who places more than seven telephone calls within seven consecutive days also would violate § 1006.14(b)(1)(ii). Separately, under the proposal, a debt collector who placed seven or fewer telephone calls within a period of seven consecutive days would per se not have placed telephone calls repeatedly or continuously to the person at the called number. See the section-by-section analysis of proposed § 1006.14(b)(4).

said they were contacted more than three times per week indicated that they were contacted too often; 74 percent of respondents who said they were contacted one to three times per week indicated that that they were contacted too often; and 22 percent of respondents who said that they were contacted less than once per week indicated that even this level of contact was too often.[299] The effect on a consumer of a single debt collector placing repeated or continuous telephone calls is amplified by the fact that, according to the Bureau's research, almost 75 percent of consumers with at least one debt in collection have multiple debts in collection, such that many consumers may receive calls from multiple debt collectors each week.[300] Debt collectors who are aware that many consumers have multiple debts in collections and that these consumers are already receiving telephone calls from other debt collectors may be placing additional calls with intent to annoy, abuse, or harass those consumers.

At the same time, debt collectors have a legitimate interest in reaching consumers. The FDCPA's purposes include "eliminat[ing] *abusive* debt collection practices by debt collectors" and ensuring that debt collectors who refrain from such practices "are not competitively disadvantaged." [301] The FDCPA does not contemplate that the elimination of abusive practices entails the elimination of "the effective collection of debts." [302] Communicating with consumers is central to debt collectors' ability to recover amounts owed to creditors. Debt collectors typically must make multiple attempts before establishing what in industry parlance is referred to as "right-party contact"—that is, before they actually speak to a consumer. Too greatly restricting the ability of debt collectors

and consumers to communicate with one another could prevent debt collectors from establishing right-party contact and resolving debts, even when doing so is in the interests of both consumers and debt collectors. For example, during the SBREFA process, small entity representatives reported that consumers who do not communicate with a debt collector may have negative information furnished to consumer reporting agencies or may face additional fees or a collection lawsuit, which can entail the financial or opportunity cost of the lawsuit or subject a consumer to wage garnishment. And as much as some consumers might prefer to avoid speaking to debt collectors, many consumers benefit from communications that enable them to promptly resolve a debt through partial or full payment or an acknowledgement that the consumer does not owe some or all of the alleged debt.

The Bureau also has considered whether debt collectors' reliance on making repeated telephone calls to establish contact with consumers could be reduced by other aspects of the proposed rule that are designed to address legal ambiguities regarding how and when debt collectors may communicate with consumers. For example, as discussed above, debt collectors who leave voicemails for consumers currently face a dilemma about whether to risk liability under FDCPA sections 806(6) and 807(11) by omitting disclosures required under those sections, or risk liability under FDCPA section 805(b) by including the disclosures and potentially disclosing a debt to a third party who might overhear the message. Proposed § 1006.2(j) seeks to address that dilemma by defining a limited-content message that debt collectors may leave for consumers without violating FDCPA sections 805(b), 806(6), or 807(11). Permitting such messages should ensure that debt collectors can leave voicemails with a return call number for a consumer to use at the consumer's convenience, which may help reduce the need for debt collectors to place repeated telephone calls to contact consumers.[303]

Another legal ambiguity regarding how and when debt collectors may communicate with consumers is that the FDCPA does not address how debt collectors may use electronic communication media such as emails or text messages to communicate. The Bureau's proposals in §§ 1006.6(d)(3)

and 1006.42 are designed to clarify that ambiguity so that debt collectors may communicate electronically with consumers who prefer to communicate that way. Further, for the reasons discussed in the section-by-section analysis of proposed § 1006.14(b)(1), the Bureau does not propose subjecting email, text messages, or other electronic communications to the proposed frequency limits.

Taking all of these factors into account, the Bureau proposes to draw the line at which a debt collector places telephone calls repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number (and the line at which such calls have the natural consequence of harassing, oppressing, or abusing any person) [304] at seven telephone calls in a seven-day period about a particular debt. The proposal would allow debt collectors to call up to seven times per week across multiple telephone numbers (*e.g.*, a home landline, mobile, and work), and to leave a limited-content message each time. It also would not limit how many mailed letters, emails, and text messages debt collectors could send. At the same time, by making clear that debt collectors cannot call consumers more than seven times each week about a particular debt in collection, the proposal would protect consumers and others from being harmed by debt collectors making repeated or continuous telephone calls with intent to annoy, abuse, or harass.

For the reasons discussed above, the Bureau proposes § 1006.14(b)(2)(i) to provide that, subject to proposed § 1006.14(b)(3), a debt collector violates proposed § 1006.14(b)(1)(i) by placing more than seven telephone calls within seven consecutive days to a particular person in connection with the collection of a particular debt. Proposed comment 14(b)(2)(i)–1 provides illustrative examples of the proposed rule.[305]

[299] *See* CFPB Debt Collection Consumer Survey, *supra* note 18, at 31. Consumers were asked "How often did this creditor or debt collector usually try to reach you each week, including times they did not reach you?" Response options included: Less than once per week; one to three times per week; four to seven times per week; eight to 14 times per week; 15 to 21 times per week; and more than 21 times per week. A separate question asked consumers whether the debt collector had contacted them too often. Survey respondents had the option of indicating that they were not sure whether contacts had come from a debt collector, creditor, or another source. The data reflects responses given by any respondent who reported being contacted about a debt in collection. Limitations on the survey data include that respondents were not asked to distinguish between contact attempts and actual contacts and were not asked to specify whether they already had spoken with the debt collector who was trying to contact them. *Id.* at 30–31.

[300] *Id.* at 13, table 1.

[301] 15 U.S.C. 1692(e) (emphasis added).

[302] 15 U.S.C. 1692(c).

[303] See the section-by-section analysis of proposed § 1006.2(j) for a full discussion of the proposed limited-content message.

[304] *Litt* v. *Portfolio Recovery Assocs. LLC,* 146 F. Supp. 3d 857, 873 (E.D. Mich. 2015) ("[W]hile the general proscription of § 1692d does not use the word 'intent,' such a requirement is inferred from the necessity to establish that the natural tendency of the conduct is to embarrass, upset or frighten a debtor. If the natural tendency of certain conduct is to embarrass, upset or frighten, then one who engages in such conduct can be presumed to have intended the natural consequences of his act."); *see also United States* v. *Falstaff Brewing Corp.,* 410 U.S. 526, 570 n.22 (1973) (Marshall, J., concurring in result) ("[P]erhaps the oldest rule of evidence—that a man is presumed to intend the natural and probable consequences of his acts—is based on the common law's preference for objectively measurable data over subjective statements of opinion and intent.").

[305] The examples would clarify how the proposed rule would apply to calls to consumers or to third parties. The Bureau understands that debt collectors may make location calls to several numbers, but

Proposed comment 14(b)(2)(i)–2 would clarify how to determine the number of telephone calls a debt collector has placed if the debt collector learns that the telephone number that the debt collector previously used to call a person is not, in fact, that person's number. The comment would clarify that telephone calls placed to the wrong number are not counted towards the frequency limit in proposed § 1006.14(b)(2)(i) with respect to the person the debt collector is trying to contact. The Bureau proposes this clarification because a person is unlikely to be harassed by debt collection calls that are placed to a number that belongs to someone else.

The Bureau requests comment on several aspects of proposed § 1006.14(b)(2)(i). First, the Bureau *requests comment on the proposal to set* the frequency limit at seven telephone calls to a particular consumer within seven consecutive days regarding a particular debt, including on the harms to consumers that may be prevented by this limit and on how such a limit may impact debt collectors. Some stakeholders may take the position that this proposed line should be adjusted upward or downward to account for certain concerns. Debt collectors and other industry stakeholders have advised the Bureau that, today, they often need to make more telephone calls than would be allowed under the proposal in order to establish right-party contact; they have expressed concern that a too-restrictive limit may hamper their ability to reach consumers and collect debts. Consumer advocates have suggested that a lower call limit is necessary to prevent harassment in part because consumers with multiple debts *in collection could receive multiple* calls about each debt each week; under the proposed limits, for example, a consumer with four or five debts in collection could receive up to two or three dozen telephone calls each week.[306] Some consumer advocates

therefore have recommended that the Bureau prohibit a debt collector from placing, for example, more than three telephone calls per week to any one *consumer, regardless of how many debts* the debt collector is trying to recover from that consumer.

The Bureau encourages commenters who believe the Bureau should set a higher or lower limit to provide data supporting any recommended numbers, such as data regarding the frequency of calls that debt collectors currently make and how that frequency relates to the time needed to establish right-party contact and payments received from consumers. The Bureau also encourages commenters to provide data demonstrating the marginal impact on consumers and debt collectors, as well as on competition and the cost of credit, of adjusting the weekly limit on telephone calls from the proposed seven calls per week to a different number. To the extent that a commenter recommends a higher limit on telephone calls to permit debt collectors to recover more payments from consumers, the Bureau *encourages the commenter to* submit data quantifying the benefits such increased recovery would have on competition or consumers, such as by lowering the cost of credit. The Bureau also requests data regarding the financial, emotional, or other impact on consumers of calls from debt collectors at varying levels of frequency. In addition, the Bureau requests comment on whether debt collectors currently are able to, or under the proposed rule would expect to be able to, establish right-party contact through voicemails or electronic media, such that debt collectors may have less of a need to place repeated telephone calls to *consumers.*

Second, the Bureau requests comment on the proposal to measure the frequency of telephone calls on a per-week basis. This framework could result in debt collectors placing, for example, seven telephone calls about one debt to *a consumer in one day.* The Bureau considered combining a seven-day frequency limit with a per-day frequency limit that would have prohibited, for example, more than one telephone call to a consumer per debt per day, up to a limit of seven telephone calls per consumer per debt every seven days. The Bureau does not propose a combined daily and weekly limit because, while such an approach would eliminate multiple telephone calls about a single debt on any given day, it might not provide flexibility for unforeseen situations or the need to attempt to contact some consumers at different telephone numbers and at different

times of the day. It also is not clear that many debt collectors would respond to the proposed weekly limit on telephone calls by placing all of their permitted *calls in rapid succession,* thus foregoing the opportunity to call the consumer at a different time of day or on a different day of the week for the following seven days. Further, a rule with both daily and weekly frequency limits would sacrifice the ease of implementing and monitoring one frequency limit. The Bureau requests comment on its approach and on the merits of limiting telephone calls based on a different time period (*e.g.,* by day, by month, or through a combination of time periods).

Third, the Bureau requests comment on the proposal to apply frequency limits on a per-debt, rather than on a per-consumer, basis.[307] As proposed, § 1006.14(b)(2)(i) could permit, for example, a debt collector who is attempting to collect two debts from the same consumer to place up to 14 telephone calls in one week to that consumer without violating the FDCPA, the Dodd-Frank Act, or Regulation F based on the frequency of its calling. The Bureau requests comment on this aspect of the proposal, which also is discussed further in the section-by-section analysis of proposed § 1006.14(b)(5).

Fourth, the Bureau requests comment on the proposal to count telephone calls placed about a particular debt to different telephone numbers associated with the same consumer together for purposes of determining whether a debt collector has exceeded the limit in proposed § 1006.14(b)(2)(i) (*i.e.,* an aggregate approach). The Bureau considered a proposal that would have limited the number of calls permitted to any particular telephone number (*e.g.,* at most two calls to each of a consumer's landline, mobile, and work telephone numbers). The Bureau considered such a limit either instead of or in addition to an overall limit on the frequency of telephone calls to one consumer. The Bureau instead proposes an aggregate approach because of concerns that a more prescriptive, per-telephone number approach could produce undesirable results—for example, some consumers could receive (and some debt collectors could place) more telephone calls simply based on the number of telephone numbers that certain consumers happened to have (and that

---

that location calls do not generally involve frequently calling each number. Therefore the Bureau does not expect that debt collectors would be *affected by the proposed limits as they apply to* location calls made to third parties.

[306] The proposed frequency limits generally would apply per debt in collection (see proposed § 1006.14(b)(5)), and the Bureau's research shows that a majority of consumers who have at least one debt in collection have multiple debts in collection. For example, 57 percent of consumers with at least one debt in collection reported having between two and four debts in collection. *See* CFPB *Debt* Collection Consumer Survey, *supra* note 18, at 13, table 1. Overall, the Bureau's research shows that almost 75 percent of consumers with at least one debt in collection have multiple debts in collection. *See id.; see also* CFPB Medical Debt Report, *supra* note 20, at 20 (reporting that most consumers with one tradeline have multiple tradelines).

[307] As discussed in the section-by-section analysis of proposed § 1006.14(b)(5), with respect to student loan debts, all debts that a consumer owes or allegedly owes that were serviced under a single account number at the time the debts were obtained by the debt collector would be treated as a single debt for purposes of the frequency limits.

debt collectors happened to know about). Such an approach also could incentivize debt collectors to place telephone calls to less convenient telephone numbers after exhausting their telephone calls to consumers' preferred numbers. The Bureau requests comment on the merits of an aggregate versus a per-telephone number limit.

Finally, the Bureau requests comment on proposed comment 14(b)(2)(i)–2. In particular, the Bureau requests comment on whether the Bureau should provide additional clarification about how a debt collector determines that a telephone number is not associated with a particular person, or whether, for purposes of the proposed frequency limits, there is an alternative way to treat telephone calls inadvertently made to the wrong person.

The Bureau's Small Business Review Panel Outline described a proposal under consideration that would have limited a debt collector's weekly contact attempts with consumers by any communication medium. Before a debt collector *confirmed contact* with a consumer, the proposal under consideration would have imposed weekly limits of (i) three contact attempts per unique communication medium and (ii) six total contact attempts. After confirming contact with the consumer, a debt collector would have been subject to weekly limits of (i) two contact attempts per unique communication medium and (ii) three total contact attempts.[308] Many small entity representatives expressed a strong preference for bright-line, simplified rules. Many also stated that the proposal under consideration would inhibit communications between debt collectors and consumers and extend the time necessary to reach consumers. In particular, small entity representatives stated that they regularly attempt to contact consumers more than seven times per week when trying to establish right-party contact. Small entity representatives suggested several

exceptions to the proposal under consideration, including telephone calls about which a consumer was unaware because, for example, the telephone number called was not, in fact, associated with that consumer.[309] In its report, the Small Business Review Panel recommended, among other things, that the Bureau consider whether the frequency limits should apply equally to all communication media (*e.g.,* telephone, postal mail, email, text messages, and other newer communication media).[310]

The Bureau considered the small entity representatives' feedback in developing the proposed frequency limits and believes that proposed § 1006.14(b)(2)(i) responds to many of the small entity representatives' concerns. In particular, proposed § 1006.14(b)(2)(i) would permit a debt collector to place seven telephone calls to a consumer in a seven-day period regarding a particular debt, without a different numerical limit on the number of calls the debt collector could make during a seven-day period after having established initial contact with the consumer. The proposal thus avoids potential ambiguities regarding when a debt collector has confirmed or lost contact with a consumer and may represent the type of bright-line, simplified approach that small entity representatives sought. The proposal would not limit debt collectors to sending a particular number of letters, emails, and text messages, and proposed comment 14(b)(2)(i)–2 would clarify that a telephone call to a number that the debt collector later determines is not associated with the consumer does not count toward the frequency limit. As discussed in the section-by-section analysis of proposed § 1006.14(b)(3), the Bureau proposes several other exceptions to the frequency limits in response to small entity representatives' feedback.

As noted above, the Bureau proposes § 1006.14(b)(2)(i) and its related commentary pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors, and as an interpretation of FDCPA section 806(5), because a debt collector who places more than seven telephone calls to a particular person about a particular debt within seven consecutive days may have the intent to annoy, abuse, or harass the person.[311]

Some debt collectors may, in fact, place more than seven telephone calls to a person each week precisely because they believe that additional telephone calls may cause sufficient harassment or annoyance to pressure the person to respond or make a payment that the person otherwise would not have made.

With respect to a debt collector who is collecting a consumer financial product or service debt, as defined in proposed § 1006.2(f), the Bureau also proposes § 1006.14(b)(2)(i) pursuant to its authority under section 1031(b) of the Dodd-Frank Act to prescribe rules applicable to a covered person or service provider that identify, and that may include requirements to prevent, unfair acts or practices in connection with any transaction with a consumer for a consumer financial product or service. To identify an act or practice as unfair under the Dodd-Frank Act, the Bureau must have a reasonable basis to conclude that: (1) The act or practice causes or is likely to cause substantial injury to consumers, which consumers *cannot reasonably avoid;* and (2) *such* substantial injury is not outweighed by countervailing benefits to consumers or to competition.[312]

The Bureau proposes § 1006.14(b)(2)(i) to prevent [313] the unfair act or practice, identified in proposed § 1006.14(b)(1)(ii), of placing, in connection with the collection of a consumer financial product or service debt, telephone calls to any person repeatedly or continuously such that the natural consequence is to harass, oppress, or abuse any person at the called number. The Bureau proposes to set the frequency limit at seven telephone calls within seven consecutive days about a particular debt because such a limit appears to bear a reasonable relationship to preventing the unfair practice.[314]

---

[308] The proposals under consideration described in the Small Business Review Panel Outline would have applied the same limits for contact attempts to individuals other than the consumer, except that all third-party contact attempts would have been prohibited after the debt collector had successfully contacted the consumer, on the theory that the debt collector at that point would have had no reason to continue to engage in third-party outreach. The Bureau's proposal does not include the aspect of the Small Business Review Panel Outline that would have prohibited third-party contact attempts after the debt collector had successfully contacted the consumer. Proposed § 1006.10, which would implement FDCPA section 804's general prohibition against communicating more than once with a person to obtain location information, may provide sufficient protection regarding the making of location information communications when location information has already been obtained.

[309] *See* Small Business Review Panel Report, *supra* note 57, at 36–37.

[310] *Id.* at 37.

[311] Calls in excess of this limit may have the natural consequence of harassing, oppressing, or

abusing a person at the called number, and, as noted above, the Bureau assumes that debt collectors intend the natural consequences of their actions.

[312] Dodd-Frank Act section 1031(c), 12 U.S.C. 5531(c).

[313] The Bureau has not determined in connection with this proposal whether telephone calls in *excess* of the limit in proposed § 1006.14(b)(2)(i) by creditors and others generally not covered by the FDCPA would constitute an unfair act or practice under section 1031(c) of the Dodd-Frank Act if engaged in by those persons, rather than by an FDCPA-covered debt collector. The Bureau's proposal does not address, for example, whether consumers could reasonably avoid harm from creditor contacts or whether frequent creditor contacts provide greater benefits to consumers or competition.

[314] Dodd-Frank Act section 1031(c). Some courts have held that the consumer stated a claim under FDCPA section 806(5) where the debt collector called, on average, more than seven times per week. *See, e.g., U.S.* v. *Cent. Adjustment Bureau, Inc.,* 667

Consumers may suffer or be likely to suffer substantial injury from repeated or continuous debt collection telephone calls. Consumers have alleged in complaints lodged with the FTC and the Bureau, and in litigation, that such telephone calls can cause them, among other things, to suffer great emotional distress and anxiety, and that such calls can interfere with their health or sleep.[315] Consumers may pay debts that they otherwise might not have paid simply to stop the telephone calls. For example, consumers may pay debts that they do not owe or to which they have legal defenses; pay debts using funds that are exempt from collection; or pay the particular debt being collected instead of other debts or expenses that the consumer otherwise would prioritize, such as a secured or nondischargable debt or expenses for food, shelter, clothing, or medical treatment. A debt collector's telephone calls also may cause some consumers to incur charges on their mobile telephones.[316] Although the charge for an individual call may be minimal, the FCC has found that "[t]hese costs can be substantial" when aggregated across all consumers,[317] which is consistent with the FTC's and the Bureau's approach of

aggregating all injuries (including small injuries) caused by a practice to determine whether the practice is unfair.[318]

Consumers may not be reasonably able to avoid the substantial injuries that could stem from frequent or repeated debt collection telephone calls. Many consumers carry their mobile telephones at all times to coordinate essential tasks or to be available in case of emergency.[319] Consumers also may share their mobile or landline telephones with family members. For these consumers, disengaging from all telephone calls to avoid debt collectors may not be an option. Moreover, courts have held that the ringing or vibrating alert caused by a debt collector's calls can contribute to harassment by conveying a sense of urgency to the consumer,[320] which can overwhelm some consumers, especially those with multiple debts in collection.

FDCPA section 805(c) provides, in part, that a debt collector generally shall not communicate further with a consumer with respect to a debt if the consumer notifies the debt collector in writing that the consumer wishes the debt collector to cease further

communication.[321] Section 805(c), however, may be insufficient to permit consumers to reasonably avoid injuries from repeated or continuous telephone calls. First, many consumers may invoke the cease communication right only after they are harassed. Second, some consumers, even if they are aware of their rights, may not invoke them because ceasing communication entirely could make it more difficult to resolve the debt and, in turn, subject the consumer to other injuries. In particular, an unresolved debt could cause the consumer to incur additional fees, interest, adverse credit reporting, or, in the case of secured debts, loss of a home, automobile, or other property. Numerous debt collectors also have reported that a consumer who ceases communications is more likely to be sued and subjected to wage garnishment because the debt collector has no other way to recover on the debt.[322] Accordingly, a consumer who is aware of these potential outcomes, even if only in the abstract, or who wishes to resolve the debt in the future, may be reluctant to invoke the cease communication right to prevent harassment. Moreover, it may not be reasonable to expect a consumer to avoid harassment by invoking the cease communication right if doing so makes it more likely that the debt collector will sue the consumer to recover on the debt. Third, only a consumer as defined in FDCPA sections 803(3) and 805(d) may invoke the cease communication right, leaving other persons unable to invoke this remedy.

The Bureau proposes § 1006.14(b)(2)(i) because the injuries described above appear not to be outweighed by the countervailing benefits to consumers or to competition from more frequent telephone calls from FDCPA-covered debt collectors. If the proposed limit on telephone calls adversely affects debt collectors' ability to collect debts, the reduction in recoveries and corresponding increases in losses could result in an increase in the cost of credit. However, as discussed above and more fully in part VI, debt collectors may not need to make repeated or continuous telephone calls to collect debts effectively, and debt collectors may face diminishing returns as they increase the frequency of their calling. Further, the Bureau has sought

F. Supp. 370, 376, 394 (N.D. Tex. 1986), aff'd as modified, 823 F.2d 880 (5th Cir. 1987) (per curiam) (holding that debt collector violated FDCPA section 806(5) by, among other things, placing successive telephone calls in a single day and calling at least one consumer four-to-five times in a single day); Schwartz-Earp v. Advanced Call Ctr. Techs., LLC, No. 15–CV–01582–MEJ, 2016 WL 899149, at *4 (N.D. Cal. Mar. 9, 2016) (denying debt collector's summary judgment motion where the debt collector called the consumer "multiple times a day, with as many as five calls in a day," and remarking that "the volume and pattern of calls alone is sufficient to raise a genuine dispute of material fact"); Neu v. Genpact Servs., LLC, No. 11–CV–2246 W KSC, 2013 WL 1773822, at *4 (S.D. Cal. Apr. 25, 2013) (holding that 150 telephone calls in 51 days raised a triable issue of fact as to the debt collector's intent to harass and observing that "[a] reasonable trier of fact could find that [calling the consumer six times in one day] alone, apart from the sheer volume of calls placed by [the debt collector], is sufficient to find that [the debt collector] had the 'intent to annoy, abuse or harass' "); Forrest v. Genpact Servs., LLC, 962 F. Supp. 2d 734, 737 (M.D. Pa. 2013) (holding that consumer stated a claim under FDCPA section 806(5) by alleging that debt collector called the consumer 225 times within 54 days); Bassett v. I.C. Sys., Inc., 715 F. Supp. 2d 803, 810 (N.D. Ill. 2010) (denying debt collector's summary judgment motion where debt collector called the consumer 31 times in 12 days).

[315] See supra notes 286 and 287.

[316] See the section-by-section analysis of proposed § 1006.6(e).

[317] Fed. Comms. Comm'n, In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 FCC Rcd. 7961, 8020 ¶ 118 (2015) ("In addition to the invasion of consumer privacy for all wireless consumers, the record confirms that some are charged for incoming calls and messages. These costs can be substantial when they result from the large numbers of voice calls and texts autodialers can generate.").

[318] Fed. Trade. Comm'n v. Pantron I Corp., 33 F.3d 1088, 1102–03 (9th Cir. 1994) ("Both the Commission and the courts have recognized that consumer injury is substantial when it is the aggregate of many small individual injuries.") (citing Orkin Exterminating Co. v. Fed. Trade. Comm'n, 849 F.2d 1354, 1365 (11th Cir. 1988)); FTC Policy Statement on Unfairness, supra note 100, at 1073 n.12 ("An injury may be sufficiently substantial . . . if it does a small harm to a large number of people, or if it raises a significant risk of concrete harm."); Bureau of Consumer Fin. Prot., CFPB Examination Procedures, Unfair, Deceptive, or Abusive Acts or Practices, at 2 (Oct. 2012), https://www.consumerfinance.gov/documents/4576/102012_cfpb_unfair-deceptive-abusive-acts-practices-udaaps_procedures.pdf ("An act or practice that causes a small amount of harm to a large number of people may be deemed to cause substantial injury.").

[319] See, e.g., Fed. Comms. Comm'n, In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 FCC Rcd. 7961, 7996 ¶ 61 (2015) at 7996 ¶ 61 ("Indeed, some consumers may find unwanted intrusions by phone more offensive than home mailings because they can cost them money and because, for many, their phone is with them at almost all times.").

[320] See, e.g., Clements v. HSBC Auto Fin., Inc., Civ. A. No. 5:09–cv–0086, 2011 WL 2976558, at *5 (S.D. W. Va. July 21, 2011) (noting that "[m]issed calls communicate more than a phone number" and "can, depending on volume and frequency, communicate urgency and panic," but nevertheless finding that, based on the facts of the case, plaintiffs had suffered minimal emotional harm); Bassett v. I.C. Sys., Inc., 715 F. Supp. 2d 803, 807–810 (N.D. Ill. 2010) (denying debt collector's summary judgment motion where debt collector placed 31 telephone calls to a consumer's blocked telephone and explaining that, although the consumer's telephone did not ring, the consumer could still have been harassed because the telephone displayed the incoming calls).

[321] 15 U.S.C. 1692c(c). Proposed § 1006.6(c) would implement FDCPA section 805(c).

[322] As noted earlier in this section-by-section analysis, the Bureau has received feedback from small entity representatives and other industry stakeholders that overly restrictive frequency limits could result in some of these same consumer harms, and the Bureau requests comment on the proposed frequency limits for that reason.

to mitigate concerns about increasing the cost of credit by limiting only the number of telephone calls placed per seven days, not the total number of telephone calls placed throughout the course of collections, thus permitting debt collectors to continue making as many telephone calls as needed, albeit over a longer period. Further, even if preventing harassing or oppressive contacts did have some marginal effect on collections success, the injuries caused by such contacts do not appear to be outweighed by countervailing benefits to consumers or to competition.

For similar reasons, the FTC and the Bureau previously have alleged through enforcement actions that repeated or continuous telephone calls or telephone conversations can constitute an unfair act or practice in violation of section 5 of the FTC Act and section 1031 of the Dodd-Frank Act.[323] For example, the FTC has alleged that a party engaged in an unfair act or practice under section 5 by making repeated or continuous

telephone calls with intent to harass or abuse either consumers who owed debts or third parties, explaining that these calls can cause substantial injuries by, among other things, affecting the consumer's reputation, impairing the consumer's relationship with family, friends, and co-workers, and inducing the payment of disputed debts.[324] Similarly, the Bureau has alleged that a party engaged in unfair acts or practices under section 1031 by making an excessive number of telephone calls to consumers and by calling third parties repeatedly even after being informed that the calls were to the wrong person.[325]

Section 1031(c)(2) of the Dodd-Frank Act allows the Bureau to "consider established public policies as evidence to be considered with all other evidence" in determining whether an act or practice is unfair, as long as the public policy considerations are not the primary basis of the determination.[326] Established public policy appears to support the Bureau's proposed finding that it is an unfair act or practice for a debt collector who is collecting a consumer financial product or service debt to place telephone calls repeatedly or continuously such that the natural consequence is to harass, oppress, or abuse any person at the called number. Several consumer financial statutes and regulations, as well as industry standards,[327] require or recommend that debt collectors or others who are engaged in marketing or collections limit the frequency of their telephone calls to consumers. These include several State and local laws that limit the number of times a debt collector or creditor may call a consumer each week,[328] as well as the Telemarketing and Consumer Fraud and Abuse Prevention Act, the Telephone Consumer Protection Act, and related FTC and FCC rulemakings that establish the Do Not Call Registry, limit the use of autodialers, and impose requirements related to Caller ID.[329] In short, Congress, State and local legislatures,

and other agencies have found that consumers are harmed by repeated telephone calls. These established policies support a finding that it is an unfair act or practice for a debt collector who is collecting a consumer financial product or service debt to place telephone calls to a person repeatedly or continuously such that the natural consequence is to harass, oppress, or abuse any person at the called number, and they evince public policy that supports the Bureau's proposed frequency limits. The Bureau gives weight to this policy and bases its proposed finding that the identified act or practice is unfair in part on this body of public policy.

*14(b)(2)(ii)*

Proposed § 1006.14(b)(2)(ii) would provide that, subject to the exceptions in proposed § 1006.14(b)(3), a debt collector must not place a telephone call to a person in connection with the collection of a particular debt after already having had a telephone conversation with that person in connection with the collection of such debt within a period of seven consecutive days ending on the date of the call. Proposed comment 14(b)(2)(ii)–1 provides examples of the proposed rule.

In developing this proposal, the Bureau has considered both the legitimate interests of consumers and debt collectors in resolving debts and the potentially harmful effects on consumers of repeated or continuous telephone calls after a telephone conversation. A debt collector who already has engaged in a telephone conversation with a consumer about a debt may have less of a need to place additional telephone calls to that consumer about that debt within the next seven days than a debt collector *who has yet to reach a consumer. As a* result, the debt collector who has already conversed with a consumer may be more likely than the debt collector who has not conversed with a consumer to intend to annoy, abuse, or harass the consumer by placing additional telephone calls within one week after a telephone conversation. At the same time, a consumer who has spoken to a debt collector about a debt by telephone may be more likely than a consumer who has not spoken to a debt collector about a debt by telephone to experience annoyance, abuse, or harassment if the debt collector places additional, unwanted telephone calls to the consumer about that debt again within the next seven days.

A consumer may experience, and a debt collector may intend to cause, such

---

[323] Complaint at ¶¶ 56–58, *Fed. Trade Comm'n v. Citigroup Inc.*, No. 1:01–CV–00606 JTC (N.D. Ga. Mar. 6, 2001), *https://www.ftc.gov/sites/default/files/documents/cases/2001/03/citigroupcmp.pdf* (alleging that defendant engaged in an unfair act or practice under section 5 of the FTC Act by "making repeated and continuous telephone calls to consumers with intent to annoy, abuse, or harass any person at the called number"); Consent Order at ¶¶ 5, 6, 19, *In re Avco Fin. Servs.*, 104 F.T.C. 485, 1984 WL 565343, at *2–3 (1984) (settling FTC's allegations that defendant engaged in an unfair act or practice under section 5 of the FTC Act by "[m]aking repeated or continuous telephone calls to debtors or third parties with intent to harass or abuse persons at the called number," and explaining that these "acts and practices * * * had and now [have] the capacity and tendency to cause substantial injury to debtors or third parties who are contacted by [defendant] by, among other things, adversely affecting the debtor's reputation, interfering with the debtor's or third party's employment relations including, but not limited to, causing warnings by employees of possible discharge, impairing the debtor's relations with friends, relatives, neighbors, and co-workers, and inducing the payment of disputed debts."); Consent Order at ¶¶ 12, 19–23, *In re Ace Cash Express*, No. 2014–CFPB–0008 (July 10, 2014), *https://files.consumerfinance.gov/f/201407_cfpb_consent-order_ace-cash-express.pdf* (settling Bureau's allegations that defendant engaged in unfair acts or practices under section 1031 of the Dodd-Frank Act by, among other things, "[m]aking an excessive number of calls to consumers' home, work, and cell phone numbers" and "[c]ontinuing to call consumers with no relation to the debt after being told that [defendant] had the wrong person"); *see also* Consent Order, *In re DriveTime Auto. Grp., Inc.*, 2014–CFPB–0017 (Nov. 19, 2014), *https://files.consumerfinance.gov/f/201411_cfpb_consent-order_drivetime.pdf* (settling Bureau's allegations that defendant engaged in unfair acts or practices under section 1031 of the Dodd-Frank Act "by failing: (A) To prevent account servicing and collection calls to consumers' workplaces after consumers asked [defendant] to stop such calls; (B) to prevent calls to consumers' third-party references after the references or consumers asked [defendant] to stop calling them; and (C) to prevent calls to people at wrong numbers after they have asked [defendant] to stop calling").

[324] *Avco Fin. Servs.*, 104 F.T.C. 485, 1984 WL 565343, at *2–3.

[325] *Ace Cash Express*, No. 2014–CFPB–0008.

[326] 12 U.S.C. 5531(c)(2).

[327] Many creditors and debt collectors have found it advantageous to adopt voluntary daily or weekly limits on telephone calls that they or their service provider make in connection with collecting debts. *See, e.g.,* Bureau of Consumer Fin. Prot., *The Consumer Credit Card Market*, at 313–14 (Dec. 2017), *https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2017.pdf*. See also infra part VI.B.2.

[328] See *supra* note 284.

[329] 15 U.S.C. 6101 *et seq.*; 47 U.S.C. 227; 16 CFR part 310; 47 CFR 64.1200 *et seq.*; 47 CFR 64.1600 *et seq.*

annoyance, abuse, or harassment from a second telephone conversation within one week even if the consumer, rather than the debt collector, initiated the first telephone conversation. Therefore, under the proposal, if a consumer initiated a telephone conversation with *the debt collector, that telephone* conversation generally would count as the debt collector's one permissible telephone conversation for the next week. In some instances, a consumer might request additional information when speaking with a debt collector and would not view a follow-up telephone call from the debt collector as harassing. For that reason, proposed § 1006.14(b)(3)(i), discussed below, would create an exception for telephone calls that are made to respond to a request for information from the consumer. Similarly, proposed § 1006.14(b)(3)(ii), also discussed below, would create an exception under which a consumer who wishes to speak to a debt collector more than once in one week could consent, in the first telephone conversation or by other media, to additional telephone calls from the debt collector.

The Bureau requests comment on proposed § 1006.14(b)(2)(ii). The Bureau considered, but does not propose, a frequency limit that would have limited only the total number of telephone calls that a debt collector could place to a person about a debt during a defined *time period, regardless of whether the* debt collector had engaged in a telephone conversation with that person about that debt during the relevant time period. The Bureau requests comment on the merits of such an alternative approach.

The Bureau proposes § 1006.14(b)(2)(ii) and its commentary pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors and its authority to interpret FDCPA section 806(5). The Bureau proposes § 1006.14(b)(2)(ii) on the basis that, unless an exception (such as consent) applies, once a debt collector *and a consumer engage in a telephone* conversation regarding a particular debt, a debt collector who places additional calls to that person about that debt within the following seven days may intend to annoy, abuse, or harass the person.[330]

With respect to a debt collector who is collecting a consumer financial product or service debt, as defined in proposed § 1006.2(f), the Bureau also proposes § 1006.14(b)(2)(ii) pursuant to its authority under section 1031(b) of the Dodd-Frank Act to prescribe rules identifying and preventing unfair acts or practices.[331] Specifically, the Bureau proposes § 1006.14(b)(2)(ii) to prevent the unfair act or practice described in proposed § 1006.14(b)(1)(ii).[332] For the reasons discussed in the section-by-section analysis of proposed § 1006.14(b)(2)(i), and based on the evidence currently available to the Bureau, the Bureau believes that, if a debt collector places a telephone call to a particular person about a particular debt after already having spoken to that *person about that debt within the* previous seven days, the person naturally may feel harassed by the subsequent telephone call. For the reasons discussed in the section-by-section analysis of proposed § 1006.14(b)(2)(i), the debt collector's conduct may cause or be likely to cause the person to suffer substantial injury that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or to competition.[333] The Bureau thus proposes § 1006.14(b)(2)(ii) to establish a frequency limit that would prevent debt collectors from engaging in this unfair act or practice and, as detailed above, the Bureau proposes a limit of one telephone conversation per seven days on the theory that such a limit bears a reasonable relationship to preventing the unfair practice.

**14(b)(3) Certain Telephone Calls Excluded From the Frequency Limits**

Proposed § 1006.14(b)(3) describes four types of telephone calls that would not count toward, and that would be permitted in excess of, the frequency limits in proposed § 1006.14(b)(2). These are telephone calls that are: (i) Made to respond to a request for information from the person whom the debt collector is calling; (ii) made with such person's consent given directly to *the debt collector; (iii) unable to connect* to the dialed number; or (iv) placed to a person described in proposed

§ 1006.6(d)(1)(ii) through (vi). As discussed in the section-by-section analysis of proposed § 1006.14(b)(3)(i) through (iv) below, the Bureau proposes these exclusions pursuant to its authority under FDCPA section 814(d) to prescribe rules for the collection of debts by debt collectors and to implement and interpret FDCPA section 806(5). The Bureau proposes to exclude these telephone calls from counting toward the proposed frequency limits because they are unlikely to be harassing to consumers, and debt collectors are unlikely to place such calls with intent to annoy, abuse, or harass a person. The Bureau further proposes to exclude these telephone calls from counting toward the proposed frequency limits because they are unlikely to contribute to substantial injury that a person cannot reasonably avoid and that is not outweighed by countervailing benefits to consumers or competition. The Bureau requests comment on proposed § 1006.14(b)(3) and its related commentary, including on whether any other types of telephone calls should be excluded from the frequency limits.

During the SBREFA process, the Bureau's proposal under consideration noted that a bright-line frequency limit could except certain types of contacts, but it did not identify any specific exceptions. Many small entity representatives suggested exceptions, including for: (1) Contacts that respond to a consumer's request or question; (2) contact attempts that leave no "footprint," such that the consumer is unaware of the telephone call or other contact attempt; (3) contacts with a consumer's attorney; and (4) contacts that are legally required. The Small Business Review Panel Report *recommended that the Bureau consider* incorporating such exceptions into the proposal.[334] The Panel Report also specifically recommended that the Bureau consider whether the frequency limits should be modified for communications that occur after a law firm files a complaint, on the grounds that one conversation per week might not be sufficient in various litigation situations. Proposed § 1006.14(b)(3) takes into account the small entity representatives' suggestions and the *recommendations in the Panel Report.* The Bureau does not propose an

---

[330] Unless an exception applies, a person who receives such a telephone call after already having spoken to the debt collector within the previous seven days may naturally feel harassed, oppressed, or abused, and, as noted above, the Bureau assumes that debt collectors intend the natural consequences of their actions.

[331] The Bureau has not determined in connection with this proposal whether telephone calls in excess of the limit in proposed § 1006.14(b)(2)(ii) by creditors and others not covered by the FDCPA would constitute an unfair act or practice under Dodd-Frank Act 1031(c) if engaged in by those persons, rather than by an FDCPA-covered debt collector.

[332] As with § 1006.14(b)(2)(i), proposed § 1006.14(b)(2)(ii) would apply when a debt collector places a telephone call to "a person."

[333] 12 U.S.C. 5531(c).

[334] *See* Small Business Review Panel Report, *supra* note 57, at 36. Other suggested exceptions in the Small Business Review Panel Report—including for contacts initiated by the consumer, contacts that occur through written correspondence (*e.g.,* letters), and misdirected contact attempts—are addressed elsewhere in the section-by-section analysis of proposed § 1006.14(b).

exception for legally required communications because the Bureau understands that very few legally required communications must be delivered by telephone and that, with respect to the few such communications that must be delivered telephonically, it appears unlikely that a debt collector would need to place more than seven telephone calls to a consumer within a period of seven consecutive days to deliver the required communication.

14(b)(3)(i)

Proposed § 1006.14(b)(3)(i) would exclude from the frequency limits telephone calls that a debt collector places to a person to respond to a request for information from that person. The Bureau proposes this exclusion because the Bureau believes that, if a person is speaking to a debt collector and asks for information that the debt collector does not have at the time of the telephone conversation, the person likely would expect (and not be harassed by) a return telephone call (or calls) from the debt collector providing the requested information; nor would the debt collector place the return telephone call with intent to annoy, abuse, or harass the person. Proposed comment 14(b)(3)(i)–1 would clarify that, once a debt collector provides a response to a person's request for information, the exception in proposed § 1006.14(b)(3)(i) would not apply to subsequent telephone calls placed by the debt collector to the person, unless the person makes another request. Proposed comment 14(b)(3)(i)–2 provides an example of the rule.[335]

The Bureau requests comment on the proposal to exclude from the frequency limits the placement of telephone calls that are made to respond to a request for information. The Bureau specifically requests comment on whether there should be any separate limit on the number of telephone calls a debt collector could place under the exception. As proposed, § 1006.14(b)(3)(i) would permit a debt collector who engages in a telephone conversation with a consumer to place

an unlimited number of unanswered telephone calls to the consumer during the next seven days in an effort to provide the requested information. As proposed, § 1006.14(b)(3)(i) also would permit the debt collector to continue to exceed the frequency limits until the debt collector reached the frequency limit in response to the request. A debt collector responding to a person's request for information may not need to place repeated or continuous telephone calls to reach the consumer, however, because such a debt collector is likely to have reliable contact information and the consumer presumably will be expecting the debt collector's telephone call. The Bureau requests comment on this approach and on alternatives to it. The Bureau also requests comment on whether additional clarification is needed on how to determine whether a debt collector makes a particular telephone call in response to a request for information, as opposed to for some other purpose, or on how to determine whether the debt collector has responded to a request for information, such that the exclusion no longer applies.

14(b)(3)(ii)

Proposed § 1006.14(b)(3)(ii) would exclude from the proposed frequency limits telephone calls that a debt collector places to a person with the person's prior consent given directly to the debt collector. The Bureau proposes to exclude such telephone calls from the frequency limits because the Bureau believes that a person can determine when additional telephone calls from, or telephone conversations with, a debt collector would not be harassing, and that a debt collector who has a person's consent to additional telephone calls would not be likely to place such calls with intent to annoy, abuse, or harass the person. The Bureau also believes that proposed § 1006.14(b)(3)(ii) may address small entity representatives' concerns about the frequency limits precluding necessary conversations in various litigation contexts because it would enable a person to consent to additional telephone calls if, for example, the parties were negotiating a settlement or resolving a discovery dispute.

Proposed comment 14(b)(3)(ii)–1 refers to the commentary to proposed § 1006.6(b)(4)(i) for guidance concerning a person giving prior consent directly to a debt collector. Proposed comment 14(b)(3)(ii)–2 provides an example of the rule. The Bureau requests comment on proposed § 1006.14(b)(3)(ii) and its related commentary, including on whether there should be a separate limit

on the number of telephone calls that a debt collector could place under the proposed exception or whether there should be any other type of limitation or condition on the proposed exception.

14(b)(3)(iii)

Proposed § 1006.14(b)(3)(iii) would exclude from the frequency limits telephone calls that a debt collector places to a person but that are unable to connect to the dialed number (e.g., that result in a busy signal or are placed to an out-of-service number). The Bureau proposes this exclusion because a person is unlikely to know about, let alone be harassed by, a debt collector's telephone call in response to which the debt collector receives a busy signal or a message indicating that the dialed number is not in service. Similarly, it appears that a debt collector who places several calls to a person in response to which the debt collector receives a busy signal or out-of-service notification is likely to place additional telephone calls to the person in an effort to contact the person and not with the intent to annoy, abuse, or harass the person.[336] The proposed exclusion also responds to feedback from small entity representatives suggesting that, for example, a telephone call met with a busy signal should not count toward the frequency limit.[337] Proposed comment 14(b)(3)(iii)–1 and –2 provide examples of telephone calls that are able and unable to connect to the dialed number. The Bureau requests comment on proposed § 1006.14(b)(3)(iii), including on whether the Bureau should include any other specific examples in commentary.

14(b)(3)(iv)

Proposed § 1006.14(b)(3)(iv) would exclude from the frequency limits telephone calls that a debt collector places to the persons described in proposed § 1006.6(d)(1)(ii) through (vi). Proposed § 1006.6(d)(1)(ii) through (vi) would implement, in part, FDCPA section 805(b)'s exception from the general prohibition on communicating

---

[335] Some State and local laws exclude responsive communications from their frequency limits. For example, Massachusetts' creditor-collection law provides that "a creditor shall not be deemed to have initiated a communication with a debtor if the communication by the creditor is in response to a request made by the debtor for said communication". 940 Code Mass. Regs. 7.04(1)(f). See also 9 Wash. Rev. Code 19.16.250(13)(a) (debt collector may exceed the weekly contact limit when "responding to a communication from the debtor or spouse"); N.Y.C. Admin. Code 5–77(b)(1)(iv) (weekly contact limit does not include "any communication between a consumer and the debt collector which is in response to an oral or written communication from the consumer").

[336] The Bureau's approach in proposed § 1006.14(b)(3)(iii) is informed, in part, by State and local laws that exclude undeliverable contact attempts from their frequency limits. See Commonwealth of Mass., Off. of the Att'y Gen., Guidance with Respect to Debt Collection Regulations (2013), https://www.mass.gov/files/documents/2016/08/xc/debt-collection-guidance-2013.pdf ("unsuccessful attempts . . . to reach a debtor via telephone" do not count toward the frequency limit in 940 Code Mass. Regs. 7.04(1)(f) "if the creditor is truly unable to reach the debtor or to leave a message for the debtor); N.Y.C. Admin. Code 5–77(b)(1)(iv) (weekly contact limit does not include "returned unopened mail").

[337] See Small Business Review Panel Report, supra note 57, at 37.

about a debt with a person other than the consumer; it would permit a debt collector to communicate with a consumer's attorney, a consumer reporting agency, a creditor, a creditor's attorney, or a debt collector's attorney. Proposed § 1006.14(b)(3)(iv) would exclude from the frequency limits telephone calls placed to such persons on the basis that these persons are unlikely to be harassed by frequent and repeated telephone calls from a debt collector and that a debt collector is unlikely to place such calls to such persons with intent to annoy, abuse, or harass them. Unlike most consumers, each of these persons has professional training and experience in, and is likely engaging in, the debt collection process in a professional capacity. Moreover, the Bureau is not aware of evidence that such persons receive an excessive number of telephone calls from debt collectors.

The Bureau also proposes to exclude telephone calls to such persons from the frequency limits because debt collectors may have non-harassing reasons for calling these persons more often than proposed § 1006.14(b)(2) would permit. For example, during litigation, a debt collector may need to speak frequently with its own attorneys, as well as with the creditor's or the consumer's attorneys; the Bureau's proposal would not limit such contacts. The Bureau requests comment on proposed § 1006.14(b)(3)(iv), including on whether telephone calls that a debt collector places to certain other persons also should be excluded from the frequency limits and, if so, which categories of persons should be excluded.

14(b)(4) Effect of Complying With Frequency Limits

Proposed § 1006.14(b)(4) would clarify the effect of complying with the frequency limits in § 1006.14(b)(2). Under proposed § 1006.14(b)(4), a debt collector who complies with (*i.e.*, does not exceed) the frequency limits in § 1006.14(b)(2) would per se comply with § 1006.14(b)(1). Proposed § 1006.14(b)(4) would also clarify that a debt collector who complies with § 1006.14(b)(2) does not violate either: (1) FDCPA section 806's general prohibition as it applies to placing telephone calls or engaging any person in telephone conversation repeatedly or continuously such that the natural consequence is to harass, oppress, or abuse the person; or (2) FDCPA section 806(5)'s specific prohibition against causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent

to annoy, abuse, or harass the person. Based on the evidence currently available to the Bureau, the Bureau believes that a debt collector who places seven or fewer telephone calls to, and engages in one telephone conversation with, a particular consumer about a particular debt within a period of seven consecutive days, including the additional telephone calls permitted under proposed § 1006.14(b)(3), may not have the natural consequence of harassing, oppressing or abusing a person; that a debt collector who places such calls or engages in such conversations does not intend to annoy, abuse, or harass the person; and that such a frequency of telephone calls and conversations would not be repeated or continuous as those terms are used in FDCPA section 806(5).

Proposed § 1006.14(b)(4) also would clarify the consequence under the Dodd-Frank Act of complying with the frequency limits. Proposed § 1006.14(b)(4) provides that a debt collector who complies with § 1006.14(b)(2) does not violate Dodd-Frank Act sections 1031(c) or 1036(a)(1)(B) by engaging in the unfair act or practice of, in connection with the collection of a consumer financial product or service debt, placing telephone calls or engaging any person in telephone conversation repeatedly or continuously such that the natural consequence is to harass, oppress, or abuse the person. The Bureau proposes § 1006.14(b)(4) on the basis that telephone calls that do not exceed the frequency limits in § 1006.14(b)(2) do not cause substantial injury and that any possible injury is outweighed by the benefits to consumers or to competition. Under this interpretation, telephone calls at or below the frequency limits are unlikely to harass consumers and, in turn, are unlikely to cause substantial injury. Further, under this interpretation, debt collection provides substantial benefits to the consumer credit marketplace, and debt collectors may need to make telephone calls up to the frequency limits to collect debts effectively. Given these premises, any injury that might result from telephone calls at or below the frequency limits would be outweighed by the benefits to consumers or to competition.

The Bureau further believes that clarifying the effect of complying with proposed § 1006.14(b)(2), and creating a bright-line rule for compliance with it, could benefit both consumers and debt collectors. For debt collectors, the clarification should provide greater legal certainty and, in turn, should reduce the costs of litigation and threats of litigation about repeated or continuous

contacts under FDCPA section 806 and 806(5). Consistent with this view, during the SBREFA process, small entity representatives expressed a preference for a bright-line approach. For consumers, a bright-line rule could make it easier to identify violations of the FDCPA. Providing a bright-line rule for determining compliance with the FDCPA and the Dodd-Frank Act therefore may be appropriate to advance the objectives of the FDCPA and title X of the Dodd-Frank Act.

Proposed § 1006.14(b)(4) would not provide a debt collector with protection from liability as to any other provision of the proposed rule, the FDCPA, or the Dodd-Frank Act. For example, proposed § 1006.14(b)(4) would not protect a debt collector from liability for using obscene language or false representations in connection with collection of a debt, in violation of FDCPA sections 806 or 807 (as proposed to be implemented by §§ 1006.14 and 1006.18). Similarly, proposed § 1006.14(b)(4) would not protect a debt collector from liability for communicating with a consumer in violation of FDCPA section 805(a) or (c) (as proposed to be implemented by § 1006.6(b)(1) and (c)). Nor would proposed § 1006.14(b)(4) protect a debt collector from liability under the Dodd-Frank Act for engaging in other unfair, deceptive, or abusive acts or practices.

The Bureau requests comment on all aspects of proposed § 1006.14(b)(4). The Bureau specifically requests comment on whether proposed § 1006.14(b)(4) adequately addresses concerns about debt collectors making telephone calls in rapid succession and, if not, what approach would address such calling behavior without imposing undue or unnecessary costs on debt collectors. For example, under the Bureau's proposed approach, a debt collector would not violate § 1006.14(b)(1) by placing seven or fewer telephone calls in rapid succession, so long as the debt collector did not exceed seven telephone calls or one telephone conversation with the same person about the same debt during a period of seven consecutive days.

The Bureau also requests comment on whether, instead of a bright-line rule, the Bureau should adopt a rebuttable presumption of compliance and of a violation. Under a rebuttable presumption approach, a debt collector who places telephone calls at or below the frequency limits presumptively would comply with § 1006.14(b)(1). Likewise, a debt collector who exceeds the frequency limits presumptively would violate § 1006.14(b)(1). These presumptions could be rebutted based on the facts and circumstances of a

particular situation. For example, a consumer could rebut the presumption of compliance for a debt collector who stayed below the frequency limits by showing that the debt collector knew or should have known that telephone calls, even below the frequency limits, would have the natural consequence of harassing, oppressing, or abusing the consumer. Similarly, a debt collector who exceeded the frequency limits could rebut the presumption of a violation by showing that, under the circumstances, additional calls above the limits would not have the natural consequence of harassing, oppressing, or abusing the consumer.

Finally, the Bureau requests comment on the alternative of adopting only a rebuttable presumption of a violation or only a rebuttable presumption of compliance. For example, one alternative would be to provide a safe harbor only for telephone calls below the frequency limits, with no provision for telephone calls above the frequency limits. Such an approach would provide certainty to both debt collectors and consumers about a per se permissible level of calling, but it would leave open the question of how many telephone calls is too many under the FDCPA and the Dodd-Frank Act. The Bureau does not propose such an approach because it appears that it would not provide the clarity that debt collectors and consumers have sought; nor does it appear to provide the same degree of consumer protection as a per se prohibition against telephone calls in excess of a specified frequency. Another alternative that the Bureau considered is a safe harbor for telephone calls below the limits paired with a rebuttable presumption of a violation for telephone calls above the limits. (The Bureau also considered the opposite: A rebuttable presumption of compliance for telephone calls below the limits paired with a per se prohibition against telephone calls in excess of the limits). The Bureau requests comment on the merits of these alternative approaches and others that the Bureau may not have considered.

14(b)(5) Definition

Proposed § 1006.14(b)(5) generally would define the term particular debt, as that term is used in proposed § 1006.14(b)(2), to mean each of a consumer's debts in collection. With respect to student loan debts, however, the term particular debt would mean all debts that a consumer owes or allegedly owes that were serviced under a single account number at the time the debts were obtained by the debt collector. Proposed § 1006.14(b)(5) would clarify

how the frequency limits in § 1006.14(b)(2) would apply when a consumer has multiple debts being collected by the same debt collector at the same time.[338]

In some cases, when a consumer has multiple debts in collection, either from one creditor or from multiple creditors, a single debt collector will attempt to collect some or all of them. Debt collectors in this situation typically make distinct efforts to collect each debt rather than, for example, asking the consumer about all of the debts during a single telephone call. One reason for this segregation is that larger debt collectors often collect multiple debts owed by the same consumer to different creditors, and each creditor may require its debt collectors to keep information about its debts separate from information about other creditors' debts. A creditor may require this so that it can ensure that debt collectors are complying with the creditor's specific debt collection guidelines. Consequently, some larger debt collectors may have groups of employees dedicated to collecting only a particular creditor's debts.

In addition, some debt collectors segregate debts because they have employees who specialize in collecting different types of debts. In other cases, such as with medical debts, privacy concerns or State or Federal laws may require a debt collector to segregate information about a particular debt from information about a consumer's other debts. A consumer's debts also may enter collection at different points in time and thus be at different stages of the collections process, such that the different debts may be eligible for different types of settlement offers. Debt collectors report that, in many cases, their systems are not structured to consolidate information about different debts owed by the same consumer. Finally, debt collectors may not find it productive to discuss multiple debts on a single telephone call because consumers may not be able or prepared to discuss more than one debt during the telephone call or may find it overwhelming, confusing, or simply too time consuming to discuss multiple debts, with different related terms and offers, during a single telephone call.

The Bureau considered proposing a limit on the number of times a debt

collector could place telephone calls to any one person within seven days (i.e., a per-person limit), regardless of how many debts the debt collector was attempting to collect from that person. Creditors, however, could sidestep a per-person limit by placing debts with debt collectors who collect for only one or a limited number of creditors, or by assigning only a single debt to any one debt collector. Alternatively, if one debt collector were collecting multiple debts for multiple creditors, a per-person limit could incentivize the debt collector to discuss all of those debts with the consumer in the single permissible telephone conversation each week. This could result in consumers receiving an overwhelming amount of information about, for example, different settlement or payment structures for different creditors. This also could complicate debt collection conversations if, for example, consumers wanted to dispute one or some, but not all, of the debts. Alternatively, a per-person limit could encourage debt collectors to sequence collection of a consumer's debts, thereby prolonging the collections process for some debts. For these reasons, and pursuant to its authority under FDCPA section 814(d) to prescribe rules for the collection of debt by debt collectors, the Bureau proposes § 1006.14(b)(5) to define the term particular debt, as used in proposed § 1006.14(b)(2), generally to mean each of a consumer's debts in collection.

The concerns outlined above may not apply to the collection of multiple student loan debts that were serviced under a single account number at the time the debts were obtained by the debt collector. In these situations, the debt collector and consumer appear to interact as if there were only a single debt. This would be consistent with how the loans were likely serviced before entering collection, as multiple student loan debts are often serviced under a single account number and billed on a single, combined account statement, with a single total amount due and requiring a single payment from the consumer. For this reason, in the case of student loan debts, the Bureau proposes to define the term particular debt to mean all such debts that a consumer owes or allegedly owes that were serviced under a single account number at the time the debts were obtained by the debt collector. Under proposed § 1006.14(b)(5), the frequency limits in proposed § 1006.14(b)(2) would apply to all such debts collectively. Proposed comment 14(b)(5)–1 provides illustrative examples.

---

[338] This clarification may be necessary because most consumers with at least one debt in collection have multiple debts in collection. See CFPB Debt Collection Consumer Survey, supra note 18, at 13, table 1; see also CFPB Medical Debt Report, supra note 20, at 20 (reporting that most consumers with one collections tradeline have multiple collections tradelines).

The Bureau requests comment on the proposed definition of particular debt. The Bureau specifically requests comment on the proposal to apply the frequency limits in proposed § 1006.14(b)(2) generally on a per-debt, as opposed to per-person, basis. The Bureau requests comment on whether, if the proposed per-debt approach is adopted, additional clarification is needed about how to count telephone calls when a debt collector places one telephone call to a consumer to discuss more than one particular debt. In particular, the Bureau requests comment on whether the rule should clarify how the frequency limits apply when a debt collector places an unanswered telephone call to a consumer to discuss two of the consumer's debts (e.g., a credit card debt and a medical debt), or when a debt collector who is collecting two such debts leaves the consumer only a general message that does not refer specifically to either debt (e.g., "Please remember to pay what you owe"). The Bureau similarly requests comment on whether clarification is needed for the situation in which a debt collector has a telephone conversation with a consumer about more than one debt but does not specifically refer to either debt, and on whether the proposal appropriately counts the single conversation as having been about all of the debts for purposes of the frequency limits.

Finally, the Bureau requests comment on: (1) The proposal to aggregate certain student loan debts for purposes of § 1006.14(b)(2), including whether some student loan debts serviced under the same account number should be counted separately; and (2) whether any types of debts other than student loans should be aggregated, such that multiple debts that were serviced under a single account number at the time the debts were obtained by the debt collector (or met other specified conditions) would be treated as a single debt for purposes of the frequency limits. Under such an approach, for example, multiple medical debts could be aggregated for purposes of § 1006.14(b)(2) if they met certain conditions, such as being serviced under the same account number at the time the debt collector obtained them. The Bureau requests comment on such an approach, including on the possible difficulties of aggregating accounts other than student loan accounts given the different facts that could apply to each debt.

14(h) Prohibited Communication Media [339]

14(h)(1) In General

Proposed § 1006.14(h)(1) would prohibit a debt collector from communicating or attempting to communicate with a consumer through a medium of communication if the consumer has requested that the debt collector not use that medium to communicate with the consumer. Pursuant to its authority under FDCPA section 814(d) to write rules with respect to the collection of debts by debt collectors, the Bureau proposes § 1006.14(h)(1) as an interpretation of FDCPA section 806, which, as discussed in part IV, prohibits a debt collector from engaging in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt.

Since the enactment of the FDCPA, the possible media through which communications generally are conducted has expanded beyond telephone, mail, and in-person conversations to include various mobile and portable technologies that were not contemplated in 1977. For example, with the advent of the mobile telephone, a consumer may receive a telephone call at any time or place. As the CFPB Debt Collection Consumer Survey indicated, consumers have varied but strong preferences about the media that debt collectors use to communicate with them.[340]

Once a consumer has requested that a debt collector not use a specific medium of communication to communicate with the consumer, the Bureau believes that the natural consequence of further communications or attempts to communicate from the debt collector to the consumer using that same medium likely is harassment, oppression, or abuse of the consumer. Consistent with this interpretation, the Bureau understands that some debt collectors currently refrain from communicating with a consumer through a medium that the consumer has requested that the debt collector not use to communicate with the consumer, including, for example, specific telephone numbers that the consumer has asked the debt collector not to call.

For these reasons, the Bureau proposes § 1006.14(h)(1) to provide that, in connection with the collection of any

debt, a debt collector must not communicate or attempt to communicate with a consumer through a medium of communication if the consumer has requested that the debt collector not use that medium to communicate with the consumer. The Bureau also proposes commentary to § 1006.14(h)(1). Proposed comment 14(h)(1)–1 refers to comment 2(d)–1 for examples of communication media. Proposed comment 14(h)(1)–2 would clarify that, within a medium of communication, a consumer may request that a debt collector not use a specific address or telephone number and provides an example. The Bureau proposes this comment on the grounds that a specific address or telephone number may be considered a medium, and that contacting a consumer through a specific address or telephone number that the consumer has requested the debt collector not use may be just as harassing as contacting the consumer through a medium of communication that the consumer has requested the debt collector not use. The Bureau requests comment on proposed § 1006.14(h)(1) and its related commentary.

As discussed above, pursuant to its authority under FDCPA section 814(d) to write rules with respect to the collection of debts by debt collectors, the Bureau proposes § 1006.14(h)(1) as an interpretation of FDCPA section 806, on the basis that once a consumer has requested that a debt collector not use a specific medium of communication to communicate with the consumer, a debt collector who nevertheless continues to communicate or attempt to communicate with the consumer using that medium is engaging in conduct the natural consequence of which is to harass, oppress, or abuse. The Bureau believes that proposed § 1006.14(h)(1) is consistent with this statutory language and the purpose of the FDCPA. As FDCPA section 802(e) explains, in relevant part, the purpose of the Act is to eliminate abusive debt collection practices by debt collectors.[341] The Bureau interprets FDCPA section 806's general prohibition on engaging in conduct the natural consequence of which is to harass, oppress, or abuse in light of this purpose specified in the FDCPA, as well as in light of similar conduct specifically prohibited by the FDCPA.

14(h)(2) Exceptions

Proposed § 1006.14(h)(2) provides two exceptions to the general prohibition in proposed § 1006.14(h)(1). Proposed

---

[339] As noted above, proposed § 1006.14(c) through (g) generally mirror the statute, with minor wording and organizational changes for clarity, and are not discussed further in this section-by-section analysis.

[340] See CFPB Debt Collection Consumer Survey, supra note 18, at 36–37.

[341] 15 U.S.C. 1692(e).

§ 1006.14(h)(2)(i) provides that, notwithstanding the prohibition in § 1006.14(h)(1), if a consumer opts out in writing of receiving electronic communications from a debt collector, a debt collector may reply once to confirm the consumer's request to opt out, provided that the reply contains no information other than a statement confirming the consumer's request. Proposed § 1006.14(h)(2)(ii) provides that, if a consumer initiates contact with a debt collector using an address or a telephone number that the consumer previously requested the debt collector not use, the debt collector may respond once to that consumer-initiated communication. The Bureau proposes § 1006.14(h)(2) because a single communication from a debt collector of the types described likely would not have the natural consequence of harassing, oppressing, or abusing the consumer within the meaning of FDCPA section 806.[342] The Bureau requests comment on the exceptions in proposed § 1006.14(h)(2).

As discussed above, a consumer may request that a debt collector not communicate with the consumer using a specific medium of communication. However, there may be circumstances in which applicable law requires the debt collector to communicate with the consumer only through that specific medium and does not offer an alternative medium for compliance (e.g., by permitting a debt collector to electronically provide a notice that otherwise would be mailed). The Bureau requests comment on whether there are specific laws that require communication with the consumer through one specific medium, and if so, whether additional clarification is needed regarding the delivery of legally required communications through a specific medium of communication required by applicable law if the consumer has generally requested that the debt collector not use that medium to communicate with the consumer.

Section 1006.18 False, Deceptive, or Misleading Representations or Means

FDCPA section 807 generally prohibits a debt collector from using any false, deceptive, or misleading representations or means in connection with the collection of any debt. The section lists 16 non-exhaustive examples of such prohibited conduct.[343] Proposed § 1006.18 would implement FDCPA section 807. Except for certain

organizational changes and interpretations in § 1006.18(e) through (g), which are discussed below, proposed § 1006.18 generally restates the statute with only minor wording changes for clarity. The Bureau proposes § 1006.18 pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors.

The Bureau proposes to organize § 1006.18 by grouping the 16 non-exhaustive examples of prohibited false or misleading representations in FDCPA section 807 into categories of related conduct, as follows. Proposed § 1006.18(a) would implement the general prohibition in FDCPA section 807 by prohibiting a debt collector from using any false, deceptive, or misleading representation or means in connection with the collection of any debt. Proposed § 1006.18(b) restates FDCPA section 807's examples of false, deceptive, or misleading representations.[344] Proposed § 1006.18(c) restates FDCPA section 807's examples of false, deceptive, or misleading collection means.[345] Proposed § 1006.18(d) restates the catch-all prohibition against false representations or deceptive means as described in FDCPA section 807(10). Proposed § 1006.18(e) addresses the disclosures required under FDCPA section 807(11). Finally, proposed § 1006.18(f) addresses the use of assumed names by debt collectors' employees, and proposed § 1006.18(g) addresses misrepresentations of meaningful attorney involvement in debt collection litigation.

18(e) Disclosures Required

FDCPA section 807(11) requires debt collectors to disclose in their initial communications with consumers that they are attempting to collect a debt and that any information obtained will be used for that purpose, and to disclose in their subsequent communications with consumers that the communication is from a debt collector, except in a formal pleading made in connection with a

legal action.[346] Proposed § 1006.18(e) would implement FDCPA section 807(11).

Proposed comment 18(e)(1)–1 describes the circumstances in which debt collectors would be required to provide disclosures in initial communications under proposed § 1008.18(e)(1). Proposed comment 18(e)(1)–1 specifies that a debt collector must provide the disclosures in the debt collector's initial communication with the consumer, regardless of whether that initial communication is written or oral, and regardless of whether the debt collector or the consumer initiated the communication. Proposed comment 18(e)(1)–1 also provides an example of the rule regarding required disclosures during initial communications.

Proposed comment 18(e)–1 provides general commentary to explain how the disclosure requirements in proposed § 1006.18(e) interact with the proposed rule's limited-content message, a message that is not a communication under proposed § 1006.2(d). Proposed comment 18(e)–1 would clarify that, because a limited-content message is not a communication, a debt collector who leaves only a limited-content message for a consumer does not need to provide the disclosures required under proposed § 1008.18(e)(1) and (2). For a more detailed discussion of the terms communication and limited-content message, see the section-by-section analysis of proposed § 1006.2(d) and (j), respectively.

The Bureau requests comment on all aspects of proposed § 1006.18 and on whether additional clarification would be useful. In particular, the Bureau requests comment on whether additional clarification regarding false or misleading representations would be helpful in the decedent debt context, or whether to require any affirmative disclosures when debt collectors communicate in connection with the collection of a debt owed by a deceased consumer. As discussed in the section-by-section analysis of proposed §§ 1006.2(e) and 1006.6(a)(4), this proposal would define the term consumer to clarify with whom debt collectors may communicate when attempting to resolve the debts of a deceased consumer. In its Policy Statement on Decedent Debt, the FTC expressed concern that, even absent explicit misrepresentations, a debt collector might violate FDCPA section 807 by communicating with such individuals in a manner that conveys the misleading impression that the individual is personally liable for the

---

[342] Proposed § 1006.14(h)(2) also is consistent with the regulations implementing the CAN–SPAM Act, which permit senders to send a reply electronic message. See 16 CFR 316.5.

[343] 15 U.S.C. 1692e.

[344] Proposed § 1006.18(b)(1)(i) through (viii) would implement, respectively, paragraphs (1), (16), (3), (7), (6), (12), (13), and (15) of FDCPA section 807, and proposed § 1006.18(b)(2) would implement FDCPA section 807(2). Restating the statutory language is not intended to suggest any particular interpretation of that language. For example, the omission of the words "or imply" from the introductory language to § 1006.18(b)(2) consistent with the statutory language in FDCPA section 807(2) is not intended to suggest that the Bureau would not regard implied false representations as violations of FDCPA section 807 or 807(2) or proposed § 1006.18(b)(2).

[345] Proposed § 1006.18(c)(1) through (4) would implement, respectively, paragraphs (5), (8), (9), and (14) of FDCPA section 807.

[346] 15 U.S.C. 1692e(11).

deceased consumer's debts, or that the debt collector could seek assets outside of the deceased consumer's estate to satisfy the consumer's debt. The FTC's Policy Statement suggested two possible disclosures that debt collectors generally could use to avoid deceiving such individuals about their liability for the decedent's debts.[347] The FTC also noted that the information that would need to be disclosed to avoid deception would depend on the circumstances.

While the Bureau believes that the FTC's suggested disclosures generally would be sufficient to avoid deception in many circumstances, proposed § 1006.18 would not require such disclosures. Since the FTC issued its Policy Statement in 2011, neither the FTC nor the Bureau has brought any cases against debt collectors for making deceptive claims in the decedent debt context, including any such claims concerning the liability of other individuals for the decedent's debts. Proposed § 1006.18's general prohibition against false, deceptive, or misleading representations, however, would apply to express or implied misrepresentations that a personal representative is liable for the deceased consumer's debts. The Bureau requests comment on whether the general prohibition against false, deceptive, or misleading representations in proposed § 1006.18 is sufficient to protect individuals who communicate with debt collectors about a deceased consumer's debts, or whether affirmative disclosures in the decedent debt context are needed.

18(f) Use of Assumed Names

Debt collectors commonly instruct or permit their employees to use assumed names when interacting with consumers, including by telephone. They do so for a variety of reasons. For example, some employees may have names that are difficult for some consumers to spell or pronounce. These employees may find that assuming a simpler name facilitates communications with consumers. Other employees who have privacy or safety concerns about revealing their true name and employer to a potentially large number of consumers.

From a consumer's perspective, it may not be relevant whether employees use true names or assumed names,

provided that the name used does not mislead the consumer about the debt at issue and who is attempting to collect it. For example, the FTC previously issued guidance stating that a debt collector's employee does not violate the FDCPA by using an assumed name if the employee uses the assumed name consistently and the debt collector can readily ascertain the employee's identity.[348] An employee's consistent use of that name is not likely to affect the decisions a consumer makes about the debt. Further, a debt collector's ability to readily ascertain the employee's identity would enable the debt collector to monitor and address the conduct of such employee. Therefore, an approach similar to the FTC's prior guidance may be appropriate for the use of assumed names.

For these reasons, proposed § 1006.18(f) provides that nothing in § 1006.18 prohibits a debt collector's employee from using an assumed name when communicating or attempting to communicate with a person, provided that the employee uses the assumed name consistently and that the employer can readily identify the employee even if the employee is using the assumed name. The Bureau requests comment on proposed § 1006.18(f), including on the use of assumed names by debt collectors' employees in general, as well as on whether and how employers can readily identify their employees who are using assumed names.

The Bureau proposes § 1006.18(f) pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors. Specifically, the Bureau interprets FDCPA section 807's prohibition on false or misleading representations, and 806(6)'s prohibition on placing telephone calls without "meaningful disclosure of the caller's identity," to allow a debt collector's employee to disclose an assumed name as long as the employee uses the name consistently and the debt collector can readily ascertain that employee's true identity.

18(g) Safe Harbor for Meaningful Attorney Involvement in Debt Collection Litigation Submissions

FDCPA section 807 contains certain provisions designed to protect consumers from false, deceptive, or misleading representations made by, or means employed by, attorneys in debt collection litigation. FDCPA section 807(3) prohibits the false representation or implication that any individual is an attorney or that any communication is from an attorney. In addition, debt collection communications sent under an attorney's name may violate FDCPA section 807(10) if the attorney was not meaningfully involved in the preparation of the communication.[349] The meaningful attorney involvement case law has been applied in the specific context of debt collection litigation submissions.[350]

It may be particularly important for consumers, attorneys, and law firms engaged in such litigation to be protected by a clear articulation of what meaningful attorney involvement in debt collection litigation submissions means under FDCPA section 807, as would be implemented by proposed § 1006.18. A clear articulation of meaningful attorney involvement also may be useful to avoid confusion and unnecessary conflicts between State standards and Federal standards under the FDCPA and any implementing regulations.

To provide clarity for law firms and attorneys submitting pleadings, written motions, or other papers to courts in debt collection litigation, proposed section § 1006.18(g) provides a safe harbor for attorneys and law firms against claims that they violated § 1006.18 due to the lack of meaningful attorney involvement in debt collection litigation materials signed by the attorney and submitted to the court,

---

[347] FTC Policy Statement on Decedent Debt, *supra* note 192, at 44922. The FTC's suggested disclosures were: "(1) That the collector is seeking payment from the assets in the decedent's estate; and (2) [that] the individual could not be required to use the individual's assets or assets the individual owned jointly with the decedent to pay the decedent's debt." *Id.*

[348] Fed. Trade Comm'n, Staff Commentary on the Fair Debt Collection Practices Act, 53 FR 50097, 50105 (Dec. 13, 1988) ("1. *Aliases.* A debt collector employee's use of an alias that permits identification of the debt collector (*i.e.*, where he uses the alias consistently, and his true identity can be ascertained by the employer) constitutes a "meaningful disclosure of the caller's identity."); *see also id.* at 50103 ("An individual debt collector may use an alias if it is used consistently and if it does not interfere with another party's ability to identify him (*e.g.*, the true identity can be ascertained by the employer).").

[349] *See, e.g., Clomon* v. *Jackson,* 988 F.2d 1314, 1320 (2d Cir. 1993); *Nielsen* v. *Dickerson,* 307 F.3d 623, 635 (7th Cir. 2002). Courts have found violations of other subsections of FDCPA section 807 for similar conduct. *See e.g., Avila* v. *Rubin,* 84 F.3d 222, 229 (7th Cir. 1996); *Lesher* v. *Law Offices of Mitchell N. Kay, PC,* 650 F.3d 993, 1002 (3d Cir. 2011).

[350] *See Miller* v. *Upton, Cohen & Slamowitz,* 687 F.Supp.2d 86, 100 (applying meaningful involvement liability to, among other actions, filing of complaint in court); *Bock* v. *Pressler & Pressler, 30 F.Supp.3d 283, 303 (D.N.J. 2014)* ("The claimed misrepresentation here does not relate to the ultimate veracity of the numbered factual allegations of the complaint; it concerns the veracity of the implied representation that an attorney was meaningfully involved in the preparation of the complaint. If, in fact, the attorney who signed the complaint is not involved and familiar with the case against the debtor, then the debtor has been unfairly misled and deceived within the meaning of the FDCPA. . . ."), *reaff'd on remand,* 254 F.Supp.3d 724, 729 (D.N.J. 2017).

provided that they meet the requirements in proposed § 1006.18(g). Proposed § 1006.18(g) provides that an attorney has been meaningfully involved in the preparation of debt collection litigation submissions if the attorney: (1) Drafts or reviews the pleading, written motion, or other paper; and (2) personally reviews information supporting the submission and determines, to the best of the attorney's knowledge, information, and belief, that, as applicable: The claims, defenses, and other legal contentions are warranted by existing law; the factual contentions have evidentiary support; and the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or lack of information.

The factors in proposed § 1008.18(g) are similar to some of the nationally recognized standards for attorneys making submissions in civil litigation.[351] Because most FDCPA claims are considered by Federal courts, and Federal court rules are adopted and apply nationwide, Federal Rule of Civil Procedure 11(b)(2) through (4) as currently adopted may provide an appropriate guide for judging whether a submission to the court has complied with § 1006.18(g). Indeed, courts that have applied the meaningful attorney involvement doctrine to litigation submissions have considered that standard.[352] Accordingly, the safe harbor in proposed § 1006.18(g) restates certain provisions of Federal Rule of Civil Procedure Rule 11(b). An attorney or law firm who establishes compliance with the factors set forth in proposed § 1006.18(g), including when a court in debt collection litigation determines that the debt collector has complied

with a court rule that is substantially similar to the standard in § 1006.18(g), will have complied with FDCPA section 807 regarding the attorney's meaningful involvement in submissions made in debt collection litigation. The Bureau requests comment on whether the safe harbor proposed for meaningful attorney involvement in debt collection litigation submissions provides sufficient clarity for consumers, attorneys, and law firms.

### Section 1006.22  Unfair or Unconscionable Means

FDCPA section 808 prohibits a debt collector from using any unfair or unconscionable means to collect or attempt to collect any debt and lists eight non-exhaustive examples of such prohibited conduct.[353] The Bureau proposes § 1006.22 to implement and interpret FDCPA section 808 and pursuant to its authority under FDCPA section 814(d) to write rules with respect to the collection of debts by debt collectors.

Proposed § 1006.22(a) would implement FDCPA section 808's general prohibition against unfair debt collection practices, and proposed § 1006.22(b) through (f)(2) would implement the prohibited conduct examples in FDCPA section 808.[354] These proposed paragraphs generally mirror the statute, with minor wording and organizational changes for clarity. The following section-by-section analysis thus discusses only proposed § 1006.22(f)(3) and (4) and (g).

#### 22(f) Restrictions on Use of Certain Media

Proposed § 1006.22(f)(3) and (4) would restrict a debt collector's use of two specific types of electronic media: Work email accounts and public-facing social media. As to electronic media more generally, the Bureau plans to monitor their evolution and use by debt collectors, as well as any trends in FDCPA section 808 litigation concerning such media, to identify issues that pose a risk of consumer harm or require clarification as part of any future rulemakings.

#### 22(f)(3)

Proposed § 1006.22(f)(3) would prohibit a debt collector from communicating or attempting to

communicate with a consumer using an email address that the debt collector knows or should know is provided to the consumer by the consumer's employer, unless the debt collector has received directly from the consumer either prior consent to use that email address or an email from that email address.

The FDCPA contains both general and specific prohibitions intended to protect consumers from the harms that workplace collections communications can cause. For example, absent obtaining the consumer's prior consent, a debt collector who discloses a debt to a consumer's employer generally would violate FDCPA section 805(b)'s prohibition on communicating with a third party about a debt.[355] A debt collector also could violate FDCPA section 805(a)(3) by communicating with the consumer at the consumer's place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communications.[356]

Debt collectors and consumers may have questions about how the FDCPA's protections against third-party disclosures apply to workplace contacts by newer means of communication, such as email. Debt collectors should be aware that many employers have a legal right to read, and in fact frequently do read, messages sent or received by employees on their work email accounts.[357] Workplace emails therefore present a particularly high risk of third-party disclosure through an employer reading an email sent by a debt collector to a consumer's work account. In addition, Congress and the courts have recognized that an employer learning that an employee has a debt in collection may cause the consumer to suffer significant harms, including loss

---

[351] The factors in proposed § 1008.18(g) omit the following two aspects of Federal Rule of Civil Procedure 11(b)(2) through (4): First, that the claims, defenses, or other legal contentions are a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law; and second, that the factual contentions are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. This safe harbor is proposed in part to set clearer standards for routine debt collection litigation cases, in which there is unlikely to be an argument to extend, modify, or reverse existing law or to establish new law. The Bureau also understands that most factual contentions pled in debt collection litigation should be supported by evidence in the creditor's or debt collector's possession, thereby negating the need for further investigation or discovery. Moreover, proposed § 1006.18(g) would provide a safe harbor; thus, meeting one of these omitted aspects may permit an attorney to establish meaningful attorney involvement even if doing so would not entitle the attorney to the safe harbor that proposed § 1006.18(g) would establish.

[352] See, e.g., Bock v. Pressler & Pressler, 2017 WL 4711472 at *7 n.5 (discussing initial decision at 30 F.Supp.3d 283, 299–302); Miller, 687 F.Supp.2d at 101 (analogizing to Rule 11).

[353] 15 U.S.C. 1692f.

[354] Specifically, proposed § 1006.22(b) would implement FDCPA section 808(1); proposed § 1006.22(c) would implement FDCPA section 808(2) through (4); proposed § 1006.22(d) would implement FDCPA section 808(5); proposed § 1006.22(e) would implement FDCPA section 808(6); proposed § 1006.22(f)(1) would implement FDCPA section 808(7); and proposed § 1006.22(f)(2) would implement FDCPA section 808(8).

[355] 15 U.S.C. 1692c(b).

[356] 15 U.S.C. 1692c(a)(3).

[357] See, e.g., Am. Mgmt. Ass'n & ePolicy Inst., Electronic Monitoring and Surveillance 2007 Survey (2008), http://www.amanet.org/training/articles/2007-electronic-monitoring-and-surveillance-survey-41.aspx (reporting that a survey of employers conducted in 2007 found that, among other things, 43 percent of employers monitored their employees' email accounts and 66 percent of employers monitored their employees' internet connection, with 45 percent of employers tracking the content, keystrokes, and time spent at the keyboard); Bingham v. Baycare Health Sys., No. 8:14–CV–73–T–23JSS, 2016 WL 3917513, at *4 (M.D. Fla. July 20, 2016) (collecting cases and concluding that "the majority of courts have found that an employee has no reasonable expectation of privacy in workplace emails when the employer's policy limits personal use or otherwise restricts employees' use of its system and notifies employees of its policy").

of employment.[358] The Bureau proposes § 1006.22(f)(3) on the ground that a debt collector who sends a communication to a consumer's work email account violates the FDCPA if the debt collector knows or can reasonably anticipate that a communication sent to a consumer's work email account might be opened and read by someone other than the consumer. There is support for this interpretation in court decisions holding that a debt collector who sends a letter to a consumer's place of employment violates the FDCPA if the debt collector "knew or could reasonably anticipate that [such] a letter . . . might be opened and read by someone other than the debtor as it made its way to [the consumer]." [359]

[358] S. Rept. No. 382, *supra* note 70, at 1699 ("[A] debt collector may not contact third persons such as a consumer's friends, neighbors, relatives, or employer. Such contacts are not legitimate collection practices and result in serious invasions of privacy, as well as the loss of jobs."); *id.* at 1696 ("Collection abuse takes many forms, including . . . disclosing a consumer's personal affairs to friends, neighbors, or an employer."); 122 Cong. Rec. H730707 (daily ed. July 19, 1976) (remarks of Rep. Annunzio on H. Rept. 13720) (Clearinghouse No. 31,059U) ("Communication with a consumer at work or with his employer may work a tremendous hardship for a consumer because such calls can embarrass a consumer and can result in his losing a deserved promotion" and "[i]f a consumer loses his job, he is in a worse, not better, position to pay the debt."); *Am. Fin. Servs. Ass'n* v. *Fed. Trade Comm'n,* 767 F.2d 957, 974 (D.C. Cir. 1985) (upholding provision in the FTC's Credit Practices Rule that prohibited certain wage assignments because, among other things, the rulemaking record showed that "employers tend to view the consumer's failure to repay the debt as a sign of irresponsibility. As a consequence many lose their jobs after wage assignments are filed. Even if the consumer retains the job, promotions, raises, and job assignments may be adversely affected.") (citing Credit Practices Rule, 49 FR 7740, 7758 (1984) (codified at 16 CFR 444)); *Fed. Trade Comm'n* v. *LoanPointe, LLC,* No. 2:10-CV-225DAK, 2011 WL 4348304, at *6–8 (D. Utah Sept. 16, 2011) (holding that "Defendants' practice of disclosing debts and the amount of the debts to consumers' employers" violated the FDCPA and "qualifies as an unfair practice under the FTC Act"), *aff'd,* 525 F. App'x 696 (10th Cir. 2013). The State of New York prohibits a debt collector from corresponding with a consumer by email unless, among other things, the consumer voluntarily provided the email address to the debt collector and has affirmed that the email is not "furnished or owned by the consumer's employer." 23 N.Y. Comp. Codes R. & Regs. tit. 23, sec. 1.6(a) (2018).

[359] *Evon* v. *Law Offices of Sidney Mickell,* 688 F.3d 1015, 1025–26 (9th Cir. 2012) (holding that a letter addressed "in care of [consumer's] employer" and delivered to her at work, "manifestly constitutes a violation [of the FDCPA because the debt collector] knew or could *reasonably* anticipate that a letter sent to a class member's employer might be opened and read by someone other than the debtor as it made its way to him/her. This is exactly what happened to [the consumer], causing her stress and embarrassment, precisely what the Act is designed to prevent."); *see also* Fed. Trade Comm'n, Staff Commentary on the Fair Debt Collection Practices Act, 53 FR 50097–02, 50104 (Dec. 13, 1988) ("*Accessibility by third party.* A debt collector may not send a written message that is easily accessible to third parties. For example, he may not use a computerized billing statement that can be seen on the envelope itself. A debt collector may use an 'in care of' letter only if the consumer lives at, or accepts mail at, the other party's address.").

As suggested by numerous consumer advocacy groups and a consortium of State attorneys general in comments to the Bureau's ANPRM, requiring a debt collector to obtain a consumer's consent, or to have received an email from the consumer, before sending emails to the consumer's work account could protect the consumer's privacy interest in avoiding the disclosure of the debt to the consumer's employer. This privacy interest is implicated by both communications and attempts to communicate. A debt collector's initial, unsolicited email that does not convey information regarding a debt nonetheless may induce a recipient such as a consumer or an employer to inquire about the purpose of the debt collector's message. The debt collector's attempt to communicate thus may lead to the disclosure of the debt to a third party before the consumer has had a meaningful opportunity to provide prior consent. A consumer who chooses to use a work email account to contact a debt collector, or who provides prior consent for the debt collector to use such an email account to contact the consumer, presumably has made a determination that the benefits of communicating with a debt collector about a debt using a work email account outweigh the potential risks, and a debt collector who receives such an email or prior consent from the consumer may not reasonably anticipate that its emails to the consumer would be read by the consumer's employer. Accordingly, after a consumer uses the work email account to contact the debt collector or provides prior consent, it would not appear to be an unfair or unconscionable practice under FDCPA section 808 for a debt collector to communicate or attempt to communicate with the consumer using an email address that the debt collector knows or should know is provided by the consumer's employer.

For all of these reasons, pursuant to its authority to implement and interpret FDCPA section 808 and its authority under FDCPA section 814(d) to write rules with respect to the collection of *debts by debt collectors,* the Bureau proposes § 1006.22(f)(3) to prohibit a debt collector from communicating or attempting to communicate with a consumer using an email address that the debt collector knows or should *know* is provided to the *consumer* by the debt collector's employer, unless the debt collector has received directly from the consumer either prior consent to use that email address or an email from that email address.

Proposed comment 22(f)(3)–1 notes that, even after providing prior consent directly to a debt collector, a consumer could opt out of receiving emails at a work email address at any time using instructions provided by a debt collector pursuant to proposed § 1006.6(e), or otherwise request not to receive emails at that address pursuant to proposed § 1006.14(h). Proposed comment 22(f)(3)–1 also refers to the commentary to proposed § 1006.6(b)(4)(i) for additional guidance on prior consent.

Proposed comment 22(f)(3)–2 would clarify that a debt collector who receives an email directly from a consumer from an email address provided by the consumer's employer may communicate or attempt to communicate with the consumer at that email address, even if the consumer's email does not provide prior consent to the debt collector. Proposed comment 22(f)(3)–2 also provides an example of such a situation.

Proposed comment 22(f)(3)–3 provides examples of email addresses that a debt collector knows or should know are provided to the consumer by the consumer's employer. Proposed comment 22(f)(3)–3 also states that, in the absence of contrary information, a debt collector neither would know nor should know that an email address is provided to the *consumer* by the consumer's employer if the email address's domain name is one commonly associated with a provider of non-work email addresses. Examples of domain names that are commonly associated with a provider of non-work email addresses would include *gmail.com, yahoo.com, hotmail.com, aol.com,* or *msn.com,* among others.[360]

During the SBREFA process, small entity representatives sought guidance on how they would know whether an email address is provided to a consumer by an employer and also suggested that a consumer's consent to use a work email should transfer from the creditor to the debt collector.[361] Proposed comment 22(f)(3)–3, which addresses when a debt collector knows or should

[360] *See, e.g.,* Email-Verify.My.Addr.com, List of Most Popular Email Domains (By Number of Live Emails), *https://email-verify.my-addr.com/list-of-most-popular-email-domains.php* (last visited May 6, 2019) (listing the most popular email domain names, ranked by number of live emails).

[361] These comments were similar to ANPRM comments submitted by several industry members, who noted that debt collectors may not be able to determine accurately whether an email address is provided by an employer because, among other things, the domain name may not signify that it is a work email or the consumer may consolidate multiple email accounts.

know that an email address is provided by a consumer's employer, is designed to provide such guidance. In addition, proposed § 1006.22(f)(3) would not apply a strict liability standard, so a debt collector would not violate the rule if the debt collector neither knew nor should have known that the debt collector used a consumer's work email address. The Bureau does not propose, however, that a consumer's prior consent to receive email on the consumer's work account from a creditor would transfer to a debt collector. A consumer may enter into a transaction with, and consent to receiving emails on their work account from, a creditor based on the characteristics of that particular creditor; in contrast, consumers generally have no ability to choose which debt collector attempts to collect their debt.

One small entity representative recommended that emails to a consumer's work address be presumptively prohibited only if the debt collector knows or should know that the employer prohibits such contact (i.e., applying the FDCPA section 805(a)(3) framework to work email accounts).[362] As discussed above, workplace email communications present a particularly high risk of third-party disclosure because many employers have a legal right to read messages sent or received by employees on their work email accounts. For this reason, the prohibition in proposed § 1006.22(f)(3) does not apply the FDCPA section 805(a)(3) framework. Rather, to protect consumers from loss of employment and risk of embarrassment, the Bureau proposes to require that a debt collector obtain prior consent to use that email address directly from the consumer, or have received an email sent from the consumer's work email account, before using the consumer's work email account.

The Bureau requests comment on all aspects of proposed § 1006.22(f)(3). In particular, the Bureau requests comment on whether FDCPA section 805(a)(3)'s framework should apply to emails to a consumer's work account, so that such emails are presumptively prohibited only when a debt collector knows or should know that a consumer's employer prohibits the consumer from receiving such communications. The Bureau also requests comment on whether more clarification is necessary regarding when a debt collector knows or should know that the debt collector

is communicating using a consumer's work email address and, if so, what circumstances should indicate to a debt collector that an email address is provided by a consumer's employer. The Bureau further requests comment on the scope of proposed § 1006.22(f)(3). As proposed, it would apply only to email contacts with the person obligated or allegedly obligated to pay a debt (i.e., a person defined as a consumer under proposed § 1006.2(e)). The Bureau requests comment on whether it should be broadened to apply to email contacts with a consumer as defined in proposed § 1006.6(a).

### 22(f)(4)

Proposed § 1006.22(f)(4) provides that a debt collector must not communicate or attempt to communicate with a consumer in connection with the collection of a debt by a social media platform that is viewable by a person other than the consumer or other person described in proposed § 1006.6(d)(1)(i) through (vi).

The FDCPA contains numerous provisions that guard against the disclosure of the consumer's financial affairs to individual third parties or the broader public.[363] For example, FDCPA section 805(b) generally prohibits communicating with third parties in connection with the collection of a debt; FDCPA section 806(3) prohibits publishing public "shame lists" of consumers who allegedly refuse to pay their debts;[364] and FDCPA section 808(7) and (8) prohibits communicating with a consumer regarding a debt by postcard or using most language or symbols on the outside of an envelope. The Bureau believes that communications or attempts to communicate by social media platforms that are viewable by a person other than a person with whom a debt collector may communicate under FDCPA section 805(b) similarly risk exposing a consumer's affairs to the public. For example, a debt collector's message to a consumer posted on a public-facing social media page may be viewed by

many of the consumer's social or professional contacts, who may interpret a widely distributed message asking that the consumer return a call as an indication that the consumer is delinquent on an obligation. Accordingly, a debt collector may engage in an unfair or unconscionable act by, in connection with the collection of a debt, communicating or attempting to communicate with a consumer by publicly viewable social media platform.

Such conduct also may have the natural consequence of harassing, oppressing, or abusing the consumer. Although some social media contacts, such as a limited-content message, may not convey information regarding a debt directly or indirectly to any person, given the many other ways a debt collector could attempt to communicate with a consumer that are not viewable by a potentially wide array of the consumer's social or professional colleagues—such as by telephone, text message, postal mail, email, or private message through the same social media platform—a debt collector may have no legitimate purpose in contacting a consumer by publicly viewable social media. As a result, such conduct may serve only to harass, oppress, or abuse.

For these reasons, and pursuant to its authority under FDCPA section 814(d) and to interpret FDCPA sections 806 and 808, proposed § 1006.22(f)(4) provides that a debt collector must not communicate or attempt to communicate with a consumer in connection with the collection of a debt by a social media platform that is viewable by a person other than a person described in proposed § 1006.6(d)(1)(i) through (vi). Proposed comment 22(f)(4)–1 provides examples illustrating the proposed rule.

The Bureau requests comment on all aspects of proposed § 1006.22(f)(4), including on whether debt collectors anticipate that they will use social media platforms to contact consumers. The Bureau also requests comment on whether debt collectors have any non-harassing purpose for attempting to communicate with consumers using public-facing social media platforms and, if so, whether proposed § 1006.22(f)(4) should have an exception for attempts to communicate such as limited-content messages. The Bureau further requests comment on the scope of proposed § 1006.22(f)(4). As proposed, it would apply only to social media contacts with the person obligated or allegedly obligated to pay a debt (i.e., a person defined as a consumer under proposed § 1006.2(e)). The Bureau requests comment on

---

[362] See the section-by-section analysis of proposed § 1006.6(b)(3).

[363] Invasion of individual privacy appears to have been one of the primary harms that Congress sought to eliminate through the FDCPA. FDCPA section 802(a), (e); 15 U.S.C. 1692(a), (e); S. Rept. No. 382, supra note 70, at 1699 ("[A] debt collector may not contact third persons such as a consumer's friends, neighbors, relatives, or employer. Such contacts are not legitimate collection practices and result in serious invasions of privacy, as well as the loss of jobs."); id. at 1696 ("Collection abuse takes many forms, including . . . disclosing a consumer's personal affairs to friends, neighbors, or an employer."); see also Douglass v. Convergent Outsourcing, 765 F.3d 299, 303 (3d Cir. 2014) (describing "the invasion of privacy" as "a core concern animating the FDCPA").

[364] S. Rept. No. 382, supra note 70, at 1696.

whether it should be broadened to apply to social media contacts with any person described as a consumer in proposed § 1006.6(a).

## 22(g) Safe Harbor for Certain Emails and Text Messages Relating to the Collection of a Debt

FDCPA section 808 contains certain provisions designed to protect consumer privacy. As noted, FDCPA section 808(7) prohibits a debt collector from communicating with a consumer regarding a debt by postcard, and FDCPA section 808(8) generally prohibits a debt collector from using any language or symbol, other than the debt collector's address, on any envelope when communicating with a consumer by postal mail. As courts have recognized, these provisions aim to protect consumer privacy by limiting public disclosure of a consumer's debts.[365] The examples in FDCPA section 808(7) and (8) apply to postal mail practices. In pre-proposal feedback, industry groups noted that uncertainty about how similar prohibitions might be applied to emails and text messages discourages the use of those technologies to communicate with consumers.

To mitigate such uncertainty while also protecting consumer privacy, proposed § 1006.22(g) provides that a debt collector who communicates with a consumer using an email address, or telephone number for text messages, and follows the procedures described in proposed § 1006.6(d)(3) does not violate § 1006.22(a) by revealing in the email or text message the debt collector's name or other information indicating that the communication relates to the collection of a debt. The procedures in proposed § 1006.6(d)(3) are designed to ensure that a debt collector who uses a particular email address or telephone number to communicate with a consumer by email or text message does not have a reason to anticipate that an unauthorized third-party disclosure may occur. If the proposed procedures work as designed, there would not be a reason to anticipate that a third party would see the debt collector's name or other debt-collection-related information included in a communication sent to such an email address or telephone number. Some pre-proposal feedback raised the possibility that a third party could read an electronic communication on, for example, the consumer's mobile telephone by looking over the

consumer's shoulder. However, this feedback did not include any actual evidence of the prevalence of such behavior. Moreover, consumers generally should be able to manage over-the-shoulder risk by choosing where and when to read electronic communications and how to configure their devices.

Proposed § 1006.22(g) would provide a safe harbor only as to claims that a debt collector violated § 1006.22 by revealing in the email or text message the debt collector's name or other information indicating that the communication relates to the collection of a debt. The proposed provision would not provide a safe harbor as to claims that a debt collector's email or text message violated the FDCPA or Regulation F in other ways. The Bureau requests comment on proposed § 1006.22(g).

In the Small Business Review Panel Outline, the Bureau described a proposal under consideration to prohibit a debt collector from sending an email message to a consumer if the "from" or "subject" lines contained information revealing that the email was about a debt.[366] The Bureau's concern was that such information could reveal to others that the communication related to a debt.[367] The Bureau does not propose this restriction described in the Small Business Review Panel Outline. In pre-proposal feedback, debt collectors suggested that the restriction would make electronic communication generally more difficult. Some industry participants predicted that, if debt collectors were required to exclude from an email's "from" or "subject" lines all information suggestive of debt collection, consumers would be less likely to understand the email's purpose and more likely to treat the email like spam and ignore or ignore it. This is consistent with research suggesting that the most important factors in whether a consumer will open an email are whether they recognize the sender and the content of the subject line.[368] Proposed § 1006.6(d)(3) which, as noted above, describes procedures for obtaining and using an email address or a telephone number that is unlikely to lead to a third-party disclosure, may be a more effective initial step to minimize the risk of third-party disclosure.

## Section 1006.26 Collection of Time-Barred Debts

Proposed § 1006.26 contains interventions related to the collection of time-barred debts. Proposed § 1006.26(a) would define several terms, and proposed § 1006.26(b) would prohibit debt collectors from suing or threatening to sue consumers to collect time-barred debts. The Bureau proposes § 1006.26 pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors.

### 26(a) Definitions

Proposed § 1006.26(a) would define several terms used in § 1006.26 but not defined in the FDCPA. These definitions would facilitate compliance with proposed § 1006.26(b), which would interpret FDCPA section 807 to prohibit debt collectors from suing and threatening to sue consumers to collect time-barred debts.

### 26(a)(1) Statute of Limitations

Proposed § 1006.26(a)(2), discussed below, would define the term time-barred debt to mean a debt for which the applicable statute of limitations has expired. Proposed § 1006.26(a)(1), in turn, would define the term statute of limitations to mean the period prescribed by applicable law for bringing a legal action against the consumer to collect a debt.

Statutes of limitations typically are established by State law and provide time limits for bringing suit on legal claims.[369] They reflect a public policy determination that it is unjust to subject defendants to suit after a specified period.[370] For debt collection claims, the length of the applicable statute of limitations often varies by State and, within each State, by debt type.[371] Most statutes of limitations applicable to debt collection claims are between three and six years, although some are as long as 15 years.[372]

---

[365] See, e.g., Douglass v. Convergent Outsourcing, 765 F.3d 299, 302 (3d Cir. 2014) ("Section 1692f evinces Congress's intent to screen from public view information pertinent to the debt collection.").

[366] Small Business Review Panel Outline, supra note 56, at appendix H.

[367] Id.

[368] Direct Marketing Ass'n, Consumer Email Tracker 2017, at 18 (2017), https://dma.org.uk/uploads/misc/5a1583ff3301a-consumer-email-tracking-report-2017-(2)_5a1583ff32f65.pdf.

[369] Federal law sometimes establishes the statute of limitations. For example, legal actions to recover certain telecommunications debt are subject to a statute of limitations set by Federal law. See 47 U.S.C. 415(a).

[370] See, e.g., United States v. Kubrick, 444 U.S. 111, 117 (1979) ("Statutes of limitations . . . represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." (internal citation and quotation marks omitted)).

[371] See Fed. Trade Comm'n, Repairing a Broken System: Protecting Consumers in Debt Collection Litigation and Arbitration, at 24 (July 2010) (hereinafter FTC Litigation Report).

[372] See FTC Debt Buying Report, supra note 14, at 42.

Debt collectors generally are familiar with the concept of statutes of limitations, and the proposed definition generally should be consistent with debt collectors' understanding of the term. The Bureau requests comment on the proposed definition and whether any additional clarification is needed.

### 26(a)(2) Time-Barred Debt

Proposed § 1006.26(a)(2) would define the term time-barred debt to mean a debt for which the applicable statute of limitations has expired. Debt collectors generally are familiar with the concept of time-barred debt, and the definition of time-barred debt in proposed § 1006.26(a)(2) is consistent with debt collectors' understanding of the term.

Many debt collectors already determine whether the statute of limitations applicable to a debt has expired. Some do so to comply with State and local disclosure laws that require them to inform consumers when debts are time barred.[373] Others do so to assess whether they can sue to collect the debt, which may affect their collection strategy. The information that debt buyers generally receive when bidding on and purchasing debts, and the information that other debt collectors generally receive at placement, should allow them to determine whether the applicable statute of limitations has expired.[374] The Bureau requests comment on the proposed definition and on whether any additional clarification is needed.

### 26(b) Suits and Threats of Suit Prohibited

Under the laws of most States, expiration of the applicable statute of limitations, if raised by the consumer as an affirmative defense, precludes the debt collector from recovering on the debt using judicial process, but it does not extinguish the debt itself.[375] In other words, in most States, a debt collector may use non-litigation means to collect a time-barred debt, as long as those means do not violate the FDCPA or other laws. If a debt collector does sue to collect a time-barred debt and the consumer proves the expiration of the statute of limitations as an affirmative defense, the court will dismiss the suit. Multiple courts have held that suits and threats of suit on time-barred debt violate the FDCPA, reasoning that such practices violate FDCPA section 807's prohibition on false or misleading representations, FDCPA section 808's prohibition on unfair practices, or both.[376] The FTC has also concluded that the FDCPA bars actual and threatened suits on time-barred debt.[377] In addition, at least one industry group requires its members to refrain from suing or threatening to sue on time-barred debts.[378] Nevertheless, the Bureau's enforcement experience suggests that some debt collectors may continue to sue or threaten to sue on time-barred debts.[379]

A debt collector who sues or threatens to sue a consumer on a time-barred debt may explicitly or implicitly misrepresent to the consumer that the debt is legally enforceable, and that misrepresentation likely is material to consumers because it may affect their conduct with regard to the collection of that debt, including, for example, whether to pay it.[380] In response to the Bureau's ANPRM, some consumer advocacy groups and State Attorneys General observed that consumers are often uncertain about their rights concerning time-barred debt. The Bureau's consumer testing to date is consistent with those observations.[381] In addition, as courts have recognized, the passage of time "dulls the consumer's memory of the circumstances and validity of the debt" and "heightens the probability that [the consumer] will no longer have personal records detailing the status of the debt."[382] Consumers sued or threatened with suit on a time-barred debt may not recognize that the debt is time barred, that time-barred debts are unenforceable in court, or that generally they must raise the expiration of the statute of limitations as an affirmative defense.

Suits and threats of suit on time-barred debts can harm consumers in multiple ways. A debt collector's threat to sue on a time-barred debt may prompt some consumers to pay or prioritize that debt over others in the mistaken belief that doing so is necessary to forestall litigation. Similarly, suits on time-barred debts may lead to judgments against consumers on claims for which those consumers had meritorious defenses, including, but not limited to, a statute-of-limitations defense. Such judgments may be especially likely given that few consumers sued for allegedly unpaid debts—whether time-barred or not—actually defend themselves in court, and those who do often are unrepresented. As a result, the vast majority of judgments on unpaid debts, including on time-barred debts, are default judgments, entered solely on the representations contained in the debt collector's complaint.[383]

---

[373] *See, e.g.,* Cal. Civ. Code § 1788.52(d)(3); Conn. Gen. Stat. § 36a–805(a)(14); Mass. Code Regs., tit. 940, § 7.07(24); N.M. Code R. § 12.2.12.9(A); N.Y. Comp. Codes R. & Regs., tit. 23, § 1.3; New York City, N.Y., Rules, tit. 6, § 2–191(a); W. Va. Code § 46a–2–128(f).

[374] *See* FTC Debt Buying Report, *supra* note 14, at 49 ("The data the Commission received from debt buyers suggests that debt buyers usually are likely to know or be able to determine whether the debts on which they are collecting are beyond the statute of limitations."); CFPB Debt Collection Operations Study, *supra* note 45, at 23 (noting that the majority of respondents reported always or often receiving, among other things, debt balance at charge off, account agreement documentation, and billing statements).

[375] In Mississippi and Wisconsin, debts are extinguished when the applicable statute of limitations expires. *See* Miss. Code Ann. § 15–1–3 ("The completion of the period of limitation prescribed to bar any action, shall defeat and extinguish the right as well as the remedy."); Wis.

Stat. Ann. § 893.05 ("When the period within which an action may be commenced on a Wisconsin cause of action has expired, the right is extinguished as well as the remedy.").

[376] *See, e.g., Pantoja* v. *Portfolio Recovery Assocs., LLC,* 852 F.3d 679, 683–84 (7th Cir. 2017); *McMahon* v. *LVNV Funding, LLC,* 744 F.3d 1010, 1020 (7th Cir. 2014); *Phillips* v. *Asset Acceptance, LLC,* 736 F.3d 1076, 1079 (7th Cir. 2013); *Huertas* v. *Galaxy Asset Mgmt.,* 641 F.3d 28, 33 (3d Cir. 2011); *Goins* v. *JBC & Assocs., P.C.,* 352 F. Supp. 2d 262, 273 (D. Conn. 2005); *Kimber* v. *Fed. Fin. Corp.,* 668 F. Supp. 1480, 1487–89 (M.D. Ala. 1987).

[377] FTC Litigation Report, *supra* note 371, at 23.

[378] Receivables Mgmt. Ass'n Int'l, *Receivables Management Certification Program,* at 32 (Jan. 2018), *https://rmassociation.org/wp-content/uploads/2018/02/Certification-Policy-version-6.0-FINAL-20180119.pdf* ("A Certified Company shall not knowingly bring or imply that it has the ability to bring a lawsuit on a debt that is beyond the applicable statute of limitations, even if state law revives the limitations period when a payment is received after the expiration of the statute."); *see also* David R. Reid, *Out-of-Statute Debt: What is a Smart, Balanced, and Responsible Approach,* at 8 (Receivables Mgmt. Ass'n Int'l, White Paper, 2015), *https://rmassociation.org/wp-content/uploads/2017/04/RMA_Whitepaper_OOS.pdf* ("Although, as noted, the statute of limitations is an affirmative defense that, in almost all states, must be raised by the defendant or it is waived, it is improper to knowingly file OSD [*i.e.,* out-of-statute debt] suits and wait to see if the defense is pled.").

[379] Consent Order at ¶¶ 65–69, *In re Encore Capital Group, Inc.,* No. 2015–CFPB–0022 (Sept. 9, 2015), *http://files.consumerfinance.gov/f/201509_cfpb_consent-order-encore-capital-group.pdf*; Consent Order at ¶¶ 56–59, *In re Portfolio Recovery Assocs. LLC,* No. 2015–CFPB–0023 (Sept. 9, 2015), *http://files.consumerfinance.gov/f/201509_cfpb_consent-order-portfolio-recovery-associates-llc.pdf*.

[380] *See, e.g., Kimber,* 668 F. Supp. at 1489 ("By threatening to sue Kimber on her alleged debt . . . FFC implicit[ly] represented that it could recover in a lawsuit, when in fact it cannot properly do so.").

[381] *See* FMG Focus Group Report, *supra* note 38, at 9–10; FMG Cognitive Report, *supra* note 40, at 36–37; FMG Summary Report, *supra* note 42, at 35–36; *see also* FTC Litigation Report, *supra* note 371, at iii, 26.

[382] *Phillips,* 736 F.3d at 1079 (quoting *Kimber,* 668 F. Supp. at 1487).

[383] *See* FTC Debt Buying Report, *supra* note 14, at 45 (observing that "90 percent or more of consumers sued in [debt collection actions] do not appear in court to defend," which "creates a risk that consumer will be subject to a default judgment on a time-barred debt"); Peter A. Holland, *The One Hundred Billion Dollar Problem in Small Claims Court: Robo-Signing and Lack of Proof in Debt Buyer Cases,* 6 J. Bus. & Tech. L. 259, 265 (2011) ("In the majority of debt buyer cases, the courts grant the debt buyer a default judgment because the consumer has failed to appear for trial. . . . Debtors

According to the small entity representatives who participated in the SBREFA process, debt collectors generally do not sue on debt they know to be time barred. Similarly, a trade association representing debt buyers has reported that, in a poll of its members, not one responded that they knowingly or intentionally file lawsuits after the applicable statute of limitations has expired.[384] During the SBREFA process, however, several small entity representatives stated that determining whether the statute of limitations has expired can be complex. The determination may involve analyzing which statute of limitations applies, when the statute of limitations began to run, and whether the statute of limitations has been tolled or reset. The Bureau believes that, in many cases, a debt collector will know, or can readily determine, whether the statute of limitations has expired. In some instances, however, a debt collector may be genuinely uncertain even after undertaking a reasonable investigation; this could occur, for example, when the case law in a State is unclear as to which statute of limitations applies to a particular type of debt.

For these reasons, the Bureau proposes to interpret FDCPA section 807 to provide that a debt collector must not bring or threaten to bring a legal action against a consumer to collect a debt that the debt collector knows or should know is a time-barred debt. FDCPA section 807 generally prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt," and FDCPA section 807(2)(A) specifically prohibits falsely representing "the character, amount, or legal status of any debt." The Bureau interprets FDCPA section 807 and 807(2)(A) to prohibit debt collectors from suing or threatening to sue consumers on debts they know or

who do receive notice usually appear without legal representation."); CFPB Debt Collection Operations Study, *supra* note 45, at 18 (observing that respondents reported obtaining default judgments in 60 to 90 percent of their filed suits); *cf. Kimber,* 668 F. Supp. at 1487 ("Because few unsophisticated consumers would be aware that a statute of limitations could be used to defend against lawsuits based on stale debts, such consumers would unwittingly acquiesce to such lawsuits. And, even if the consumer realizes that she can use time as a defense, she will more than likely still give in rather than fight the lawsuit because she must still expend energy and resources and subject herself to the embarrassment of going into court to present the defense; this is particularly true in light of the costs of attorneys today.").

[384] *See* David E. Reid, *Out-of-Statute Debt: What is a Smart, Balanced, and Responsible Approach,* at 8, (Receivables Mgmt. Ass'n Int'l, White Paper, 2015), *https://rmassociation.org/wp-content/uploads/2017/04/RMA_Whitepaper_OOS.pdf.*

should know are time-barred debts because such suits and threats of suit explicitly or implicitly misrepresent, and may cause consumers to believe, that the debts are legally enforceable. In addition, threats to sue consumers on time-barred debts are similar to threats to take actions that cannot legally be taken, which FDCPA section 807(5) specifically prohibits, because both involve the threat of action to which the consumer has a complete legal defense. The Bureau's proposed interpretation of FDCPA section 807 is generally consistent with well-established case law holding that lawsuits and threats of lawsuits on time-barred debt violate FDCPA section 807.[385] The proposed rule may provide debt collectors with greater certainty as to what the law prohibits while also protecting consumers and enabling them to prove legal violations without having to litigate in each case whether lawsuits and threats of lawsuits on time-barred debt violate the FDCPA.

The Bureau requests comment on proposed § 1006.26(b) and on whether any additional clarification is needed. In particular, the prohibitions in proposed § 1006.26(b) would apply only if the debt collector knows or should know that the applicable statute of limitations has expired. It sometimes may be difficult, however, to determine whether a "know or should have known" standard has been met. Such uncertainty could increase litigation costs and make enforcement of proposed § 1006.26(b) more difficult. In part to address this concern, the Small Business Review Panel Outline described an alternative strict-liability standard pursuant to which a debt collector would be liable for suing or threatening to sue on a time-barred debt even if the debt collector neither knew nor should have known that the debt was time barred.[386] The Bureau specifically requests comment on using a "knows or should know" standard in proposed § 1006.26(b) and on the merits of using a strict liability standard instead.

**26(c) Reserved**

The Bureau is likely to propose that debt collectors must provide disclosures to consumers when collecting time-barred debts. The Bureau currently is completing its evaluation of whether consumers take away from non-litigation collection efforts that they can or may be sued on a debt and, if so,

[385] *See, e.g., Pantoja,* 852 F.3d at 683; *McMahon,* 744 F.3d at 1020; *Phillips,* 736 F.3d at 1079; *Kimber,* 668 F. Supp. at 1488–89.

[386] Small Business Review Panel Outline, *supra* note 56, at 20.

whether that take-away changes depending on the age of the debt. In many States, a consumer's partial payment on a time-barred debt or acknowledgment of a time-barred debt in writing restarts the statute of limitations period and "revives" the debt collector's right to sue for the full amount. The Bureau is also completing its evaluation of how a time-barred debt disclosure might affect consumers' understanding of whether debts can be revived. The disclosures under consideration include a disclosure that would inform a consumer that, because of the age of the debt, the debt collector cannot sue to recover it. They also include, where applicable, a disclosure that would inform a consumer that the right to sue on a time-barred debt can be revived in certain circumstances. The Small Business Review Panel Outline discussed certain such disclosures, and the Bureau has received feedback from stakeholders about both the need for, and the content of, such disclosures.[387]

The Bureau plans to conduct additional consumer testing of possible time-barred debt and revival disclosures, and expects this additional testing to further inform the Bureau's evaluation of any time-barred debt disclosures. At a later date, the Bureau intends to issue a report on such testing and any disclosure proposals related to the collection of time-barred debt. Stakeholders will have an opportunity to comment on such testing if the Bureau intends to use it to support disclosure requirements in a final rule. The Bureau reserves § 1006.26(c) and appendix B of the regulation for any such proposals.

**Section 1006.30   Other Prohibited Practices**

Proposed § 1006.30 contains several measures designed to protect consumers from certain harmful debt collection practices. Specifically, proposed § 1006.30(a) would regulate debt collectors' furnishing practices under certain circumstances; proposed § 1006.30(b) would limit the transfer of certain debts; and proposed § 1006.30(c), (d), and (e) would generally restate statutory provisions regarding allocation of payments, venue, and the furnishing of certain deceptive forms, respectively.

**30(a) Communication Prior to Furnishing Information**

Debt collectors may actively attempt to collect debts about which they furnish information to consumer reporting agencies by, for example,

[387] *Id.* at 20–21.

calling or writing to consumers. However, some debt collectors engage in "passive" collections by furnishing information to consumer reporting agencies for inclusion in consumer reports without first communicating with consumers.[388] Debt collectors may attempt to collect debts passively where the expected return from that technique exceeds the cost of attempting to collect the debt by communicating with consumers.[389]

A consumer may suffer harm if a debt collector furnishes information to a consumer reporting agency without first communicating with the consumer. If debt collectors do not communicate with consumers prior to furnishing, consumers are likely to be unaware that they have a debt in collection unless they obtain and review their consumer report. In turn, many consumers may not obtain and review their consumer reports until they apply for credit, housing, employment, or another product or service provided by an entity that reviews consumer reports during the application process. At that point, consumers may face pressure to pay debts that they otherwise would dispute, including debts that they do not owe,[390] in an effort to remove the debts from their consumer reports and more quickly obtain a mortgage or job or desired product or service. Consumers unaware of the debt before a financial institution, landlord, employer, or other similar person makes a decision also may face the denial of an application, a higher interest rate, or other negative consequences.[391] If the debt collector had instead communicated with the consumer prior to furnishing by, for example, sending the consumer a validation notice, then the consumer would have been more likely to have information about the debt and to have the opportunity to resolve the debt with the debt collector by either paying or disputing it.

These consumer harms could be avoided if debt collectors communicated with consumers before

furnishing information about debts in collection. The Bureau thus proposes § 1006.30(a), which provides that a debt collector must not furnish to a consumer reporting agency, as defined in section 603(f) of the Fair Credit Reporting Act (FCRA),[392] information regarding a debt before communicating with the consumer about the debt. Taken together with proposed § 1006.34— which generally would require debt collectors to provide consumers important information about debts at the outset of collection, including consumers' options for resolving them— proposed § 1006.30(a) should reduce the harms that result from consumers being unaware of or uninformed about their debts in collection.

During the SBREFA process, small entity representatives expressed concern over the potential burden to a debt collector of documenting, such as by using certified mail, that a consumer received a communication. The Small Business Review Panel recommended that the Bureau consider clarifying the type of communication that would be sufficient to satisfy the requirement, including clarifying that debt collectors do not need to send the validation notice by certified mail.

Proposed comment 30(a)–1 is designed to address the Panel's recommendation. Proposed comment 30(a)–1 would clarify that a debt collector would satisfy proposed § 1006.30(a)'s requirement to communicate if the debt collector conveyed information regarding a debt directly or indirectly to the consumer through any medium, but a debt collector would not satisfy the communication requirement if the debt collector attempted to communicate with the consumer but no communication occurred. For example, a debt collector communicates with the consumer if the debt collector provides a validation notice to the consumer, but a debt collector does not communicate with the consumer by leaving a limited-content message for the consumer. Proposed comment 30(a)–1 also would clarify that a debt collector may refer to proposed § 1006.42 for more information on how to provide disclosures in a manner that is reasonably expected to provide actual notice to consumers. The Bureau requests comment on proposed § 1006.30(a) and its related commentary.

The Bureau proposes § 1006.30(a) pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors; its authority to interpret

FDCPA section 806 regarding harassment, oppression, or abuse in connection with the collection of a debt; and its authority to interpret FDCPA section 808 regarding unfair or unconscionable means to collect or attempt to collect any debt. As discussed in part IV, a debt collector violates FDCPA section 806 if the debt collector engages in conduct that has the natural consequence of harassing, oppressing, or abusing any person in connection with the collection of a debt. A debt collector violates FDCPA section 808 if the debt collector uses unfair or unconscionable means to collect or attempt to collect any debt.

Courts have interpreted FDCPA sections 806 and 808 to prohibit certain coercive collection methods that may cause consumers to pay debts not actually owed.[393] Passive collection practices are similar to these other types of prohibited conduct because, as discussed above, they exert significant pressure in circumstances that undermine the ability of consumers to decide whether to pay debts, sometimes resulting in them paying debts they do not owe or would have otherwise disputed. The Bureau thus proposes § 1006.30(a) to prohibit a debt collector from furnishing information about a debt to consumer reporting agencies prior to communicating with the consumer about that debt, on the basis that subjecting a consumer to pressure by furnishing information to a consumer reporting agency without first providing notice to the consumer constitutes conduct that may have the natural consequence of harassment, oppression, or abuse in violation of FDCPA section 806, and that is an unfair or unconscionable means to collect or attempt to collect a debt under FDCPA section 808.

### 30(b) Prohibition on the Sale, Transfer, or Placement of Certain Debts

#### 30(b)(1) In General

The sale, transfer, and placement for collection of debts that have been paid or settled or discharged in bankruptcy,

---

[388] *See* CFPB Medical Debt Report, *supra* note 20, at 36.

[389] *See id.*

[390] In some cases, the information furnished to consumer reporting agencies may be inaccurate. *See id.* at 51 ("Significant questions exist as to the accuracy of collections tradeline reporting.").

[391] Such consumers generally would receive adverse action notices alerting them to the negative item on their consumer report, but these notices would occur too late to prevent the initial harm from passive collection practices. *See* 15 U.S.C. 1681m(a). Consumers who obtained credit from financial institutions also generally would have received notices that the financial institutions furnish negative information to nationwide consumer reporting agencies. *See* 15 U.S.C. 1681s–2(a)(7).

[392] 15 U.S.C. 1681a(f).

[393] *See, e.g., Fox v. Citicorp Credit Servs., Inc.,* 15 F.3d 1507, 1517 (9th Cir. 1994) (reversing grant of summary judgment to debt collector in part because "a jury could rationally find" that filing writ of garnishment was unfair or unconscionable under section 808 when debt was not delinquent); *Ferrell v. Midland Funding, LLC,* No. 2:15–cv–00126–JHE, 2015 WL 2450615, at *3–4 (N.D. Ala. May 22, 2015) (denying debt collector's motion to dismiss section 806 claim where debt collector allegedly initiated collection lawsuit even though it knew plaintiff did not owe debt); *Pittman v. J.J. Mac Intyre Co. of Nev., Inc.,* 969 F. Supp. 609, 612–13 (D. Nev. 1997) (denying debt collector's motion to dismiss claims under sections 807 and 808 where debt collector allegedly attempted to collect fully satisfied debt).

or that are subject to an identity theft report creates risk of consumer harm. If a debt is paid or settled, or discharged in bankruptcy, the debt is either extinguished or uncollectible. If a debt is listed on an identity theft report, the debt likely resulted from fraud, in which case the consumer may not have a legal obligation to repay it. Identity theft frequently results in fraudulent use of credit and often is discovered only after unauthorized account activity has occurred.[394]

Because debts that have been paid or settled or discharged in bankruptcy are either extinguished or uncollectible, and because consumers likely do not owe debts that are subject to an identity theft report, debt collectors seeking to collect such debts almost inevitably will make an express or implied false claim that consumers owe the debts. For example, in response to the ANPRM, consumer advocates noted that debt collectors who sue consumers to recover debts that were paid or settled with previous creditors may rely on an incomplete account history that does not reflect a consumer's prior payment or settlement. The FDCPA in many places reflects a concern with debt collectors collecting or attempting to collect debts that consumers likely do not owe.[395]

When the FDCPA became law in 1977, debt sales and related transfers were not common. In subsequent years, debt sales and transfers have become more frequent.[396] The general growth in debt sales and transfers may have increased the likelihood that a debt that has been paid, settled, or discharged in bankruptcy may be transferred or sold.[397] Moreover, identity theft, which has emerged as a major consumer protection concern, may increase the number of debts that are created if consumers' identities are stolen and their personal information misused.[398]

Other Federal regulators have raised similar concerns about the risk of consumer harm from the sale, transfer, and placement of these categories of debt. The FTC has considerable expertise with respect to the debt buying industry[399] and has identified a risk of consumer harm if a debt collector purchases and seeks to collect discharged debt.[400] The Office of the Comptroller of the Currency (OCC) has advised its supervised institutions that certain categories of debt—including settled debts, debts belonging to borrowers seeking bankruptcy protection, and debts incurred as a result of fraudulent activity—are not appropriate for sale because of the reputational risk and the threat of legal liability related to the unlawful tactics employed to collect these debts.[401]

Segments of the debt collection industry also appear to recognize the risks of transferring these categories of debt. Some debt collectors have adopted policies to identify and exclude certain debts from sale or transfer. For example, a trade association representing debt buyers administers a certification program that prohibits the sale of debts that have been settled in full, paid in full, or are the result of identity theft or fraud.[402]

For these reasons, proposed § 1006.30(b)(1)(i) generally would prohibit a debt collector from selling, transferring, or placing for collection a debt if the debt collector knows or should know that the debt has been paid or settled, discharged in bankruptcy, or that an identity theft report has been filed with respect to the debt.[403] The Bureau understands that debt collectors may be required to sell or transfer such debts for non-debt collection purposes and proposes certain exceptions in § 1006.30(b)(2) to accommodate those situations. Proposed comment 30(b)(1)(i)(C)–1 provides an example clarifying that a debt collector knows or should know that an identity theft report was filed with respect to a debt if, for example, the debt collector has received a copy of the identity theft report.

The Bureau proposes § 1006.30(b)(1)(i) pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors, and pursuant to its authority to interpret FDCPA section 808 regarding unfair or unconscionable debt collection practices. The Bureau proposes to prohibit the sale, transfer, or placement of such debts as unfair under FDCPA section 808 on the basis that, because consumers do not owe or cannot be subject to collections on alleged debts that have been paid or settled or discharged in bankruptcy, and likely do not owe alleged debts that are subject to identity theft reports, the sale, transfer, or placement of such debts is unfair or unconscionable. Further, the sale, transfer or placement of such debts is unfair under section 1031 of the Dodd-Frank Act because it is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers where the substantial injury is not outweighed by countervailing benefits to consumers or to competition. Prohibiting the sale, transfer, or placement of such debts is reasonably designed to prevent this unfair practice.

With respect to a debt collector who is collecting a consumer financial product or service debt, as defined in proposed § 1006.2(f), the Bureau also proposes § 1006.30(b)(1)(i) pursuant to its authority under section 1031(b) of the Dodd-Frank Act to prescribe rules to identify and prevent the commission of unfair acts or practices by Dodd-Frank Act covered persons, and the Bureau

---

[394] In 2014, approximately 86 percent of identity theft victims reported that their most recent incident involved unauthorized charges on an existing credit card or bank account. More than 60 percent of victims learned of the identity theft when either a financial institution notified them of suspicious activity in an account or the victim noticed fraudulent charges on an account statement. Erika Harrell, Bureau of Justice Stats., *Victims of Identity Theft, 2014*, at 2, 5, U.S. Dep't of Justice, (revised Nov. 13, 2017), *https://www.bjs.gov/content/pub/pdf/vit14.pdf*.

[395] See, e.g., 15 U.S.C. 1692f(1) (prohibiting "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law"); *see also Jacobson v. Healthcare Fin. Servs., Inc.*, 516 F.3d 85, 89 (2d Cir. 2008) (quoting S. Rept. No. 382, *supra* note 70, at 4); *Fox v. Citicorp Credit Servs., Inc.*, 15 F.3d 1507, 1517 (9th Cir. 1994) (reversing grant of summary judgment to debt collector in part because "a jury could rationally find" that filing writ of garnishment was unfair or unconscionable under section 808 when debt was not delinquent); *Ferrell v. Midland Funding, LLC*, No. 2:15–cv–00126–JHE, 2015 WL 2450615, at *3–4 (N.D. Ala. May 22, 2015) (denying debt collector's motion to dismiss section 806 claim where debt collector allegedly initiated collection lawsuit even though it knew plaintiff did not owe debt); *Pittman v. J.J. Mac Intyre Co. of Nev., Inc.*, 969 F. Supp. 609, 612–13 (D. Nev. 1997) (denying debt collector's motion to dismiss claims under sections 807 and 808 where debt collector allegedly attempted to collect fully satisfied debt).

[396] In 2009, the FTC stated that the "most significant change in the debt collection business in recent years has been the advent and growth of debt buying." FTC Modernization Report, *supra* note 176, at 4.

[397] See, e.g., Bureau of Consumer Fin. Prot., *Supervisory Highlights, Issue No. 12*, at 6–7 (Summer 2016), *https://www.consumerfinance.gov/data-research/research-reports/supervisory-highlights-issue-no-12-summer-2016/* (discussing examinations finding that debt sellers failed to code accounts to reflect that they were in bankruptcy, the product of fraud, or settled in full).

[398] See generally Kristin Finklea, *Identity Theft: Trends and Issues*, Cong. Research Serv., RL40599 (2014), *https://fas.org/sgp/crs/misc/R40599.pdf*.

[399] See generally, e.g., FTC Debt Buying Report, *supra* note 14.

[400] FTC Modernization Report, *supra* note 176, at 64–65.

[401] See Off. of the Comptroller of the Currency, Bulletin 2014–37, *Description: Risk Management Guidance* (Aug. 4, 2014), *http://www.occ.gov/news-issuances/bulletins/2014/bulletin-2014-37.html*.

[402] See Receivables Mgmt. Ass'n Int'l, *Receivables Management Certification Program, Certification Governance Document*, at 43 (2018), *https://rmassociation.org/wp-content/uploads/2018/02/Certification-Policy-version-6.0-FINAL-*

---

*20180119.pdf*. A large debt buyer also indicated in preproposal feedback that it has adopted policies to exclude certain debts from debt sales transactions.

[403] Proposed § 1006.30(b) would define "identity theft report" as defined in the FCRA, 15 U.S.C. 1681a(q)(4).

proposes § 1006.30(b)(1)(ii) to identify this unfair act or practice.[404] As discussed in part IV.B, to declare an act or practice unfair under Dodd-Frank Act section 1031(b), the Bureau must have a reasonable basis to conclude that: (1) The act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (2) such substantial injury is not outweighed by countervailing benefits to consumers or to competition. Selling, transferring, or placing for collection debts described in proposed § 1006.30(b)(1)(i) likely causes substantial injury to consumers because the collection of such debts likely results in deceptive claims of indebtedness and the unfair collection of amounts not owed.[405] Consumers cannot reasonably avoid this harm because they have no control over debt sales, transfers, or placements or collection activity arising subsequent to those sales, transfers or placements. The collection of debts that are either not owed or likely not owed does not benefit consumers or competition.

The Bureau requests comment on all aspects of proposed § 1006.30(b)(1). In particular, the Bureau requests comment on whether additional categories of debt, such as debt currently subject to litigation and debt lacking clear evidence of ownership, should be included in any prohibition adopted in a final rule. The Bureau also requests comment on how frequently consumers identify a specific debt when filing an identity theft report, and on how frequently debt collectors learn that an identity theft report was filed in error and proceed to sell or transfer the debt. The Bureau also requests comment on any potential disruptions that proposed § 1006.30(b)(1)(i) would cause for secured debts, such as by preventing servicing transfers or foreclosure activity related to mortgage loans. Finally, the Bureau requests comment on whether any of the currently proposed categories of debts should be clarified and, if so, how; and on whether additional clarification is needed regarding the proposed "know or should know" standard.

30(b)(2) Exceptions

Allowing the sale, transfer, or placement of the debts described in proposed § 1006.30(b)(1)(i) for certain bona fide business purposes other than debt collection may not create a significant risk of deceptive or unfair collections activity. Proposed § 1006.30(b)(2) sets forth four narrow exceptions to proposed § 1006.30(b)(1) to accommodate such circumstances.

Proposed § 1006.30(b)(2)(i) would allow a debt collector to transfer a debt described in proposed § 1006.30(b)(1)(i) to the debt's owner. This exception would permit a third-party debt collector who identifies such a debt among its collection accounts to return that debt to the debt's owner. Allowing a debt collector to return a debt to the debt's owner likely would not raise the risk of deceptive or unfair collections activity. Debts frequently are returned to a debt's owner after unsuccessful collections efforts.[406] Moreover, unlike a debt collector, whose overriding economic incentive is to secure a debt's repayment, certain debt owners may have other priorities that make it less likely that the owner will place the debt with another debt collector or try to collect the debt itself.[407] For creditors in particular, these moderating factors include general reputational concerns and a desire to preserve the specific customer relationship. Proposed comment 30(b)(2)(i)–1 would clarify that a debt collector may not engage in an otherwise prohibited transfer with any other entity on behalf of a debt's owner unless another exception applies.

The Bureau proposes three additional exceptions that parallel the exceptions in the FCRA to the prohibition on the sale, transfer, or placement of debt caused by identity theft.[408] Section 615(f) of the FCRA prohibits a person from selling, transferring for consideration, or placing for collection a debt after being notified that a consumer reporting agency identified that debt as having resulted from identity theft.[409] Because proposed § 1006.30(b)(1) also would prohibit the sale, transfer, or placement of debts subject to an identity theft report, the Bureau proposes to adopt the exceptions under FCRA section 615(f)(3) regarding the repurchase, securitization, or transfer of a debt as the result of a merger or acquisition, since these exceptions would appear to be equally relevant and provide some consistency between proposed Regulation F and the

FCRA's existing identity theft requirements. Further, the FCRA's exceptions may provide debt collectors with sufficient flexibility to transfer debts for bona fide non-debt collection business purposes.

Proposed § 1006.30(b)(2)(ii) would allow a debt collector to transfer a debt described in proposed § 1006.30(b)(1)(i) to a previous owner if transfer is authorized by contract. Creditors may include provisions in debt sales contracts that authorize repurchase or transfer when certain issues, such as consumer disputes or identity theft, surface.[410] Such agreements may benefit debt collectors by removing non-performing debts from collection portfolios, which allows debt collectors to focus their efforts on accounts with higher recovery rates. These agreements also may benefit consumers because interactions with creditors may be less adversarial and offer speedier and fuller resolution than interactions with debt collectors.[411] The Bureau proposes § 1006.30(b)(2)(ii) to avoid impeding these agreements in debt sales contracts.

Proposed § 1006.30(b)(2)(iii) would permit a debt collector to securitize a debt described in proposed § 1006.30(b)(1)(i), or to pledge a portfolio of such debt as collateral in connection with a borrowing. The Bureau understands that, if a debt collector securitizes or pledges a portfolio of debt, the debt collector may be unable to exclude the debts described in proposed § 1006.30(b)(1)(i) from the portfolio. The Bureau proposes § 1006.30(b)(2)(iii) to allow a debt collector to securitize or pledge portfolios in connection with its own commercial borrowing without violating Regulation F.

Proposed § 1006.30(b)(2)(iv) would allow a debt collector to transfer a debt

---

[404] See part IV.B for a discussion of the Bureau's framework for interpreting Dodd-Frank Act section 1031(b).

[405] Cf. Fed. Trade Comm'n v. Neovi, Inc., 604 F.3d 1150, 1157 (9th Cir. 2010) (holding that the defendant engaged in an unfair practice by creating a website that fraudsters predictably used to injure consumers).

[406] CFPB Debt Collection Operations Study, supra note 45, at 13.

[407] When passing the FDCPA, Congress determined that creditors "generally are restrained by their desire to protect their good will when collecting past due accounts," unlike debt collectors. S. Rept. No. 382, supra note 70, at 2.

[408] See 15 U.S.C. 1681m(f)(3).

[409] See 15 U.S.C. 1681m(f).

[410] Creditors may include such repurchase provisions in debt sales agreements based on compliance and reputational concerns. For national banks and Federal savings associations in particular, regulatory guidance may incentivize this practice. See, e.g., Off. of the Comptroller of the Currency, Bulletin 2014–37, Description: Risk Management Guidance (Aug. 4, 2014), http://www.occ.gov/news-issuances/bulletins/2014/bulletin-2014-37.html.

[411] See CFPB Debt Collection Consumer Survey, supra note 18, at 46–47 ("Consumers reported more favorable experiences with creditors than debt collectors along many of the dimensions surveyed. About three-quarters (77 percent) of consumers who reported being contacted by a creditor, for example, said that the creditor provided accurate information compared with 49 percent of consumers contacted by a debt collector. Consumers contacted by creditors similarly were more likely to say that the creditor provided options to pay the debt, addressed their questions, and was polite. Finally, those contacted by creditors were less likely than those contacted by debt collectors to agree with less-favorable characterization of interactions such as reporting that the creditor threatened them.").

described in proposed § 1006.30(b)(1)(i) as a result of a merger, acquisition, purchase and assumption transaction, or transfer of substantially all of the debt collector's assets. Transfers in these circumstances are not likely to raise the risk of unlawful collections activities because the transfers are for a bona fide non-debt collection business purpose. Further, excluding the categories of debt in proposed § 1006.30(b)(1)(i) from a business acquisition may be impracticable.

The Bureau requests comment on proposed § 1006.30(b)(2), including on whether additional exceptions are necessary to allow for transfers of debts for non-debt collection business purposes, and on whether the proposed exceptions should be more narrowly tailored or clarified. The Bureau also requests comment on the costs and benefits to consumers of allowing debts to be transferred under the proposed exceptions.

30(c) Multiple Debts

FDCPA section 810 provides that, if any consumer owes multiple debts and makes any single payment to any debt collector with respect to such debts, that debt collector must not apply the consumer's payment to any debt which is disputed by the consumer and must apply the payment in accordance with the consumer's directions, if any.[412] Pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors, the Bureau proposes § 1006.30(c) to implement FDCPA section 810. Proposed § 1006.30(c) mirrors the statute, except that minor changes have been made for organization and clarity. The Bureau requests comment on proposed § 1006.30(c), including on whether additional clarification is needed.

30(d) Legal Actions by Debt Collectors

FDCPA section 811 restricts the venue in which a debt collector may initiate legal action on a debt against a consumer.[413] Pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors, the Bureau proposes § 1006.30(d) to implement FDCPA section 811. Proposed § 1006.30(d) mirrors the statute, except that minor changes have been made for organization and clarity. The Bureau requests comment on proposed § 1006.30(d), including on

whether additional clarification is needed.

30(e) Furnishing Certain Deceptive Forms

FDCPA section 812(a) prohibits any person from knowingly designing, compiling, and furnishing any form that would be used to create the false belief in a consumer that a person other than the consumer's creditor is participating in the collection of, or in an attempt to collect, a debt the consumer allegedly owes, if in fact the creditor is not participating.[414] Pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors, the Bureau proposes § 1006.30(e) to implement FDCPA section 812(a). Because the Bureau's rulemaking authority under FDCPA section 814(d) is limited to debt collectors, as that term is defined in the FDCPA, proposed § 1006.30(e)'s coverage is more limited than that of FDCPA section 812(a), which applies to any person. Proposed § 1006.30(e) would not narrow coverage under the statute. Proposed § 1006.30(e) otherwise generally mirrors the statute, except that minor changes have been made for organization and clarity. The Bureau requests comment on proposed § 1006.30(e), including on whether additional clarification is needed.

Section 1006.34    Notice for Validation of Debts

FDCPA section 809(a) generally requires a debt collector to provide certain information to a consumer either at the time that, or shortly after, the debt collector first communicates with the consumer in connection with the collection of a debt. The required information—i.e., the validation information—includes details about the debt and about consumer protections, such as the consumer's rights to dispute the debt and to request information about the original creditor.[415]

The requirement to provide validation information is an important component of the FDCPA and was intended to improve the debt collection process by helping consumers to recognize debts that they owe and raise concerns about debts that are unfamiliar. Congress in 1977 considered the requirement a "significant feature" of the statute, explaining that it was designed to "eliminate the recurring problem of debt collectors dunning the wrong person or attempting to collect debts which the

consumer has already paid." [416] Despite the FDCPA's requirement that debt collectors provide validation information, Congress provided the Bureau with rulemaking authority in 2010 apparently to address inadequacies around validation and verification, among other things.[417] In addition, debt collectors have sought clarification about how to provide additional information consistent with the statute. For these reasons, and as discussed in more detail below, the Bureau proposes § 1006.34 to require debt collectors to provide certain validation information to consumers and to specify when and how the information must be provided.

34(a)(1) Validation Information Required

FDCPA section 809(a) provides, in relevant part, that, within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall send the consumer a written notice containing certain information, unless that information is contained in the initial communication or the consumer has paid the debt.[418] Proposed § 1006.34(a)(1) would implement and interpret this general requirement.[419]

Proposed § 1006.34(a)(1)(i) addresses situations in which the debt collector provides the validation information in writing or electronically.[420] Proposed § 1006.34(a)(1)(i) would clarify that, in those situations, a debt collector may provide the validation information by sending the consumer a validation notice either in the initial communication or within five days of that communication.[421] In either case,

---

[412] 15 U.S.C. 1692h.
[413] 15 U.S.C. 1692i.

[414] 15 U.S.C. 1692j.
[415] See 15 U.S.C. 1692g(a).

[416] S. Rept. No. 382, supra note 70, at 4; see also Jacobson v. Healthcare Fin. Servs., Inc., 516 F.3d 85, 95 (2d Cir. 2008) (validation notices "make the rights and obligations of a potentially hapless debtor as pellucid as possible"); Wilson v. Quadramed Corp., 225 F.3d 350, 354 (3d Cir. 2000); Miller v. Payco-Gen. Am. Credits, Inc., 943 F.2d 482, 484 (4th Cir. 1991); Swanson v. S. Oregon Credit Serv., Inc., 869 F.2d 1222, 1225 (9th Cir. 1988).
[417] See S. Rept. No. 111–176, at 19 ("In addition to concerns about debt collection tactics, the Committee is concerned that consumers have little ability to dispute the validity of a debt that is being collected in error.").
[418] See 15 U.S.C. 1692g(a). FDCPA section 809(a) provides that a debt collector need not send the written notice if the consumer pays the debt before the time that the notice is required to be sent. Proposed § 1006.34(a)(2) would implement that exception.
[419] Proposed § 1006.34(c) describes the validation information that proposed § 1006.34(a)(1) would require debt collectors to provide.
[420] Proposed § 1006.34(b)(4) would define a validation notice as any written or electronic notice that provides the validation information described in § 1006.34(c).
[421] Proposed § 1006.34(b)(2) provides that, with limited exceptions, initial communication means
Continued

the debt collector would be required to provide the validation notice in a manner that satisfies the delivery requirements in § 1006.42(a).[422]

Proposed § 1006.34(a)(1)(ii) would clarify that a debt collector could provide the validation information orally in the initial communication.[423] The Bureau requests comment on whether clarification regarding content and formatting requirements is needed for a debt collector who provides the validation information orally.

Proposed comment 34(a)(1)–1 would clarify the provision of validation notices if the consumer is deceased. As described in the section-by-section analysis of proposed § 1006.2(e), the failure to provide a validation notice to a person who is authorized to act on behalf of the deceased consumer's estate, such as the executor, administrator, or personal representative, may cause difficulty or delay in resolving the estate's debts. Proposed comment 34(a)(1)–1 explains that, if the debt collector knows or should know that the consumer is deceased, and if the debt collector has not previously provided the deceased consumer the validation information, a person who is authorized to act on behalf of the deceased consumer's estate operates as the consumer for purposes of providing a validation notice under § 1006.34(a)(1).[424] As explained in the section-by-section analysis of proposed § 1006.2(e), the Bureau proposes to interpret the term consumer to include deceased consumers.

The Bureau's interpretation of FDCPA section 809 in proposed § 1006.34(a)(1) would require a debt collector to provide the validation information

when collecting debt from a deceased consumer if the debt collector has not previously provided the consumer the validation information. In such circumstances, under proposed comment 34(a)(1)–1, the debt collector must provide the validation information to an individual that the debt collector identifies by name who is authorized to act on behalf of the deceased consumer's estate. If a debt collector knows or should know that the consumer is deceased, it may be unclear whether the debt collector should continue to address the validation notice to the deceased consumer, or whether the debt collector instead should address the notice to the individual who is authorized to act on behalf of the deceased consumer's estate. In light of this uncertainty, the Bureau proposes to interpret sending the validation information to a deceased consumer (i.e., the deceased consumer's estate) to mean providing the validation information to an individual that the debt collector identifies by name who is authorized to act on behalf of the deceased consumer's estate. As explained below, this interpretation may be preferable to addressing the validation information using the name of the deceased consumer or using "the estate of" with the name of the deceased consumer.

Accordingly, just as a debt collector attempting to collect a debt from a living consumer generally would provide a validation notice to the consumer within five days after the initial communication with such consumer (where the validation information was not contained in the initial communication), the proposal generally would require a debt collector attempting to collect a debt from a deceased consumer's estate to provide the validation notice to the named person who is authorized to act on behalf of the deceased consumer's estate. The validation notice would have to be provided within five days after the initial communication with such person.

In its Policy Statement on Decedent Debt, the FTC expressed concern about debt collectors addressing substantive written communications to the decedent's estate, or to an unnamed executor or administrator.[425] In the FTC's experience, individuals who lack the authority to resolve the estate but who wish to be helpful are likely to open these communications, which makes such communications insufficiently targeted to a consumer

with whom the debt collector may generally discuss the debt. Therefore, according to the FTC, "communication[s] addressed to the decedent's estate, or an unnamed executor or administrator, [are] location communication[s] and must not refer to the decedent's debts." [426] The FTC also noted that letters addressed to deceased consumers raised similar concerns, although there may be circumstances where a debt collector neither knows nor has reason to know that the consumer has died. The Bureau agrees with these concerns. The requirement in proposed comment 34(a)(1)–1 to send any required validation notice to a named person who is authorized to act on behalf of the deceased consumer's estate would limit the practice of addressing validation notices to deceased consumers or unnamed executors, administrators, or personal representatives because a debt collector would be required to identify a person who is authorized to act on behalf of the deceased consumer's estate in order to properly direct any communication to that individual. The Bureau requests comment on the effects of any potential inconsistency between proposed comment 34(a)(1)–1 and the consumer protections that the FTC sought to achieve when it published its Policy Statement on Decedent Debt.

The Bureau proposes § 1006.34(a)(1) to implement and interpret FDCPA section 809(a) and pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors. The Bureau requests comment on proposed § 1006.34(a)(1) and its related commentary.

34(a)(2) Exception

FDCPA section 809(a) contains a limited exception that provides that, if required information is not contained in the initial communication, a debt collector need not send the consumer a written notice within five days of the debt collector's initial communication with the consumer in connection with the collection of the debt if the consumer has paid the debt prior to the time that the notice is required to be sent.[427] Pursuant to its authority to implement and interpret FDCPA section 809(a) and its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors, the Bureau proposes § 1006.34(a)(2) to implement this exception. Proposed § 1006.34(a)(2) provides that a debt collector who

---

[422] As discussed in the section-by-section analysis of proposed § 1006.42, the proposed rule would provide a general standard for the delivery of required disclosures, including the validation notice, in writing or electronically, and would clarify, among other things, how debt collectors may provide required notices to consumers by email or text message.

[423] While FDCPA section 809(a) does not prohibit a debt collector from providing validation information orally in the debt collector's initial communication, it may be impractical for debt collectors to do so given that proposed § 1006.34(c) would require a significant amount of validation information that debt collectors may not currently provide. In addition, debt collectors providing the validation information orally would not be able to use Model Form B–3 in appendix B to achieve a safe harbor for compliance with § 1006.34(a).

[424] This interpretation is supported by the proposed definition of consumer, which, as discussed in the section-by-section analysis of proposed § 1006.2(e), is defined to include "[a]ny natural person, whether living or deceased, who is obligated or allegedly obligated to pay any debt."

the first time that, in connection with the collection of a debt, a debt collector conveys information, directly or indirectly, to the consumer regarding the debt.

[425] FTC Policy Statement on Decedent Debt, supra note 192.

[426] Id. at 44920.

[427] See 15 U.S.C. 1692g(a).

otherwise would be required to send a validation notice pursuant to proposed § 1006.34(a)(1)(i)(B) is not required to do so if the consumer has paid the debt prior to the time that proposed § 1006.34(a)(1)(i)(B) would require the validation notice to be sent. Proposed § 1006.34(a)(2) generally restates the statute, except for minor changes for organization and clarity.

### 34(b) Definitions

To facilitate compliance with § 1006.34, proposed § 1006.34(b) would define several terms that appear throughout the section. Except as discussed otherwise below, the Bureau proposes these definitions to implement and interpret FDCPA section 809(a) and pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors.

### 34(b)(1) Clear and Conspicuous

To facilitate compliance with proposed § 1006.34(d)(1), which would require that the validation information described in § 1006.34(c) be clear and conspicuous, proposed § 1006.34(b)(1) would define the term clear and conspicuous. The Bureau proposes to define the term clear and conspicuous for purposes of Regulation F consistent with the standards used in other consumer financial services laws and their implementing regulations, including Regulation E, subpart B (Remittance Transfers).[428] Proposed § 1006.34(b)(1) thus provides that disclosures that are clear and conspicuous if they are readily understandable and, in the case of written and electronic disclosures, the location and type size are readily noticeable to consumers. Oral disclosures are clear and conspicuous if they are given at a volume and speed sufficient for a consumer to hear and comprehend them. The Bureau proposes to adopt this standard to help ensure that required disclosures, including disclosures containing validation information, are readily understandable and noticeable to consumers. Disclosures that are not clear and conspicuous will not be effective, defeating the purpose of the disclosures.

The Bureau requests comment on proposed § 1006.34(b)(1), including on whether basing the clear and conspicuous standard on existing regulations, such as Regulation E, presents any consumer protection or compliance issues, including for validation information delivered electronically or orally. The Bureau also requests comment on whether additional clarification about the meaning of clear and conspicuous would be useful in the context of the specific information that proposed § 1006.34(a)(1) would require.

### 34(b)(2) Initial Communication

As discussed above, FDCPA section 809(a) requires debt collectors to provide consumers with certain validation information either in the debt collector's initial communication with the consumer in connection with the collection of the debt, or within five days after that initial communication. FDCPA section 803(2) defines the term communication broadly to mean the conveying of information regarding a debt directly or indirectly to any person through any medium.[429] FDCPA section 809(d) and (e) identifies particular communications that are not initial communications with the consumer in connection with the debt for purposes of FDCPA section 809(a) and that therefore do not trigger the validation notice requirement.[430] Pursuant to FDCPA section 809(d), an initial communication excludes a communication in the form of a formal pleading in a civil action. Pursuant to FDCPA section 809(e), an initial communication also excludes the sending or delivery of any form or notice that does not relate to the collection of the debt and is expressly required by the Internal Revenue Code of 1986, title V of the Gramm-Leach-Bliley Act, or any provision of Federal or State law relating to notice of a data security breach or privacy, or any regulation prescribed under any such provision of law.

Proposed § 1006.34(b)(2) would implement FDCPA section 809(a), (d), and (e) by defining the term initial communication to mean the first time that, in connection with the collection of a debt, a debt collector conveys information, directly or indirectly, regarding the debt to the consumer, other than a communication in the form of a formal pleading in a civil action, or a communication in any form or notice that does not relate to the collection of the debt and is expressly required by any of the laws referenced in FDCPA section 809(e).

The Bureau requests comment on proposed § 1006.34(b)(2) and on whether additional clarification about the term communication would be helpful. The Bureau specifically requests comment on the scenario in which a debt collector's first attempt to communicate with a consumer is through an electronic communication method, such as an email or a text message, and the consumer provides no response. For example, as proposed, if a debt collector sends a consumer an email notifying the consumer that a debt has been placed with the debt collector but includes no other information, the debt collector would be required to send the consumer a validation notice within five days, even if the consumer did not reply to the debt collector's email. The Bureau requests comment about the risks, costs, and benefits to industry and consumers of treating these types of debt collection communications as initial communications that would trigger § 1006.34(a)(1).

### 34(b)(3) Itemization Date

FDCPA section 809(a)(1) requires debt collectors to disclose to consumers, either in the debt collector's initial communication in connection with the collection of the debt, or within five days after that communication, the amount of the debt.[431] In proposed § 1006.34(c)(2)(vii) through (ix), the Bureau would interpret the phrase "amount of the debt" to mean that debt collectors must disclose information about the amount of the debt as of a particular "itemization date."[432] To facilitate compliance with § 1006.34(c)(2)(vii) through (ix), proposed § 1006.34(b)(3) would define the term itemization date.

Account information available to debt collectors may vary by debt type because some account information is not universally tracked or used across product markets. For example, the Bureau understands that charge off is fundamental account information for credit card debt, but appears not to be applicable for some other debt types. To ensure that debt collectors working in a variety of product markets can comply with proposed § 1006.34(c)(2)(vii) through (ix), the Bureau proposes to define the term itemization date to mean any one of four reference dates for which a debt collector can ascertain the amount of the debt: (1) The last statement date, (2) the charge-off date, (3) the last payment date, or (4) the

---

[428] See 12 CFR 1005.31(a)(1), comment 31(a)(1)–1.

[429] See 15 U.S.C. 1692a(2). See also the section-by-section analysis of proposed § 1006.2(d).

[430] See 15 U.S.C. 1692g(d), (e).

[431] See 15 U.S.C. 1692g(a)(1).

[432] Proposed § 1006.34(c)(2)(vii) and (viii) would require debt collectors to disclose, respectively, the itemization date and the amount of the debt on the itemization date. Proposed § 1006.34(c)(2)(ix) would require debt collectors to disclose an itemization of the debt reflecting interest, fees, payments, and credits since the itemization date. For additional discussion of these provisions, see the section-by-section analysis of proposed § 1006.34(c)(2)(vii) through (ix).

transaction date.[433] As discussed further in the section-by-section analysis of proposed § 1006.34(b)(3)(i) through (iv), the proposed definition is designed to allow the use of dates that debt collectors could identify with relative ease because they reflect routine and recurring events and that correspond to notable events in the debt's history that consumers may recall or be able to verify with records. The proposed definition also is designed to include dates for which debt collectors typically may receive account information from debt owners and that, therefore, debt collectors should be able to use to provide the disclosures described in § 1006.34(c)(vii) through (ix).

Proposed comment 34(b)(3)–1 explains that a debt collector may select any of the potential reference dates listed in proposed § 1006.34(b)(3) as the itemization date to comply with § 1006.34. Once a debt collector uses one of the reference dates for a specific debt in a communication with an individual consumer, however, the debt collector would be required to use that reference date for that debt consistently when providing disclosures as proposed by § 1006.34 to that consumer. If a debt collector provides the consumer with validation information based on different reference dates for the same debt, the consumer may have difficulty recognizing the debt and be less likely to engage with the debt collector. Thus, a debt collector who used reference dates inconsistently for the same debt could undermine the purpose of proposed § 1006.34.

The Bureau's Small Business Review Panel Outline described a proposal under consideration that would have required a debt collector to provide an itemization of the debt based on a single reference date, the date of default.[434] Multiple small entity representatives expressed concern with that proposal, noting both that default has no established definition and that the default concept may be inapplicable to some debt types, such as medical debt.[435] Small entity representatives also noted that determining a date of default can involve State law interpretations that impose significant costs. Consistent with these concerns, the Small Business Review Panel Report recommended that the Bureau consider alternatives to the date of default and

suggested the charge-off date, last payment date, or date of service instead.[436] Based in part on this feedback, the Bureau believes that it may be difficult to identify a single reference date that applies to all debt types across all relevant markets and, as a result, proposes to define itemization date as one of the four potential reference dates.

The Bureau requests comment on proposed § 1006.34(b)(3) and on comment 34(b)(3)–1, including on whether the itemization date definition will facilitate compliance with the requirement to disclose the validation information in § 1006.34(c)(vii) through (ix), and on whether additional clarification regarding the itemization date definition is needed. The Bureau also requests comment on whether the proposed itemization date definition would not capture certain debt types, such as mortgage debt where coupon books are provided instead of periodic statements, and on whether additional or alternative reference dates should be considered. The Bureau also requests comment on whether creditors' data management systems capture information related to the reference dates that the proposed itemization date definition would incorporate. Further, the Bureau requests comment on whether the proposed definition should mandate a single reference date, which would standardize validation notices across all relevant markets, and if so, what reference date might be suitable for all types of debt. In addition, the Bureau requests comment on how the proposed definition should function with respect to a debt that multiple debt collectors have attempted to collect. For example, the Bureau requests comment on whether a subsequent debt collector should be permitted to use a different itemization date than a prior debt collector used for the same debt.

Finally, the Bureau requests comment on whether the proposed itemization date definition should be structured as a prescriptive ordering of potential reference dates, such as a hierarchy. For example, this alternative approach could require a debt collector to determine the itemization date by identifying the first date in a hierarchy of four reference dates set forth in proposed § 1006.34(b)(3)(i) through (iv) for which a debt collector could ascertain the amount of the debt using readily available information. With respect to this alternative approach, the Bureau requests comment on whether the use of any particular reference date, such as the last statement date, is more

likely than other reference dates, such as the charge-off date, to improve consumer understanding of the required disclosures. The Bureau also requests comment on whether, for purposes of a hierarchy, any particular reference date would be more likely than others to impose costs or burdens on debt collectors.

The Bureau proposes § 1006.34(b)(3), including the specific dates described in proposed § 1006.34(b)(3)(i) through (iv), pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors. The Bureau also proposes § 1006.34(b)(3) pursuant to its authority under section 1032(a) of the Dodd-Frank Act to prescribe rules to ensure that the features of consumer financial products and services are disclosed to consumers fully, accurately, and effectively.

### 34(b)(3)(i)

When placing a debt for collection, creditors frequently may provide debt collectors with the last periodic or written account statements provided to consumers. Therefore, in many cases, last statement information should be readily available to debt collectors. In addition, many consumers may recall the amount of the debt on the last statement because this figure may be the most recent amount of the debt the consumer has seen, or the consumer may be able to verify that amount with their records.

For these reasons, proposed § 1006.34(b)(3)(i) would permit debt collectors to use the last statement date as the itemization date. Pursuant to proposed § 1006.34(b)(3)(i), last statement date would mean the date of the last periodic statement or written account statement or invoice provided to the consumer. Proposed comment 34(b)(3)(i)–1 explains that a statement provided by a creditor or a third party acting on the creditor's behalf, including a creditor's service provider, may constitute the last statement provided to the consumer for purposes of § 1006.34(b)(3)(i). The Bureau requests comment on proposed § 1006.34(b)(3)(i) and on comment 34(b)(3)(i)–1, including on how often creditors provide periodic statements, written statements, and invoices to debt collectors, and on whether there are specific debt types for which creditors may not provide such statements. In addition, the Bureau requests comment on whether a validation notice that a previous debt collector provided to the consumer should constitute a last statement for purposes of proposed § 1006.34(b)(3)(i).

---

[433] The four reference dates are set forth in proposed § 1006.34(b)(3)(i) through (iv). See the section-by-section analysis of proposed § 1006.34(b)(3)(i) through (iv).

[434] *See* Small Business Review Panel Outline, *supra* note 56, at appendix F.

[435] *See* Small Business Review Panel Report, *supra* note 57, at 18.

[436] *Id.*

### 34(b)(3)(ii)

When placing credit card accounts for collection, creditors frequently may provide debt collectors with account information at charge off, including the charge-off date. For this reason, some small entity representatives suggested during the SBREFA process that, for credit card debt, the Bureau should define the itemization date to mean the charge-off date.[437] Charge off is relevant to debt types other than credit cards, as well, and consumers may approximately recognize the amount of a debt due at charge off because charge off often occurs shortly after a last account statement is provided.

For these reasons, proposed § 1006.34(b)(3)(ii) would permit debt collectors to use the charge-off date— *i.e.*, the date that the debt was charged off—as the itemization date. The Bureau requests comment on proposed § 1006.34(b)(3)(ii). The Bureau generally requests comment on how often creditors provide charge-off information to debt collectors and on whether there are specific debt types for which charge off is not a relevant concept. In addition, the Bureau requests comment on whether creditors assess fees or penalties at charge off, which would cause the amount the consumer owed at charge off to differ significantly from the amount that appeared on the last periodic statement, invoice, or other written statement that the consumer received.

### 34(b)(3)(iii)

In some cases, creditors may provide debt collectors with account information related to a consumer's last payment. For this reason, some small entity representatives suggested during the SBREFA process that the Bureau define the itemization date to mean the last payment date.[438] Consumers also may recognize the amount of a debt that reflects the balance after the consumer's last payment.[439] Proposed § 1006.34(b)(3)(iii) thus would permit debt collectors to use the last payment date—*i.e.*, the date the last payment was applied to the debt—as the itemization date. The Bureau requests comment on proposed § 1006.34(b)(3)(iii), including on how often creditors provide debt collectors with last payment date information. The Bureau also requests comment on how proposed § 1006.34(b)(3)(iii) should be applied if a third party made the last payment on the debt. For example, such a third-

party payment might include a partial payment on a consumer's medical debt by an insurance provider.

### 34(b)(3)(iv)

For some debt types, including for medical debt, creditors may provide debt collectors with account information related to the transaction date (*e.g.*, the date a service or good was provided to a consumer). Some small entity representatives thus suggested during the SBREFA process that the Bureau define the itemization date for medical debt to mean the date of service.[440] In addition, consumers may recognize the amount of a debt on the transaction date, which may be reflected in a copy of a contract or a bill provided by a creditor. For these reasons, proposed § 1006.34(b)(3)(iv) would permit debt collectors to use the transaction date—*i.e.*, the date of the transaction that gave rise to the debt—as the itemization date.

Proposed comment 34(b)(3)(iv)–1 explains that the transaction date is the date that a creditor provided, or made available, a good or service to a consumer and includes examples of transaction dates. The comment also explains that, if a debt has more than one potential transaction date, a debt collector may use any such date as the transaction date but must use whichever transaction date it selects consistently, as described in comment 34(b)(3)–1. The Bureau requests comment on proposed § 1006.34(b)(3)(iv) and on comment 34(b)(3)(iv)–1, including on how often creditors provide transaction date information to debt collectors and on whether the transaction date concept is inapplicable to certain debt types.

### 34(b)(4) Validation Notice

As already discussed, FDCPA section 809(a) provides, in relevant part, that, within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall send the consumer a written notice containing certain information, unless that information is contained in the initial communication or the consumer has paid the debt.[441] If debt collectors have provided the validation information in writing, whether in the initial communication or within five days after that communication, debt collectors and others commonly have referred to the document containing the information as a "validation notice," or "g notice." The Bureau understands that most debt

collectors do not currently send validation notices electronically. As discussed in the section-by-section analysis of proposed § 1006.42, the Bureau proposes to clarify how debt collectors may send validation notices electronically in compliance with applicable law.

To facilitate compliance with proposed § 1006.34, as well as to account for the possibility that more debt collectors may begin providing the validation information electronically, proposed § 1006.34(b)(4) would define validation notice to mean a written or electronic notice that provides the validation information described in proposed § 1006.34(c). The Bureau requests comment on proposed § 1006.34(b)(4).

### 34(b)(5) Validation Period

FDCPA section 809(b) contains certain requirements that a debt collector must satisfy if a consumer disputes a debt or requests the name and address of the original creditor. If a consumer disputes a debt in writing within 30 days of receiving the validation information, a debt collector must stop collection of the debt until the debt collector obtains verification of the debt or a copy of a judgment against the consumer and mails it to the consumer.[442] Similarly, if a consumer requests the name and address of the original creditor in writing within 30 days of receiving the validation information, FDCPA section 809(b) requires the debt collector to cease collection of the debt until it obtains and mails such information to the consumer.[443] FDCPA section 809(b) also prohibits a debt collector, during the 30-day period consumers have to dispute a debt or request information about the original creditor, from engaging in collection activities and communications that overshadow, or are inconsistent with, the disclosure of the consumer's rights to dispute the debt and request original-creditor information, which are sometimes referred to as "verification rights."[444]

As described in the section-by-section analysis of § 1006.34(c)(3)(i) through (iii), the proposed rule would require debt collectors to disclose to a consumer the date certain on which the consumer's FDCPA section 809(b) verification rights expire. Without additional clarification, debt collectors may be uncertain how to calculate this

[437] *Id.*

[438] *Id.*

[439] *See* FMG Focus Group Report, *supra* note 38, at 20–21.

[440] Small Business Review Panel Report, *supra* note 57, at 18.

[441] *See* 15 U.S.C. 1692g(a).

[442] 15 U.S.C. 1692g(b).

[443] *See id.* The Bureau refers to the consumer's rights to dispute the validity of the debt and to request original-creditor information collectively as the consumer's "verification rights."

[444] *Id.*

date certain. First, debt collectors may be unsure how to reliably determine when a consumer has received the validation information (*i.e.*, the event that triggers the running of the 30-day period). In addition, some debt collectors may honor disputes and original-creditor information requests that a consumer provides after the 30-day period to dispute a debt or request information about the original creditor set forth in the FDCPA expires and may benefit from clarification about how to specify a longer period.

To facilitate compliance with the proposed requirement to provide the date certain on which the consumer's verification rights expire, proposed § 1006.34(b)(5) would define the term validation period to mean the period starting on the date that a debt collector provides the validation information described in § 1006.34(c) and ending 30 days after the consumer receives or is assumed to receive the validation information. To clarify how to calculate the end of the validation period—including how debt collectors may disclose a period that provides consumers additional time to exercise their validation rights—proposed § 1006.34(b)(5) also would provide that a debt collector may assume that a consumer receives validation information on any day that is at least five days (excluding legal public holidays, Saturdays, and Sundays) after the debt collector provides it. Proposed § 1006.34(b)(5) is designed to provide a debt collector with a straightforward yet flexible way to determine the last date of the validation period referenced in § 1006.34(c)(3)(i) through (iii). The Bureau proposes § 1006.34(b)(5) on the basis that consumers will typically receive a validation notice no more than five days (excluding legal public holidays, Saturdays, and Sundays) after the debt collector provides it. Further, proposed § 1006.34 would not prohibit a debt collector from honoring a consumer's request to exercise verification rights after the date certain that appears in the validation notice pursuant to § 1006.34(c)(3)(i) through (iii).

Proposed comment 34(b)(5)–1 would clarify that, if a debt collector sends a subsequent validation notice to a consumer because the consumer did not receive the original validation notice, and the consumer has not otherwise received the validation information, the debt collector must calculate the end of the validation period based on the date the consumer receives or is assumed to receive the subsequent validation notice. In other words, proposed comment 34(b)(5)–1 would clarify that,

if a debt collector sends an initial validation notice that was not received and then sends a subsequent validation notice, the validation period ends 30 days after the consumer receives or is assumed to receive the subsequent validation notice.

The Bureau requests comment on proposed § 1006.34(b)(5) and on comment 34(b)(5)–1. In particular, the Bureau requests comment on debt collectors' current practices for determining the end of the validation period. The Bureau also requests comment on whether the length of the five-day timing presumption should be modified and on whether different timing presumptions should apply depending on whether a validation notice is delivered by mail or electronically, for example by email or text message. Finally, the Bureau requests comment on whether a different timing presumption should apply if validation information is provided orally.

### 34(c) Validation Information

Proposed § 1006.34(c) sets forth the validation information that debt collectors would be required to disclose under § 1006.34(a)(1). As described below, the validation information that proposed § 1006.34(c) would require consists of four general categories: Information to help consumers identify debts (including the information specifically referenced in FDCPA section 809(a)); information about consumers' protections in debt collection; information to facilitate consumers' ability to exercise their rights with respect to debt collection; and certain other statutorily required information.

### 34(c)(1) Debt Collector Communication Disclosure

FDCPA section 807(11) requires a debt collector to disclose in its initial written communication with a consumer—and if the initial communication is oral, in that oral communication as well—that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose. FDCPA section 807(11) also requires a debt collector to disclose in each subsequent communication that the communication is from a debt collector.[445] As discussed above, the Bureau proposes the § 1006.18(e) disclosure to implement FDCPA section 807(11). If a debt collector provides validation information, the debt collector engages

in a debt collection communication and must make an appropriate FDCPA section 807(11) disclosure.[446] The Bureau proposes § 1006.34(c)(1) to provide that the § 1006.18(e) disclosure is validation information that must be provided to the consumer pursuant to § 1006.34(a)(1). The Bureau requests comment on proposed § 1006.34(c)(1).

### 34(c)(2) Information About the Debt

While validation notices in use today typically contain the specific information required under FDCPA section 809(a), the Bureau understands that debt collectors often do not include any other information to help consumers identify debts.[447] As a result, validation notices in use today may lack sufficient information to enable some consumers to exercise their FDCPA section 809 rights. For example, the Bureau's qualitative consumer research indicates that certain information that appears to help consumers to recognize a debt—including a debt's original account number or an itemization of interest and fees—may not consistently appear on validation notices.[448] Complaints about insufficient information to verify debts consistently rank among the most frequent types of consumer debt collection complaints received by the Bureau.[449] Further, validation notices in use today may not be written in plain language that promotes consumer understanding. Thus, in some cases, consumers may not understand information about the debt that appears on the validation notice.

The Bureau's understanding is consistent with FTC findings, as well as with consumer advocate and industry feedback. According to the FTC, debt collectors do not provide sufficient information to allow consumers to determine whether they owe a debt in question or to exercise their FDCPA rights.[450] Observing that validation notices lack sufficient detail for consumers to recognize whether a debt belongs to them, the FTC has suggested that more information about the debt

---

[445] See the section-by-section analysis of proposed § 1006.18(e).

[446] See, e.g., Dorsey v. Morgan, 760 F. Supp. 509 (D. Md. 1991).

[447] See Small Business Review Panel Outline, supra note 56, at 15.

[448] See FMG Cognitive Report, supra note 40, at 8–11.

[449] In its 2019 FDCPA Annual Report, the Bureau noted that 72 percent of consumers who complain about written notifications about debt stated that they did not receive enough information to verify the debt. 2019 FDCPA Annual Report, supra note 11, at 17. Consumers have consistently complained to the Bureau about receiving insufficient information to verify debts. See 2018 FDCPA Annual Report, supra note 16, at 15–16; 2017 FDCPA Annual Report, supra note 21, at 16.

[450] FTC Modernization Report, supra note 176, at 21.

should appear in validation notices.[451] In response to the Bureau's ANPRM, consumer advocates stated that many validation notices contain insufficient information for consumers to evaluate whether they owe a debt. Industry commenters also identified additional information for validation notices that would help consumers recognize debts, such as the date of the consumer's last payment and itemization information.

The lack of information about the debt currently provided in validation notices—combined with limited disclosure of consumers' rights with respect to debt collection, which is discussed in the section-by-section analysis of proposed § 1006.34(c)(3)—may disadvantage both consumers and debt collectors. If a consumer receives a validation notice for an unfamiliar debt, the consumer may experience uncertainty, which may lead to the consumer disputing a debt that is owed. If a consumer disputes a debt the consumer owes but does not recognize, the debt collector must spend time and resources responding to a dispute that could have been avoided had the consumer initially received more complete information. Participants in the Bureau's consumer testing also reported that the inability to recognize a debt is a major concern because of the risk of potential fraud or identity theft.[452] In addition, a consumer may, in some instances, pay an unfamiliar debt that the consumer did not owe.[453]

In light of these concerns, proposed § 1006.34(c)(2) would describe the information about the debt and the parties related to the debt that debt collectors must provide to the consumer

[451] *Id.* at 29.

[452] FMG Focus Group Report, *supra* note 38, at 13.

[453] Academic research and agency experience offer insight into why some consumers may pay debts that they do not owe in response to debt collection efforts. In one study of how consumers would react to a validation notice concerning a debt that they did not owe, 3 percent of respondents stated that they would pay the debt rather than dispute it. The study's authors hypothesized that fear of negative credit reporting may explain this behavior. *See* Jeff Sovern et al., *Validation and Verification Vignettes: More Results from an Empirical Study of Consumer Understanding of Debt Collection Validation Notices,* Rutgers L. Rev. (forthcoming) (manuscript at 46–47), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3219171.* In a settlement agreement with a debt collector, the FTC alleged that many consumers paid purported debts that they did not owe because they believed that the debts were real, or because they wanted to stop harassing debt collection efforts. *See* Complaint at ¶ 22, *Fed. Trade Comm'n v. Lombardo Daniels & Moss,* LLC No. 3:17–CV–503–RJC (W.D.N.C. Aug. 21, 2017), *https://www.ftc.gov/system/files/documents/cases/lombardo_complaint_8-29-17.pdf.*

under § 1006.34(a)(1).[454] The section-by-section analysis of proposed § 1006.34(c)(2)(i) through (x) discusses the specific items of information, which would include existing statutory disclosures, designed to help consumers recognize debts. Except where noted—for example, in the case of merchant brand information for credit card debt under proposed § 1006.34(c)(2)(iii)—the information described in proposed § 1006.34(c) is not conditioned on availability. Thus, if a debt collector does not have a piece of information for a debt, the debt collector would be unable able to comply with proposed § 1006.34(a)(1) for that debt.

The Bureau requests comment on proposed § 1006.34(c)(2), including on whether any of the proposed items should be excluded or any additional items should be added. The Bureau also requests comments on whether proposed § 1006.34(c)(2)'s content requirements risk overwhelming consumers and decreasing their understanding, thereby making the proposed disclosures less effective.

Except with respect to § 1006.34(c)(2)(iv), the Bureau proposes § 1006.34(c)(2) pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors and, as described more fully below, its authority to implement and interpret FDCPA section 809. Except with respect to § 1006.34(c)(2)(vi) and (x), the Bureau also proposes § 1006.34(c)(2) pursuant to its authority under section 1032(a) of the Dodd-Frank Act, on the basis that the validation information describes the debt, which is a feature of debt collection. Requiring disclosure of validation information may help to ensure that the features of debt collection are fully, accurately, and effectively disclosed to consumers, such that consumers may better understand whether they owe particular debts and, consequently, the costs, benefits, and risks associated with paying or not paying those debts.

*34(c)(2)(i)*

FDCPA section 809(b) provides that a consumer may notify a debt collector in writing, within 30 days after receipt of the information required by FDCPA section 809(a), that the consumer is exercising certain verification rights, including the right to dispute the debt. FDCPA section 809(a)(3) through (5), in turn, requires debt collectors to disclose how consumers may exercise their

[454] Proposed § 1006.34(c)(5) would establish a special rule for information about the debt for certain residential mortgage debt.

verification rights. To notify a debt collector in writing that the consumer is exercising the consumer's verification rights, the consumer must have the debt collector's name and address.[455] For this reason, and pursuant to its authority to interpret FDCPA section 809(a)(3) through (5) and (b), as well as its authority under Dodd-Frank Act section 1032(a), the Bureau proposes § 1006.34(c)(2)(i) to provide that the debt collector's name and mailing address is validation information that must be provided to the consumer under § 1006.34(a)(1). The Bureau requests comment on proposed § 1006.34(c)(2)(i) and on whether additional clarification would be useful.

*34(c)(2)(ii)*

FDCPA section 809(a) requires debt collectors to disclose information about the debt itself that helps consumers identify the debt and facilitate resolution of the debt. Like the information specifically referenced in FDCPA section 809(a), the consumer's name and address is essential information about the debt that may help a consumer determine whether the consumer owes a debt and is the intended recipient of a validation notice. For this reason, and pursuant to its authority to interpret FDCPA section 809(a), as well as its authority under Dodd-Frank Act section 1032(a), the Bureau proposes § 1006.34(c)(2)(ii) to provide that the consumer's name and mailing address is validation information that must be provided to the consumer under § 1006.34(a)(1).[456]

To avoid confusing or misleading consumers, the consumer's name and mailing address used by the debt collector in a validation notice would be the most complete information that the debt collector obtained from the creditor or another source. For example, a consumer advocate has noted that including the consumer's complete name in the validation notice would help senior consumers who may be contacted about a debt owed by a spouse or an adult child. Because a consumer may share the same last name as a spouse or an adult child, the consumer may need complete name information—for example, a name suffix such as "Junior" or "Senior"—to determine whether the consumer is the

[455] Participants in the Bureau's consumer testing reported that contact information for debt collectors, including the debt collector's mailing address, is important. FMG Focus Group Report, *supra* note 38, at 15–16.

[456] As discussed in part VI, debt collectors may already include the consumer's complete name information available on validation notices, so proposed § 1006.34(c)(2)(ii) may not pose significant operational challenges.

validation notice's intended recipient, or whether the consumer received the validation notice in error. Proposed comment 34(c)(2)(ii)–1 therefore would clarify that the consumer's name should reflect what the debt collector reasonably determines is the most complete version of the name information about which the debt collector has knowledge, whether obtained from the creditor or another source. Proposed comment 34(c)(2)(ii)–1 further explains that a debt collector would not be able to omit name information in a manner that would create a false, misleading, or confusing impression about the consumer's identity.

The Bureau requests comment on proposed § 1006.34(c)(2)(ii) and on comment 34(c)(2)(ii)–1, including on whether additional clarification would be useful. The Bureau specifically requests comment on how debt collectors currently determine the complete version of a consumer's name if creditors or third parties, such as a skip tracing vendors, provide conflicting name information. The Bureau also requests comment on what a debt collector should be required to do to reasonably determine the consumer's complete name information.

34(c)(2)(iii)

The purpose of FDCPA section 809 is to "eliminate the recurring problem of debt collectors dunning the wrong person or attempting to collect debts which the consumer has already paid." [457] Consistent with this purpose, FDCPA section 809(a) requires debt collectors to disclose to consumers certain information, including the name of the creditor, to help consumers identify debts and determine whether they owe them. For credit card debts, the merchant brand appears to be an integral part of the name of the creditor that helps consumers identify debts and determine whether they owe them. Merchant brands appear to be salient information for debts arising from use of co-branded or private-label credit cards because consumers may associate such debts more closely with merchant brands than with credit card issuers. [458] For example, the Bureau's consumer focus group findings indicate consumers

use merchant brands to recognize credit card debts. [459]

For this reason, and pursuant to its authority to interpret FDCPA section 809(a), as well as its authority under Dodd-Frank Act section 1032(a), the Bureau proposes § 1006.34(c)(2)(iii) to provide that the merchant brand, if any, associated with a credit card debt, to the extent available to the debt collector, is validation information that must be provided to the consumer under § 1006.34(a)(1). Proposed comment 34(c)(2)(iii)–1 provides an example of merchant brand information that the Bureau believes would be available to a debt collector and must be included on a validation notice. The Bureau requests comment on proposed § 1006.34(c)(2)(iii) and on comment 34(c)(2)(iii)–1. In particular, the Bureau requests comment on whether merchant brand or similar information should be required for debts other than credit card debts.

34(c)(2)(iv)

FDCPA section 809(a)(2), which requires debt collectors to disclose to consumers the name of the creditor to whom the debt is owed, typically is understood to refer to the current creditor. [460] When the original creditor (or the creditor as of the itemization date) and the current creditor are the same, a consumer is more likely to recognize the creditor's name. If they are different, however, a consumer may be less likely to recognize the current creditor. For example, after the itemization date, a creditor may have sold a debt to a debt buyer, or may have changed its corporate identity following a merger or acquisition, and the consumer may not have had any contact with the new entity before collections began. In these cases, the consumer may be more likely to recognize the name of the creditor as of the itemization date than the name of the current creditor. This is because (as discussed in the section-by-section analysis of proposed § 1006.34(b)(3)) the itemization date is intended to reflect a notable event in a debt's history that the consumer may recall, or for which the consumer may have records. A consumer may be more likely to recognize the creditor as of that date than the current creditor, with whom the consumer may have no prior relationship.

For these reasons, and pursuant to its authority under Dodd-Frank Act section 1032(a), the Bureau proposes § 1006.34(c)(2)(iv) to provide that, if a debt collector is collecting a consumer financial product or service debt, as that term is defined in § 1006.2(f), the name of the creditor to whom the debt was owed on the itemization date is validation information that the debt collector must provide to the consumer under § 1006.34(a)(1). The Bureau requests comment on proposed § 1006.34(c)(2)(iv).

34(c)(2)(v)

The purpose of FDCPA section 809 is to "eliminate the recurring problem of debt collectors dunning the wrong person or attempting to collect debts which the consumer has already paid." [461] The Bureau believes that the problem of debt collectors attempting to collect debts from consumers who do not owe the debts continues today. For example, "attempts to collect debt not owed" is consistently the most common type of debt collection complaint consumers provide to the Bureau. [462]

Consistent with the FDCPA's purpose, FDCPA section 809(a) requires debt collectors to disclose to consumers certain information, such as the amount of the debt itself, to help consumers identify debts. An account number associated with a debt on the itemization date may be integral information that a consumer uses to identify the debt itself. For example, the Bureau's consumer testing suggests that a validation notice that includes an account number appears to ease concerns that a debt is fraudulent because the consumer may recognize the number or be able to verify the debt with their records. [463] In addition, in response to the Bureau's ANPRM, State attorneys general, consumer advocates, and industry stakeholders all provided feedback that the account number associated with a debt may help a consumer recognize the debt. For these reasons, and pursuant to its authority to interpret FDCPA section 809(a), as well as its authority under Dodd-Frank Act section 1032(a), the Bureau proposes § 1006.34(c)(2)(v) to provide that the account number, if any, associated with the debt on the itemization date, or a

---

[457] S. Rept. No. 382, *supra* note 70, at 4.

[458] The Bureau believes that merchant brand information is unique to credit card debt. Other types of debt do not typically involve an entity like a merchant, whom the consumer may associate with the debt but who did not provide the credit, product, or service that gave rise to the debt.

[459] FMG Focus Group Report, *supra* note 38, at 13–14; FMG Usability Report, *supra* note 41, at 43–44.

[460] See the section-by-section analysis of proposed § 1006.34(c)(2)(vi) regarding FDCPA section 809(a)(2)'s requirement to disclose the name of the creditor to whom the debt is owed.

[461] S. Rept. No. 382, *supra* note 70, at 4.

[462] See 2019 FDCPA Annual Report, *supra* note 11, at 16 (40 percent of consumer complaints about debt collection involve attempts to collect debt not owed); 2018 FDCPA Annual Report, *supra* note 16, at 15 (39 percent of consumer complaints about debt collection involve attempts to collect debt not owed).

[463] FMG Focus Group Report, *supra* note 38, at 19.

truncated version of that number, is validation information that the debt collector must provide to the consumer under § 1006.34(a)(1).

Debt collectors may wish to truncate account numbers to prevent disclosure of consumer account information, or to comply with applicable privacy rules, such as the FTC Safeguards Rule.[464] Proposed comment 34(c)(2)(v)–1 explains that debt collectors may do so provided that the account number remains recognizable. For example, in lieu of disclosing a complete account number, debt collectors may disclose only the last four digits of the number. The Bureau requests comment on proposed § 1006.34(c)(2)(v) and on comment 34(c)(2)(v)–1, including on whether the Bureau should mandate truncation of account numbers rather than making truncation optional. Further, the Bureau requests comment on whether additional clarification about truncation would be helpful. For example, such clarification might explain when a truncated account number is recognizable, or how debt collectors may indicate that digits have been omitted from a truncated account number.

34(c)(2)(vi)

FDCPA section 809(a)(2) requires debt collectors to disclose to consumers the name of the creditor to whom the debt is owed. By using the present tense "is owed," the statute appears to refer to the creditor to whom the debt is owed when the debt collector makes the disclosure. For this reason, and pursuant to its authority to implement and interpret FDCPA section 809(a)(2), the Bureau proposes § 1006.34(c)(2)(vi) to provide that the name of the current creditor is validation information that the debt collector must provide to the consumer under § 1006.34(a)(1).

34(c)(2)(vii)

FDCPA section 809(a)(1) requires debt collectors to disclose to consumers the amount of the debt. In § 1006.34(c)(2)(viii), the Bureau proposes to interpret FDCPA section 809(a)(1), and to use its authority under Dodd-Frank Act section 1032(a), to provide that the amount of the debt on the itemization date is validation information that the debt collector must disclose under § 1006.34(a)(1).[465] Consistent with proposed § 1006.34(c)(2)(viii)—and for the same reasons and pursuant to the same authority discussed in the section-by-

section analysis thereof—the Bureau proposes § 1006.34(c)(2)(vii) to provide that the itemization date, as defined in § 1006.34(b)(3), also is validation information that must be provided to the consumer under § 1006.34(a)(1).[466] The itemization date would indicate the beginning of the time period that the itemization of the debt in proposed § 1006.34(c)(2)(ix) is intended to capture. The Bureau requests comment on proposed § 1006.34(c)(2)(vii).

34(c)(2)(viii)

FDCPA section 809(a)(1) requires debt collectors to disclose to consumers the amount of the debt. The phrase "the amount of the debt" is ambiguous; it does not specify which debt amount is being referred to, even though the debt amount may change over time. For example, because of accrued interest or fees, the current amount of the debt (*i.e.*, the amount on the date that the validation information is provided) may be more than the amount of the debt at origination. Because of applied payments or credits, the current amount of the debt also may be less than the amount of the debt the consumer originally incurred. If the amount of the debt has changed over time, consumers may not recognize the debt or the current amount of the debt. By contrast, consumers may recognize the amount of the debt as of the itemization date. As discussed in the section-by-section analysis of proposed § 1006.34(b)(3), the itemization date reflects a notable event in a debt's history that a consumer may recall or be able to verify with records, particularly if that amount is itemized as described in § 1006.34(c)(ix).

Because the amount of the debt on the itemization date may help a consumer recognize a debt and determine whether the amount of a debt is accurate, the Bureau proposes to interpret FDCPA section 809(a)(1), and to use its authority under Dodd-Frank Act section 1032(a), to provide in § 1006.34(c)(2)(viii) that the amount of the debt on the itemization date is validation information that the debt collector must provide to the consumer under § 1006.34(a)(1).[467] Proposed comment 34(c)(2)(viii)–1 explains that

this amount includes any fees, interest, or other charges owed as of the itemization date. The Bureau requests comment on proposed § 1006.34(c)(2)(viii) and on comment 34(c)(2)(viii)–1.

34(c)(2)(ix)

FDCPA section 809(a)(1) requires a debt collector to disclose to consumers the amount of the debt. This disclosure is intended to help consumers recognize debts that they owe and raise concerns about debts that are unfamiliar or inaccurate. For the reasons discussed in the section-by-section analysis of proposed § 1006.34(c)(2)(viii) and (x), the Bureau proposes to implement and interpret FDCPA section 809(a)(1) to provide that debt collectors must disclose to consumers both the amount of the debt on the itemization date and the current amount of the debt (*i.e.*, the amount of the debt on the date that the validation information is provided).

In conjunction with the amount of the debt on the itemization date and the current amount of the debt, an itemization of how the amount of the debt changed between those dates may be an integral part of the amount of the debt. Specifically, consumers may be better positioned to recognize whether they owe a debt and to evaluate whether the current amount alleged due is accurate if they understand how the amount changed over time due, for example, to interest, fees, payments, and credits that have been assessed or applied to the debt.

The Bureau's qualitative consumer testing indicates that an itemization appears to improve consumer understanding about and recognition of the debt.[468] In particular, some testing participants emphasized that an itemization in a tabular format helped them understand specific fees and charges.[469] The FTC has also suggested that the validation notice should contain an itemization that includes principal, interest, and fees.[470] Some State debt collection laws also require that the validation notice include an itemization.[471]

Courts have also observed that an itemization may enhance consumer understanding. Some courts have opined that an itemized accounting helps a consumer assess the validity of

---

[464] *See* 16 CFR part 314.
[465] See the section-by-section analysis of proposed § 1006.34(c)(2)(viii).

[466] As discussed in the section-by-section analysis of proposed § 1006.34(b)(3) and (c)(2)(viii) and (ix), the itemization date is the reference date for, among other things, the itemization of the debt, which the Bureau believes may help a consumer identify an alleged debt. For additional discussion of these provisions, see the section-by-section analysis of proposed § 1006.34(c)(2)(iv) and (v).
[467] Proposed § 1006.34(c)(2)(x) separately provides that the current amount of the debt also is validation information that must be disclosed under § 1006.34(a)(1). See the section-by-section analysis of proposed § 1006.34(c)(2)(x).

[468] FMG Usability Report, *supra* note 41, at 16–19.
[469] FMG Cognitive Report, *supra* note 40, at 10.
[470] FTC Modernization Report, *supra* note 176, at v.
[471] *See* Cal. Civ. Code sec. 1788.52(a)(2); NYCRR § 1.2(b)(2).

an alleged debt.[472] Further, *some courts* have held that a debt collector's failure to properly disclose interest and fees—or to disclose that a debt may increase in the future due to interest and fees—may violate the FDCPA.[473]

An itemization also may discourage debt collectors from engaging in unfair, deceptive, or abusive practices by ensuring that consumers have, as a matter of course, sufficient information to evaluate claims of indebtedness presented in validation notices. For example, requiring a debt collector to disclose an itemization of the debt may help a consumer identify erroneous or fabricated fees that a creditor or debt collector may have added that inflated the amount of an alleged debt. An itemization requirement also may help debt collectors disclose interest and fees in a manner that provides essential information to consumers and reduces debt collectors' legal risk when providing validation notices.

For these reasons, and pursuant to its authority to interpret FDCPA section 809(a)(1), as well as its authority under Dodd-Frank Act section 1032(a), the Bureau proposes § 1006.34(c)(2)(ix) to provide that an itemization of the current amount of the debt, in a tabular format reflecting interest, fees, *payments, and credits since the* itemization date, is validation information that must be provided to the consumer under § 1006.34(a)(1). Proposed comment 34(c)(2)(ix)–1 would clarify how debt collectors can disclose that no interest, fees, payments, or credits were assessed or applied to a debt.

The Bureau requests comment on proposed § 1006.34(c)(2)(ix) and on comment 34(c)(2)(ix)–1. In particular, the Bureau requests comment on whether the itemization should be more detailed—for example, by reflecting each fee charged and each payment received—or whether certain itemization categories, such as credits and payments, should be combined. The Bureau also requests comment on

whether the itemization proposal is practicable across all categories of debt or conflicts with disclosure requirements established by other applicable law, such as State case law, statutory law, and regulatory law, as well as disclosures required by judicial opinions or orders.

### 34(c)(2)(x)

FDCPA section 809(a)(1) requires debt collectors to disclose to consumers the amount of the debt. As noted, however, the phrase "the amount of the debt" is ambiguous; it does not specify which debt amount is being referred to, even though the debt amount may change over time. One reasonable interpretation of FDCPA section 809(a)(1) is that "amount of the debt" refers to the current amount of the debt, which is the amount of the debt on the date that the validation information is provided. For this reason, and pursuant to its authority to implement and interpret FDCPA section 809(a)(1), proposed § 1006.34(c)(2)(x) provides that the current amount of the debt is validation information that the debt collector must provide to the consumer under § 1006.34(a)(1).

Proposed comment 34(c)(2)(x)–1 explains that, for residential mortgage *debt subject to § 1006.34(c)(5)*, a debt collector may comply with § 1006.34(c)(2)(x) by including in the validation notice the total balance of the outstanding mortgage, including principal, interest, fees, and other charges. The Bureau proposes this to accommodate debt collectors collecting mortgage debt, who sometimes disclose to consumers the total balance of the outstanding mortgage, rather than the current amount due on a given date when providing the amount of the debt *pursuant to FDCPA section 809(a)(1)*.[474] The Bureau requests comment on proposed § 1006.34(c)(2)(x) and on comment 34(c)(2)(x)–1.

### 34(c)(3) Information About Consumer Protections

The disclosures in FDCPA section 809(a) help consumers determine if a particular debt is theirs and facilitate action in response to a collection

attempt. The Bureau understands, however, that debt collectors typically may disclose only the information that FDCPA section 809(a) specifically references and may provide the FDCPA section 809 information using statutory language, rather than plain language that consumers can more easily comprehend.

Consumer advocates, State agencies, and State attorneys general provided ANPRM feedback that validation notices do not contain enough information about a consumer's rights with respect to debt collection.[475] The FTC similarly has asserted that debt collectors generally do not provide enough information about the actions consumers may take under the FDCPA, which makes it difficult for some *consumers to exercise those rights.*[476] The Bureau's consumer focus group findings also indicate that consumers often are unfamiliar with or have erroneous beliefs about their FDCPA rights.[477] Many testing participants responded favorably to sample validation notices that disclosed additional rights and protections.[478] Consumer testing also suggests that consumers generally prefer disclosures written in plain language, as opposed to statutory language.[479]

To address these concerns, proposed § 1006.34(c)(3) would deem certain information about a consumer's rights with respect to debt collection to be validation information that must be provided to the consumer under § 1006.34(a)(1). This information, which is discussed in the *section-by-section* analysis of proposed § 1006.34(c)(3)(i) through (vi), would include disclosures specifically referenced in FDCPA

---

[472] See, e.g., *Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, 758 F. 3d 777, 785 (6th Cir. 2015).

[473] See *Avila v. Riexinger & Associates, LLC*, 817 F.3d 72, 76 (2d Cir. 2016) (holding that 15 U.S.C. 1692e requires debt collectors to disclose when the amount of a debt may increase due to interest and fees); *Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, and Clark, LLC*, 214 F.3d 872, 875–76 (7th Cir. 2000) (finding that a validation notice's omission of accrued interest and fees violated 15 U.S.C. 1692g(a)(1)'s requirement to disclose the amount of the debt); *Wood v. Allied Interstate, LLC* (17 C 4921), 2018 WL 2967061, at *2–3 (N.D. Ill. June 13, 2018) (holding that an itemization that listed "$0.00" due in interest and fees, when interest and fees were not allowed, could violate 15 U.S.C. 1692e and 1692f).

[474] Under Regulation Z, 12 CFR 1026.41(d)(3), certain mortgage servicers are required to provide a past-payment breakdown that may be functionally equivalent to, and as useful for the consumer, as the disclosures that would be required by proposed § 1006.34(c)(2)(vii) through (ix). As discussed in the section-by-section analysis of proposed § 1006.34(c)(5), the Bureau proposes a special rule that would allow servicers of certain residential mortgage debt to satisfy the requirements of proposed § 1006.34(c)(2)(vii) through (ix) by providing disclosures required by Regulation Z, 12 CFR 1026.41(d)(3).

[475] Consumer complaints received by the Bureau tend to corroborate this feedback. In its 2019 FDCPA Annual Report, the Bureau noted that 25 percent of consumers who complained about written notifications about debt stated that they did not receive a notice of their right to dispute. See 2019 FDCPA Annual Report, *supra* note 11, at 17.

[476] FTC Modernization Report, *supra* note 176, at v. The notion that some consumers may have difficulty exercising FDCPA verification rights is supported by one academic study that found a substantial proportion of survey respondents did not understand they would need to dispute a debt in writing to trigger certain FDCPA protections. According to the study, 75 percent of consumers who were shown a court-approved validation notice believed that they could orally exercise their verification rights, even though the notice expressly stated that disputes must be in writing. See Jeff Sovern & Kate E. Walton, "Are Validation Notices Valid? An Empirical Evaluation of Consumer Understanding of Debt Collection Validation Notices," 70 SMU L. Rev. 63, at 94–98 (2017).

[477] FMG Focus Group Report, *supra* note 38, at 6–8.

[478] FMG Cognitive Report, *supra* note 40, at 27–33.

[479] *Id.* at 26–27; FMG Summary Report, *supra* note 42, at 25–26.

section 809(a)(4) and (5), as well as additional disclosures intended to help consumers understand their debt collection rights.[480] The Bureau requests comment on proposed § 1006.34(c)(3) generally, including on whether any of the proposed items should be excluded or any additional items should be added.

The Bureau proposes § 1006.34(c)(3)(i) through (iii) and (v) pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors and, as described more fully below, its authority to implement and interpret FDCPA section 809. The Bureau also proposes § 1006.34(c)(3) pursuant to its authority under section 1032(a) of the Dodd-Frank Act, on the basis that a consumer's rights are a feature of debt collection. Requiring disclosure of information about these rights may help to ensure that the features of debt collection are fully, accurately, and effectively disclosed to consumers, such that consumers may better understand the costs, benefits, and risks associated with debt collection.

### 34(c)(3)(i)

FDCPA section 809(a)(4) requires debt collectors to disclose to consumers their right under FDCPA section 809(b) to dispute the validity of the debt within 30 days after receipt of the validation information (*i.e.*, during the validation period). As discussed in the section-by-section analysis of proposed § 1006.38, if a consumer disputes a debt in accordance with FDCPA section 809(b), a debt collector must cease collecting the debt until the debt collector provides verification to the consumer; this is sometimes referred to as the collections pause. FDCPA section 809(a)(4) does not expressly indicate that a debt collector must disclose to consumers that a dispute triggers FDCPA section 809(b)'s collections pause, or whether a debt collector must disclose the end date of the validation period.

FDCPA section 809(b)'s collections pause is an integral feature of the dispute right disclosure required by FDCPA section 809(a)(4). Unless debt collectors disclose the collections pause, consumers may not fully appreciate their FDCPA dispute right. Participants in the Bureau's consumer testing reported that knowing about the collections pause was important and would encourage them to exercise their dispute right if they question a debt's

validity.[481] This is consistent with the FTC's observation that consumers are generally unaware of the collections pause, even though it may benefit them.[482]

The validation period end date similarly is an integral feature of a consumer's dispute right. Unless debt collectors disclose the end date of the validation period, consumers may be uncertain about the time period during which they are entitled to dispute the debt under FDCPA section 809(b).

For these reasons, and pursuant to its authority to interpret FDCPA section 809(a)(4) and (b), as well as its authority under Dodd-Frank Act section 1032(a), the Bureau proposes § 1006.34(c)(3)(i) to provide that validation information includes a statement that specifies the end date of the validation period and states that, if the consumer notifies the debt collector in writing before the end of the validation period that the debt, or any portion of the debt, is disputed, the debt collector must cease collection of the debt until the debt collector sends the consumer either the verification of the debt or a copy of a judgment. The Bureau requests comment on proposed § 1006.34(c)(3)(i).

### 34(c)(3)(ii)

FDCPA section 809(a)(5) requires debt collectors to disclose to consumers their right under FDCPA section 809(b) to request, within 30 days after receipt of the validation information, the name and address of the original creditor, if different than the current creditor. FDCPA section 809(a)(5) does not expressly indicate that a debt collector must disclose to consumers that an original-creditor information request invokes FDCPA section 809(b)'s collections pause, or whether a debt collector must disclose the end date of the validation period.

FDCPA section 809(b)'s collections pause is an integral feature of the consumer's right to request original-creditor information under FDCPA section 809(a)(5). Unless debt collectors disclose the collections pause, consumers may not fully appreciate their right to request original-creditor information under FDCPA section 809(b).

The validation period end date similarly is an integral feature of a consumer's right to request original-creditor information. Unless debt collectors disclose the validation period end date, consumers may be uncertain

about the time period during which they are entitled to request original-creditor information under FDCPA section 809(b).

For these reasons, and pursuant to its authority to interpret FDCPA section 809(a)(5) and (b), as well as its authority under Dodd-Frank Act section 1032(a), the Bureau proposes § 1006.34(c)(3)(ii) to provide that validation information includes a statement that specifies the end date of the validation period and states that, if the consumer requests in writing before the end of the validation period the name and address of the *original creditor*, the debt collector must cease collection of the debt until the debt collector sends the consumer the name and address of the original creditor, if different from the current creditor. The Bureau requests comment on proposed § 1006.34(c)(3)(ii). In particular, the Bureau notes that the proposed § 1006.34(c)(3)(ii) disclosure language that appears on proposed Model Form B–3 omits the statutory phrase, "if different from the current creditor." The Bureau intentionally omitted this phrase to achieve a plain language disclosure that enhances consumer understanding. The Bureau requests comment on whether omitting this phrase on proposed Model Form B–3 would enhance consumer understanding by simplifying the statutory language, or whether it might lead consumers incorrectly to conclude that a debt collector always would need to cease collection upon request for original-creditor information, even if the original creditor and the current creditor were the same.

### 34(c)(3)(iii)

FDCPA section 809(a)(3) requires a debt collector to disclose to a consumer that, unless the consumer disputes the validity of the debt within 30 days of receipt of the validation information, the debt collector will assume the debt to be valid. The Bureau is aware that courts in various jurisdictions have reached different conclusions about whether FDCPA section 809(a)(3) requires debt collectors to recognize oral disputes, received within 30 days of a consumer's receipt of the validation information, about the validity of the debt.[483] These differing decisions

---

[480] *See* 15 U.S.C. 1692g(a)(4) and (5).

[481] FMG Cognitive Report, *supra* note 40, at 30; *see also* FMG Summary Report, *supra* note 42, at 25.

[482] FTC Modernization Report, *supra* note 176, at 26–27.

[483] *Compare Clark* v. *Absolute Collection Serv., Inc.*, 741 F.3d 487, 490 (4th Cir. 2014) (holding that oral disputes trigger certain FDCPA protections, including under FDCPA section 809(a)(3)), *Hooks* v. *Forman, Holt, Eliades & Ravin, LLC*, 717 F.3d 282, 286 (2d Cir. 2013) (same), *and Camacho* v. *Bridgeport Fin. Inc.*, 430 F.3d 1078, 1082 (9th Cir. 2005) (same), *with Graziano* v. *Harrison*, 950 F.2d 107, 112 (3d Cir. 1991) ("[A] dispute, to be effective, must be in writing"), *and Durnell* v. *Stoneleigh*
Continued

principally arise from the fact that, whereas FDCPA section 809(a)(4) and (5) explicitly require a consumer to submit a written dispute to invoke the FDCPA's verification rights, FDCPA section 809(a)(3) specifies no writing requirement. In the absence of an express writing requirement in FDCPA section 809(a)(3), the majority of circuit courts that have considered this issue have determined that a consumer's oral dispute triggers certain FDCPA protections, including, for example, FDCPA section 810's payment application requirement.[484] These decisions have created uncertainty for debt collectors in some jurisdictions when seeking to comply with FDCPA section 809(a)'s disclosure requirements.[485]

Consistent with the position articulated by the majority of circuit courts, and pursuant to its authority to implement and interpret FDCPA section 809(a)(3) as well as its authority under Dodd-Frank Act section 1032(a), the Bureau proposes to interpret FDCPA 809(a)(3) to allow oral disputes. The Bureau believes that this may be the most persuasive interpretation of Congressional intent, given the lack of the words "in writing" in FDCPA 809(a)(3), as compared to the presence of those words throughout FDCPA 809(a)'s other provisions. Accordingly, the Bureau proposes § 1006.34(c)(3)(iii) to provide that validation information includes a statement that specifies the end date of the validation period and states that, unless the consumer contacts the debt collector to dispute the validity of the debt, or any portion of the debt, before the end of the validation period, the debt collector will assume that the debt is valid. Model Form B–3 would inform consumers that they have the option to "call" or "write" a debt collector to dispute the validity of a debt

during the validation period. While Model Form B–3 would alert consumers to an oral dispute option, the form would clarify that only a written dispute would invoke verification rights pursuant to FDCPA sections 809(a)(4) and (5).[486] As discussed in the section-by-section analysis of proposed § 1006.34(d)(2), the use of Model Form B–3 would provide debt collectors with a safe harbor for compliance with FDCPA section 809(a)'s disclosure requirements.[487] The Bureau requests comment on whether debt collectors require additional clarification about how to comply with FDCPA section 809(a)(3).

34(c)(3)(iv)

As discussed in the section-by-section analysis of proposed § 1006.34(c)(3), consumers may not receive sufficient information about their rights and protections in debt collection. While validation information helps consumers determine if a particular debt is theirs and facilitates action in response to a collection attempt, consumers could benefit if validation information included additional information about consumer protections in debt collection. The Bureau makes such information available on its website and intends to develop additional resources to enhance consumer understanding of these protections and the debt collection process in general. The Bureau is developing a reference document that would describe certain legal protections relevant to debt collection. This reference document was initially conceived as a mandatory disclosure that debt collectors would be required to provide to consumers along with the validation notice. Although the Bureau does not propose to require debt collectors to provide the reference document to consumers, if the Bureau finalizes proposed § 1006.34(c)(3)(iv), the Bureau would publish a version of the document as a consumer resource on the Bureau's website before the final rule's effective date.[488]

To enhance consumer understanding of protections available during the debt collection process, and pursuant to its authority under Dodd-Frank Act section 1032(a), the Bureau proposes § 1006.34(c)(3)(iv) to provide that, if a debt collector is collecting a consumer financial product or service debt, as

defined in § 1006.2(f), then validation information includes a statement that informs the consumer that additional information regarding consumer rights in debt collection is available on the Bureau's website at *https://www.consumerfinance.gov*.[489] The Bureau proposes this requirement on the basis that this information informs consumers how to exercise their FDCPA rights and protections and therefore is a feature of debt collection. The Bureau *requests comment on proposed § 1006.34(c)(3)(iv).*

34(c)(3)(v)

*As discussed below, proposed § 1006.34(c)(4)* would provide that validation information includes information that a consumer can use to take certain actions, which generally include disputing a debt or requesting original-creditor information.[490] As discussed in the section-by-section analysis of proposed § 1006.34(c)(3)(i) and (ii), FDCPA section 809(b) provides that consumers must notify a debt collector "in writing" to dispute a debt or request original-creditor information. As discussed in the section-by-section analysis of proposed § 1006.38, the Bureau would interpret FDCPA section 809(b)'s writing requirement as being satisfied when a consumer submits a dispute or request for original-creditor information to the debt collector via a medium of electronic communication through which a debt collector accepts electronic communications from consumers, such as email or a website portal. Thus, debt collectors only would be required to give legal effect to consumer disputes or requests for original-creditor information submitted electronically where a debt collector chooses to accept electronic communications from consumers. This would apply regardless of whether the validation notice itself is delivered electronically.

Further, FDCPA section 809(b) prohibits debt collector communications during the validation period that are inconsistent with the disclosure of a consumer's verification rights. If debt collectors refuse to accept consumers' disputes or requests for original-creditor information through a medium of electronic communication after

---

*Recovery Assocs., LLC,* (No. 18–2335), 2019 WL 121197, at *3–4 (E.D. Pa. Jan. 7, 2019) (holding that a validation notice that "mirror[ed] the language" of the FDCPA section 809 still violated the FDCPA because disputes must be in writing).

[484] *See* 15 U.S.C. 1692i; *Camacho,* 430 F.3d at 1081–82 (holding that oral disputes trigger certain FDCPA protections, including under FDCPA sections 807(8) and 810).

[485] *See, e.g., Caprio* v. *Healthcare Revenue Recovery Grp.,* 709 F.3d 142, 151–52 (3d Cir. 2013) (holding that a collection letter encouraging a consumer to "please call" the debt collector violated FDCPA section 809(a)); *Riggs* v. *Prober & Raphael,* 681 F.3d 1097, 1103–04 (9th Cir. 2012) (holding that a validation notice that implied a written dispute requirement—but that did not expressly require a written dispute—did not violate FDCPA section 809(a)(3)); *Homer* v. *Law Offices of Frederic I. Weinberg & Assocs., P.C.,* 292 F. Supp. 3d 629, 633–34 (E.D. Pa. 2017) (holding that a validation notice that used "hears from you" language was deceptive because it suggested that disputes could be made orally).

[486] *See* the section-by-section analysis of proposed § 1006.34(c)(3)(i) and (ii).

[487] *See* the section-by-section analysis of proposed § 1006.34(d)(2).

[488] For additional detail about information that may appear on the reference document, refer to appendix G of the Small Business Review Panel Outline, *supra* note 56.

[489] To the extent that the Bureau develops a more specific landing page for information about consumer protections during the debt collection process, the Bureau would include the website address for that landing page in a final rule.

[490] Proposed § 1006.34(c)(4) would set forth required consumer response information. Proposed § 1006.34(d)(3)(iii)(B) and (vi)(B) would permit certain other consumer response information related to payment requests and requests for Spanish-language validation notices.

providing an electronic validation notice through that same medium, consumers may become confused about how to exercise their verification rights. While the FDCPA does not directly address electronic debt collection communications, a reasonable consumer could expect to be able to respond to a debt collector through the same medium of electronic communication that the debt collector used to contact the consumer. Because of the potential for confusion, a debt collector's refusal to accept a dispute or request for original-creditor information electronically after providing a validation notice electronically may be inconsistent with the effective disclosure of the consumer's verification rights.

For these reasons, and pursuant to its authority to interpret FDCPA section 809(a) and (b), as well as its authority under Dodd-Frank Act section 1032(a), the Bureau proposes § 1006.34(c)(3)(v) to provide that validation information includes a statement explaining how a consumer can take the actions described in § 1006.34(c)(4) electronically, if the debt collector sends the validation notice electronically. Proposed comment 34(c)(3)(v)–1 explains that a debt collector may provide the information described in proposed § 1006.34(c)(3)(v) by including the statements, "We accept disputes electronically," using that phrase or a substantially similar phrase, followed by an email address or website portal that a consumer can use to take the action described in § 1006.34(c)(4)(i), and "We accept original creditor information requests electronically," using that phrase or a substantially similar phrase, followed by an email address or website portal that a consumer can use to take the action described in § 1006.34(c)(4)(ii). Proposed comment 34(c)(3)(v)–1 also would clarify that, if a debt collector accepts electronic communications from consumers through more than one medium, such as by email and through a website portal, the debt collector is only required to provide information regarding one of these media but may provide information about additional media.

During the SBREFA process, small entity representatives supported the Bureau's proposal to clarify how debt collectors could use newer communication technologies, such as email and text messages, which some consumers may prefer.[491] Consistent

with this feedback, the Small Business Review Panel Report recommended that the Bureau consider whether the debt collection rule should promote newer communication technologies, and, if so, establish guidelines for the appropriate use of such technologies.[492] Proposed § 1006.34(c)(3)(v) is responsive to this feedback. The Bureau requests comment on proposed § 1006.34(c)(3)(v) and on comment 34(c)(3)(v)–1.

### 34(c)(3)(vi)

As discussed elsewhere in this proposed rule—for example, in the section-by-section analysis of proposed § 1006.42—the use of electronic media such as email and text messages for debt collection communications may further the interests of both consumers and debt collectors, but communications sent by such media may require tailored protections for consumers. One such protection, as proposed in § 1006.6(e), would require a debt collector who communicates or attempts to communicate with a consumer electronically in connection with the collection of a debt using a specific email address, telephone number for a text message, or other electronic-medium address to include in such communication or attempt to communicate a clear and conspicuous statement describing one or more ways the consumer can opt out of further electronic communications or attempts to communicate by the debt collector to that address or telephone number.

Consistent with proposed § 1006.6(e), and pursuant to the legal authorities discussed in the section-by-section analysis thereof, the Bureau proposes § 1006.34(c)(3)(vi) to provide that, for a validation notice delivered in the body of an email pursuant to § 1006.42(b)(1) or (c)(2)(i), validation information includes the opt-out statement required by § 1006.6(e). Proposed comment 34(c)(3)(vi)–1 explains that, if a validation notice is delivered on a website pursuant to § 1006.42(c)(2)(ii), the validation notice need not contain the opt-out statement because the statement will be required in any email or text message that provides a hyperlink to the website where the notice is placed. Proposed comment 34(c)(3)(vi)–1 further explains that delivery of a validation notice that a debt collector previously provided pursuant to § 1006.42(b)(1) or (c)(2)(i) or (ii) is not rendered ineffective because a consumer opts out of future electronic

communications. The Bureau requests comment on proposed § 1006.34(c)(3)(vi) and on comment 34(c)(3)(vi)–1.

### 34(c)(4) Consumer Response Information

The FTC has noted that some consumers do not receive sufficient information explaining how they may exercise their FDCPA rights.[493] This observation is consistent with at least one academic study, which found that many consumers did not understand how to properly exercise their FDCPA verification rights even after reviewing a typical validation notice.[494]

During the development of this proposal, the Bureau tested validation notices that included information about how consumers could exercise their FDCPA verification rights using a separate section of the notice, which consumers could detach and return to the debt collector. For purposes of this section-by-section analysis, the Bureau refers to this information as consumer response information. The Bureau's usability testing indicated that consumers understood that they could use the consumer response information to dispute a debt, or to communicate that information about the debt in the validation notice was incorrect.[495] The usability testing findings thus indicated that the consumer response information enhanced consumers' comprehension of their dispute rights.[496]

The Bureau's testing suggests that requiring debt collectors to disclose consumer response information, segregated from other validation information, appears to help consumers exercise their FDCPA section 809(b) rights to dispute the validity of a debt and to request original-creditor information. Further, the consumer response information may facilitate a debt collector's ability to process and understand a consumer's response to a validation notice. For example, by requiring the consumer response information section to include statements describing specific reasons for disputes, proposed § 1006.34(c)(4) could reduce the burden of responding to generic or ambiguous disputes. While the proposal would not require consumers to indicate a specific dispute

---

[491] See Small Business Review Panel Report, *supra* note 57, at 16–17; *see also* CFPB Debt Collection Consumer Survey, *supra* note 18, at 37 (finding that email was the most preferred contact

method for 11 percent of consumers contacted about a debt in collection).

[492] Small Business Review Panel Report, *supra* note 57, at 38.

[493] See FTC Modernization Report, *supra* note 176, at v.

[494] See Jeff Sovern & Kate E. Walton, *Are Validation Notices Valid? An Empirical Evaluation of Consumer Understanding of Debt Collection Validation Notices*, 70 SMU L. Rev. 63, 94–98 (2017).

[495] See FMG Usability Report, *supra* note 41, at 59–60.

[496] See id.

description listed in the consumer response information, consumers may be likely to do so, thereby lessening the number of generic disputes (*e.g.*, a communication that only contains the statement "I dispute" with no further detail) sent to debt collectors.[497]

For these reasons, the Bureau proposes requiring a consumer response information section on the validation notice. Specifically, proposed § 1006.34(c)(4) provides that the validation information that must be disclosed under § 1006.34(a)(1) includes certain consumer response information situated next to prompts that the consumer could use to indicate that action or request. The information, which is discussed in the section-by-section analysis of proposed § 1006.34(c)(4)(i) through (iii), would include statements describing certain actions that a consumer can take, including submitting a dispute, identifying the reason for the dispute, providing additional detail about the dispute, and requesting original-creditor information.[498]

Proposed § 1006.34(c)(4) provides that the consumer response information section must be segregated from the validation information described in § 1006.34(c)(1) through (3) and from any optional information included pursuant to § 1006.34(d)(3)(i), (ii), (iv), or (v) and, if the validation information is provided in writing or electronically, located at the bottom of the notice and under the headings, "How do you want to respond?" and "Check all that apply:". Requiring the consumer response information section to be presented in this manner may help consumers respond to the disclosures required under § 1006.34(a)(1). Specifically, requiring the information to be located at the bottom of a validation notice may enable consumers to use the bottom section of the notice to reply to the debt collector while retaining the required disclosures located in the validation notice's upper section. Proposed comment 34(c)(4)–1 would clarify that, if the validation information is provided in writing or electronically, a prompt described in § 1006.34(c)(4) may be formatted as a checkbox, as in Model Form B–3.

The Bureau requests comment on proposed § 1006.34(c)(4). The Bureau

specifically requests comment on whether validation information should include consumer response information, and, if so, on whether any of the proposed items should be excluded or any additional items should be added.

The Bureau proposes § 1006.34(c)(4) pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors and, as described more fully below, its authority to implement and interpret FDCPA section 809. The Bureau also proposes § 1006.34(c)(4) pursuant to its authority under section 1032(a) of the Dodd-Frank Act, on the basis that the information in proposed § 1006.34(c)(4)(i) through (iii) informs consumers how to exercise their rights under FDCPA section 809(b) and therefore is a feature of debt collection. Requiring disclosure of the information may help to ensure that the features of debt collection are fully, accurately, and effectively disclosed to consumers, such that consumers may better understand the costs, benefits and risks associated with debt collection.

### 34(c)(4)(i) Dispute Prompts

FDCPA section 809(a)(4) requires a debt collector to disclose to consumers their right under FDCPA section 809(b) to dispute the validity of the debt within 30 days after receipt of the validation notice. As discussed in the section-by-section analysis of proposed § 1006.34(c)(3)(i), which would implement and interpret FDCPA section 809(a)(4), some consumers may not adequately understand this FDCPA dispute right or may face challenges when attempting to exercise it. Providing consumers with prepared dispute statements may assist consumers by helping them articulate the nature of their disputes. Enabling consumers to communicate specific information about their disputes also may reduce the number of burdensome, generic disputes received by debt collectors and may allow debt collectors to provide more relevant information in response.

For this reason, and pursuant to its authority to implement and interpret FDCPA section 809(a)(4), as well as its authority under Dodd-Frank Act section 1032(a), the Bureau proposes § 1006.34(c)(4)(i) to provide that consumer response information includes statements, situated next to prompts, that the consumer can use to dispute the validity of a debt and to specify a reason for that dispute. Proposed § 1006.34(c)(4)(i), which is designed to work in tandem with proposed § 1006.34(c)(3)(i), would provide that consumer response

information includes the following four statements, listed in the following order, using the following phrasing or substantially similar phrasing,[499] each next to a prompt: "I want to dispute the debt because I think:"; "This is not my debt"; "The amount is wrong"; and "Other: (please describe on reverse or attach additional information)." The first three proposed dispute categories appear to capture the vast majority of consumer disputes about the validity of a debt.

During the SBREFA process, small entity representatives suggested that including dispute prompts in the validation notice could increase dispute volume and frequency, which could cause debt collectors to incur more costs investigating and responding to disputes. Some small entity representatives particularly were concerned that the consumer response information might increase the number of generic disputes that lack enough detail for debt collectors to provide responsive information to consumers. Several small entity representatives also objected to a potential dispute prompt that would state, "You are not the right person to pay," noting that this statement would not provide debt collectors enough information to respond effectively to the dispute and would require the debt collector to re-contact the consumer, imposing costs on both debt collectors and consumers. The Small Business Review Panel Report recommended that the Bureau consider further its proposed consumer response information, including soliciting more specific disputes.

In response to this feedback, the proposed rule omits the dispute prompt, "You are not the right person to pay." However, the proposed rule retains the consumer response information concept. Proposed § 1006.34(c)(4)(i) may facilitate consumers' ability to exercise their dispute right, which is an important FDCPA protection. In addition, proposed § 1006.34(c)(2), by requiring more information about the debt, may help consumers recognize debts that they owe, reducing the number of disputes arising from lack of consumer recognition and, thereby, limiting overall dispute volume. Further, any information that consumers provide in response to the free-form dispute prompt in proposed § 1006.34(c)(4)(i)(D) could help debt collectors better understand the nature of a consumer's dispute and respond

---

[497] Usability testing findings suggested that consumers generally understood how to use the consumer response information section to indicate a specific reason for a dispute. *See id.* at 59–61.

[498] As discussed in the section-by-section analysis of proposed § 1006.34(d)(3)(iii)(B) and (vi)(B), a debt collector also could choose to include a payment disclosure and Spanish-language validation notice request disclosure as consumer response information.

[499] To provide debt collectors with greater flexibility, the Bureau does not propose to require a debt collector to use the exact phrasing set forth in proposed § 1006.34(c)(4)(i).

more efficiently than if consumers had provided generic disputes.

The Bureau requests comment on proposed § 1006.34(c)(4)(i), including on whether any dispute prompts should be added, revised, or removed. In addition, the Bureau requests comment on the potential risks, costs, and benefits of the dispute prompts for both consumers and industry, including on whether proposed § 1006.34(c)(4)(i) will impact dispute volumes or affect the proportion of specific disputes that debt collectors receive as compared to generic disputes.

As discussed in the section-by-section analysis of proposed § 1006.38, the Bureau would interpret FDCPA section 809(b) to require a debt collector to honor disputes that a consumer provides via a medium of written electronic communication [500] accepted by the debt collector, such as a dispute portal accessed on or through a hyperlink in an electronic communication. The Bureau declines to propose requirements related to debt collector website communications, including the content or formatting of dispute information accessible via website or hyperlink.[501] The Bureau requests comment on whether the Bureau should propose rules concerning website communications. In particular, the Bureau requests comment about the risks, costs, and benefits to consumers and industry related to prescribing requirements for the content and formatting of debt collector website communications.

34(c)(4)(ii) Original-Creditor Information Prompt

FDCPA section 809(a)(5) requires a debt collector to disclose to consumers their right under FDCPA section 809(b) to request the name and address of the original creditor, if different from the current creditor.[502] As discussed in the

section-by-section analysis of proposed § 1006.34(c)(3)(ii), which would implement and interpret FDCPA section 809(a)(5), some consumers may not adequately understand their right to request original-creditor information or how to exercise it. Providing consumers with a prepared statement that they could use to request original-creditor information could help to address this concern.

For this reason, and pursuant to its authority to interpret FDCPA section 809(a)(5), as well as its authority under Dodd-Frank Act section 1032(a), the Bureau proposes § 1006.34(c)(4)(ii) to provide that consumer response information includes the statement, "I want you to send me the name and address of the original creditor," using that phrase or a substantially similar phrase, next to a prompt the consumer could use to request original-creditor information. Proposed § 1006.34(c)(4)(ii) is intended to work in tandem with proposed § 1006.34(c)(3)(ii). The Bureau requests comment on proposed § 1006.34(c)(4)(ii).

34(c)(4)(iii) Mailing Addresses

FDCPA section 809(b) assumes that a consumer has the ability to write to a debt collector to exercise the consumer's verification rights. Requiring a debt collector to include mailing addresses for the consumer and the debt collector, which would include the consumer's and the debt collector's names, along with the consumer response information described in proposed § 1006.34(c)(4)(i) and (ii), may facilitate consumers' use of that address information to exercise their debt collection rights. For example, for mailed validation notices, a debt collector may choose to format the addresses to appear in a return envelope's glassine window, which the Bureau understands is industry practice. Alternatively, the mailing address may be useful in the event the consumer loses the upper portion of the validation notice containing the debt collector's contact information. In this scenario, the consumer also could review the mailing address in the consumer response information section to confirm that the consumer was the intended recipient of the validation notice. For these reasons, and pursuant to its authority to implement FDCPA section 809(a), as well as its authority under Dodd-Frank Act section 1032(a), the Bureau proposes § 1006.34(c)(4)(iii) to provide that consumer response information includes mailing addresses for the consumer and the debt collector.

The Bureau requests comment on proposed § 1006.34(c)(4)(iii). The Bureau understands that some debt

collectors use letter vendors to mail validation notices and that, in some cases, the letter vendor's mailing address may appear on validation notices in lieu of the debt collector's mailing address. The Bureau requests comment on whether proposed § 1006.34(c)(4)(iii) would be consistent with current practices related to debt collectors' use of letter vendors to mail validation notices.

34(c)(5) Special Rule for Certain Residential Mortgage Debt

FDCPA section 809(a)(1) requires a debt collector to disclose to consumers the amount of the debt. As discussed in the section-by-section analysis of proposed § 1006.34(c)(2)(vii) through (ix), the Bureau interprets FDCPA section 809(a)(1) to require debt collectors to disclose three pieces of itemization-related information: The itemization date; the amount of the debt on the itemization date; and an itemization of the debt reflecting interest, fees, payments, and credits since the itemization date.[503] The Bureau proposes to establish a special rule that would replace these disclosure requirements for debt collectors collecting certain residential mortgage debt.

For certain residential mortgage debt subject to 12 CFR 1026.41, 12 CFR 1026.41(b) generally requires that a periodic statement be delivered or placed in the mail within a reasonably prompt time after the payment due date or the end of any courtesy period provided for the previous billing cycle. The Bureau believes that most residential mortgage debt is subject to this requirement, although exceptions exist.[504] The Bureau understands that a consumer is provided with such a periodic statement every billing cycle, even when a loan is transferred between

---

[500] For ease of reference, the Bureau uses the phrase "written electronic communications" to refer to emails, text messages, and other electronic communications that are readable. The Bureau's use of this phrase has no bearing on the Bureau's interpretation of the terms "written" or "in writing" under any law or regulation, including the FDCPA or the E-SIGN Act.

[501] While the Bureau does not propose rules specifically addressing debt collector website communications, such communications are subject to existing legal requirements, including those under the FDCPA and the Dodd-Frank Act. For example, debt collectors may be liable for website communications that violate the Dodd-Frank Act's prohibition on unfair, deceptive, or abusive practices, or the overshadowing prohibition under FDCPA section 809(b).

[502] Proposed § 1006.34(c)(2)(iv) also would require that the validation notice include the name of the creditor to whom the debt was owed on the itemization date, if the debt collector is collecting a consumer financial product or service debt, as defined in proposed § 1006.2(f).

[503] Proposed § 1006.34(c)(2)(x) would require debt collectors also to disclose the current amount of the debt.

[504] The periodic statement requirement pursuant to 12 CFR 1026.41(b) does not apply to open-end consumer credit transactions, such as a home equity line of credit. See 12 CFR 1026.41(a)(1). Pursuant to 12 CFR 1026.41(e), certain types of transactions are exempt from § 1026.41(b)'s periodic statement requirement, including reverse mortgages, timeshare plans, certain charged-off mortgage loans, mortgage loans with certain consumers in bankruptcy, and fixed-rate mortgage loans where a servicer provides the consumer with a coupon book for payment. Further, small servicers as defined by 12 CFR 1026.41(e)(4)(ii) are entirely exempt from the periodic statement requirement. Where the § 1026.41(b) periodic statement was not provided, a debt collector collecting debts related thereto would not be able to satisfy proposed § 1006.34(c)(2)(vii) through (ix) by providing a consumer, at the same time as the validation notice, a copy of the most recent periodic statement provided to the consumer under § 1026.41(b).

servicers. Pursuant to Regulation Z, 12 CFR 1026.41(d)(3), such a periodic statement must include a past payment breakdown, which shows the total of all payments received since the last statement, including a breakdown showing the amount, if any, that was applied to principal, interest, escrow, fees, and charges, and the amount, if any, sent to any suspense or unapplied funds account.

The Bureau believes that these periodic statement disclosures may be functionally equivalent to, and as useful for the consumer as, the information described in proposed § 1006.34(c)(2)(vii) through (ix). For example, 12 CFR 1026.41(d)(3) requires that the past payment breakdown reflect payments, interest, and other charges since the last periodic statement. This requirement is consistent with the proposed rule: Pursuant to proposed § 1006.34(b)(3)'s itemization date definition, a debt collector may use the date of the last periodic statement as the reference date for the itemization-related information required by proposed § 1006.34(c)(2)(vii) through (ix). Further, the periodic statement required by 12 CFR 1026.41(b) is tailored to disclose mortgage information effectively. For example, the periodic statement under 12 CFR 1026.41(d) specifically addresses disclosure of escrow and suspense account information. Proposed § 1006.34(c)(2)(vii) through (ix), which applies to debts more generally, is silent with respect to these mortgage-specific concepts.

For these reasons, proposed § 1006.34(c)(5) would establish that, for debts subject to Regulation Z, 12 CFR 1026.41, a debt collector need not provide the validation information described in § 1006.34(c)(2)(vii) through (ix) if the debt collector provides the consumer, at the same time as the validation notice, a copy of the most recent periodic statement provided to the consumer under 12 CFR 1026.41(b), and refers to that periodic statement in the validation notice. Proposed comment 34(c)(5)–1 provides examples clarifying how debt collectors may comply with § 1006.34(c)(5).

The Bureau proposes § 1006.34(c)(5) to implement and interpret the FDCPA section 809(a)(1) requirement that the validation notice include the amount of the debt, and pursuant to its FDCPA section 814(d) authority to prescribe rules with respect to the collection of debts by debt collectors. The Bureau also proposes this requirement under section 1032(a) of the Dodd-Frank Act to prescribe rules to ensure that the features of consumer financial products

and services are disclosed fully, accurately, and effectively. The Bureau proposes this requirement on the basis that the information otherwise required to be disclosed under § 1006.34(c)(2)(vii) through (ix) is a feature of debt collection and the alternative information that proposed § 1006.34(c)(5) would permit is equally effective and accurate for the collection of debts subject to 12 CFR 1026.41. For the reasons described above, the Bureau proposes § 1006.34(c)(5) to ensure that the debt, which is a feature of debt collection, is fully, accurately, and effectively disclosed in a manner that permits the consumer to understand the costs, benefits, and risks associated with debt collection.

The Bureau requests comment on proposed § 1006.34(c)(5) and on comment 34(c)(5)–1. In particular, the Bureau requests comment on the application of proposed § 1006.34(c)(5) to mortgage debt for which consumers were provided coupon books. For instance, the Bureau believes that for mortgage debt for which consumers were provided coupon books, debt collectors could comply with proposed § 1006.34(c)(5) because servicers generally have a practice of providing periodic statements to delinquent consumers, even if coupon books were previously provided. The Bureau also requests comment on the extent to which creditors, assignees, and servicers for transaction types that are exempt from 12 CFR 1026.41(b)'s periodic statement requirement pursuant to § 1026.41(e) nevertheless provide periodic statements voluntarily and, if so, whether the Bureau should clarify how proposed § 1006.34(c)(5) would apply in those circumstances. The Bureau also requests comment on the application of proposed § 1006.34(c)(5) to servicers exempt from 12 CFR 1026.41(b)'s periodic statement requirement pursuant to § 1026.41(e), such as small servicers or servicers servicing mortgage loans that have been charged off, and servicers who provide modified periodic statements pursuant to 12 CFR 1026.41(f) where a consumer on the mortgage loan is a debtor in bankruptcy. Finally, the Bureau also requests comment on whether there are other debt types, such as student loan debt, for which the information described in proposed § 1006.34(c)(vii) through (ix) may duplicate existing disclosure requirements.

34(d) Form of Validation Information

34(d)(1) In General

34(d)(1)(i)

FDCPA section 809(a)'s required disclosures will be ineffective unless a debt collector discloses them in a manner that is readily understandable to consumers. For this reason, the Bureau proposes § 1006.34(d)(1) to require that the validation information described in § 1006.34(c) be conveyed in a clear and conspicuous manner. As discussed in the section-by-section analysis of § 1006.34(b)(1), the Bureau proposed to define the term clear and conspicuous consistent with the standards used in other consumer financial services laws and their implementing regulations. The clear and conspicuous standard would apply to written, electronic, and oral disclosures.

The Bureau proposes § 1006.34(d)(1)(i) to implement and interpret FDCPA section 809(a), and pursuant to its authority under FDCPA section 814(d) to prescribe rules with respect to the collection of debts by debt collectors. The Bureau also proposes § 1006.34(d)(1)(i) pursuant to its authority under section 1032(a) of the Dodd-Frank Act to prescribe rules to ensure that the features of consumer financial products and services are disclosed fully, accurately, and effectively. The Bureau proposes this requirement on the basis that validation information is a feature of debt collection and this information must be readily understandable to be effectively and accurately disclosed. The Bureau requests comment on proposed § 1006.34(d)(1)(i).

34(d)(1)(ii)

As discussed in the section-by-section analysis of proposed § 1006.34(d)(2), the Bureau proposes Model Form B–3 in appendix B as a model validation notice form that debt collectors could use to comply with the disclosure requirements of proposed § 1006.34(a)(1) and (d)(1). Model Form B–3 was developed over multiple rounds of consumer testing and through additional feedback and consideration, as described in part III.B above. The Bureau believes that this form effectively discloses the information described in proposed § 1006.34(c). For the same reasons and pursuant to the same authority discussed in the section-by-section analysis of proposed § 1006.34(d)(1)(i), proposed § 1006.34(d)(1)(ii) would require that, if provided in a validation notice, the content, format, and placement of the information described in proposed § 1006.34(c) and the optional

disclosures permitted by proposed § 1006.34(d)(3) must be substantially similar to proposed Model Form B–3 in appendix B.

Proposed comment 34(d)(1)(ii)–1 explains that a debt collector may make certain changes to the content, format, and placement of the validation information described in § 1006.34(c) as long as the resulting disclosures are substantially similar to Model Form B–3 in appendix B of the regulation. Proposed comment 34(d)(1)(ii)–1 also provides an example of a change that debt collectors may make to the validation notice if the consumer is deceased. As described in the section-by-section analyses of §§ 1006.2(e) and 1006.6(d)(4), the proposal includes interpretations of the term consumer designed to clarify communications between debt collectors and individuals attempting to resolve the debts of a deceased consumer, including provision of the validation notice to such individuals. Although the validation notice will contain the name of the deceased consumer, some persons who are authorized to act on behalf of the deceased consumer's estate may be misled by the use of second person pronouns such as "you" in the validation notice. For example, the model validation notice states that "you owe" the debt collector.

While nothing in the proposed rule would prohibit a debt collector from including a cover letter to explain the nature of the validation notice, proposed comment 34(d)(1)(ii)–1 also would clarify that a debt collector may modify inapplicable language in the validation notice that could suggest that the recipient of the notice is liable for the debt. For example, if a debt collector sends a validation notice to a person who is authorized to act on behalf of the deceased consumer's estate, and if that person is not liable for the debt, the debt collector may use the deceased consumer's name instead of "you." In other contexts, such as mortgage servicing, the Bureau has allowed servicers to include an explanatory notice and acknowledgement form, add an affirmative disclosure, or adjust language in required notices to reduce the risk of confusion to successors in interest.[505] The Bureau proposes a similar approach in § 1006.34 and comment 34(d)(1)(ii)–1. The Bureau requests comment on proposed comment 34(d)(1)(ii)–1, on the risk of confusion or deception caused by the second-person framing of the model validation notice in the deceased-consumer context, and on options for

reducing any possible confusion or deception.

34(d)(2) Safe Harbor

A model validation notice form that provides a safe harbor may benefit both consumers and debt collectors. A model validation notice form may effectively disclose validation information required by § 1006.34(a)(1) in a manner that permits consumers to understand the costs, benefits, and risks associated with debt collection. Further, a model form may afford debt collectors protection from liability that could arise if they developed and used their own forms. During the SBREFA process, small entity representatives asserted that a model form that provided protection from liability would promote efficiency and predictability for debt collectors by reducing legal risk.[506] Because of these potential benefits, the Bureau has developed a model validation notice—Model Form B–3 in appendix B.

Model Form B–3 was evaluated over multiple rounds of consumer testing, as described in part III.B above, as well as through additional feedback and consideration.[507] Based on this testing, the Bureau believes that Model Form B–3 effectively discloses the validation information required by § 1006.34(a)(1). Because of Model Form B–3's effectiveness, and pursuant to its authority under section 1032(b) of the Dodd-Frank Act, the Bureau proposes § 1006.34(d)(2) to permit a debt collector to comply with § 1006.34(a)(1)(i) and (d)(1) by using Model Form B–3 in appendix B.

Proposed comment 34(d)(2)–1 explains that, although the use of Model Form B–3 in appendix B is not required, a debt collector who uses the model form, including a debt collector who delivers the model form electronically, will be in compliance with the disclosure requirements of § 1006.34(a)(1)(i) and (d)(1) and the requirements of FDCPA section 809(a). Proposed comment 34(d)(2)–1 also

[505] 81 FR 72160, 72182 (Oct. 19, 2016).

[506] Small Business Review Panel Report, supra note 57, at 22; see also Johnson v. Revenue Mgmt. Corp., 169 F.3d 1057, 1059–60 (7th Cir. 1999) (holding that where a validation notice included demands for "prompt payment" and that the consumer call the debt collector "immediately," such statements may confuse a consumer or overshadow their verification rights); Adams v. Law Offices of Stuckert & Yates, 926 F.Supp. 521, 527 (E.D. Pa. 1996) (holding that a validation notice threatening a lawsuit violated the FDCPA); Vaughn v. CSC Credit Servs., Inc. (No. 93–4151), 1995 WL 51402, at *3 (N.D. Ill. Feb. 3, 1995) (holding that a statement on a validation notice about a debt's potential negative impact on consumer's credit score violated FDCPA section 809(b) because it overshadowed the verification rights disclosures).

[507] See generally FMG Cognitive Report, supra note 40; FMG Usability Report, supra note 41; FMG Summary Report, supra note 42.

explains that a debt collector who includes on Model Form B–3 the optional disclosures described in proposed § 1006.34(d)(3) continues to be in compliance as long as those disclosures are made consistent with the instructions in § 1006.34(d)(3). Further, proposed comment 34(d)(2)–1 explains that a debt collector may embed hyperlinks in Model Form B–3 if delivering the form electronically and continue to be in compliance so long as the hyperlinks are included consistent with § 1006.34(d)(4)(ii).

The Bureau requests comment on proposed § 1006.34(d)(2) and on proposed comment 34(d)(2)–1. In particular, the Bureau requests comment on whether the Bureau should provide additional clarification about how to deliver Model Form B–3 electronically in a manner that affords protection from liability pursuant to proposed § 1006.34(d)(2). For example, the Bureau requests comment on whether to prescribe or define additional formatting requirements (e.g., type size) or delivery standards for validation notices delivered electronically. The Bureau also requests comment on the risks, costs, and benefits to consumers and industry of extending the protection from liability pursuant to proposed § 1006.34(d)(2) to validation notices delivered electronically.

34(d)(3) Optional Disclosures

Proposed § 1006.34(d)(3) provides that a debt collector may include the optional information described in proposed § 1006.34(d)(3)(i) through (vi) if providing the validation information required by § 1006.34(a)(1). These optional disclosures may assist debt collectors and consumers by providing additional information about the debt and consumers' rights with respect to debt collection in a manner that does not violate FDCPA section 809(b)'s overshadowing prohibition, a prohibition implemented by § 1006.38(b). Under the proposal, providing the disclosures in proposed § 1006.34(d)(3) would not be regarded as overshadowing or inconsistent with the disclosure about the consumer's right to dispute the debt or request the name and address of the original creditor. The Bureau proposes § 1006.34(d)(3) to implement and interpret FDCPA section 809(a) and (b) and pursuant to its FDCPA section 814(d) authority to prescribe rules with respect to the collection of debts by debt collectors and pursuant to its authority under section 1032(a) of the Dodd-Frank Act to prescribe rules to ensure that the features of consumer financial products

and services are disclosed fully, accurately, and effectively.

### 34(d)(3)(i) Telephone Contact Information

Telephone communications may benefit both debt collectors and consumers by providing a low-cost and convenient communication method. Debt collectors routinely contact consumers by telephone and currently include their telephone numbers in validation notices. Also, some consumers may prefer to engage with debt collectors by telephone rather than by other communication methods.[508] For these reasons, proposed § 1006.34(d)(3)(i) would permit a debt collector to include the debt collector's telephone contact information, including telephone number and the times that the debt collector accepts consumer telephone calls, along with the validation information. The Bureau requests comment on proposed § 1006.34(d)(3)(i).

### 34(d)(3)(ii) Reference Code

Many debt collectors currently include reference codes on validation notices for administrative purposes. Proposed § 1006.34(d)(3)(ii) would accommodate this practice by permitting a debt collector to include, along with the validation information, a number or code that the debt collector uses to identify the debt or the consumer. The Bureau requests comment on proposed § 1006.34(d)(3)(ii).

### 34(d)(3)(iii) Payment Disclosures

Payment disclosures that provide a method to easily send payment to a debt collector may benefit both consumers and debt collectors. For consumers who recognize and choose to repay all or part of a debt, payment disclosures may make the transaction more efficient and convenient. For consumers who determine that they owe a debt but may not be ready to repay all of it at that time, payment disclosures may facilitate a discussion that can lead to repayment, settlement, or a payment plan.[509] Consumer testing suggests that consumers believe that a payment option is an important disclosure that should appear in the validation

notice.[510] The Bureau also received feedback from debt collectors requesting the ability to request payment from consumers when providing validation information. For example, during the SBREFA process, small entity representatives requested the ability to include payment options in the consumer response information that § 1006.34(c)(4) would require.[511]

Consumer advocates recommended that the Bureau prohibit debt collectors from including payment disclosures along with validation information. Consumer advocates expressed concerns that a consumer who desires to dispute a debt might misconstrue the disclosure to require the consumer to submit a payment in order to exercise the FDCPA dispute right. The Bureau's proposal does not treat these concerns as persuasive. While some formulations of a payment disclosure could create a false sense of urgency or exaggerate the consequences of non-payment,[512] the Bureau believes that payment disclosures can be designed to articulate payment requests in a neutral, non-threatening manner. Moreover, the Bureau's consumer testing indicates that consumers who encounter a payment disclosure on a validation notice understand that a payment is not required to dispute a debt.[513]

For these reasons, the Bureau proposes to allow debt collectors to include certain payment disclosures along with the validation information. Proposed § 1006.34(d)(3)(iii) would permit a debt collector to include certain payment disclosures in the validation notice. Proposed § 1006.34(d)(3)(iii) would require that these optional payment disclosures be no more prominent than any of the validation information described in proposed § 1006.34(c). Proposed § 1006.34(d)(3)(iii)(A) would allow the debt collector to include in the validation notice the statement "Contact us about your payment options," using that phrase or a substantially similar phrase. Proposed § 1006.34(d)(3)(iii)(B) would allow the debt collector to include in the consumer response information section that would be required by proposed § 1006.34(c)(4) the statement, "I enclosed this amount," using that phrase or a substantially similar phrase, payment instructions after that statement, and a prompt. The

Bureau requests comment on proposed § 1006.34(d)(3)(iii), including on whether the payment disclosures should be permitted and, if so, whether the payment disclosures should be modified.

### 34(d)(3)(iv) Disclosures Required by Applicable Law

Some States require specific disclosures to appear on the validation notice. The Small Business Review Panel Report recommended that the Bureau consider how to reconcile the Bureau's model validation notice and such required State law disclosures.[514] The Bureau also understands that some courts have prescribed additional validation notice disclosure requirements, or have fashioned optional disclosures that offer a safe harbor to debt collectors providing information required by the FDCPA. For example, several courts have crafted language that debt collectors may use to comply with FDCPA section 809(a)(1) by disclosing that the amount of a debt may vary because of accruing interest and fees.[515] In response to these judicial opinions, industry commenters have requested that the Bureau address how debt collectors may disclose that the amount of a debt may vary because of accruing interest and fees.

To enable debt collectors to comply both with § 1006.34(a)(1) and with other applicable disclosure requirements, the Bureau proposes § 1006.34(d)(3)(iv) to permit a debt collector to include, on the front of the validation notice, a statement that other disclosures required by applicable law appear on the reverse of the form and, on the reverse of the validation notice, any such legally required disclosures. Proposed comment 34(d)(3)(iv)–1 provides examples of disclosure requirements that proposed § 1006.34(d)(3)(iv) would cover, including disclosures required by State statutes or regulations and disclosures required by judicial opinions or orders.

The Bureau requests comment on proposed § 1006.34(d)(3)(iv) and on comment 34(d)(3)(iv)–1. The Bureau requests comment on conflicts that might arise between the Bureau's model validation notice and other disclosures required by applicable law. In particular, the Bureau requests comment on whether proposed § 1006.34(d)(3)(iv) would allow debt collectors to comply with applicable law, including on

---

[508] A Bureau survey found that 30 percent of consumers who had been contacted about a debt in the prior year would most prefer to be contacted about a debt in collection at a non-work telephone number, as compared to a work telephone number, postal mail, email, or in-person visits. See CFPB Debt Collection Consumer Survey, *supra* note 18, at 36–37.

[509] FMG Focus Group Report, *supra* note 38, at 9.

[510] FMG Cognitive Report, *supra* note 40, at 17–19.

[511] Small Business Review Panel Report, *supra* note 57, at 22–23.

[512] FMG Focus Group Report, *supra* note 38, at 11–12.

[513] FMG Usability Report, *supra* note 41, at 59–61.

[514] Small Business Review Panel Report, *supra* note 57, at 34.

[515] See, e.g., Avila v. Riexinger & Associates, LLC, 817 F.3d 72, 77 (2d Cir. 2016); Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, and Clark, LLC, 214 F.3d 872, 876 (7th Cir. 2000).

# EXHIBIT E

| IN THE MATTER OF: | * | BEFORE THE MARYLAND |
|---|---|---|
| | | STATE COLLECTION AGENCY |
| LVNV FUNDING LLC; | * | LICENSING BOARD IN THE |
| | | OFFICE OF THE COMMISSIONER |
| and | * | OF FINANCIAL REGULATION |
| RESURGENT CAPITAL SERVICES | * | |
| LIMITED PARTNERSHIP, | | |
| | * | CFR-FY2012-012 |
| Respondents | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## SETTLEMENT AGREEMENT

This Settlement Agreement is entered into this 28th day of June, 2012, by and between the Maryland State Collection Agency Licensing Board in the Office of the Commissioner of Financial Regulation (hereinafter the "Agency") and LVNV Funding LLC ("LVNV"), and Resurgent Capital Services Limited Partnership a/k/a Resurgent Capital Services L.P. ("Resurgent"), (collectively, the "Respondents"). The Respondents are part of a family of companies under Sherman Financial Group LLC. The Agency and Respondents (the "Parties") consent to the entry of this Settlement Agreement (the "Agreement") as a final resolution of this matter. All paragraphs below are intended to be part of the contractual obligations of the Parties hereto, so far as they may be so construed, and are not mere recitals to this Agreement.

1.      Pursuant to the Maryland Collection Agency Licensing Act ("MCALA"), at Md. Code Ann., Bus. Reg. ("BR") § 7-101 *et seq*., the Agency is responsible for licensing and regulating persons engaged in collection agency activities in the State of Maryland (the "State").

2.      The definition of "collection agency" under BR § 7-101(c) includes, among other things, "a person who engages directly or indirectly in the business of: (1) (i) collecting for, or

soliciting from another, a consumer claim; or (ii) collecting a consumer claim the person owns, if the claim was in default when the person acquired it."

3.    BR § 7-401(a) provides that, "except as otherwise provided in this title, a person may not knowingly and willfully do business as a collection agency in the State unless the person has a license."

4.    A non-exempt person who acquires consumer claims in default at the time of acquisition (a "consumer debt purchaser"), who then attempts to collect on those debts through litigation in Maryland State courts, is conducting business as a "collection agency" in the State under BR § 7-101(c).  This applies regardless of whether the consumer debt purchaser is represented in litigation by attorneys who are also licensed as collection agencies.  As such, a consumer debt purchaser collecting debts through litigation in Maryland State courts is required to be licensed as a collection agency under MCALA, and is subject to the regulatory authority of the Agency in the conduct of that litigation.

5.    A consumer debt purchaser collecting debts through litigation in Maryland State courts also meets the definitions of "collector" under Md. Code Ann., Com. Law ("CL") § 14-201(b) of the Maryland Consumer Debt Collection Act ("MCDCA"), at CL § 14-201 *et seq.*, and of "debt collector" under 15 U.S.C. § 1692(a) of the Fair Debt Collection Practices Act ("FDCPA"), at 15 U.S.C. § 1692 *et seq.*

6.    Pursuant to BR § 7-308(a), the Agency can bring an action to suspend or revoke the license of a collection agency "if the licensee or any owner, director, officer, member, partner, or agent of the licensee" engages in various prohibited activities, including, among other things, the following: "(3) in connection with the collection of any consumer claim: ... (ii)

2

engages in any illegal or dishonest activities; or (4) knowingly or negligently violates the Maryland Consumer Debt Collection Act."

7.    Pursuant to CL § 14-202(8) of the MCDCA, "[i]n collecting or attempting to collect an alleged debt," a debt collector (or "collector") may not "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist."

8.    The FDCPA provides, in relevant part, as follows:

**§ 1692e. False or misleading representations**

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

\*\*\*

(2)    The false representation of—
    (A)    the character, amount, or legal status of any debt; or

\*\*\*

(5)    The threat to take any action that cannot legally be taken or that is not intended to be taken.

\*\*\*

(10)    The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

\*\*\*

**§ 1692f. Unfair practices**

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1)    The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

\*\*\*

9.    Thus, the Agency has the authority to bring actions under MCALA against persons engaged in various prohibited activities in connection with the collection of any

consumer claim, including for violations of the FDCPA pursuant to BR § 7-308(a)(3)(ii) (engaging in illegal activities), and for violations of the MCDCA pursuant to BR §§ 7-308(a)(3)(ii) and 7-308(a)(4).   Such authority extends to both litigation-related collection activities, as well as to non-litigation (*i.e.*, "traditional") collection activities.   Further, pursuant to BR § 7-205 and Md. Code Ann., Fin. Inst. ("FI") § 2-115(b), such enforcement actions could result in an order to cease and desist, suspension or revocation of Maryland State collection agency licenses, civil money penalties for each violation of MCALA, the MCDCA, and FDCPA (as violations of MCALA), an order to provide restitution to affected Maryland consumers or to take other affirmative action to correct the violations, or any combination of the aforementioned sanctions.

10.     LVNV is a consumer debt purchaser that, on February 18, 2010, became duly licensed as a Maryland collection agency, as that term is defined in BR § 7-101(c), receiving collection agency license number 04-5594 for its business location at 625 Pilot Road, Suite 3, Las Vegas, Nevada 89119. Resurgent is a collection agency that services the consumer claims owned by LVNV and other business entities.   At all times relevant to the facts set forth herein, Resurgent has been duly licensed under MCALA as a Maryland collection agency, currently holding collection agency license number 04-2955 for its business location at 15 S. Main Street, Suite 600, Greenville, South Carolina 29601.

11.     On October 25, 2011, the Agency issued a Summary Order to Cease and Desist and Summary Suspension of Collection Agency Licenses against Respondents and certain affiliated parties of the Respondents (the "Summary Order") after finding, in the Agency's opinion, reasonable grounds to believe that the Respondents and their affiliated parties had engaged in unlicensed collection agency activities and other violations of MCALA, and were

4

violating the provisions of the MCDCA and the FDCPA referenced above, (collectively the "Alleged Violations"), and upon determining that action under FI § 2-115 and Md. Code Ann., State Gov't ("SG") § 10-226(c)(2), was appropriate.

12.    The parties subsequently entered into an Interim Settlement Agreement and Modification to Summary Order to Cease and Desist and Summary Suspension of Collection Agency Licenses on November 17, 2011 (the "Interim Agreement"), pursuant to which Respondents were permitted to resume certain collection activities.

13.    This Agreement is intended to resolve all administrative, judicial, or other legal actions between the Parties, as well as any such action which the Agency brought, or could have brought, against Respondents or Respondents' predecessors, successors, subsidiaries, affiliates, parents, shareholders, current or former directors, officers, employees, or assigns prior to the execution of this Agreement, relating to those issues and pending collection matters which formed the basis for the Summary Order, and is intended to fully supersede and replace the Summary Order and the Interim Agreement.

14.    Respondents do not admit to the Alleged Violations set forth herein but nonetheless wish to resolve the Alleged Violations without the need for an administrative hearing, thereby avoiding the costs associated with such hearing and any potential appeals, and therefore agree to resolve this matter fully, finally, and completely without an administrative hearing as set forth in this Agreement, and further accept without condition, and fully agree to abide by, each and every term set forth in this Agreement.

15.    The Agency desires to ensure that Respondents will comply with all applicable statutes, regulations, and others laws governing collection agency activities in the State of

Maryland, including complying with MCALA, the MCDCA, and the FDCPA, and further wishes to avoid the costs to the taxpayers of an administrative hearing and any potential appeals.

16.    Neither this Agreement nor the agreement of the Respondents to make payments to the Agency or to provide restitution as set forth below shall be construed as an admission of liability by the Respondents, but is in compromise and settlement of the Alleged Violations. The Respondents expressly deny any such liability or wrongdoing.

17.    Respondents represent that, to the best of their knowledge, information, and belief, as of the date of this Agreement they are in compliance with the MCDCA, the FDCPA, and MCALA.

18.    Respondents have agreed to take each and every one of the following actions in exchange for a final resolution of this matter:

a.    Respondents will pay a total voluntary penalty to the Agency of $1,000,000 (ONE MILLION DOLLARS) in the form of a single check made payable to the "Commissioner of Financial Regulation" immediately upon this Agreement being fully executed.

b.    With regard to pending debt collection cases filed in Maryland district courts on behalf of any of the Respondents named in the Summary Order, Respondents will dismiss without prejudice all cases filed prior to the date of this Agreement. To effectuate these dismissals, Respondents will submit a proposed order, in a form agreed to by the Agency, to the Chief Judge of the District Court of Maryland within 15 days of the date this Agreement is fully executed, and will notify the Agency once this has been completed. Attachment 1 is a spreadsheet listing the names of the affected Maryland consumers, the case numbers to be dismissed, the specific district court in which each case was filed, the name of the plaintiff, and

6

the amount claimed in each complaint. Pursuant to this paragraph, 3,564 cases are being dismissed without prejudice, and the amount claimed in these cases totals $7,770,564.98.

        c.     With regard to all debt collection cases filed in Maryland district courts on behalf of any of the Respondents named in the Summary Order, pursuant to which a judgment was obtained prior to the date of this Agreement, with the exception of accounts that were sold by Respondents prior to the date of the Summary Order to a party not affiliated with any of the Respondents named in the Summary Order and of consumer claims that are subject to a pending bankruptcy proceeding or were discharged in bankruptcy, Respondents will provide restitution to the consumer defendants by crediting their accounts in an amount equal to the sum of all prejudgment interest and attorney's fees awarded by the court, with the credits being applied to the account balance as of March 12, 2012. If the amount of the credit exceeds the balance remaining on the account as of March 12, 2012, the account shall be considered satisfied in full as of that date. To effectuate these credits, within 15 days of the date this Agreement is fully executed Respondents will both update their internal account records to reflect these credits, and will also submit proposed orders, in a form agreed to by the Agency, to the Chief Judge of the District Court of Maryland as follows: for consumer claims where the total credit exceeds the balance remaining on the consumer's account as of March 12, 2012, Respondents shall submit appropriate orders indicating that the judgments have been satisfied in full; and for cases where the total credit is less than the balance remaining on the consumer's account as of March 12, 2012, Respondents shall submit appropriate orders indicating that the judgments against the Maryland consumers have been satisfied with regard to all prejudgment interest and attorney's fees awarded by the courts. Attachment 2 is a spreadsheet providing the name of each affected Maryland consumer, the applicable court and case number, the name of the plaintiff, the amount

of prejudgment interest awarded by the court, the amount of attorney's fees awarded by the court, and the total amount of the credit (consisting of the sum of the prejudgment interest and attorney's fees). There are 5,793 consumers entitled to credits pursuant to this paragraph, and the amount of all such credits totals $3,609,367.74.

    d.  With regard to all debt collection cases filed in Maryland district courts on behalf of any of the Respondents named in the Summary Order, in which a settlement upon stipulated terms was reached with the Maryland consumer prior to a judgment being entered by the court, Respondents will provide restitution to the consumer defendants by crediting their accounts the total amount of the settlement that exceeds the amount claimed by the plaintiffs, which is the amount sued for in the case excluding any interest, attorney's fees and court costs, with the credits being applied to the account balance as of March 12, 2012. If the amount of the credit exceeds the balance remaining on the account as of March 12, 2012, the account shall be considered satisfied in full as of that date. Respondents will update their internal account records to reflect these credits within 15 days of the date this Agreement is fully executed. Attachment 3 is a spreadsheet providing the name of each affected Maryland consumer, the applicable court and case number, the name of the plaintiff, and the total amount of the credit. There are 453 consumers entitled to credits pursuant to this paragraph, and the amount of all such credits totals $235,824.72.

    e.  The credits referenced in Paragraphs 18.c and 18.d, above, shall be applied as of March 12, 2012, and any payments received after that date shall be applied to reduce the balance on the consumer's account only after the associated credit has been applied.

    f.  Respondents will pay administrative expenses incurred by various governmental units totaling $23,567 (TWENTY-THREE THOUSAND FIVE HUNDRED AND

SIXTY-SEVEN DOLLARS) by way of separate checks as designated by the Agency immediately upon this Agreement being fully executed.

        g.     Respondents will appropriately update the credit reports of the applicable consumers affected by this Agreement as required by the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*

        h.     The Respondents shall not seek, and are not entitled to obtain, releases from consumers in conjunction with the restitution discussed herein or otherwise related to this Agreement.

        i.     Respondents agree that they are subject to the regulatory authority of the Agency with regard to their consumer collection activities involving Maryland residents.

        j.     Respondents will make good faith efforts to ensure that their collection activities in the State of Maryland, including both their traditional and their litigation-related collection activities, fully comply with all applicable statutes, regulations, and other laws governing collection agency activities in the State, including but not limited to MCALA, the MCDCA, and the FDCPA.

        k.     Respondents will provide the Agency with an acceleration contact for resolution of Maryland consumer complaints filed with the Agency against Respondents.

    19.     Respondents acknowledge that they have voluntarily entered into this Agreement with full knowledge of their right to a hearing pursuant to FI § 11-518 and the Maryland Administrative Procedure Act – Contested Cases (SG § 10-201 *et seq.*), arising from the Summary Order issued by the Agency based on the Alleged Violations, and that Respondents hereby waive their right to a hearing. Respondents further acknowledge that they have had an opportunity to consult with independent legal counsel in connection with the waiver of this right

and with the negotiation and execution of this Agreement, and that they have in fact consulted with independent legal counsel.

20.     The Parties hereto agree that this Agreement shall be binding upon all Parties and enforceable in a court of competent jurisdiction by the Agency and by Respondents, shall be admissible in court, if relevant, and shall be binding upon and inure to any of the Respondents' present and future owners, principals, directors, officers, members, partners, managers, successors, and assigns.

21.     The Parties hereto acknowledge that this Agreement does not in any way relate to, impact, or otherwise affect the legal rights of, or preclude the Agency from bringing actions against, persons not Parties to this Agreement, except as set forth in Paragraph 22, below.

22.     The Agency fully and finally releases, acquits, and forever discharges Respondents, as well as Respondents' predecessors, successors, subsidiaries, affiliates, parents, shareholders, current or former directors, officers, employees, and assigns, from any claim, action, suit, or proceeding, whether civil or administrative, the Agency has for conduct occurring prior to the date that this Agreement is fully executed which relates to the subject matter of the Alleged Violations set forth in the Summary Order.

23.     The Parties hereto agree that they shall not disparage or otherwise undermine this Agreement in any way.

24.     The Parties hereto agree that any notices hereunder shall be effectively delivered when sent via overnight delivery or certified mail as follows:

    a.   To the Agency:
         Commissioner of Financial Regulation
         500 North Calvert Street, Suite 402
         Baltimore, Maryland 21202-3651
         Attention: Anne Balcer Norton, Deputy Commissioner

Copy to:

W. Thomas Lawrie, Assistant Attorney General
Department of Labor, Licensing, and Regulation
500 North Calvert Street, Suite 406
Baltimore, Maryland 21202-3651

b.  To the Respondents:

Scott E. Silver, General Counsel
200 Meeting Street, Suite 206
Charleston, South Carolina  21202-3651

Copy to:

Ronald S. Canter, Esquire
Law Offices of Ronald S. Canter, LLC
200-A Monroe Street, Suite 104
Rockville, Maryland  20850

NOW, THEREFORE, it is, by the Commissioner of Financial Regulation on behalf of the

Agency, HEREBY

**ORDERED** that the Respondents shall adhere to all terms of this Settlement Agreement;

it is further

**ORDERED** that this Agreement fully supersedes and replaces both the Summary Order

to Cease and Desist and Summary Suspension of Collection Agency Licenses issued by the

Agency on October 25, 2011 ("Summary Order"), as well as the Interim Settlement Agreement

and Modification to Summary Order to Cease and Desist and Summary Suspension of Collection

Agency Licenses which the Parties entered into on November 17, 2011 ("Interim Agreement");

and it is further

**ORDERED** that, except for LVNV and Resurgent, all of the Respondent business

entities and individuals named in the Summary Order are dismissed from this action; and it is

further

11

**ORDERED** that, those restrictions placed on the collection-related litigation activities of LVNV and Resurgent pursuant to the Summary Order, and which were subsequently modified pursuant to the Interim Agreement, are lifted; and that the collection agency licenses of LVNV and Resurgent are fully reinstated without restriction; and it is further

**ORDERED** that, Respondents shall make good faith efforts to ensure that their litigation related collections activities in the State of Maryland comply with all applicable federal and Maryland State laws, including but not limited to MCALA, the MCDCA, and the FDCPA; and it is further

**ORDERED** that, in the event Respondents, or any of the owners, parents, directors, officers, members, partners, managers, employees, agents, or successors of Respondents, violate any provision of this Settlement Agreement, or otherwise engage in activities similar to those which formed the basis for the Alleged Violations set forth in the Summary Order, the Agency may, at the Agency's discretion, take any enforcement actions available under FI § 2-115, BR § 7-205, BR § 7-308(a), and/or SG § 10-226(c)(2), as well as take any other enforcement actions as permitted by, and in accordance with, applicable State law; and it is further

**ORDERED**, that this matter shall be resolved in accordance with the terms of this Settlement Agreement and the same shall be reflected among the records of the Office of the Commissioner of Financial Regulation; and it is further

**ORDERED** that this document shall constitute a Final Order of the Maryland State Collection Agency Licensing Board in the Office of the Commissioner of Financial Regulation, and that the Agency may consider this Settlement Agreement in connection with, and in deciding, any action or proceeding before the Agency; and that this Settlement Agreement may, if relevant, be admitted into evidence in any matter before the Agency.

It is so ORDERED.

IN WITNESS WHEREOF, this Settlement Agreement is executed on the day and year first above written.

MARYLAND STATE COLLECTION
AGENCY LICENSING BOARD IN THE
OFFICE OF THE COMMISSIONER OF
FINANCIAL REGULATION

By: _____

Mark Kaufman
Commissioner of Financial Regulation
Chairperson, State Collection Agency
Licensing Board

LVNV FUNDING LLC

By: _____

Kevin Branigan
President
Authorized Representative

RESURGENT CAPITAL SERVICES
LIMITED PARTNERSHIP

By: _____

John Shinovich
Vice President
Authorized Representative

13

Attachments 1 – 3

Redacted in Full

# EXHIBIT F

Español

# A.G. Schneiderman Announces Settlements With Two Major Consumer Debt Buyers For Unlawful Debt Collection Actions

### *For Years, Portfolio Recovery Associates And Sherman Financial Group Obtained Judgments Against New York Consumers Based Upon Untimely Claims*

### *Schneiderman: Debt Collectors Must Abide By Same Rules As The Rest Of Us*

NEW YORK – Attorney General Eric T. Schneiderman today announced that his office has secured settlements with two major debt collectors, Portfolio Recovery Associates, LLC, and Sherman Financial Group, LLC, for repeatedly bringing improper debt collection actions against New York consumers.   For years, the two companies had sued New York consumers and obtained uncontested default judgments against the individuals who failed to respond to these lawsuits, even though the underlying claims were untimely under New York law.  The settlements require Portfolio Recovery Associates and Sherman Financial Group to vacate the improper judgments with the court and cease any further collection activities on the judgments, make key enhancements to their debt collection practices, and pay civil penalties and costs to the state in the amounts of $300,000 and $175,000, respectively.  All told, nearly three thousand improper judgments, totaling approximately $16 million, that had been entered against New York consumers will be vacated under the settlement agreements.

"Debt collectors must follow the same rules the rest of us do when bringing lawsuits—in this case, suing for debts that were not enforceable in the first place," said **Attorney General Schneiderman.** "When these kinds of practices occur on such a large scale, hard-working New Yorkers feel the pain, to the massive tune of $16 million across nearly 3,000 people. In this case and others, my office will continue to pursue debt collectors and lenders who improperly take advantage of New Yorkers in tough times."

Portfolio Recovery Associates and Sherman Financial Group are both debt buyers that purchase unpaid consumer debt (largely credit card debt) from the original creditors of the debt, or from other debt buyers, at deeply discounted prices, and then attempt to collect on the debt. Portfolio Recovery Associates and Sherman Financial Group are two of the most active debt collection plaintiffs in New York State, with each company filing thousands of debt collection actions in the state in any given year.

It is unlawful for a debt collector to bring suit against a consumer when the claims are outside of the applicable statute of limitations, the time frame established for the enforcement of legal rights.  Under New York's longstanding "borrowing statute," in order for an action to be timely filed in this state, it must be commenced not only within New York's own statute of limitations, but also within the statute of limitations of the state where the cause of action accrued (if other than New York). In debt collection

actions, a cause of action accrues where the original creditor of the debt resides. For example, while New York's statute of limitations to collect on a debt is generally six years, if the original creditor on the debt was located in Delaware, which has a three-year statute of limitations, the shorter statute of limitations would govern the action.

The Attorney General's investigation found that for many years, despite the clear requirements of New York's borrowing statute, the debt buying industry failed to ensure that their claims were timely under the statutes of limitations where the causes of action accrued, which are often shorter than New York's statute of limitations. Because most consumers fail to respond when they are sued by a debt collector, this practice resulted in the debt buyers repeatedly obtaining default judgments in their favor against consumers based on claims that were beyond the legal time limit for their enforcement.

In April 2010, the New York Court of Appeals, the state's highest court, in a case involving Portfolio Recovery Associates, reaffirmed that all New York litigants, including the debt buying industry, must strictly comply with the requirements of New York's borrowing statute.  Since that time, it appears that both Portfolio Recovery Associates and Sherman Financial Group have sought to comply with the requirement that the companies file only new debt collection actions that are timely under both New York's statute of limitations and the statute of limitations of the state where the causes of action accrued.  Both companies, however, continued to collect on the faulty judgments that they had obtained prior to the Court of Appeals' decision. According to the Attorney General's analysis, Portfolio Recovery Associates obtained more than 2,000 improper judgments since 2008, while Sherman Financial Group obtained more than 400 hundred improper judgments.

Under the settlements announced today, Portfolio Recovery Associates and Sherman Financial Group will seek to vacate these improper judgments with the courts and will immediately cease any further collection efforts on the judgments. Based on information provided by the companies, the combined outstanding balance on the judgments being vacated is more than $16 million. In addition, the two companies have agreed to several important enhancements to their current practices in New York to help safeguard consumers against any further potentially deceptive or confusing debt collection practices relating to old debts, including:

> Disclosing in any written or oral communication with a consumer about a debt that is outside the statute of limitations that the company will not sue to collect on the debt.

> Disclosing in any written or oral communication with a consumer about a debt that is outside the date for reporting the debt provided for by the federal Fair Credit Reporting Act that, because of the age of the debt, the company will not report the debt to any credit reporting agency.

> Alleging certain information relevant to the statute of limitations in any debt collection complaint filed by the company, such as the name of the original creditor of the debt, the complete chain of title of the debt, and the date of the consumer's last payment on the debt.

> Submitting an affidavit with any application for a default judgment specific to the statute of limitations that, among other things, attests that after reasonable inquiry, the company or its counsel has reason to believe that the applicable statute of limitations has not expired.

In addition, Portfolio Recovery Associates and Sherman Financial Group will pay $300,000 and $175,000, respectively, to the state as civil penalties and costs.

These settlements are a part of the Attorney General's continuing efforts to combat unlawful and abusive debt collection activity. As discussed **here**, just last week, New York's Chief Judge Jonathan Lippman proposed a new comprehensive set of court reforms that incorporate many of the prior recommendations by Attorney General Schneiderman's office for improvements to the legal process that governs the tens of thousands of debt collection lawsuits brought every year in New York State.

The case was handled by Assistant Attorney General Brian N. Lasky, Special Assistant Attorney General Stephen Mindell and Bureau Chief Jane M. Azia, all in the Consumer Frauds Bureau, and Executive Deputy Attorney General of Economic Justice Karla G. Sanchez.

**Attorney General's Press Office:** (212) 416-8060

**nyag.pressoffice@ag.ny.gov**

# Press Release Archive

> September 2019
> August 2019
> July 2019
> June 2019
> May 2019
> April 2019
> March 2019
> February 2019
> January 2019
> December 2018
> November 2018